JASON D. GUINASSO, ESQ. (SBN# 8478)
HUTCHISON & STEFFEN, PLLC
500 Damonte Ranch Parkway, Suite 980
Reno, NV 89521
Telephone: (775) 853-8746
Facsimile: (775) 201-9611
jguinasso@hutchlegal.com
*Attorney for Michael Erwine*

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| MICHAEL ERWINE, an individual | Case No.: |
| Plaintiff, | Dept. No.: |
| vs. | |
| CHURCHILL COUNTY, a political subdivision of the State of Nevada; and DOES 1 through 10 inclusive. | **COMPLAINT** |
| Defendants. | |

**COMES NOW**, Plaintiff, MICHAEL ERWINE ("Plaintiff"), by and through the undersigned counsel of record, and hereby requests a jury trial relative to all issues triable as follows:

## JURISDICTION AND VENUE

1.    Plaintiff brings this action under the Constitution, laws, and treaties of the United States to remedy acts of intentional interference perpetrated against him by the Officials of Churchill County Sheriff's Office ("Churchill County"). Plaintiff contends that Churchill County official's malicious acts directly resulted and caused Plaintiff to lose gainful employment for a period of eighteen (18) months and indefinitely barred him from obtaining subsequent employment in his chosen profession.

2.    This Court has subject matter jurisdiction over this case pursuant to federal law, 28 U.S.C. §§ 1331 and 1343.

3.    Venue is proper in this judicial district under 28 U.S.C. § 1391(b)(2); as Plaintiff was employed with Churchill County in the District at the time of the alleged discrimination, Plaintiff's employment records are maintained by Churchill County in this judicial district, and a substantial amount of the decisions adverse to Plaintiff's employment that are the subject of this civil action were made in this judicial district.

**PARTIES**

4.    Plaintiff is a citizen of the United States and a resident of the State of Nevada. At all times relevant to this action, Plaintiff resided in Churchill County, Nevada.

5.    Defendant is a political subdivision of the State of Nevada, organized and existing under, and by virtue of, the laws of the State of Nevada.

7.    Plaintiff does not know the true names and capacities, whether governmental or individual, of those Defendants sued herein as Does 1-10, inclusive. Plaintiff prays leave that when the true names and capacities of said Defendants are ascertained, he may be permitted to insert the same herein with appropriate allegations; but upon information and belief, Plaintiff alleges that each of said Defendants is legally responsible for the events and happenings referred to herein and proximately caused damages to Plaintiff, as alleged herein.

8.    That each of the Defendants is the agent, servant, employee, representative, principal, master, supervisor and/or employer of each of the other Defendants; each Defendant was acting within the service and scope of that agency, employment or other relationship at all times alleged herein. Relief is sought herein against each and all Defendants, as well as its or their agents, assistants, successors, employees and all persons acting in concert or cooperation with them or at their direction.

/ / /

# GENERAL ALLEGATIONS

1.     Between December 9, 2015 and October 10, 2016, Defendant employed Plaintiff in the capacity of Detention Deputy at an hourly wage of $21.44.

2.     On December 9, 2015, Plaintiff took an Official Oath to among other things, faithfully perform all the duties of the office of the Deputy Sheriff and to support, protect and defend the Constitution and Government of the United States, and the Constitution and Government of the State of Nevada. (See: Official Oath Dated 12/9/15 at Exhibit "1").

3.     On December 9, 2015, the first day Plaintiff was employed by Defendant, Plaintiff reviewed and signed various acknowledgements certifying his receipt and review of new hire documents including but not limited to Safety Rules and Regulations, Workplace Safety, Harassment Policy, General Safety, Fraud Prevention, and even acknowledgement of the Job Description of a Detention Deputy Sheriff.

