LUKE A. BUSBY, ESQ
Nevada Bar No. 10319
LUKE ANDREW BUSBY, LTD.
316 California Ave. 82
Reno, Nevada 89509
775-453-0112
luke@lukeandrewbusbyltd.com
*Attorney for the Plaintiff*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

* * *

| | |
|---|---|
| MICHAEL ERWINE,<br><br>                    Plaintiff,<br><br>vs.<br><br>CHURCHILL COUNTY, a political subdivision of the State of Nevada, CHURCHILL COUNTY SHERIFF BENJAMIN TROTTER, and DOES 1 through 10 inclusive;<br><br>                    Defendants.<br>_____/ | Case No.: 3:18-cv-00461-RCJ WGC<br><br>**MOTION FOR PARTIAL SUMMARY JUDGMENT ON LIABILITY ON PLAINTIFF'S DUE PROCESS AND MONELL CLAIMS**<br><br>**ORAL ARGUMENT REQUESTED** |

COMES NOW, Plaintiff MICHAEL ERWINE, by and through the undersigned

counsel, and hereby moves for partial summary judgment against Defendants

CHURCHILL COUNTY, a political subdivision of the State of Nevada, and

CHURCHILL COUNTY SHERIFF BENJAMIN TROTTER pursuant to Rule 56 of

the Federal Rules of Civil Procedure ("FRCP").

**MEMORANDUM OF POINTS AND AUTHORITIES**

Erwine has filed claims against Churchill County and Sheriff Trotter herein for

violation of his liberty interest due process rights under the Nevada and US

Constitutions, tortious discharge, defamation, defamation per se, and intentional

interference with prospective employment. On April 29, 2021, the parties filed a

stipulation for dismissal of Erwine's procedural due process property interest claim

and the Court dismissed this claim accordingly. *See* ECF #114.

Erwine is seeking that the Court enter partial summary judgment on his liberty interest due process claims under the US and Nevada Constitutions based largely on admissions of the Defendants.  Erwine is also seeking that the Court grant partial summary judgment on his *Monell* claim against Churchill County.  Erwine was discharged without any due process and contrary to law by Defendants Churchill County and Sheriff Benjamin Trotter in response to his documentation of the misconduct of his fellow employees at the Churchill County Jail.  The facts in Erwine's case squarely meet the elements of these claims based on the admissions of the Defendants, and the other facts to which no genuine issue exists explained below.

## I.   Statement of Undisputed Facts

Mr. Erwine is a former Deputy Sheriff for the Churchill County Sheriff's Office. Between December 9, 2015 and October 10, 2016, Churchill County employed Erwine in the capacity of Detention Deputy at the County Jail.  In the Plaintiff's Declaration in Exhibit 1, the Plaintiff described the facts and circumstances surrounding his termination. October 8, 2016, Erwine went in for the day shift and began checking cells. Erwine was informed that an inmate, Andrew Beaulieu ("Beaulieu") was in the security cell and needed to be booked. When Erwine arrived at Beaulieu' s security cell he noticed blood on the walls and asked the grave shift deputy what the blood was from. The grave shift deputy informed Erwine that Beaulieu had come in with a cut on his hand and that it ripped open while in the cell. After investigating the circumstances, Erwine discovered Beaulieu had been requesting water for hours. Erwine was informed by the inmate and later confirmed during review of surveillance footage that every time Beaulieu would request water, the grave shift deputy would flush the drain in Beaulieu's cell making Beaulieu's request inaudible over the flushing noise. Erwine provided Beaulieu with water pursuant to his essential job functions to provide inmates with food and explained to Beaulieu what the rest of the booking process would look like. During this time,

Beaulieu expressed to Erwine that the grave shift deputies were "assholes", and he would be filing a lawsuit against them.  Erwine continued to conduct his rounds in the jail. While Erwine was conducting his rounds, other inmates asked Erwine what had happened to the "guy in the security cell" the previous night and explained what the grave shift did "was messed up." Inmate Zachary White even filed a grievance request to Captain Matheson regarding the treatment of Beaulieu.  Erwine reviewed surveillance footage of the grave shift's interaction with Beaulieu before he removed him for booking, mainly to be aware of any safety concerns with Beaulieu before removing him from the security cell. Erwine did not note any alarming actions by Beaulieu wherein Erwine would need to be concerned, however, he did note concerning inappropriate acts of the grave shift deputy that he believed needed to be brought to his sergeant's attention. Since the concerns were not an immediate threat, and the sergeant did not work on weekends, Erwine chose to log the events on his computer (attached to Exhibit 1) so he could follow up with his sergeant on Monday, October 10, 2016, when his sergeant returned to work.

