# EXHIBIT 1 –
# "Deposition of Michael Erwine"

EXHIBIT 1 –
"Deposition of Michael Erwine"

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| MICHAEL ERWINE, an individual,<br><br>Plaintiff,<br><br>vs.<br><br>CHURCHILL COUNTY, a political subdivision of the State of Nevada; CHURCHILL COUNTY SHERIFF BENJAMIN TROTTER; and DOES 1 through 10, inclusive,<br><br>Defendants. | CASE NO. 3:18-cv-00461 RCJ-WGC |

REMOTE VIDEOCONFERENCE
DEPOSITION OF MICHAEL ANDREW ERWINE

Taken on Thursday, December 17, 2020

At 8:59 a.m.

Reno, Nevada

Job No. 688466

Reported by: Sherry L. Graham, CCR #378

**Q. When did you first obtain employment after you received your criminal justice Associate's degree?**

A. That would have been -- I believe my first employment after I received that degree would have been with a company called Allied Barton Security Services. They were a security firm. I believe now they are referred to as Allied Universal.

**Q. How long have you been employed at the Washoe Tribe?**

A. Since November of last year.

**Q. And what is your position?**

A. Police officer.

**Q. Are you a probationary officer or have you completed any probationary period, if there was one?**

A. I completed my one-year probation.

**Q. What are your current duties?**

A. I always have difficulty answering that. Just general police duties. Everything you can imagine a general law enforcement officer handles. We are a fairly small department, so we don't have other units to do in-depth investigations or anything like that. So depending upon the incident, the officer will pretty much handle it from beginning to end no matter the severity.

**submitted to the Washoe Tribe?**

A. No. I believe it was online, and it was not something that was ever printed out on my end. It was just electronically submitted.

**Q. In the application for your position with the Washoe Tribe, were you asked to provide information regarding prior employment?**

A. Yes.

**Q. And in your application to the Washoe Tribe, did you list Churchill County Sheriff's Office as a prior employer?**

A. Yes.

**Q. And in your application with the Washoe Tribe, did you provide any details about your separation from employment with Churchill County?**

A. Yes.

**Q. What sort of information did you provide?**

A. Having became aware of the memorandum and sorted documents in my employee file, part of my application with the Washoe Tribe and the affidavit, which are part of my case, from the two inmates involved, I basically provided them with my story of the events that took place during my employment, what I was accused of in the memorandum and then the affidavits and the story of the people involved in

that.

**Q. Did you provide the Washoe Tribe with a copy of the affidavits that you are referring to?**

A. No.

**Q. Did you provide the Washoe Tribe with a copy of the memorandum of Sheriff Trotter, former sheriff Trotter that you are referring to?**

A. No. I provided them with no material that's part of this case.

**Q. Were you interviewed for your position with the Washoe Tribe?**

A. Yes.

**Q. Who conducted that interview?**

A. I believe it was the former chief of police David Roberts and there was a member of HR, human resources, on the panel and someone else I can't recall.

**Q. During your interview with the Washoe Tribe, were you asked any questions about the Andrew Beaulieu incident?**

A. No.

**Q. During your interview with the Washoe Tribe, were you asked any questions regarding the Maes incident?**

A. No.

**regarding your prior employment?**

A. Yes. I had to list all my previous employers and the dates and times.

**Q. Did you list Churchill County Sheriff's Office as one of your prior employers?**

A. Yes.

**Q. Did you provide any details in connection with your application with the Pyramid Lake Paiute Tribe about the reasons underlying your separation from employment with Churchill County?**

A. At this time I filled out this application, I was not aware of my employee file or what was contained in it. At that time, all I knew is I had effectively resigned in lieu of termination because of something related to the Beaulieu incident that I was accused of investigating.

**Q. The what?**

A. The Beaulieu incident that I was accused of investigating inappropriately. That's about all I knew. Like I said, I didn't have the memorandum or anything that was in it at this time. I basically told employers what I told every other background person is during -- I resigned in lieu of termination because I witnessed some unethical things taking place in which of the sheriff told me

I was not part of the team or a good team player and I needed to look for employment elsewhere.

**Q. You provided that information to the Pyramid Lake Paiute Tribe?**

A. Yes. Verbally because that's all I had or knew at the time.

**Q. Right. Because you had a meeting with Sheriff Trotter on October 10th of 2016 just before you resigned in lieu of termination, correct?**

A. Yes.

**Q. At the time that you had your meeting sheriff Trotter on October 10, 2016, were you given a reason during your meeting with him to believe that the Beaulieu incident had something to do with your termination?**

A. He told me that he knew about the booking over the weekend and that I had looked into it and watched the video. I wasn't a good team player, or something to that effect, and my termination would be done at the end of that meeting.

