1
2
3
4
5
6                      **UNITED STATES DISTRICT COURT**

7                              **DISTRICT OF NEVADA**

8

9    MICHAEL ERWINE,                          )
                                              )
10                    Plaintiff,              )
                                              )
11           vs.                              )         3:18-cv-00461-RCJ-WGC
                                              )
12   CHURCHILL COUNTY, a political            )         **ORDER**
     subdivision of the State of Nevada, *et al.*  )
13                                            )
                     Defendants.              )
14   _____     )

15          Plaintiff twice moves for sanctions for alleged spoliation of evidence and moves for

16   summary judgment on three of his seven remaining claims. (ECF Nos. 84, 98, 115.) These motions

17   are ripe and ready for this Court's review. For the reasons stated herein, the Court denies these

18   three motions.[1]

19   ///

20   ///

21   _____

22   [1] There are two other issues for this Court to address, which can be handled quickly. First, the
     parties have stipulated for an extension of time to respond to one of the above motions. (ECF No.
     104.) The Court grants this request. Second, Plaintiff twice moves to file an exhibit under seal.
23   (ECF Nos. 101, 116.) The exhibit is a document generated by the Las Vegas Metropolitan Police
     Department (LVMPD) from a background check into Plaintiff. It was produced by the department
     on the condition that it remain confidential as these documents are to be kept as such pursuant to
24   Nev. Rev. Stat. § 239B.020. These motions are unopposed. The Court will therefore grant them.

## FACTUAL BACKGROUND

From December 9, 2015 until October 10, 2016, Plaintiff was employed as a Deputy Sheriff for the Churchill County Sheriff's Office (CCSO). This employment came after Plaintiff ran into some trouble finding a job as a police officer. Plaintiff applied for positions with the Washoe Tribal Police in 2011, Washoe County Sheriff's Office in October of 2015, Sparks Police Department in June of 2015, Lyon County Sheriff's Office in April of 2015, and Fallon Tribal Police in April of 2015. (ECF No. 120 Ex. 1 at 72, 75–80, 87.) All of these applications were denied. (*Id.*) As one of Plaintiff's letters of recommendation states and Plaintiff acknowledges, this difficulty in securing employment may have been due to a prior arrest for driving under the influence in 2011. (*Id.* at 86–87, 106–07; ECF No. 120 Ex. 2.) At the time of this arrest, Plaintiff was a part-time volunteer deputy with the Carson City Sheriff's Office. (ECF No. 120 Ex. 1 at 86–87.) He resigned shortly after the arrest, while the criminal case was proceeding. (*Id.*)

When CCSO hires deputy sheriffs, they are hired on a probationary status for one year. (ECF No. 98 Ex. 12 at 9.) As Plaintiff's employment ended approximately ten months after its start, he never completed his probationary period.

During his employment with CCSO, Plaintiff acknowledges that his supervisors had noted that he had issues with accountability and taking responsibility. (ECF No. 120 Ex. 1 at 118.) Former CCSO captain, Captain Michael Matheson in a memo dated August 11, 2016, stated, "[Plaintiff] needs to focus on and master his duties and functions in the detention center before being distracted by other opportunities," and "I told [Plaintiff] that to this time he had earned a reputation with his coworkers as an unmotivated and underperforming deputy. I strongly encouraged him to refocus and motivate himself to perform at a higher level . . . ." (ECF No. 93 Ex. 3.) Plaintiff however claims that he received a favorable nine-month evaluation, which is required by the CCSO Administration Policy 1.200. (ECF No. 98 Ex. 10 ¶¶ 7–8; Ex. 12 at 9.)

Defendants contend that, while this was in their written procedures, it was not actually performed on any of the new hire probationary employees, including Plaintiff. (ECF No. 110 Ex. 2 at 26.)

In July 2016, Plaintiff claims that he and another police officer, Officer Jessica Zamora, witnessed an inmate, Mr. Samuel Davis, be mistreated by a sergeant, Sergeant Summers. Plaintiff states the following: Officer Zamora transported Mr. Davis to the jail. Plaintiff and Sergeant Summers went outside to assist her in bringing Mr. Davis into the jail. While Mr. Davis was in the patrol car, he began to yell obscenities to the three officers standing by the car. At which point, Sergeant Summers grabbed Mr. Davis by the throat and slammed him against the side of the car. Later, after booking Mr. Davis into the jail, Sergeant Summers told Plaintiff to write his use of force report for him and be sure to include that it was because of the inmate's "physically aggressive nature" that he used the force he did. A few days later, Sergeant Summers called Plaintiff into his office to discuss Mr. Davis's booking. He also told Plaintiff to "watch out for that bitch" (referencing Officer Zamora) because she reported him for excessive force. Just a few days later, Captain Matheson talked to Plaintiff about Sergeant Summers in relation to Mr. Davis's booking. Shortly after talking to Captain Matheson, Sergeant Summers yelled, "Did you rat me out?" while walking past Plaintiff in the hallway.