4.     In the Job Description, Essential Functions of a Detention Deputy Sheriff included the following:

     a.  Accountability for inmates-Conducts daily headcounts, periodic cell and pod checks; moves inmates to and from locations for court appearances, medical care, visits, etc.

     b.  Intake and release of inmates- Brings inmates into the jail by conducting searches, booking questionnaires, fingerprints, photography, access to money and phone.

     c.  Ensures Safety of Inmates and Staff- Conduct facility and person searches for weapons/drugs/contraband; conduct surveillance, investigations, and reports of crimes committed within the detention facility; monitor activity of inmates; handle inmates with mental health issues- Carry out processes

to ensure that inmates are provided with adequate food, clothing, medicine, and clean living arrangements; Conduct inspections of living conditions to ensure compliance with departmental policy and federal law.

d. Customer Service- Receives and screens visitors and telephone calls and directs the caller to the proper person or personally handles the call; provide information which requires the use of judgment and interpretation of policies, rules and procedures.

e. Court Appearances- Transports inmates to and from court; provides security for court staff and inmates during proceedings; updates legal paperwork to ensure timely compliance with court orders; responds to emergencies in the court house.

f. Medical Treatment- Provide first aid for inmates as required; triage inmates for physician visits and needs for emergency medical treatment and transport; sets up medications and distribute to inmates daily as required; complete documentation for medical issues; provide security for medical staff.

g. Extraditions- Transport inmates to other agency jails, courts, and other facilities; send notices to other agencies of arrests, process warrants, and set-up extraditions with outside companies who transport inmates.

h. Represents the County with dignity, integrity, and a spirit of cooperation in all relationships with staff and the public. (See

Job Description dated 12/9/2015 Exhibit "2").

5.      From the commencement of Erwine's employment with Defendant Erwine witnessed Plaintiff's officials blatantly ignore the County and Department rules, and further disregard the essential duties of a Detention Deputy.

6.      During one instance, almost immediately after beginning his tenure with the County, Erwine witnessed that an Inmate in the detention facility's security cell, Jimmy Thomas, had urinated inside of the security cell. Erwine witnessed Sergeant Summers open the door to the Mr. Thomas' cell and swiftly push the urine with a squeegee so as it became airborne and splashed all over Mr. Thomas who was currently sleeping. Sergeant Summers laughed about this as if it was entertaining to him. Deputy Davis was also present during this incident. When Erwine spoke to Deputy Davis after the fact, Deputy Davis informed Erwine "it is just the way things are." and "It would be best to look the other way." (For purposes of this Complaint, this incident will be referred to as the "First Urine Incident").

7.      Erwine witnessed Sergeant Summers treat other inmates the same way when they had urinated in the security cell.

8.      On or about April 16, 2016, female inmate Lacy Habberstead approached Erwine saying she wanted to talk to a sergeant about something took place while she was at the hospital with Deputy Keller. Ms. Habberstead informed Erwine that Deputy Keller had her drop her pants in front of him and watched her as she used the bathroom. Ms. Habberstead asked Erwine if Deputy Keller's actions were appropriate, and Erwine informed Ms. Habberstead that he would talk to the Sergeant about it. Erwine told Sergeant Summers about Habberstead's complaint and that she wanted to talk to Summers about it; however Sergeant Summer's response was "Oh Jesus Christ Erwine, why don't you just hug them all"... "They are inmates for Christ's sake". A few days later Captain Matheson went to Erwine and asked him about the event. Erwine repeated to Captain Matheson the information he previously

provided to Deputy Keller. Shortly after Captain Matheson's discussion with Erwine, Deputy Keller stopped Erwine in the hallway and attemped to talk to Erwine about Habberstead's complaint. Deputy Keller tol Erwine, "we don't report that kind of stuff around here." (For purposes of this Complaint this incident will be referred to as the "Sexual Harassment Incident").