In the Plaintiff's Declaration in Exhibit 1 the Plaintiff also describes the events of the next day Sunday, October 9, 2016, involving inmate Matthew Maes.  During Erwine's dayshift, Deputy Jabines had dropped a container of miscellaneous tools and other items inside of a booking cage. Included in these items were screwdrivers and other sharp instruments. Deputy Jabines did not want to pick up the items herself, so she asked an inmate to come into the booking cage and pick them up for her. Bringing in an inmate to pick up the sharp inmates created a dangerous situation for everyone involved. Erwine did not feel it was appropriate for Deputy Jabines to have an inmate, Matthew Maes, come into the booking cage to pick up items which could be easily used as weapons. Erwine questioned Deputy Jabines about this but her only response was "Senior Deputy" which Erwine understood as to mean he did not have a say in the matter. When the Matthew Maes ("Maes") came into the cage, Erwine positioned himself between Maes and the control panel

of the facility. Erwine was in an uncomfortable position with Maes being only a few feet away from Erwine and backed into a corner. Erwine removed his taser from its holster and held it in his hand with the taser pointed to the ground. Erwine removed the cartridge from the taser due to the close proximity of inmate Maes to both Erwine and Deputy Jabines. Maes cleaned up the items and left the cage without incident.

As explained by Mr. Erwine in his Declaration No. 4, attached hereto as Exhibit 2, near the end of Erwine's shift on October 10, 2016, Erwine was confronted by Captain Matheson and Sheriff Trotter. Sheriff Trotter informed Erwine that he was aware of the booking that took place over the weekend with Beaulieu and that Erwine was intentionally trying to harm the Department. Erwine began to speak about the Beaulieu Incident as he had originally intended to do from the beginning of his shift that day, however, Erwine was not afforded any opportunity to explain what he had witnessed or discovered, nor was he provided with any notice of the meeting or that we was to be terminated at the meeting.  Instead, Trotter stated Erwine had two choices: he could resign, or the Department would terminate his employment effective immediately.  Either way, Erwine was informed his employment was not continuing after the meeting.  *Id.*

As further explained in Exhibit 2, at the meeting with Sheriff Trotter on October 10, 2016, Erwine was informed that he would receive his vacation pay/sick pay if he chose to resign rather than be terminated, but that he would be terminated in either case.  Erwine's financial situation was not secure, and he had moved to Churchill County and signed a lease so that he could work as a deputy there. Further, the job at Churchill county was his first position in law enforcement after graduating from the academy, and a termination would have been catastrophic on his future career prospects. Erwine was forced to make a snap decision under financial duress and Erwine signed a Letter of Separation on October 10, 2016.

Unbeknownst to Mr. Erwine, Sheriff Trotter placed a stigmatizing memorandum in Mr. Erwine's employee file, dated October 10, 2016, which was

4

subsequently distributed to at least one law enforcement agency in Nevada with whom Erwine had filed an application for employment.  *See* Exhibit 3.  Sheriff Trotter's October 10, 2016 Memorandum is riddled with stigmatizing allegations against Mr. Erwine as it alleges that Erwine "failure to follow proper chain of command," engaged in "conduct unbecoming a deputy and unjustifiable use of force," that created "liability" for the agency, was "unprofessional," or violated the "taser and use of force" policy as well as "behavioral standards."  *Id.*

In the Defendant Churchill County's Responses to the Plaintiff's First Requests for Admission, attached hereto as Exhibit 4, the Defendants admitted to the following facts:

a.   Erwine was provided with no written notice that he had been accused misconduct before Erwine executed the Letter of Separation on October 10, 2016 (See RFA No.1);

b.   Erwine was not afforded a hearing before Erwine executed the Letter of Separation on October 10, 2016 (RFA No. 2);

c.   Sheriff Trotter authored the October 10, 2016 Memorandum (RFA No. 4); Sheriff Trotter placed the October 10, 2016 Memorandum into Erwine's personnel file (RFA No. 5);

d.   The October 10, 2016 Memorandum was not provided to Erwine before the Letter of Separation on October 10, 2016 was executed by Erwine;

e.   The October 10, 2016 Memorandum was never shown to Erwine such that he may have read and initialed the document before it was placed in his personnel file (RFA No. 8); and

f.   The October 10, 2016 Memorandum contains no notation to the effect that the document was shown to Erwine and that Erwine refused to initial the document (RFA No. 9).

Also included in Mr. Erwine's personal file at Churchill County, unbeknownst to him, were statements from Churchill County Sheriff's Office employees Deputy

Thompson and Sergeant Summers describing the Beaulieu incident (*See* Exhibits 5 and 6), and a statement from Deputy Jabines describing the Maes incident. *See* Exhibit 7.  In the statements in Exhibits 5 and 6, express reference is made to the video of the Beaulieu incident. Sergeant Summers' statement in Exhibit 6 indicates that he believed that Beaulieu had spoken to Mr. Erwine about a lawsuit. Deputy Jabines' statement in Exhibit 7 also expressly mentions a possible lawsuit involving Maes against the Churchill County Sheriff's Office.