**Q. Okay. Is that the type of information that you provided to the Paiute -- Pyramid Lake Paiute Tribe?**

A. Yes.

**Q. Were you interviewed by the Pyramid Lake**

questions that I asked you through your attorney, are included in the exhibits that I provided previously, if you could look for those.

A. Yes, I have them.

Q. Those are going to be marked as Exhibit Number 5 to your deposition. It appears that maybe the page numbers at the bottom were cutoff in the course of these being copied, Mr. Erwine, but if you look to page 5 -- actually page 6, answer to Interrogatory Number 9.

MR. BUSBY: For the record, I'm going to preserve our objection as stated in the answer to the interrogatory.

Go ahead.

MS. PARKS: And you can let me know when you get there.

THE WITNESS: I'm there.

MS. PARKS: All right.

BY MS. PARKS:

Q. According to your interrogatory responses, you worked for the Paiute Tribe from January 8th of 2018 to April 4th of 2018. Do you see that there?

A. Yes.

Q. And your last day of employment with the Churchill County sheriff's office was when?

interrupt. I actually -- do you mind if we take a quick bathroom break?

MS. PARKS: Yeah. That's fine.

(Brief recess.)

BY MS. PARKS:

**Q. Mr. Erwine, according to your response to Interrogatory Number 9, your last day of employment with the Pyramid Lake Paiute Tribe was April 4, 2018. Does that sound right to you?**

A. Yes.

**Q. Tell me the reasons why you were informed that you would no longer be working for the Paiute Tribe.**

A. Basically, according to what they told me, I just did not complete the training process successfully.

**Q. Okay. Did you ask for any particulars with respect to how you failed to complete the field training program?**

A. I did inquire a little bit. I didn't really get much answers other than I just was not at the level that they expected me to be at.

**Q. Did you have any issues or difficulties, any particular incidents that stick out in your mind during your training program at the Paiute Tribe**

**that may have contributed to your termination?**
A. Yeah. My -- I apologize. I didn't mean to cut you off.
**Q. Go ahead.**
A. But I did hear the question. When I went to the third phase, basically every phase is a month long and you have three different training officers. Like I said, Adam Robertson was my first phase. Brandon Donnan was my second, and my third was under Richard Fay.
As far as the numbers go and where I'm told I'm at in the training process for Phase I and Phase II, I was about average or above average or right where I needed to be as far as what they told me and what they had indicated on my Daily Observation Reports.
When I went to the third phase under Richard Fay, the one that called me the weasel and had friends that worked for Churchill County, that is when I started to go very much so downhill in the training process. That's kind of what --
I don't remember the exhibit number, I apologize, but the pictures of the computer screen we referenced earlier, that's where you can see the numbers kind of, when I went to that training

officer, completely went downhill and some numbers strangely subsequently got changed from okay to bad.
So I hope that answers your question.

**Q. Following your termination from employment with the Paiute Tribe, did you ask for an opportunity to review your employee file?**

A. I did not.

**Q. Do you have any personal knowledge that anyone associated with the Pyramid Lake Paiute Tribe received a copy of the October 10, 2016 memo of Benjamin Trotter?**

A. I do not.

**Q. Do you have any personal knowledge that anyone associated with the Pyramid Lake Paiute Tribe had a copy of other information contained in your personnel file from Churchill County?**

A. I am not.

**Q. Following your termination from the Pyramid Lake Paiute Tribe having been told that you did not successfully complete its field training program, did you ask to have a meeting with either the chief of police or the lawsuit as related to your employment?**

A. Well, no. I was told in a meeting with the chief of police and the lieutenant that's why I was

being let go.

**Q. Did you raise any issues at that point in time with the fact that Officer Fay allegedly called you a weasel?**

A. I did. I did speak with my difficulties with Officer Fay; however, I was told that the decision was already made and that is what it is.