Plaintiff requested CCSO produce the investigative file of Mr. Davis. CCSO admits that it did not produce any file for this request. It contends that there was nothing to produce. Captain Matheson of CCSO swore in his deposition that he did investigate the Mr. Davis incident but did not create a written report. (ECF No. 110 Ex. 1 at 40–41.)

In October of 2016, two events occurred that culminated in the termination of the Plaintiff's employment with CCSO. First, on October 8, Plaintiff went into work for the day shift. When he came in there was an inmate who was complaining about not receiving water, Mr. Andrew Beaulieu. He was in a security cell and waiting to be booked into the jail.

Regarding this incident, Plaintiff claims the following: When Plaintiff arrived at Mr. Beaulieu's security cell, he noticed blood on the walls and asked the grave shift deputy what the blood was from. The grave shift deputy informed Plaintiff that Mr. Beaulieu had come in with a cut on his hand and that it ripped open while in the cell. After investigating the circumstances, Plaintiff discovered Mr. Beaulieu had been requesting water for about two hours. Plaintiff was informed by the inmate and later confirmed during review of surveillance footage that every time Plaintiff would request water, the grave shift deputy would flush the drain in Mr. Beaulieu's cell making Mr. Beaulieu's request inaudible over the flushing noise. Plaintiff provided Mr. Beaulieu with water pursuant to his essential job functions to provide inmates with food and explained to Mr. Beaulieu what the rest of the booking process would look like. During this time, Mr. Beaulieu expressed to Plaintiff that the grave shift deputies were "assholes," and he would be filing a lawsuit against them. Plaintiff continued to conduct his rounds in the jail. While Plaintiff was conducting his rounds, other inmates asked Plaintiff what had happened to the "guy in the security cell" the previous night and explained what the grave shift did "was messed up." Another inmate filed a grievance request to Captain Matheson regarding the treatment of Mr. Beaulieu. Plaintiff reviewed surveillance footage of the grave shift's interaction with Mr. Beaulieu before he removed him for booking, mainly to be aware of any safety concerns with Mr. Beaulieu before removing him from the security cell. Plaintiff did not note any alarming actions by Mr. Beaulieu wherein Plaintiff would need to be concerned, however, he did note concerning inappropriate acts of the grave shift deputy that he believed needed to be brought to his sergeant's attention. Since the concerns were not an immediate threat, and the sergeant did not work on weekends, Plaintiff chose to log the events on his computer (ECF No. 115 Ex. 1 Attachment A) so he could follow up with his sergeant on Monday, October 10, 2016, when his sergeant returned to work.

///

Another deputy that was working during this incident, Deputy Thompson, drafted a memo that he sent to Defendant Benjamin Trotter, who was the sheriff at the time. In this memo, he largely agrees with Plaintiff's version of events with a few key differences. He adds that the deputies had not given Mr. Beaulieu water for the two-hour period because he was drunk and being verbally aggressive. Whenever a deputy approached him, he would tell him, "Go fuck yourself." He claims that he heard Mr. Beaulieu whisper to Plaintiff that he would like to speak with him privately, and Plaintiff then took him to the kitchen alone to speak with him for several moments.

Second, on October 9, 2016, there was an incident with Plaintiff involving an inmate, Mr. Michael Maes, and another deputy, Deputy Jolie Jabines. Regarding this incident, Plaintiff avers to the following: During Plaintiff's dayshift, Deputy Jabines had dropped a container of miscellaneous tools and other items inside of a booking cage. Included in these items were screwdrivers and other sharp instruments. Deputy Jabines did not want to pick up the items herself, so she asked an inmate to come into the booking cage and pick them up for her. Plaintiff did not feel it was appropriate for Deputy Jabines to have Mr. Maes, come into the booking cage to pick up items which could be used as weapons. Plaintiff questioned Deputy Jabines about this but her only response was "Senior Deputy" which Plaintiff understood as to mean he did not have a say in the matter. When Mr. Maes came into the cage, Plaintiff positioned himself between Mr. Maes and the control panel of the facility. Plaintiff was in an uncomfortable position with Mr. Maes being only a few feet away from Plaintiff and backed into a corner. Plaintiff removed his taser from its holster and held it in his hand with the taser pointed to the ground. Plaintiff removed the cartridge from the taser due to the close proximity of Mr. Maes to both Plaintiff and Deputy Jabines. Mr. Maes cleaned up the items and left the cage without incident.