9.      During a separate occasion, an inmate, Samuel Davis, was transported to the jail by Officer Zamora of the Fallon Police Department. Sergeant Summers and Erwine met with Officer Zamora outside of her patrol car. When Sergeant Summers opened the door to the patrol car Mr. Davis began to shout obscenities at Summers. Sergeant Summers dragged the Mr. Davis out of the patrol car, grabbed him by his throat, and slammed him against the side of the car. Sergeant Summers held Mr. Davis by his throat and asked him about the comments he made. After booking Mr. Davis into jail Sergeant Summers told Erwine to write his use of force report for him and be sure to include that it was because of the inmate's "physically aggressive nature" that he used the force he did. A few days later, Sergeant Summers called Erwine into his office to discuss the Mr. Davis' booking. He also told Erwine to "watch out for that bitch" (referencing Officer Zamora of the Fallon Police Department) because she reported him for excessive force against the inmate. Just a few days later, Captain Matheson talked to Erwine about Sergeant Summers in relation to Mr. Davis' booking. Shortly after talking to Captain Matheson, Sergeant Summers yelled, "Did you rat me out?" while walking past Erwine in the hallway. (For purposes of this Complaint, this incident will be referred to as the "Excessive Force Incident").

10.     On numerous occasions Erwine witnessed both Deputies and Sergeants go through female inmate's phones while being booked to seek out and view private pornographic photos. Two specific inmates that Erwine can recall this took place with were Jillian Whickem and Ashley Gokey.

11.     On or about August 17, 2016, while walking through the parking lot to Erwine's vehicle after his shift was over, he was stopped by Deputy Hardin, Luesing, and Maynez. While Erwine stood in the parking lot engaging in after work conversation with his fellow co-workers, Sergeant Summers walked out into the parking lot and shouted, "Erwine what the fuck are you still doing here? Go home." Erwine thought Summers was bantering with him, however Sergeant Summers continued to say, "I'm serious, get the fuck out of my parking lot." The next day Erwine reported the incident to Captain Matheson and explained how Erwine felt the comments Summers made were very unprofessional. Captain Matheson responded by saying, "You know how Sergeant Summers is…" and offered no resolution to Erwine's concern.

12.     On October 8, 2016, while Erwine was completing his essential job functions, he went onto day shift and began checking cells. Erwine was informed that an inmate, Andrew Beaulieu ("Beaulieu") was in the security cell and needed to be booked. When Erwine arrived at Beaulieu's security cell he noticed blood on the walls and asked the grave shift deputy what the blood was from. The grave shift deputy informed Erwine that Beaulieu had come in with a cut on his hand and that it ripped open while in the cell. (See: Affidavit of Andrew Allen Beaulieu at Exhibit "3").

13.     After investigating the circumstances, Erwine discovered Beaulieu had been requesting water for hours. Erwine was informed by the inmate and later confirmed during review of surveillance footage that every time Beaulieu would request water, the grave shift deputy would flush the drain in Beaulieiu's cell making Beaulieu's request inaudible over the flushing noise. (See: Affidavit of Andrew Allen Beaulieu at Exhibit "3").

14.     Erwine provided Beaulieu with water pursuant to his essential job functions to provide inmates with food and explained to Beaulieu what the rest of the booking process would look like. During this time, Beaulieu expressed to Erwine that the grave shift deputies

were "assholes" and he would be filing a lawsuit against them. (See: Affidavit of Andrew Allen Beaulieu at Exhibit "3").

15.    In accordance with Erwine's essential job functions, Erwine continued to conduct his rounds in the jail. While Erwine was conducting his rounds, other inmates asked Erwine what had happened to the "guy in the security cell" the previous night and explained what the grave shift did "was messed up." Inmate Zachary White even filed a grievance request to Captain Matheson regarding the treatment of Beaulieu. (For purposes of this Complaint this incident will be referred to as the "Beaulieu Incident").

16.    As previously stated, Erwine did go back and review surveillance footage of the grave shift's interaction with Beaulieu before he removed him for booking, mainly to be aware of any safety concerns with Beaulieu before removing him from the security cell. Erwine did not note any alarming actions by Beaulieu wherein Erwine would need to be concerned, however, he did note concerning inappropriate acts of the grave shift deputy that he believed needed to be brought to his sergeant's attention. Since the concerns were not an immediate threat, and the sergeant did not work on weekends, Erwine chose to log the events on his computer, so he could follow up with his sergeant on Monday, October 10, 2016, when his sergeant returned to work.