Despite initially denying that the October 10, 2016 Memorandum and personnel file was shared with any outside law enforcement agency (*See* the Defendant's Answer to the Amended Complaint at Doc. #71 at 9) the Defendants later admitted that the October 10, 2016 Memorandum, in addition to Mr. Erwine's entire personnel file, was shared with the Washoe County Sheriff's Office, after Washoe County provided a response to a subpoena in which it was clear that Erwine's entire employee file was sent to the Washoe County Sheriff's Office. *See* Exhibit 4 at Response to Request for Admission Nos. 14 and 15 and Exhibit 8, which is the log from Washoe County indicating that the October 10, 2016 Memorandum and Erwine's file was sent by Churchill County.

On February 8, 2021, the undersigned counsel received the Plaintiff's background file from the Las Vegas Metropolitan Police Department ("LVMPD"), which was sought by the Defendant pursuant to a subpoena issued by the Defendants.  Included in LVMPD's response is a note from the background investigator Scott Olsen indicating that Olsen had a telephone conversation with Sheriff Trotter regarding Plaintiff Mr. Erwine's employment with Churchill County. Sheriff Trotter indicated to Mr. Olsen that Mr. Erwine was terminated because he initiated an unauthorized investigation that was beyond his duties and that Mr. Erwine was sympathetic to an inmate who was looking to file a lawsuit against Churchill County.  Mr. Olsen also indicates that Sheriff Trotter indicated that an investigation was conducted, presumably of the incident involving Mr. Beaulieu

described in the Plaintiff's motions, and that no mistreatment of the inmate took place.  See Confidential Exhibit 9.[1] Mr. Olsen concludes his notes by stating that because of what Sheriff Trotter said, Erwine was "unsuitable" for employment with LVMPD. *Id*.

According to the Declaration of Mr. Beaulieu attached hereto as Exhibit 10, Erwine did nothing to encourage Mr. Beaulieu to file a lawsuit against Churchill County nor did Erwine provide Mr. Beulieu with legal advice.

Further, at the deposition of Matthew Maes, Erwine's supposed victim of the use of force incident referred to in Sheriff Trotter's October 16, 2016 Memorandum, Maes testified that the idea that Erwine used excessive force on him was untrue, and that "it never happened:"

> Q:· Okay.· And you're -- can you tell me what your
> knowledge of the facts and circumstances of this case are
> generally?
> A:· Um, my knowledge of it is that Mike Erwine was fired
> for excessive use of force with a taser, and I was named a
> victim.· But it never happened.· So, um, here we are, and
> we're  going to talk about the reasons why, um, or what
> happened.· Why why, um -- why -- why did they say that --
> that -- that he -- that he tased me, you know, when --
> when it never happened?· So, I don't know.

See Exhibit 11 at 7:1

When shown Sheriff Trotter's Memorandum attached hereto as Exhibit 3 describing Deputy Jabines' account of what happened in the case with Mr. Erwine, Mr. Maes states that it appeared to him that Jabines may be trying to frame Mr. Erwine because the description of what happened was so bizarre:

> A:· -- I was asked to go in the cage.· That's all true. But
> there was never a taser pointed at me, and I -- I don't ever
> hear a taser going off.· And so, um, the fact that she says
> that those are -- are something that happened and asking

---

[1] This Motion is accompanied by a motion for leave to file Exhibit 9 under seal per LR-10-5.

to relieve him or to send him home, you know, it just -- it
just really doesn't -- doesn't -- doesn't seem right as far as
I'm concerned. You know, I mean –
Q:· Okay.· Do you see where it says "Items of concern" on
page 3, and there's a couple of bullet points under that?
A:· Yes.
Q:· Okay.· It states, "This is unprofessional behavior."
A:· Yes.
Q:· What do you think of that statement and --
A:· I think that --
Q:· -- what happened that day in general?
A:· -- I think that had -- that that day in general, I think that
maybe Jabines is, um -- maybe she was unprofessional
with her behavior.· You know, because there was, um,
obviously some tools that were probably thrown on the
ground on purpose. You know, I mean, to -- to -- and have
me come in there and to -- to set this guy up to make him
seem like he tased me, like, it's just completely crazy, you
know. I -- I mean, and these are people that are supposed
to be, uh, upholding our laws and stuff.· You know, that's -
- that's crazy to me, and it's unprofessional.

Exhibit 11 at 40:7.