**Q. Well, did you ask or receive any specifics regarding what Officer Fay may have told the chief or the lieutenant about your performance?**

A. I'm sorry. I don't understand the question.

**Q. So you have a discussion with the chief and the lieutenant. And you are told that you did not successfully complete the training program, but you brought up the issue of Officer Fay calling you a weasel, correct?**

A. Yes.

**Q. What else did you relay to them about your experiences or relationship with Officer Fay?**

A. I basically just relayed to them what I just said a few minutes ago. Up to this point in my training process, until I got to Officer Fay, I was told I was doing great by my other training officers. I was told I was in line with the normal

**that background?**
A. I would say a month or so after the date on that questionnaire. I was contacted via phone by the representative of Allied Barton and told that I didn't pass that background. I never received a formal letter.
**Q. Let's turn to a document that says Background Questionnaire Washoe County Sheriff.**
A. I have two. I just want to make sure we are looking at the same one. Is it the one with 15-467 in the handwritten section on the top?
**Q. Yes. That's the first one I'd like you to look at.**
A. Okay.
**Q. It is Bates stamp number, the first Bates stamp number on that is WC 0081, and this exhibit runs through WC 0130. We will mark this as Exhibit Number 6.**
A. Okay.
MR. BUSBY: Just I believe that's Exhibit 7. I believe that Exhibit 6 would be the Allied Universal document. Is that correct?
MS. PARKS: I have that as five.
MR. BUSBY: Okay. I think you marked the interrogatories as five.

MS. PARKS: Thank you.
BY MS. PARKS:
**Q. Looking at what's been marked as Exhibit Number 7 to your deposition, Mr. Erwine, do you recognize that?**
A. Yes.
**Q. What is it Exhibit Number 7?**
A. Background investigation packet I filled out for the Washoe County Sheriff's Office.
**Q. When did you fill out this packet?**
A. I filled this out as an application pursuant to an application I filled out prior to my employment with Churchill County.
**Q. That is your handwriting there on the first page of Exhibit Number 7?**
A. Yes.
**Q. It appears that you submitted this background packet on or about October 5th of 2015; is that correct?**
A. Correct.
**Q. If you would look -- and I'm going to refer to Bates stamp numbers on this document as well as there are some page numbers as well. So if you look at page number 9 to Exhibit 7, it's WC 0089 at the bottom.**

agencies you have applied to."
Do you see that there?
A. Yes.
Q. The first such agency listed says Sparks Police Department, correct?
A. Yes.
Q. It says that you applied to the Sparks Police Department on June 15th -- excuse me. June of 2015, correct?
A. Yes.
Q. In connection with your application to the Sparks Police Department, did you fill out a written application for that agency?
A. I don't recall if it would have been written or online. This was quite some time ago.
Q. Sorry.
Did you keep any written documents related to your application for employment with the Sparks Police Department in June of 2015?
A. No. All application documents related to law enforcement applications I believe you already requested. Everything in my possession has already been disclosed.
Q. Were you interviewed for a law enforcement position with the Sparks Police Department?

A. Yes.

**Q. And if you applied in June of 2015, do you recall when you were interviewed?**

A. I don't recall. It would have been within a year.

**Q. Sorry. I didn't mean to interrupt you there.**

**Do you recall the name of the individual who interviewed you?**

A. I do recall that interview panel was actually about the biggest interview panel I have ever had. It was probably about ten people.

**Q. How were you notified that you were not selected for a law enforcement position with the Sparks Police Department?**

A. I was brought back in after the interview to the panel and they told me that I wasn't selected.

**Q. Did they give you any reasons as to why you were not selected for that position?**

A. They said, at that time during that application pool, they had a lot of other candidates that were previous or current law enforcement officers looking to go to that agency and they wanted someone that had more experience. At that

time, I did not really have any, so they were looking for someone that was a little bit more experienced.

**Q. Did you provide the Sparks Police Department with information about the DUI you got in June of 2011 --**

A. Yes.

**Q. -- in connection with your application?**

A. Yes. I disclose that to all law enforcement agencies.

**Q. The next agency on the list is the Lyon County Sheriff's Office, it indicates that you applied in April of 2015. Do you see that there?**

A. Yes.

**Q. Were you interviewed by the Lyon County Sheriff's Office for a deputy sheriff position?**

A. I don't recall.

**Q. You were not selected for a position with the Lyon County Sheriff's Office though, correct?**

A. Yes, I was not selected there. From my recollection of that application, the list of applicants, we were notified by the human resources department that they expired. It's not like I was disqualified. The list had just expired. If I wished to apply again, I could.

**Q. Well, did you receive some sort of correspondence that outlined that information or contained that information?**

A. That would have been a verbal phone call from human resources, from the best of my recollection.

**Q. Did you reapply to the Lyon County Sheriff's Office at any time?**

A. No.

**Q. Why did you not reapply to the Lyon County Sheriff's Office after that point? Perhaps they didn't have any openings, but why had you not reapplied there?**

A. It could have been because they didn't have very many openings or, honestly, it's not one of the agencies I would wish to work at right now.