Deputy Jabines also drafted a memo addressed to Defendant Trotter regarding the Maes incident. In it, she expressed concerns over how Plaintiff handled himself in this situation. She

contends there was never a need for the taser, and his use of it distracted her from attending to Mr. Maes as well as endangered her and Mr. Maes from being accidently tased. She says that Mr. Maes never showed any signs that he would pose a threat to them, and he crouched on the ground while Plaintiff was aiming the taser near him. Further, she says that Plaintiff "snickered," when he had his taser out. She lastly claims Plaintiff "turned off the [taser], removed the cartridge, reactivated the [taser], and pulled the trigger making a loud noise while sparking all while still aiming the [taser] at Inmate Maes."

While many, if not all, of these events would have been captured by the CCSO detention center's video surveillance system, Defendants admit that these electronic video recordings were not preserved. They aver that the old system only saves recordings for thirty days before being overwritten with new video recordings. They also state that they acquired a new recording system in December 2017, when they changed locations of the detention center.

On October 10, 2016, Defendant Trotter met with Plaintiff and gave him the choice to resign or the CCSO would terminate his employment effective immediately. Plaintiff chose to resign. On that same day, Defendant Trotter placed a memorandum in Plaintiff's personnel file (the Trotter Memo). (ECF No. 115 Ex. 3.) This memo summarizes the information Defendant Trotter had been presented through the memos from other deputies and concludes there are a number of "items of concern." (*Id.*) These items led him to conclude that it would be best to "terminate[ Plaintiff's employment] today for failing to satisfactorily complete his probation." (*Id.*)

The memo contains a number of statements, which Plaintiff claims are defamatory and stigmatizing: Plaintiff "fail[ed] to follow proper chain of command," Plaintiff engaged in "conduct unbecoming a deputy and unjustifiable use of force," Plaintiff created "liability" for the agency, Plaintiff was "unprofessional," and Plaintiff violated the "taser and use of force" policy as well as "behavioral standards."

After his resignation, Plaintiff again struggled to find employment as a police officer. (ECF No. 115 Ex. 12.) On January 17, 2017, Plaintiff received a letter from the Washoe County Sheriff informing him that "the Sheriff's Office has determined that you do not meet the established standards for a position as Deputy Sheriff and therefore you have not been selected at this time." On February 7, 2017, Plaintiff received an email from Las Vegas Metropolitan Police in response to his application for employment informing him that "based on review of your background history, you will no longer be considered for the position(s) of Police Recruit C 16-001 November with the Las Vegas Metropolitan Police Department. Candidate does not meet LVMPD hiring standards based on Employment History" and "You are not eligible to apply with LVMPD for any position indefinitely." On September 8, 2017, Plaintiff received a letter from the Carson City Department of Alternative Sentencing informing him that he is "no longer being considered in the current recruitment due to failing on one or more portions of the selection process" which included the Background Investigation and Chief's Review, and "Based on our recruitment standards you are precluded from reapplying with our agency in the future." On September 12, 2017, Plaintiff received from Douglas County Sheriff a letter informing him that he "did not successfully complete the background evaluation/testing and therefore are no longer considered an eligible applicant for employment." On November 14, 2017, Plaintiff received a letter from North Las Vegas Police informing him he was "ineligible to continue in the employment process for the position of Police Officer . . . for character issues and his employment history," and "You are disqualified indefinitely." On March 1, 2018, Plaintiff received a letter from Reno Police Department informing him that his "application for employment with the Reno Police Department for [Police Recruit] was rejected, based on your preemployment background investigation."