17.    On Sunday, October 9, 2016, during Erwine's dayshift, Deputy Jabines had dropped a container of miscellaneous tools and other items inside of a booking cage. Included in these items were screwdrivers and other sharp instruments.

18.    Deputy Jabines did not want to pick up the items herself so she asked an inmate to come into the booking cage and pick them up for her.  Bringing in an inmate to pick up the sharp inmates created a dangerous situation for everyone involved.

19.    Erwine did not feel it was appropriate for Deputy Jabines to have an inmate, Matthew Maes, come into the booking cage to pick up items which could be easily used as

weapons. Erwine questioned Deputy Jabines about this but her only response was "Senior

Deputy" which Erwine understood as to mean he did not have a say in the matter.

20.     When the Matthew Maes ("Maes") came into the cage, Erwine positioned

himself between Maes and the control panel of the facility. Erwine was in an uncomfortable

position with Maes being only a few feet away from Erwine and backed into a corner. Erwine

removed his taser from its holster and held it in his hand with the taser pointed to the ground.

Erwine chose to remove the cartridge from the taser due to the close proximity of inmate Maes

to both Erwine and Deputy Jabines. Maes cleaned up the items and left the cage without

incident. (For purposes of this Complaint, this incident will be referred to as the "Maes

Incident").

21.     On Saturday, October 8, 2016,. Erwine tried to bring the concerns of the

mistreatment during the Beaulieu Incident to the attention of Sgt. Summers. Summers

however did not show concern and stated "He's [Beaulieu] an inmate, Fuck him."

22.     Near the end of Erwine's shift on October 10, 2016, Erwine was called into

the office of Nuckolls where Erwine was confronted by Captain Mathenson and Sheriff

Trotter. Sheriff Trotter informed Erwine the he was aware of the booking that took place over

the weekend with Beaulieu and that Erwine's concerns were intentional to harm the

Department. Erwine began to speak about the Beaulieu Incident as he had originally intended

to do from the beginning of his shift that day, however Erwine was not afforded the

opportunity to explain what he had witnessed or discovered. He was provided two choices: 1)

he could resign, or 2) the Department would terminate his employment effective immediately.

Either way, Erwine was informed his employment was not continuing after the current

meeting he was present in. Erwine was given a paper to sign his resignation before he left the

room.  Feeling as though he was forced to sign the resignation letter, Erwine signed a Letter

of Separation on October 10, 2016 (See: Employee Action Notice Dated 10/10/2016 attached

1  at Exhibit "4").

2      23.    Erwine was escorted out of the Detention Center after he executed the Letter

3  of Separation and was not able to retrieve any of his paperwork from the Detention Center.

4      24.    On October 11, 2016, Erwine met with Captain Mathenson at his office to

5  return some of Erwine's gear that he had at his residence. Erwine tried to speak to Captain

6  Mathenson to find out why he was given the ultimatum to resign or be terminated. Captain

7  Mathenson's response was "You know what Mike, I think you were just trying too hard to be

8  a cop."

9      25.    Until the instances that occurred on October 9 and October 10 the only other

10  document that appeared in Erwine's employee file was an Employee Evaluation Report which

11  ranked overall at a "Fair" rating. Under the "Professionalism" rating it was noted that "Erwine

12  has made mistakes and made excuses for them rather than holding himself accountable…

13  When Deputy Erwine made a mistake, Deputy Erwine's reason was Deputy Davis did not

14  show him that way or did not show him at all." The note explaining Deputy Erwine's overall

15  "Fair" rating stating, "Deputy Erwine would be rated a lot higher and further along in his

16  training program if it was not for his issues with accountability. Accountability has effected

17  [sic] every area in his training program." (See: Employee Evaluation Report at Exhibit "5")[1].