Subsequent to Erwine's departure from the Churchill County Sheriff's Office,
after Erwine sought other law enforcement jobs, Erwine was rejected from multiple
police agencies for failing to pass background investigations. As described
Declaration No. 2 of Michael Erwine in Exhibit 12 and the documents in Attachment
A thereto, on January 17, 2017, Erwine received a letter from the Washoe County
Sheriff informing him that, "…the Sheriff's Office has determined that you do not
meet the established standards for a position as Deputy Sheriff and therefore you
have not been selected at this time."  On February 7, 2017, Erwine received an
email from Las Vegas Metropolitan Police in response to his application for
employment informing him, "…based on review of your background history, you will
no longer be considered for the position(s) of Police Recruit C 16-001 November
with the Las Vegas Metropolitan Police Department. Candidate does not meet
LVMPD hiring standards based on Employment History" and "You are not eligible to
apply with LVMPD for any position indefinitely." On September 8, 2017, Erwine

received a letter from the Carson City Department of Alternative Sentencing informing him that he is, "…no longer being considered in the current recruitment due to failing on or more portions of the selection process" which included the Background Investigation and Chiefs Review, and "Based on our recruitment standards you are precluded from reapplying with our agency in the future." On September 12, 2017, Erwine received from Douglas County Sheriff a letter informing him that he, "…did not successfully complete the background evaluation/testing and therefore are no longer considered an eligible applicant for employment.... " On November 14, 2017, Erwine received a letter from North Las Vegas Police informing him he was "...ineligible to continue in the employment process for the position of Police Officer ... " for character Issues and his employment history," and "You are disqualified indefinitely.    On March 1, 2018, Erwine received a letter from Reno Police Department informing him that his, " ... application for employment with the Reno Police Department for [Police Recruit] was rejected, based on your pre-employment background investigation."  The rejection letters quoted above are all attached to Mr. Erwine's declaration in Exhibit 12.

Upon requesting and receiving his employee file from Churchill County on April 13, 2018, Erwine discovered the existence of the October 10, 2016 Memorandum and the statements regarding the incidents with Maes and Beaulieu were placed in his employment file by Sheriff Trotter. *Id.*

## II.    Standard of Review

Pursuant to Federal Rule of Civil Procedure 56, an order granting summary judgment should be issued only when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. "The purpose of summary judgment is to avoid unnecessary trials when there is no dispute as to the facts before the court." *Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994). In a summary judgment motion, the trial court is to perform a "threshold inquiry of determining whether there is a need for a trial." *Taybron v. City*

*and County of San Francisco*, 341 F.3d 957, 959 (9th Cir. 2003) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986)).  Summary judgment should be granted if, taking the evidence and all reasonable inferences drawn therefrom in the light most favorable to the non-moving party, there are no genuine issues of material fact. *Furnace v. Sullivan*, 705 F.3d 1021, 1026 (9th Cir. 2013).  An issue of material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party. *Thomas v. Ponder*, 611 F.3d 1144, 1150 (9th Cir. 2010). The court must not weigh the evidence or determine the truth of the matter but only determine whether there is a genuine issue for trial.  See *Balint v. Carson City*, 180 F.3d 1047, 1054 (9th Cir. 1999).

III.    **14th Amendment Procedural Due Process – Liberty Interest – Against Sheriff Trotter**

Sheriff Trotter is sued in his individual capacity for his acts under color of Nevada law.  See ECF #63 at page 2.  "A public employee acts under color of state law while acting in his official capacity or while exercising his responsibilities pursuant to state law." *West v. Atkins*, 487 U.S. 42, 49, 108 S. Ct. 2250, 101 L. Ed. 2d 40 (1988). Because Sheriff Trotter fired Erwine, Trotter's conduct was the actionable cause of Erwine's claimed injury. *Harper v. City of Los Angeles*, 533 F.3d 1010, 1026 (9th Cir.2008)

"Where a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential." *Wisconsin v. Constantineau*, 400 U.S. 433, 437, 91 S. Ct. 507, 510 (1971).  Mr. Erwine has a right to be free of official stigmatization, and even threatened stigmatization requires due process that "foreclose[s] his freedom to take advantage of other employment opportunities."  *Board of Regents v. Roth*, 408 U.S. 564, 569–70 quote at 573-574 (1972); *Goss v. Lopez*, 419 U.S. 565 (1975).  While reputational harm alone does not trigger a right to due process, if coupled with a

concurrent loss of employment, the 14th Amendment requires a "name clearing" hearing under the "stigma-plus" doctrine. *Paul v. Davis*, 424 U.S. 693, 712 (1976).

The case law on this issue is quite clear, even if a police officer is a "probationary employee" they have a right to a name clearing hearing if stigmatizing information is to be placed in their employment file. "Although a probationary employee, has no protected "property" interest in his employment with a city, a public employer cannot deprive a probationary employee of his freedom to take advantage of other employment opportunities." *Sciolino v. City of Newport News*, 480 F.3d 642, 644 (4th Cir. Va. March 12, 2007). A hearing for a probationary or nontenured employee based on stigmatization is required "if the employer creates and disseminates a false and defamatory impression about the employee in connection with his termination." *Codd v. Velger*, 429 U.S. 624, 628, 97 S. Ct. 882 (1977) (per curiam).