**Q. This also indicates that you had applied at Fallon Tribal Police; is that correct?**

A. Yes.

**Q. I believe it said you applied in April of 2015, correct?**

A. Yes.

**Q. And you were not selected for a position as a police officer with the Fallon Tribal Police; correct?**

A. Yes.

**Q. Were you given any information as to why you were not selected for that position?**

A. Yes. It was between me and another candidate who was actually Native American from that tribe. In my experience, the tribal police departments, Native Americans get preference for employment over non-natives. Being he was living in Fallon as well as a Native American member of that tribe, he was selected over me.

**Q. Who told you that? How did you come by that information?**

A. I believe I had a friend that worked at the tribe at that time.

**Q. What's the friend's name?**

A. Bradley Harris. It would have been Officer Harris. He was a police officer.

**Q. Are you still friends with Bradley Harris?**

A. Yes.

**Q. When is the last time you talked to him?**

A. Yesterday.

**Q. Do you have a telephone number for him?**

A. I do. I should, just in full disclosure, he is actually a current coworker of mine. He now works for the Washoe Tribal Police Department as a

police officer.

**Q. The next agency on the list is the Washoe Tribal Police. Do you see that there?**

A. Yes.

**Q. And it states that you applied in 2011, correct?**

A. Yes.

**Q. And you were not selected for a position, correct?**

A. Correct.

**Q. Were you given any information as to why you were not selected as a police officer for the Washoe Tribal Police?**

A. That determination, from my recollection, was after an interview. That was right after I graduated the police academy, and I believe, like, ten of us out of the academy applied there. They were only taking one person. I was not that one person selected at that time out of, like, the ten of us that applied. There had been other people that had a lot more experience than me at that time.

**Q. Did you apply for that position before or after you got a DUI?**

A. That probably would have been before. I wouldn't have applied anywhere right after just from

**Q. Why did you resign as a volunteer deputy with Carson City?**
A. I chose to kind of -- I was fortunate enough to not have to be employed full time at that point. I believe I was still living at home with my parents. I wanted to go back to school and concentrate on that, so I went basically back to Western Nevada College to continue my criminal justice degree.
**Q. When is it that you got a DUI?**
A. It was 6/15, 2011.
**Q. At the time that you got that DUI, you were arrested by the Carson City Sheriff's Office, that was the agency --**
A. Yes.
**Q. -- who placed you under arrest, correct?**
A. Yes.
**Q. And did your DUI have anything to do with your resigning from the Carson City Sheriff's Office as a reserve deputy?**
A. I spoke to the sheriff immediately following the incident. It was a very professional meeting. He basically informed me that I had my due process, if you will, criminally, so I can continue to be a reserve until my court process went through.

However, I chose to leave there, and at the time, I had the opportunity to go back to school, so I chose to resign from there and go back to school. I had the option of continuing during the court proceedings, which took over a year, but I chose to resign and concentrate on school.

**Q. When you say "the sheriff," who was the sheriff at the time?**

A. Sheriff Ken Furlong.

**Q. Since you worked as a reserve deputy for the Carson City Sheriff's Office, have you ever reapplied to the sheriff's office to become a full-time deputy?**

A. No.

**Q. After you submitted your application in this background packet to the Washoe County Sheriff's Office in October of 2015, were you interviewed for a position with the Washoe County Sheriff's Office?**

A. No.

**Q. Did you have any communication from the Washoe County Sheriff's Office about your application after you submitted it in October of 2015?**

A. Yes.

**concern," letter of reference from Don Gibson.**
A. Yes.
**Q. It's Bates stamp number Erwine ERW 0004. Do you recognize that document?**
A. Yes.
**Q. This will be marked as Exhibit Number 8 to your deposition. What do you recognize Exhibit Number 8 to be?**
A. A reference letter written by Don Gibson.
**Q. Who is Don Gibson?**
A. Don Gibson is someone I originally met in the academy as an instructor. I subsequently -- part of my police academy class, his brother, named Michael Gibson, was part of my academy class, so I originally met him as an instructor in the academy.
**Q. Okay. Did you ask him to provide you with a letter of reference that you could provide to law enforcement agencies with your applications?**
A. Yes.
**Q. Obviously, he agreed to do so, correct?**
A. Yes.
**Q. This is dated April 1st of 2015. Do you see that there?**
A. Yes.
**Q. Did Mr. Gibson provide this letter to you**

directly to provide along with your application caution to various law enforcement agencies?