The parties stipulate to the fact CCSO provided the Washoe County Sheriff's Office a copy of the Trotter Memo. Defendants, however, contend they did not provide the memo to any other

agency. Plaintiff disputes this fact by pointing to Nevada statutes that dictate that a public safety

agency may compel the disclosure of personnel files for their applicants for prior service as a peace

officer. Nev. Rev. Stat. 239B.020. Plaintiff also hired an expert witness, Mr. Ron Dreher. He

opines that the Nevada departments likely saw this memo through that procedure due to the fact

that they uniformly denied his applications and the fact that the some of the police departments

denied his applications indefinitely. (ECF No. 115 Ex. 13.) He avers to the following:

> Detective Olson [of the LVMPD] most likely obtained or had already obtained Sheriff's Trotter's October 10, 2016 memorandum stating his reasons for terminating Mr. Erwine. Sheriff Trotter's memorandum tainted Mr. Erwine's background by labeling him a "liability". It is abnormal for a Nevada Law Enforcement department to indefinitely ban an applicant for any employment. In today's law enforcement world being labeled a "liability" and being terminated for that reason is a law enforcement career killer in my opinion.

(*Id.* at 13.)

In addition, Plaintiff produces the report generated by LVPMD, which details Detective

Olson spoke with Defendant Trotter in a phone interview but does not mention the Trotter Memo.

(ECF No. 116 Ex. 9.) As noted in the exhibit, Defendant Trotter spoke about the Beaulieu incident,

as why Plaintiff was forced to resign. (*Id.*) This led Detective Olson to conclude Plaintiff would

be "unsuitable for employment with LVMPD." (*Id.*)

In his deposition, Plaintiff admitted that he told each of these agencies that he applied to

that he was previously arrested for driving under the influence in 2011. (ECF No. 120 Ex. 1 at 77.)

He also admitted that he "told every . . . background person . . . I resigned [from CCSO] in lieu of

termination because I witnessed some unethical things taking place in which . . . the sheriff told

me I was not part of the team or a good team player." (*Id.* at 33–34.)

///

///

///

Plaintiff was eventually able to secure employment as a police officer with the Pyramid Lake Paiute Tribe on January 8, 2018.[2] (ECF No. 120 Ex. 1 at 53.) This department terminated Plaintiff's employment on April 4, 2018. Plaintiff claims that the reason given for this termination was vague but included failing to "complete the training process successfully" and "not [being] at the level that they expected [Plaintiff] to be at." (*Id.*)

Now, Plaintiff is gainfully employed by the Washoe Tribe of Nevada and California as a full-time police officer. (*Id.* at 18.) He was offered this position on July 10, 2019. He has successfully completed this department's one-year probationary period. (*Id.*) Plaintiff was able to secure this position despite the Trotter Memo. He states, "I basically provided them with my story of the events that took place during my employment [with CCSO], what I was accused of in the memorandum and then the affidavits and the story of the people involved in that." (*Id.* at 21–22.)

## LEGAL STANDARD

### I.    Spoliation of Electronically Stored Information (ESI)

As of December 2015, Federal Rule of Civil Procedure 37(e) provides the specific—and only[3]—basis for sanctions for spoliation of ESI, which was substantially amended to accommodate advances in technology and provide uniformity among the circuits. To succeed on this motion, the moving party must prove the following three elements:

1.    The nonmoving party should have preserved the ESI in the anticipation or conduct of litigation.
2.    The nonmoving party lost the ESI because it failed to take reasonable steps to preserve it.
3.    Additional discovery cannot restore or replace the ESI.

---

[2] The tribal police departments are not able to acquire Plaintiff's personnel files under Nev. Rev. Stat. 239B.020 like the Nevada state and local agencies are as they are not a Nevada "public safety agency" under the statute.

[3] Plaintiff also moves for sanctions for spoliation of ESI under the Court's inherent authority. But, the Advisory Committee Notes make clear that the 2015 amendment forecloses a court from imposing sanctions on that basis. *Newberry v. Cty. of San Bernardino*, 750 F. App'x 534, 537 (9th Cir. 2018) (quoting Fed. Riv. P. 37 Advisory Committee Notes to the 2015 Amendment).

Fed. R. Civ. P. 37(e). The first element incorporates the common-law rule that imposes a duty to preserve evidence in litigation and when litigation is reasonably foreseeable. Fed. R. Civ. P. 37 Advisory Committee Notes to the 2015 Amendment; *see Millenkamp v. Davisco Foods Int'l, Inc.*, 562 F.3d 971, 981 (9th Cir. 2009). Second, the rule requires the party takes reasonable steps to preserve the ESI—not perfection. Fed. R. Civ. P. 37 Advisory Committee Notes to the 2015 Amendment. Third, the rule acknowledges that ESI is often stored in many formats on many systems contemporaneously, so the deletion of ESI on one medium may result in no loss of information, when the ESI is producible by other means. *Id.*