18  Immediatley following the instances that occurred on October 9 and October 10 a

19  memorandum appeared in Erwine's file with statements and documentation from individuals

20  compiled by Sheriff Trotter (See Memorandum to Personnel File with attachments at Exhibit

21  "6"). The memorandum contains several false and defamatory statements about Erwine and

22  his performance. This memorandum and the allegations regarding his performance were never

23  shared with Erwine. In this regard, Erwine did not receive this memorandum until he requested

24

25  [1] Interestingly, when Erwine requested his employee file a 9-month evaluation that had been conducted of him was not included. Upon information and belief, the 9-month evaluation showed showed Erwine's performance ranked at or above standards and that there were no major concerns in Erwine's performance as a Deputy.

a complete copy of his employee file on April 13, 2018. The memorandum specifically alleges
and asserts facts and items of concern that would make it difficult if not impossible to obtain
gainful employment as a police officer, specifically the items of concern related to the
allaged facts contained in the report are:

> [Erwine's conduct] is unprofessional behavior. [Erwine] creates a
> liability for this agency now or for some time into the future should
> Inmate Maes elect to pursue civil action. [Erwine] discredits our
> agency and our profession. In a time when scrutiny is high on all of
> us in law enforcement, this type of play [Erwine's alleged actions]
> is inexcusable. Deputy Erwine clearly violated our policies on Taser
> and Use of Force, as well as, behavior standards.

26.     Contrary to the Evaluation Report, Erwine did not have accountability issues,
rather he was retaliated against for trying to hold the other personnel accountable to the
standards he acknowledged upon the commencement of his employment.

27.     It is also notable, that none of Erwine's concerns or complaints made to the
Detention Facility were placed in his employment file, and though a formal internal affairs
investigation was not conducted regarding any of the Incidents, the reports of Erwine's fellow
co-workers were placed in his file without any supporting documentation or even without
taking a statement from Erwine.

28.     Approximately two weeks after the Maes incident, Maes was informed by
Deputy Jabines that Deputy Erwine was terminated from his employment with Churchill
County Sheriff's Office because "he was a rat." (See: Affidavit of Matthew Maes at Exhibit
"7").

29.     Succeeding the release of Maes, Maes reached out to Erwine to inform him of
the conversation he had with Deputy Jabine regarding his improper termination. (See:
Affidavit of Matthew Maes at Exhibit "7").

30.     During the conversation, Maes informed Erwine that during the Maes Incident
his recollection of events reinforced Erwine's story and  were contrary to the falsified report

placed in Erwine's employment file. Maes confirmed the taser was never pointed at him, and the taser was never discharged. Maes did not recall a sound or spark being produced from the Maes Incident, also contrary to the biased report placed in Erwine's employment file. (See: Affidavit of Matthew Maes at Exhibit "7").

31.    Maes affirmed during the Maes incident, Maes did not at any point feel threatened in any way. (See: Affidavit of Matthew Maes at Exhibit "7").

32.    During the course of Erwine's employment, whenever Erwine approached his seniority regarding concerns of misconduct he was merely brushed off and informed the misconduct was "just the way things were."

33.    Erwine was not given a notice of misconduct regarding the Beaulieu Incident, he never received a warning regarding any alleged misconduct, and further he was never reprimanded. Erwine was not given an opportunity to improve upon his alleged misconduct. With the October Incidents being the first incidents in his file, Erwine had a right to receive further guidance from the Department before being forced to resign. Erwine did not commit any professional misconduct; however, to date, in his employment file sits biased reports from seniority in retaliation against Erwine for trying to follow Nevada Law and Department policy.

34.    Subsequent to Erwine's "resignation", Erwine sought employment elsewhere with numerous agencies that had posted job openings across the entire State of Nevada.

35.    On December 6, 2016, Washoe County Sheriff's Office contacted Churchill County Detention Center and requested any information regarding any pre-employment background investigations, employment information, and any information regarding reprimands and his resignation. (See: Fax from Washoe County Sheriff's Office at Exhibit "8").

36.    On January 17, 2017, Erwine received a letter from the Washoe County Sheriff informing him that "the Sheriff's Office has determined that you do not meet the established

standards for a position as Deputy Sheriff and therefore you have not been selected at this time. In accordance with the Washoe County Code 5.185, you are unable to be considered for any position at the Sheriff's Office for one year from the date of this letter. (See: Letter from Washoe County Sheriff at Exhibit "9").