"[A] terminated employee has a constitutionally based liberty interest in clearing his name when stigmatizing information regarding the reasons for the termination is publicly disclosed." *Cox v. Roskelley*, 359 F.3d 1105, 1106 (9th Cir. Wash. February 20, 2004). An employee's liberty interest is at issue if a charge of improper conduct impairs the employee's reputation for honesty or morality. *Vanelli v. Reynolds School District No. 7*, 667 F.2d 773 (9th Cir. 1982).

In order to prevail on his claim, Erwine must show that (1) the accuracy of the charge of Churchill County against Erwine is contested; (2) there is some public disclosure of the charge against Mr. Erwine; and (3) the charge by Sheriff Trotter is made in connection with termination of Mr. Erwine's employment. *Mustafa v. Clark Cty. Sch. Dist.*, 157 F.3d 1169, 1179 (9th Cir. 1998).

**A. The accuracy of the charges against Mr. Erwine are contested**

In his October 10, 2016 Memorandum, Sheriff Trotter accused Erwine of "conduct unbecoming an officer," for conducting an "unauthorized investigation" into

11

the Beaulieu incident and taking sides with an inmate against his own agency.

"Conduct unbecoming an officer" is a term that inarguably calls into question the

moral character of a person against whom such a charge is leveled. The term in

most commonly used in the context of infractions of the Uniform Code of Military

Justice, and applies to serious infractions with a moral component, and is plainly

stigmatizing if untrue:

> "Though it need not amount to a crime, it must offend so
> seriously against law, justice, morality or decorum as to
> expose to disgrace, socially or as a man, the offender, and
> at the same time must be of such a nature or committed
> under such circumstances as to bring dishonor or
> disrepute upon the military profession which he
> represents."

*Parker v. Levy*, 417 U.S. 733, 754, 94 S. Ct. 2547, 2560 (1974) quoting *United*

*States v. Howe*, 17 U. S. C. M. A. 165, 177-178, 37 C. M. R. 429, 441-442 (1967).

In his October 10, 2016 Memorandum, Sheriff Trotter also states that

Erwine's actions are, "unprofessional" and "discredits our agency and our

profession." Exhibit 3 at 3.

The accuracy of the allegations and conclusions of Sheriff Trotter in the October

10, 2016 Memorandum are clearly in dispute considering the statements of fact in the

Declaration of Mr. Erwine in Exhibit 1. If Sheriff Trotter had merely allowed Erwine to

speak at the meeting on October 10, 2016, he would have discovered that the night

shift deputies had in fact maltreated Mr. Beaulieu, Mr. Erwine never encouraged Mr.

Beaulieu file a lawsuit against Churchill County, Beaulieu was not uncooperative while

in the cell to the extent that denying him water for hours was justified, the

unprofessional conduct of the other deputies which Mr. Erwine noted in his report

actually happened, Mr. Erwine never fired his Taser at Mr. Maes, the Maes incident

warranted Mr. Erwine drawing his Taser, and Mr. Erwine never aimed his Taser at

Maes.  See Exhibit 1.

At the time of filing, the Plaintiff has two spoliation motions pending before the Court, (ECF #84 and #98 ) based on claims that Churchill County destroyed evidence that could have proved or disproved the facts related to the events with Mr. Maes and Mr. Beaulieu.   The outcome of those motions may establish further facts that may form the basis for summary judgment in Erwine's favor because Churchill County destroyed videos of the Beaulieu and Mees incidents, and also wrongfully failed to disclose and/or destroyed investigatory files of the Beaulieu incident.

**B. The stigmatizing statements were in fact disseminated to Erwine's potential future employers**

"The public-disclosure element requires that the defendant actually disseminate the stigmatizing comments in a way that would reach ***potential future employers*** or the community at large." *Palka v. Shelton*, 623 F.3d 447, 454 (7th Cir. 2010). [***emphasis added***] Based on the admissions of the Defendants in Exhibit 4, there is no genuine dispute of material fact that stigmatizing statements were made about Erwine by Sheriff Trotter and that they were disclosed to Erwine's potential future employers, including Washoe County and to LVMPD, and that Mr. Erwine was never given a name clearing hearing, much less any notice that the defamatory and stigmatizing information was to be placed in his file.

Further, under NRS 239B.020(1), disclosure of Mr. Erwine's employment file at the Churchill County Sheriff's Office to any other public safety agency where he applied for employment was required to be provided if requested: "Upon the request of a public safety agency, an employer shall provide to the public safety agency information, if available, regarding a current or former employee of the employer who is an applicant for the position of firefighter or peace officer, as applicable…" There is no genuine issue of material fact as to whether Mr. Erwine's personal file and the stigmatizing comments there were publicly disclosed to his potential future employers in the law enforcement community as is required by law.  Under *Cox v. Roskelley,* where state law requires disclosure of an employee file, merely placing

13

1 stigmatizing information into an employee's file without due process constitutes

2 publication. *Id.* at 1112.