A. Yes.

Q. Did you look at this letter of reference from Don Gibson before you submitted it to any law enforcement agency?

A. Yes, I would have read it before I gave it to anyone.

Q. All right. If you look towards the middle of the paragraph, the sole paragraph, it states, "He unfortunately made the mistake of driving home after consuming alcohol about four years ago, at which time he was arrested for DUI. I have not known Mike to consume alcohol since his DUI arrest. Mike always speaks to this mistake and how it has hindered his ability to obtain full-time employment with a law enforcement agency."

Do you see that last sentence?

A. Yes.

Q. And do you have any understanding as to what Mr. Gibson is referring to when he said, "Mike always speaks to this mistake and how it has hindered his ability to obtain full-time employment with a law enforcement agency"?

A. Yes. I have a great understanding of what

**document, one page. It has signatures on it.**
A. Yes.
**Q. So you are there?**
A. Yes.
**Q. That's going to be marked as Number 11, Exhibit 11 to your deposition. Do you recognize Exhibit Number 11?**
A. Yes.
**Q. What do you recognize Exhibit Number 11 to be?**
A. My acceptance of the job offer with Churchill County.
**Q. So this is -- what's the date there that you signed this document?**
A. December 9th of 2015.
**Q. That's your signature to the left there?**
A. Yes.
**Q. Underneath your signature is the name Geof, G-E-O-F, Stark. Do you know Geof Stark?**
A. He is the head of human resources for Churchill County Sheriff's Office while I was there, and I believe he still is.
**Q. Have you ever met Mr. Stark?**
A. Yes.
**Q. In what context did you meet Mr. Stark?**

**with accountability?**

A. The person that authored--

MR. BUSBY: Objection to the form of the question.

Go ahead, Mike.

THE WITNESS: The person that authored this report had mentioned it to me, yes.

BY MS. PARKS:

**Q. What were you advised about issues of accountability?**

A. He didn't feel I was taking responsibility for things that had occurred.

**Q. Like what?**

A. I don't recall off the top of my head specific incidents involving his and I's discussions about accountability.

**Q. How is your relationship with -- and you said Deputy Thorne, correct?**

A. Correct.

**Q. How was your relationship with Deputy Thorne?**

A. It was professional. I felt -- it was less desirable as my other training officers; however, it was professional.

**Q. Who were your other training officers?**

CERTIFICATE OF REPORTER

STATE OF NEVADA )
) ss.
COUNTY OF CLARK )

I, Sherry L. Graham, CCR No. 378, do hereby certify: That I reported the remote videoconference deposition of MICHAEL ERWINE, commencing on Thursday, December 17, 2020, at 8:59 a.m.

That prior to being deposed, the witness was duly sworn by me to testify to the truth, the whole truth and nothing but the truth. That I thereafter transcribed my said shorthand notes into typewritten form, and that the typewritten transcript of said remote videoconference deposition is a complete, true and accurate transcription of my said shorthand notes. That prior to the conclusion of the proceedings, pursuant to NRCP 30(e) the reading and signing of the transcript was requested by the witness or a party.

I further certify that I am not a relative or employee of counsel of any of the parties, nor a relative or employee of the parties involved in said action, nor a person financially interested in said action.

IN WITNESS WHEREOF, I have set my hand in my office in the county of Clark, State of Nevada, this 29th day of December, 2020.

Sherry L. Graham, CCR No. 378

**EXHIBIT 2 –**
**"Letter dated April 1, 2015"**

**EXHIBIT 2 –**
**"Letter dated April 1, 2015"**

To: Whom it may concern

From: Don Gibson

Date: 04/01/15

Ref: Mike Erwine

I have known Mike for about six years. Having been a police officer now myself for about 15 years, I do believe Mike possess the necessary character to take on a career in law enforcement. Mike is a person who can be counted on and is great at multitasking. Mike has expressed a career in law enforcement for several years and much of our discussions at times are about the duties and responsibilities of a police officer. Mike has above average knowledge of our roles and responsibilities as he was a reserve deputy with my agency and would accompany me on my patrols. Mike has an above average knowledge of Nevada criminal law and articulates elements to crimes with ease. I do know Mike attended a police academy at WNC in Carson City several years back. He unfortunately made the mistake of driving home after consuming alcohol about four years ago at which time he was arrested for DUI. I have not known Mike to consume alcohol since his DUI arrest. Mike always speaks to this mistake and how it has hindered his ability to obtain full time employment with a law enforcement agency. I do know he has learned from this very critical mistake and always takes responsibility for such. I feel Mike would be an asset to any agency as a long term law enforcement officer with the qualities he possesses.

Sincerely

Don Gibson