When a moving party satisfies these three prerequisites, two kinds of sanctions are available, but each requires proof of an additional element. Fed. R. Civ. P. 37(e). On the one hand, if the spoliation prejudiced the moving party, then the Court may order measures no greater than necessary to cure the prejudice. *Id.* On the other hand, harsher sanctions are available if the moving party shows that the nonmoving party acted with the intent to deprive the moving party of the information's use in the litigation, then the Court may (1) presume that the lost information was unfavorable to the party, (2) instruct the jury that it may or must presume the information was unfavorable to the party, or (3) dismiss the action or enter a default judgment. *Id.*

## II.    Spoliation of Other Evidence

The Ninth Circuit "has not set forth a precise standard for determining when spoliation sanctions are appropriate," but "the majority of trial courts have adopted the following test: (1) the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) the [evidence] w[as] destroyed with a culpable state of mind; and (3) the evidence was relevant to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense." *State Farm Fire & Cas. Co. v. Gen. Motors, LLC*, No. 1:20-CV-00040-BLW, 2021 WL 2269972, at *2 (D. Idaho June 3, 2021) (alterations in original) (quoting *Bell v.*

*City of Boise*, No. 1:09-cv-540-REB, 2015 WL 13778741, at *2 (D. Idaho Aug. 23, 2015)). The party seeking spoliation sanctions has the burden of establishing the elements. *Id.*

### III.    Summary Judgment

A court should grant summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is genuine when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Only facts that affect the outcome are material. *Id.*

To determine when summary judgment is appropriate, courts use a burden-shifting analysis. On the one hand, if the party seeking summary judgment would bear the burden of proof at trial, then he can only satisfy his burden by presenting evidence that proves every element of his claim such that no reasonable juror could find otherwise assuming the evidence went uncontroverted. *Id.* at 252. On the other hand, when the party seeking summary judgment would not bear the burden of proof at trial, he satisfies his burden by demonstrating that the other party failed to establish an essential element of the claim or by presenting evidence that negates such an element. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986) (Brennan J., concurring). A court should deny summary judgement if either the moving party fails to meet his initial burden or, if after he meets that burden, the other party establishes a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986).

### ANALYSIS

### I.    First Motion for Sanctions (ECF No. 84)

Plaintiff argues the Court should impose sanctions against Defendants for failing to preserve video footage of the Beaulieu and Maes incidents. Defendants contend they had no

///

reasonable basis to anticipate Plaintiff would file this case against them when the video recordings were deleted. The Court agrees with Defendants and denies this motion.

The Court finds Defendants did not have sufficient notice that Plaintiff intended to bring this case against them at the time they deleted the video recordings. Sufficient notice must be of future litigation that is "probable," meaning "more than a possibility." *In re Napster, Inc. Copyright Litig.*, 462 F. Supp. 2d 1060, 1068 (N.D. Cal. 2006). At the time, there is no indication that Defendants should have suspected that Plaintiff—an at-will, probationary employee—would bring a case based on his termination, especially when he not a member of a suspect class.

Plaintiff attempts to rely on notice of potential litigation from Mr. Beaulieu and Mr. Maes (which in fact never did occur). He, however, provides no case where a party can rely on a duty to preserve evidence potentially relevant to *another's* litigation. In fact, many courts have rejected such a duty. *In re Disposable Contact Lens Antitrust*, 329 F.R.D. 336, 432 (M.D. Fla. 2018) (collecting cases).

## II.   Second Motion for Sanctions (ECF No. 98)

Plaintiff also moves for sanctions on alleged spoliation of investigatory files for the Beaulieu and Davis incidents and Plaintiff's nine-month evaluation. The Court finds that Plaintiff has not proven the first element, that the alleged documents were destroyed while in Defendants' possession, as he has not carried his burden that they ever existed.

As to the Beaulieu incident, Defendants provided Plaintiff with the Trotter Memo and the deputy memoranda from Deputy Thompson and Sergeant Summers. Defendants claim this is the entirety of their records they currently and ever had. Defendant Trotter and Captain Matheson both testified that they did not conduct any further investigation into this incident—Plaintiff has no evidence to the contrary besides his speculation that there should be more. Speculation is not enough to carry his burden.

Turning to the Davis incident, the same is true. Defendant Trotter testified that a "fact check" was conducted, however, he never stated that he created a written record of this event. Further, Captain Matheson did investigate this incident and swore that he did not recall reducing anything into writing. Plaintiff again merely speculates that they must have been some record, which CCSO destroyed out of fear of litigation. And again, this does not satisfy his burden.