37.   On February 7, 2017, Erwine received an email from Las Vegas Metropolitan Police in response to his application for employment informing him "based on review of your background history, you will no longer be considered for the position(s) of Police Recruit C16-001 November with the Las Vegas Metropolitan Police Department. Candidate does not meet LVMPD hiring standards based on Employment History." (See: Email from Las Vegas Metropolitan Police Department at Exhibit "10").

38.   On September 8, 2017, Erwine received a letter from the Carson City Department of Alternative Sentencing informing him that he is "no longer being considered in the current recruitment due to failing on or more portions of the selection process" which included the Background Investigation and Chief's Review. (See: Letter from Carson City Department of Alternative Sentencing at Exhibit "11").

39.   On September 12, 2017, Erwine received from Douglas County Sheriff a letter informing him that he "did not successfully complete the background evaluation/testing and therefore are no longer considered an eligible applicant for employment…" (See: Letter from Douglas County Sheriff at Exhibit "12").

40.   On November 14, 2017, Erwine received a letter from North Las Vegas Police informing him he was "..ineligible to continue in the employment process for the position of Police Officer…" for Character Issues and his Employment History. (See: Letter from North Las Vegas Police Department at Exhibit "13").

41.   On January 4, 2017, Erwine received a letter from the Nevada Department of Safety informing him "We have carefully reviewed your qualification for the above-

referenced position and considered your background information. We regret to inform you that you are no longer being considered for a DPS Officer position with the Nevada Department of Public Safety." (See: Nevada Department of Public Safety Letter at Exhibit "14").

42.     On March 1, 2018, Erwine received a letter from Reno Police Department informing him that his "…application for employment with the Reno Police Department for [Police Recruit] was rejected, based on your pre-employment background investigation. (See: Reno Police Department Letter at Exhibit "15").

43.     The reports in Erwine's file from his fellow co-workers in October of 2016, should not have been placed in his permanent file, and should not be public information provided to potential future job candidates for reasons stated above, however, it is clear that the reports which have no merit and were intentionally placed in his file remain in Erwine's permanent employment file, and are being distributed to each prospective law enforcement agency that inquiries about Erwine's employment history with the Detention Facility, thereby interfering and preventing Erwine from obtaining prospective employment.

44.     By the above-described malicious acts, and as a direct result, Defendant caused Erwine to lose the benefit of gainful employment at his chosen occupation for a period of almost two years to Erwine's damage in excess of ten thousand dollars ($10,000.00).

**CONDITIONS PRECEDENT TO FILING THIS ACTION**

45.     Plaintiff has satisfied all required conditions precedent to initiating this action.

**FIRST CAUSE OF ACTION**

**(Violation of Due Process - 42 U.S.C. § 1983)**

46.     Plaintiff re-alleges and incorporates by reference the allegations set forth in paragraphs 1-45 above as though fully set forth herein.

47.     42 U.S.C. § 1983 provides that a party shall be liable when it "subjects, or causes to be subjected, any person of the United States... deprivation of any rights, privileges, or immunities secured by the Constitution and laws of the United States."

48.     Plaintiff was at all times a person guaranteed certain rights by the Constitution of the United States of America, including the rights enumerated in and implied by the Fourteenth Amendment to the Constitution, which guarantees the right to due process when a person is deprived of a property interest.

49.     Defendant, at all times relevant, was a governmental entity, acting under color of law, or acting as an agent of a governmental entity so as to render the City liable as a "person" acting under color of law pursuant to 42 U.S.C. §1983, which barred Defendant infringing upon Plaintiff's constitutional rights, or taking any adverse against Plaintiff without providing due process of law.

50.     At all times material to this complaint, Defendant willfully deprived Plaintiff of his proprietary right to employment in violation of his due process rights protected by the Fourteenth Amendment of the United States Constitution, by failing to provide fair and impartial treatment in Plaintiff's probationary employment, constructive dismissal, failure to receive a permanent position, and malicious interference with future prospective employment.