3     **C. The stigmatizing statements were made in direct connection to Mr.**

4 **Erwine's termination from Churchill County.**

5     Further, the statements of Sheriff Trotter in the October 10, 2016

6 Memorandum in Exhibit 3 about Mr. Erwine were made "incident to" his termination

7 from Churchill County, as it was authored on the same day but before Erwine was

8 terminated, "As of the time of my writing this (October 10, 2016 at 1122 hours)," and

9 unequivocally states, "Deputy Michael Erwine will be terminated today for failing to

10 satisfactorily complete his probation." *Id.* at 2 and 3.  Even if this Court were to

11 determine that Mr. Erwine's resignation from the Churchill County's Sheriff's office

12 were voluntary, the October 10, 2016 Memorandum in Exhibit 3 clearly states that

13 Erwine was fired for failing to complete his probation, and this is what was

14 communicated to his potential future employers.  Erwine's loss of employment was

15 contemporaneous with and coincided with the harm to his reputation and the

16 stigmatic injury arose as the result of his being terminated. *Siegert v. Gilley*, 500

17 U.S. 226, 233-34 (1991). Defamatory statements made at time of termination qualify

18 under the stigma-plus test.  *See Brandt v Board of Cooperative Educational*

19 *Services*, 820 F2d 41, 45 (2d Cir.1987).

20     As to the effects of Sheriff Trotter's statements on Mr. Erwine's career, it is

21 clear from the contents of Confidential Exhibit 9 that Erwine was found to be

22 "unsuitable" for employment at LVMPD specifically because of what Sheriff Trotter

23 told the LVMPD background investigator.  Further, Erwine has retained a police

24 practices expert, Mr. Ron Dreher, whose expert report is attached hereto as Exhibit

25 13, to opine as to the harm that was done to Mr. Erwine's career as a result of the

26 actions of Sheriff Trotter. As is clear from his resume in Exhibit 13, Mr. Dreher has

27 extensive experience in law enforcement and in representing police unions in

28 negotiations and before the Nevada Legislature, whose report clearly opines that Mr.

14

Erwine's career and reputation have been irrevocably tarnished by the statements and actions of Sheriff Trotter:

> Accordingly, Detective Olson most likely obtained or had already obtained Sheriff's Trotter's October 10, 2016 memorandum stating his reasons for terminating Mr. Erwine. Sheriff Trotter's memorandum tainted Mr. Erwine's background by labeling him a "liability". It is abnormal for a Nevada Law Enforcement department to indefinitely ban an applicant for any employment. In today's law enforcement world being labeled a "liability" and being terminated for that reason is a law enforcement career killer in my opinion.

*Id.* at page 13.

Dreher also opined that it was clear from the circumstances surrounding Erwine's October 10, 2016 meeting with Sheriff Trotter that Erwine resigned under duress.  Exhibit 13 at 4.

**D. Qualified Immunity is not available as a defense**

Further, qualified immunity defense is not available to Sheriff Trotter for this claim because the Court in *Cox v. Roskelley* ruled in 2004 that, "the contours of the right to a name-clearing hearing upon placement of stigmatizing material in a personnel file were clearly established." *Id.* at 1113.

**E. Erwine's resignation was made under duress**

Mr. Erwine's resignation from Churchill County was a product of two factors: that Erwine was to be fired whether he resigned or not, and that Erwine would suffer financially if he refused to resign.  *See* Exhibit 2. Thus, Mr. Erwine's resignation was not "voluntary," but was the result of coercion. When evaluating whether an employee's resignation is voluntary, Court's apply the *Knappenberger* factors:

> In evaluating such claims of coercion, we determine voluntariness by an objective standard, rather than by the employee's purely subjective evaluation; reject cases in which the employee did have a choice, even if between comparatively unpleasant alternatives; and consider

> additional case-specific factors that cut against a finding of coercion, such as whether the employee was given an alternative to resignation or retirement, understood the choice, had a reasonable time in which to decide, or could select the timing of the retirement or resignation.

*Knappenberger v. City of Phx.*, 566 F.3d 936, 941 (9th Cir. 2009).

Under the *Knappenberger* factors, Mr. Erwine's "resignation" was clearly not voluntary considering the totality of the circumstances, i.e., and reasonable person in Mr. Erwine's position would feel "he had no choice but to" resign. *Id.* at 941. In Erwine's First Amended Complaint, Erwine clearly alleged that he was constructively discharged. See ECF #63 at 10-11. Sheriff Trotter told Erwine he would impose a financial penalty on Erwine if he chose to be terminated as opposed to resigning. *See* Exhibit 2.