Lastly, Plaintiff complains that Defendants did not produce a nine-month review of his work. Plaintiff does attest in an affidavit dated February 6, 2021 that he remembers receiving a satisfactory nine-month evaluation in September 2016. Defendants dispute this contention and swear, while it was part of their written procedures, it was never done for Plaintiff or any other probationary employees. Based on these competing testimonies, the Court is not persuaded that Plaintiff has carried his burden that the Defendants ever actually created a nine-month evaluation. This motion is therefore denied.

### III.    Motion for Partial Summary Judgment (ECF No. 115)

Plaintiff moves for summary judgment on some but not all of his claims. He moves on the following counts:

- deprivation of a liberty interest without adequate due process in violation of the Fourteenth Amendment against Defendant Trotter pursuant to 42 U.S.C. § 1983
- deprivation of a liberty interest without adequate due process in violation of the Fourteenth Amendment against Defendant Churchill County pursuant to 42 U.S.C. § 1983 and *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978)
- deprivation of a liberty interest without adequate due process in violation of the Nevada Constitution against Defendants Trotter and Churchill County.

The Court will address each in turn.

#### A.    *Fourteenth Amendment Claim Against Defendant Trotter*

For this claim, Plaintiff needs to prove Defendant Trotter deprived Plaintiff of a constitutionally protected property or liberty interest without adequate process. Plaintiff concedes he did not have a protected property interest. (ECF No. 113.) In the public employment context, a

plaintiff may prove a deprivation of a liberty interest by showing that he was terminated from his employment in conjunction with a stigmatizing statement. *Board of Regents v. Roth*, 408 U.S. 564, 573 (1972). One without the other is insufficient. *Id.* To be sufficiently stigmatizing, it must "impair[] a reputation for honesty or morality." *Tibbetts v. Kulongoski*, 567 F.3d 529, 535–36 (9th Cir. 2009) (quoting *Brady v. Gebbie*, 859 F.2d 1543, 1552 (9th Cir. 1988)). The statements must also be so severe as to "effectively exclude the employee completely from [his] chosen profession." *Blantz v. California Dep't of Corr. & Rehab., Div. of Corr. Health Care Servs.*, 727 F.3d 917, 925 (9th Cir. 2013). Stigmatizing statements that merely cause "reduced economic returns and diminished prestige, but not permanent exclusion from, or protracted interruption of, gainful employment within the trade or profession" do not constitute a deprivation of liberty. *Id.* If a plaintiff can prove such a stigmatizing statement, he must also show (1) that the accuracy of the charge is contested, (2) that there is some public disclosure of the false, stigmatizing charge, (3) that the charge is made in connection with termination of employment, and (4) that the employer failed to allow him an opportunity to refute the veracity of the charges. *Mustafa v. Clark County Sch. Dist.*, 157 F.3d 1169, 1179 (9th Cir. 1998).

Defendants argue the Trotter Memo was not sufficiently stigmatizing and not sufficiently publicized. Defendants first argue that the statements in the Trotter Memo do not implicate Plaintiff's honesty and morality, and as such, cannot be stigmatizing. This initial argument is incorrect. At least some of the statements in the memo are more than mere accusations of incompetence and go towards morality. For example, the Trotter Memo describes Plaintiff as "unprofessional" and a "liability" and a "discredit" to the agency and appears to side with Deputy Jabines's version of the Mae's Incident that Plaintiff "snickered" as if he were engaging in reckless behavior with the taser in some sort of "play" in violation of "behavior standards."

///

Defendants next posit that a reasonable juror could conclude that the statements were not so severe as to permanently exclude Plaintiff from his chosen profession of law enforcement. A reasonable juror could conclude that the Trotter Memo was insufficient to infringe upon Plaintiff's liberty interest. While Plaintiff did struggle to find another police officer position, he did find a job with Pyramid Lake Paiute Tribe about sixteen months after his discharge from CCSO. He was also discharged from this position after three months. He was then again able to find a position with the Washoe Tribe of Nevada and California after about fifteen months. He has been able to maintain this position for the past two years.

Even though these may be protracted periods of unemployment, a juror could reasonably conclude that they were not caused by the Trotter Memo. While Plaintiff did have two stretches of unemployment that were a little over a year each, it is not clear they were due to the memo. Indeed, Plaintiff was job searching for at least eight months before his employment with CCSO (he applied for Lyon County Sheriff's Office in April of 2015 and was not hired by CCSO until December of that year)—before the memo was created. This is in conjunction with his struggles as noted in his letter of recommendation from Mr. Gibson, noting his prior driving under the influence arrest. (ECF No. 120 Ex. 2.) Plaintiff's conclusion that these Nevada state agencies denied his application based on the Trotter Memo is minimally subject to a genuine dispute of fact for the jury to decide, especially in light of the fact that he had similar trouble in acquiring employment before his job with CCSO and retaining employment with another agency.