51.     As a result of Defendant's violations of 42 U.S.C. § 1983, Plaintiff has suffered economic and non-economic damages in amounts to be determined at trial. Plaintiff seeks recovery of all compensatory damages provided by law, in addition to equitable relief and reasonable attorney fees and costs pursuant to 42 U.S.C. § 1988.

## SECOND CAUSE OF ACTION

### (Constructive Discharge)

52.     Plaintiff re-alleges and incorporates by reference the allegations set forth in paragraphs 1-51 above as though fully set forth herein.

53.     Defendant created working conditions so intolerable and aggravated based on that a reasonable person in Plaintiff's position would have felt compelled to resign.

54.     Due to such working conditions, Plaintiff resigned from his employment with Defendant.

55.     Defendant had actual or constructive knowledge of the intolerable actions and conditions of employment and their impact upon Plaintiff, despite alternate or available remedies.

56.     As a direct and proximate result of Defendant's tortious constructive discharge, Plaintiff suffered damages in an amount in excess of ten thousand dollars ($10,000.00).

## THIRD CAUSE OF ACTION

### (Defamation)

57.     Plaintiff re-alleges and incorporates herein by reference each and every allegation contained within the paragraphs above.

58.     Defendant knowingly made false and defamatory statements about the Plaintiff's employment history, which was published to the Washoe County Sheriff's Office, the Las Vegas Metropolitan Police Department, the Carson City Department of Alternative Sentencing, the Douglas County Sheriff's Office, the North Las Vegas Police Department, the Nevada Department of Public Safety Letter, and the North Las Vegas Police Department.

59.     The aforementioned false statements made by Defendant would normally tend to lower the reputation of the Plaintiff in the community, and in the profession and business or industry in which Plaintiff worked, and would excite derogatory opinions about the Plaintiff and hold the Plaintiff up to contempt.

60.     As a direct and proximate cause of Defendant's conduct, as described above, Plaintiff was prevented from securing future employment and has been damaged in an amount in excess of Ten Thousand Dollars ($10,000).

61.     Defendant's false and defamatory statements were made in reckless disregard of the rights of Plaintiff, and in reckless disregard of the truth of the matter, and constitute actual or implied malice giving rise of a claim for punitive and exemplary damages in excess of Ten Thousand Dollars ($10,000).

## FOURTH CAUSE OF ACTION

### (Defamation Per Se)

62.     Plaintiff re-alleges and incorporates herein by reference each and every allegation contained within the paragraphs above.

63.     Defendant knowingly made false and defamatory statements about the Plaintiff's employment history, which was published to the Washoe County Sheriff's Office, the Las Vegas Metropolitan Police Department, the Carson City Department of Alternative Sentencing, the Douglas County Sheriff's Office, the North Las Vegas Police Department, the Nevada Department of Public Safety Letter, and the North Las Vegas Police Department.

64.     Defendant's statements constitute defamation per se in that they tend to injure the Plaintiff in his trade, business and profession.

65.     As a direct and proximate cause of Defendant's conduct, as described above, Plaintiff was prevented from securing future employment and has been damaged in an amount in excess of Ten Thousand Dollars ($10,000).

66.     Defendant's false and defamatory statements were made in reckless disregard of the rights of Plaintiff, and in reckless disregard of the truth of the matter and constitute actual or implied malice giving rise to a claim for punitive and exemplary damages in excess of Ten Thousand Dollars ($10,000).

## FIFTH CAUSE OF ACTION

### (Intentional Interference With Prospective Employment)

67.     Plaintiff re-alleges and incorporates by reference the allegations set forth in

paragraphs 1-56 above as though fully set forth herein.

68.    Defendant sent intentionally adverse statements regarding Plaintiff's employment history to numerous potential employers of Plaintiff.

69.    Defendant knew that prospective business relationships existed and acted intentionally to interfere with those prospective business relationships, specifically the Washoe County Sheriff's Office, the Las Vegas Metropolitan Police Department, the Carson City Department of Alternative Sentencing, the Douglas County Sheriff's Office, the North Las Vegas Police Department, the Nevada Department of Public Safety Letter, and the North Las Vegas Police Department, pursuant to its transmission of false statements concerning Plaintiff's previous employment with Plaintiff.