### IV.   *Monell* Claim – Against Churchill County

Churchill County is independently liable to Mr. Erwine under *Monell v. Dep't. of Social Services of City of New York,* 436 U.S. 658, 690-691, 98 S. Ct. 2018, 2035-2036 (1978), because Erwine suffered a deprivation of his constitutional right by Sheriff Trotter, who was the final policy maker for Churchill County for such decisions. Under *Monell*, "[l]ocal governing bodies . . . can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where, as here, the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." 436 U.S. at 690.

Trotter, as Churchill County Sheriff, deprived Erwine of his rights under the law, and acting under color of state law and was the officer with final policymaking authority over personnel matters within the Sheriff's Office, including over the decision to fire Erwine and to place stigmatizing information into his employee file. *Lytle v. Carl*, 382 F.3d 978, 981 (9th Cir.2004) and *Goldstein v. City of Long Beac*h, 715 F.3d 750, 753 (9th Cir.2013).

16

Under NRS 248.040, Sheriffs in Nevada have authority to appoint and remove deputies, but a sheriff may not confer to a deputy, '…. policymaking authority for the office of the sheriff or the county by which the deputy sheriff is employed." The actions of Sheriff Trotter are a policy or custom of the Churchill County.  See *Jett v. Dallas Independent School District*, 491 U.S. 701, 737 (1989), a policy or custom becomes official when it results from the decision or acquiescence of the municipal officer or body with final policymaking authority over the subject matter of the offending policy.  Local governments are liable for underlying 42 U.S.C. 1983 claims if the deprivation is the result of the agency's custom, policy, or practice. *Anderson v. Warner*, 451 F.3d 1063, 1070 (9th Cir. 2006).  Trotter, as Sheriff, deprived Erwine of his rights under the law, and acting under color of state law and was the officer with final policymaking authority over personnel matters within the Churchill County Sheriff's Office, including over the decision to fire Erwine. *Lytle v. Carl*, 382 F.3d 978, 981 (9th Cir.2004) and *Goldstein v. City of Long Beach*, 715 F.3d 750, 753 (9th Cir.2013).

A "policy" is a deliberate choice to follow a course of action made from among various alternatives by the official or officials responsible for establishing final policy. *Fogel v. Collins*, 531 F.3d 824, 834 (9th Cir.2008).   The "function" of firing Erwine was carried out by Sheriff Trotter (See Exhibit 30) and was done in coordination with her team at WCSD, including WCSD's Office of General Counsel. Churchill County is liable for the acts of Sheriff Trotter if these acts caused a constitutional violation, even if the constitutional violation occurs only once. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 478 & n.6 (1986). In light of the facts in this case, Churchill County is independently liable to Mr. Erwine under *Monell* because there is not genuine issue of material fact as to whether Sheriff Trotter was the policy maker for the Churchill County Sheriff's Office.

1
2

**V.      Nevada Liberty Interest Due Process Violation – Against Sheriff**

**Trotter and Churchill County**

3          "The protections of due process only attach when there is a deprivation of a

4  protected property or liberty interest." *Pressler v. City of Reno*, 118 Nev. 506, 508,

5  50 P.3d 1096, 1097 (2002) "The liberty interest protected by the due process clause

6  encompasses an individual's freedom to work and earn a living." *State v. Eighth*

7  *Judicial Dist. Court*, 118 Nev. 140, 145, 42 P.3d 233, 236 (2002). In Nevada, the due

8  process rights of peace officers are codified in NRS Chapter 289.020 *et sq*., which is

9  commonly referred to as "The Police Officer's Bill of Rights." Among the protections

10 provided to peace officers in Nevada are protections against placing "unfavorable

11 comments or documents" in a peace officer's file without notice and an opportunity

12 to comment on the material.  Under NRS 289.010(3) the Police Officer's Bill of

13 Rights applies to, "any person upon whom some or all of the powers of a peace

14 officer are conferred pursuant to NRS 289.150 to 289.360…" It does not exclude

15 "probationary employees' from protection.  Under NRS 289.150(1), sheriff deputies

16 have the powers of a peace officer.

17         NRS 289.040(1) provides a straightforward procedure for the placing of

18 unfavorable comments or documents in the administrative file of a peace officer and

19 associated rights of a peace officer to contest the comments or documents before

20 the information is placed in the officer's file.  The statute is not unclear as to what is

21 required:

> [A] law enforcement agency shall not place any
> unfavorable comment or document in any administrative
> file of a peace officer maintained by the law enforcement
> agency unless: (a)The peace officer has read and initialed
> the comment or document; or (b)  If the peace officer
> refuses to initial the comment or document, a notation to
> that effect is noted on or attached to the comment or
> document.

22
23
24
25
26

27         Despite this clear duty under the law, Sheriff Trotter did not follow the

28 procedure in NRS 289.040(1) before placing the unfavorable comments at issue in

this case in Erwine's file in October of 2016.  See Exhibit 4 - Request for Admission Nos. 6 and 8 where the Defendants admit that Erwine was not shown the October 10, 2016 Memorandum before it was placed in Erwine's file.  Further, NRS 289.060(1), a peace officer is required to receive 48 hours' written notice before any interrogation or hearing is held relating to an investigation of a peace officer's conduct.