Even more, Plaintiff has not proven all of the Nevada state agencies that denied his application actually reviewed the Trotter Memo such that a juror could reasonably disagree. He only has proof that the memo was provided to the Washoe County Sheriff's Office—and no one else. Plaintiff and his expert witness opine that the memo must have reached other police departments based on his numerous rejections and the fact some of them denied him from

reapplying indefinitely, which they claim is "abnormal." (ECF No. 115 Ex. 13 at 13.) They point to Nevada statutes that dictate personnel files of peace officers must be made available to public safety agencies upon request. Nev. Rev. Stat. § 239B.020. However, just because they could request this information does not mean that they did.[4] This is an additional ground by which this Court must deny Plaintiff's motion for summary judgment.

Lastly, the Court notes Plaintiff argues his employment with the Indian Tribes should not be considered employment in his chosen profession. In his deposition, he admitted that his duties are that of a regular police officer. (ECF. No. 120 Ex. 1 at 18.) Plaintiff's expert witness nonetheless posits the following as grounds for his contention:

> If [Plaintiff] was hired by a state or local law enforcement agency he would be entitled to the compensation and benefits each sheriff's office or police agency has in NRS or in their collective bargaining agreement or both. He would be entitled to our Nevada PERS retirement. His ability to learn the many facets of policing is enhanced. His ability to promote is enhanced. His ability to transfer from one agency to the next through lateral transfers is enhanced. Tribal police agencies do not offer these benefits.

(ECF No. 115 Ex. 13 as 14.) However, the Court finds these distinctions consist of "reduced economic returns and diminished prestige," which the Ninth Circuit has said are insufficient to be a liberty interest. *Blantz*, 727 F.3d at 925.

### B. *Fourteenth Amendment Claim Against Defendant Churchill County*

Plaintiff's next claim is that the county is responsible for Defendant Trotter's actions under *Monell* for the same conduct disputed in the prior claim. As the sole basis for Plaintiff's claim is

---

[4] Plaintiff does have the report from LVMPD, showing Detective Olson had a conversion with Defendant Trotter regarding Plaintiff's application to LVMPD. (ECF No. 116 Ex. 1.) In the conversation, Defendant Trotter noted facts surrounding the Beaulieu incident, noting that Plaintiff was sympathetic to the inmate and assisted the inmate by conducting an unauthorized investigation, which is why Defendant Trotter forced Plaintiff to resign. Defendants claim this evidence is hearsay. While it is unexcepted hearsay in its present form, courts may consider evidence that may be attested to at trial in a hearsay form for summary judgment. *Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003). Even though, the Court will consider the exhibit, it only shows one other agency received any information from CCSO regarding Plaintiff.

the same conduct, which this Court finds summary judgment is precluded by genuine disputes of

material facts, the Court denies summary judgment for this claim as well.

C.   <i>Nevada Constitutional Claim Against Both Defendants</i>

Plaintiff lastly moves for summary judgment on his claim the Defendants violated the due

process clause of the Nevada Constitution. Initially, the Court notes Nevada due process clause is

identical that in the U.S. Constitution, and the Nevada Supreme Court frequently looks to federal

precedent in interpretation of the state clause. *See, e.g.*, *Rodriguez v. Dist. Ct.*, 102 P.3d 41, 48

n.22 (2004). The Nevada Supreme Court therefore held that the Nevada due process clause gives

rise to liability under the *Roth* stigma-plus test. *State v. Eighth Jud. Dist. Ct. ex rel. Cty. of Clark*,

42 P.3d 233, 242 (2002). Inasmuch, as Plaintiff's claim is based upon the stigma-plus test, the

motion for summary judgment on this claim is denied for the same reasons discussed above.

Plaintiff, however, also claims that rights identified in Nevada statutes were violated by

Defendants. He claims the violations of these rights also deprived him of a liberty interest protected

by the Nevada Constitution. He points to Nev. Rev. Stat. §§ 289.020–120, which provide "Rights

of Peace Officers." He does correctly conclude that the undisputed facts do show violations of

these rights. For example:

> [A] law enforcement agency shall not place any unfavorable comment or document
> in any administrative file of a peace officer maintained by the law enforcement
> agency unless:
> (a) The peace officer has read and initialed the comment or document; or
> (b) If the peace officer refuses to initial the comment or document, a notation to
> that effect is noted on or attached to the comment or document.