70.    The Defendant intended to harm Plaintiff by wrongfully preventing Plaintiff from obtaining new employment.

71.    Defendant had no privilege or justification for its wrongful actions.

72.    As a direct and proximate cause of Defendant's conduct, as described above, Plaintiff was prevented from securing future employment and has been damaged in an amount in excess of Ten Thousand Dollars ($10,000).

73.    Plaintiff has been forced to engage the services of an attorney to pursue this action and Plaintiff is therefore, entitled to reasonable attorney's fees and costs as damages.

### JURY TRIAL DEMANDED

Pursuant to the Federal Rules of Civil Procedure (FRCP) Rule 38, Plaintiff hereby demands a trial by jury as to all issues.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court grant the following relief:

A.    For an award of compensatory and punitive damages;

B.   For an award of economic damages according to proof;

C.   Statutory damages as allowed by law;

D.   For an award of reasonable attorneys' fees, costs, and litigation expenses; and

E.   For such other relief as the Court or jury may deem just or equitable.

**Affirmation**
**(Pursuant to NRS 239B.030)**

The undersigned does hereby affirm that the preceding document filed in this court does not contain the social security number of any person.

DATED this 28th day of September, 2018.      HUTCHISON & STEFFEN, PLLC

By: _____

JASON D. GUINASSO, ESQ. (SBN# 8478)
*Attorney for Plaintiff*

<u>VERIFICATION</u>

STATE OF NEVADA      )
                        ) ss.
COUNTY OF WASHOE    )

        I, MICHAEL ERWINE, being first duly sworn, under penalty of perjury, do hereby

depose and say:

        I am the Plaintiff in this action and I have read the foregoing Complaint, know the

contents of the Complaint and the matters stated therein are true of my own knowledge, except

for those matters stated on information and belief, and, as to those matters, I believe them to

be true.

DATED: This 2⁶day of September, 2018.               _____

                                             MICHAEL ERWINE

SUBSCRIBED and SWORN to before me

this 2⁴day of September, 2018.

_____
NOTARY PUBLIC

> BERNADETTE FRANCIS
> NOTARY PUBLIC
> STATE OF NEVADA
> My Commission Expires: 2-17-2020
> Certificate No: 16-1881-2

1

**List of Exhibits**
**Case No. (Not Yet Assigned)**
2   **Michael Erwine v. Churchill County, *et al.***
**COMPLAINT**

| 3 | Exhibit No. | Document | Page Count |
|---|---|---|---|
| 4 | Exhibit 1 | Official Oath Dated 12/9/15 | 2 |
| 5 | Exhibit 2 | Job Description Dated 12/9/2015 | 4 |
| 6 | Exhibit 3 | Affidavit of Andrew Allen Beaulieu | 2 |
| 7 | Exhibit 4 | Employee Action Notice Dated 10/10/2016 | 1 |
| 8 | Exhibit 5 | Employee Evaluation Report | 4 |
| 9 | Exhibit 6 | Memorandum to Personnel File with attachments | 12 |
| 10 | Exhibit 7 | Affidavit of Matthew Maes | 2 |
| 11 | Exhibit 8 | Fax from Washoe County Sheriff's Office | 2 |
| 12 | Exhibit 9 | Letter from Washoe County Sheriff | 2 |
| 13 | Exhibit 10 | Email from Las Vegas Metropolitan Police Department | 1 |
| 14 | Exhibit 11 | Letter from Carson City Department of Alternative Sentencing | 1 |
| 15 | Exhibit 12 | Letter from Douglas County Sheriff | 1 |
| 16 | Exhibit 13 | Letter from North Las Vegas Police Department | 1 |
| 17 | Exhibit 14 | Letter from Nevada Department of Public Safety | 1 |
| 18 | Exhibit 15 | Letter from Reno Police Department | 1 |

19

20

21

22

23

24

25