Article 1 Section 8(5) of the Nevada Constitution provides that no person shall be deprived of life, liberty, or property without due process of law. Due process forbids action which is fundamentally unfair and shocking to the universal sense of justice.  *Summers v. Warden of Nev. State Prison*, 84 Nev. 326, 329, 440 P.2d 388, 390 (1968).  Nevada law very clearly requires that a state agency must follow procedures required by statute governing employee discipline.  *McCracken v. Elko County Sch. Dist*., 103 Nev. 655, 747 P.2d 1373 (1987). A violation of the Nevada Due Process Clause occurs when a state actor deprives a person of a right granted by the state without due process of law. *Saticoy Bay LLC Series 350 Durango 104 v. Wells Fargo Home Mortg*., 133 Nev. Adv. Rep. 5, 388 P.3d 970, 971 (Nev. 2017). "First, it must be determined whether the deprivation was caused by the exercise of some right or privilege created by the state. Second, it must be determined whether the party charged with the deprivation is a person who may fairly be said to be a state actor." Id. at 28.  "The Supreme Court of Nevada has relied on federal precedent in determining the scope of Nevada's Due Process clause. Therefore, the analysis for both counts is the same." *Armstrong v. Reynolds*, No. 2:17-cv-02528-APG-CWH, 2019 U.S. Dist. LEXIS 36058, at *4 n.16 (D. Nev. Mar. 6, 2019) citing *Saticoy Bay LLC Series 350 Durango 104 v. Wells Fargo Home Mortgage*, 388 P.3d at n.3 (Nev. 2017).

There is no genuine issue of fact as to whether Sheriff Trotter, as a state actor, made stigmatizing comments about Erwine and deprived Erwine of statutorily granted due process rights designed to protect his reputation from stigmatizing

allegations, i.e., the protections provided in NRS Chapter 289, by placing the October 10 Memorandum and related materials into his employee file without any due process and without Erwine's knowledge.

WHEREFORE, Erwine moves that the Court grant this motion and enter Summary Judgment against the Defendants on liability in this case on Erwine's due process liberty interest claims under the US Constitution and Nevada Constitution against Sheriff Trotter and Mr. Erwine's *Monell* claim against Churchill County.

**DATED** this Friday, April 30, 2021

By:_____
LUKE BUSBY, ESQ.
NEVADA STATE BAR NO. 10319
316 CALIFORNIA AVE. #82
RENO, NV 89509
775-453-0112
LUKE@LUKEANDREWBUSBYLTD.COM

1

2

**EXHIBITS**

3

1.  **ERWINE DECLARATION**
2.  **ERWINE DECLARATION NO. 4**
3.  **OCTOBER 10, 2016 MEMORANDUM**
4.  **RESPONSE TO FIRST RFAS**
5.  **CONFIDENTIAL LVMPD LETTER**
6.  **DEPUTY THOMPSON STATEMENT**
7.  **ST. SUMMERS STATEMENT**
8.  **DEPUTY JABINES STATEMENT**
9.  **WASHOE COUNTY FAX**
10. **BEAULIEU AFFIDAVIT**
11. **MATTHEW MAES DEPOSITION**
12. **ERWNE DECLARATION NO. 2**
    A.  **ERW 66, WASHOE COUNTY SHERIFFS OFFICE LETTER - ERW 67, LVMPD LETTER - ERW 68, CC ALTERNATIVE SENTENCING LETTER - ERW 69, DOUGLAS COUNTY LETTER - ERW 71, NLVPD LETTER - ERW 72, RPD LETTER**
13. **EXPERT REPORT OF RON DREHER**

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

21

## CERTIFICATE OF SERVICE

Pursuant to FRCP 5, I certify that on the date shown below, I caused service to be completed of a true and correct copy of the foregoing pleading by:

_____    personally delivering;

_____    delivery via Reno/Carson Messenger Service;

_____    sending via Federal Express (or other overnight delivery service);

_____    depositing for mailing in the U.S. mail, with sufficient postage affixed thereto; or,

\_\_\_X\_\_\_    delivery via electronic means (fax, eflex, NEF, etc.) to:

> Katherine F. Parks, Esq.
> Thorndal Armstrong
> 6590 S. McCarran Blvd. Suite B.
> Reno, NV 89509
> Attorney for the Defendant

**DATED** this Friday, April 30, 2021

By:_____

LUKE BUSBY, ESQ.
NEVADA STATE BAR NO. 10319
316 CALIFORNIA AVE #82
RENO, NV 89509
775-453-0112
LUKE@LUKEANDREWBUSBYLTD.COM
ATTORNEY FOR PLAINTIFF

22