Nev. Rev. Stat. § 289.040. Defendants admit they did not disclose the Trotter Memo to Plaintiff

until over a year after the memo was placed in his file. The statutes, however, do provide for a

mechanism by which an aggrieved peace officer may raise violations of these rights:

///

1

2

> Any peace officer aggrieved by an action of the employer of the peace officer in
> violation of this chapter may, after exhausting any applicable internal grievance
> procedures, grievance procedures negotiated pursuant to chapter 288 of NRS and
> other administrative remedies, apply to the district court for judicial relief. If the
> court determines that the employer has violated a provision of this chapter, the court
> shall order appropriate injunctive or other extraordinary relief to prevent the further
> occurrence of the violation and the taking of any reprisal or retaliatory action by
> the employer against the peace officer.

Nev. Rev. Stat. § 289.120.

Plaintiff argues that since the statutes provide for these procedural rights to peace officers,

they create a liberty interest such that the due process clause is implicated. Plaintiff correctly quotes

the substantive liberty at play as "The liberty interest protected by the due process clause

encompasses an individual's freedom to work and earn a living." *Eighth Judicial Dist. Court*, 42

P.3d at 236. While Nev. Rev. Stat. §§ 289.020–120 provide for added procedural protections to

peace officers of this liberty interest, such as the right to either review or sign disciplinary

documents before they are placed into a peace officer's file pursuant to Nev. Rev. Stat. § 289.040;

the right to review their file after an investigation pursuant to Nev. Rev. Stat. § 289.060; and the

right to have representatives at an investigatory or disciplinary hearing pursuant to Nev. Rev. Stat.

§ 289.080. However, these procedural rights are not ends in themselves protected by the due

process clauses. *See Olim v. Wakinekona*, 461 U.S. 238, 251 (1983); *see also Town of Castle Rock,

Colo. v. Gonzales*, 545 U.S. 748, 771 (2005) (holding that due process interests "cannot be defined

by the procedures provided for [their] deprivation." (Souter, J., concurring)).

Under the federal due process clause, the Ninth Circuit analyzed the following

requirements before a prisoner may be put into segregation: "a sufficiently senior officer [must]

make the segregation decision, . . . the decision [must] be documented, . . . the prisoner [must]

receive assistance, if needed, in presenting his case, and . . . the prisoner [must] be informed of the

reason for his segregation." *Toussaint v. McCarthy*, 801 F.2d 1080, 1098 (9th Cir. 1986),

*abrogated in part on other grounds by Sandin v. Conner*, 515 U.S. 472, 482–83 (1995). There, the circuit held, "Such procedural requirements, even if mandatory, do not raise a constitutionally cognizable liberty interest." *Id.* (citing *Olim*, 461 U.S. at 250).

The Court finds that Plaintiff's cited rights are highly analogous to the rights in *Toussaint*, so the Court is convinced the outcome is the same—these procedural rights do not create a liberty interest in themselves protected by the due process clause. Plaintiff has failed to point to any case law from Nevada that would indicate that its state constitutional due process clause would vary from that of the federal one. Rather, the parties agree that the Nevada Supreme Court frequently turns to federal law in interpreting its due process clause, so the Court finds that the Nevada Supreme Court would adopt this clear federal precedent. As such, summary judgment is also denied on this claim as well.

///

///

///

///

///

///

///

///

///

///

///

///

///

1

## CONCLUSION

2       IT IS HEREBY ORDERED that First Motion for Sanctions (ECF No. 84) is DENIED.

3       IT IS FURTHER ORDERED that Second Motion for Sanctions (ECF No. 98) is DENIED.

4       IT IS FURTHER ORDERED that Motion to Seal (ECF No. 101) is GRANTED.

5       IT IS FURTHER ORDERED that Stipulation for Extension of Time (ECF No. 104) is

6   GRANTED.

7       IT IS FURTHER ORDERED that Motion for Partial Summary Judgment (ECF No. 115)

8   is DENIED.

9       IT IS FURTHER ORDERED that Motion to Seal (ECF No. 116) is GRANTED.

10  IT IS SO ORDERED.

11  Dated September 7, 2021.

12

13  _____

14                ROBERT C. JONES
                 United States District Judge

15

16

17

18

19

20

21

22

23

24