# EXHIBIT 1 –
# "Deposition of Michael Erwine"

EXHIBIT 1 –
"Deposition of Michael Erwine"

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| MICHAEL ERWINE, an individual,<br><br>Plaintiff,<br><br>vs.<br><br>CHURCHILL COUNTY, a political subdivision of the State of Nevada; CHURCHILL COUNTY SHERIFF BENJAMIN TROTTER; and DOES 1 through 10, inclusive,<br><br>Defendants. | CASE NO. 3:18-cv-00461 RCJ-WGC |

REMOTE VIDEOCONFERENCE
DEPOSITION OF MICHAEL ANDREW ERWINE

Taken on Thursday, December 17, 2020

At 8:59 a.m.

Reno, Nevada

Job No. 688466

Reported by: Sherry L. Graham, CCR #378

**Q. When did you first obtain employment after you received your criminal justice Associate's degree?**

A. That would have been -- I believe my first employment after I received that degree would have been with a company called Allied Barton Security Services. They were a security firm. I believe now they are referred to as Allied Universal.

**Q. How long have you been employed at the Washoe Tribe?**

A. Since November of last year.

**Q. And what is your position?**

A. Police officer.

**Q. Are you a probationary officer or have you completed any probationary period, if there was one?**

A. I completed my one-year probation.

**Q. What are your current duties?**

A. I always have difficulty answering that. Just general police duties. Everything you can imagine a general law enforcement officer handles. We are a fairly small department, so we don't have other units to do in-depth investigations or anything like that. So depending upon the incident, the officer will pretty much handle it from beginning to end no matter the severity.

**Q. Who is your supervisor?**

A. Right now, my supervisor is Sergeant Mike Hall. But we have two different sergeants as well as a deputy chief and chief, and we pretty much kind of work underneath all of them depending upon who's there that day.

**Q. How many law enforcement officers are in the department or agency?**

A. I believe 14.

**Q. What is your rate of pay?**

A. 25.85.

**Q. Are there any benefits that you receive in addition to salary?**

A. That's hourly. The 25.85 is hourly. In addition to that, I receive medical and just medical benefits, including dental and vision.

**Q. And do you contribute something in terms of premium for your benefits?**

A. No.

**Q. Is there a retirement program that is available to you in connection with your employment with the Washoe Tribe?**

A. There is not. We don't get any of the like you have for the other agencies, such as Nevada PERS or something like that. We don't have that.

**Q. What shift do you currently work in your job with the Washoe Tribe?**

A. We rotate quite frequently. My schedule currently is Saturday -- I'm sorry. Friday through Monday from 7:00 a.m. to 5:00 p.m.

**Q. Since going to work for the Washoe Tribe in November of 2019, have you applied to any other law enforcement agencies?**

A. No.

**Q. Do you enjoy your position with the Washoe Tribe?**

A. It's not the most desirable position for me, but it is a job in the field that I wish to work in.

**Q. Prior to working for the Washoe Tribe, where were you employed?**

A. I was employed by Triumph Protection Group. They were a private security contractor based out of California.

**Q. Mr. Erwine, I would like you to take a look at, and these are -- this is an exhibit from the documents that I forwarded to everyone yesterday. That is a document from Triumph Protection Group Bates stamp Erwine 000620, So the number's in the bottom right-hand corner. It is a one-page document**

told them what I needed and this is what they provided me.

**Q. How long did you work for Triumph Protection Group?**

A. It looks like 6/28 of 2018 to February 27th of 2019.

**Q. How did you come to be employed by Triumph Protection Group?**

A. I was looking for a job in the security field -- well, law enforcement and/or security. I knew people that were working in the security field. They made me aware of that job. That was -- it's actually up in Incline, Nevada is where I worked. And I applied for it and got offered a position.

**Q. What did you do for Triumph Protection Group?**

A. I did a couple of different assignments for them. The majority, probably 95 percent of the time was working at a private residence up in Incline, in Tahoe, just providing security to that residence and its occupants.

**Q. You were paid at a rate of $25 per hour in that position?**

A. Yes.

**Q. And to whom did you report?**

**that you described, did he provide you with any information or tell you that he had been in touch with the Churchill County Sheriff's Office regarding your previous employment?**

A. No. This was an introductory interview where he got my background packet for the first time. He would not have conducted any investigation prior to that because he was just receiving my information then.

**Q. Well, do you know when he received information about you and your application?**

A. When I gave it to him that day when I had the meeting.

**Q. When -- but you had applied before you had that meeting with him, correct?**

A. Correct.

**Q. So you are not -- you have no personal knowledge of the information that may have been provided to him after you submitted your application, correct?**

A. No. No, I don't.

**Q. And Lesley Hawley, the human resources manager, did you have an interview with her as well?**

A. I did not. I have actually never met her.

**Q. All right. Did you ever speak with her on**

**the phone?**

A. I probably spoke with her on the phone a couple times throughout the hiring process with questions and whatnot, but I have never met her in person, I don't believe.

**Q. What sort of questions do you recall Ms. Hawley asking you?**

A. I'm sorry. She never asked me any questions regarding my background. I might have just called human resources checking up on my application and its progress and such. She never inquired to my background at all.

**Q. In any event, you were hired by the Pyramid Lake Paiute Tribe and you went to work there, correct?**

A. Yes.

**Q. Who did you report to at the Pyramid Paiute Tribe?**

A. During my three months of employment there, I had three different training officers, if you will, as well as there was a lieutenant and a chief of police. As far as who I directly reported to, I would say it was the training officer I had at the time during the three months.

**Q. Okay. Please provide me with the names of**

agencies, you are basically graded everyday for approximately three months. Those are pictures that the program -- that they use there for grading was actually electronic. That was, that was the first time I have seen such a thing. Normally, they are on paper. They use theirs electronically on the computer. Those are broken down into dates with numbers associated with -- some numbers are better than others. There were different categories, but that is basically a picture of those daily reviews, if you will, and its associated numbers.

**Q. Are these photographs that you took with your phone or some other device?**

A. Yes.

**Q. So these are basically photographs that you took on your phone?**

A. That's a picture of the computer screen, yes.

**Q. How much was your salary or your hourly rate of pay at the Paiute Tribe?**

A. $19.44 an hour.

**Q. What were your duties there?**

A. Same duties as I have right now, general police officer duties. Everything from minor traffic enforcement to in-depth investigations of

crimes.

**Q. Did the Paiute -- does the Paiute Tribe have a detention division or were you a patrol officer or both?**

A. No, it didn't have a detention division. I was just a patrol officer.

**Q. Where are the offices of the Paiute Tribe located?**

A. Their administrative office and police department are located in Nixon, Nevada. It's just south Pyramid Lake outside of Wadsworth.

**Q. Is that where you reported for duty?**

A. That was our office. We didn't always go there to report for duty. Basically, when we hit inside of our jurisdiction, that would be us reporting for duty. Me being a trainee and always having a training officer, I essentially drove to their house every morning and we left from their house, is where I had to report personally.

**Q. How many members or officers did the Paiute Tribe have at the time that you worked there?**

A. I don't recall specifically, but I do believe it was even less than the department I have now, so I would say less than ten.

**Q. Your answers to interrogatories, written**

interrupt. I actually -- do you mind if we take a quick bathroom break?

MS. PARKS: Yeah. That's fine.

(Brief recess.)

BY MS. PARKS:

**Q. Mr. Erwine, according to your response to Interrogatory Number 9, your last day of employment with the Pyramid Lake Paiute Tribe was April 4, 2018. Does that sound right to you?**

A. Yes.

**Q. Tell me the reasons why you were informed that you would no longer be working for the Paiute Tribe.**

A. Basically, according to what they told me, I just did not complete the training process successfully.

**Q. Okay. Did you ask for any particulars with respect to how you failed to complete the field training program?**

A. I did inquire a little bit. I didn't really get much answers other than I just was not at the level that they expected me to be at.

**Q. Did you have any issues or difficulties, any particular incidents that stick out in your mind during your training program at the Paiute Tribe**

A. Okay.
Q. If you look there under Personal References, are those personal references written in your handwriting?
A. Yes.
Q. And the second one listed is someone named Sean Giurlani. Do you see that?
A. Yes.
Q. Is that the same individual that you have disclosed as an expert witness in this case?
A. Yes.
Q. Could you -- if you flip two pages to page number 11 of the application, under Previous Employers, there is a reference to Battle Born Autobody.
Do you see that there?
A. Yes.
Q. That is in your handwriting, correct?
A. Yes.
Q. And it says Reason For Leaving, work was, quote, under the table, end quote. Do you see that?
A. Yes.
Q. And what did you mean by that?
A. What I meant by that, because when I've undergone law enforcement backgrounds, in my

**Q. All right. Have you ever gone out for drinks or other social interaction with Mr. Giurlani?**

A. Just the dinner or the dinners.

**Q. Can you think of how many dinners you have attended with him?**

A. I don't know off the top of my head.

**Q. Have you ever participated in any other social activities with him, such as going to sporting events or playing sports or anything like that?**

MR. BUSBY: I'm going to object. This question has been asked, I think, three different times already, different forms, and the witness has already provided an answer.

Go ahead, Mike.

THE WITNESS: No. I don't recall any activities of those types that we attended together.

BY MS. PARKS:

**Q. Prior to your termination from employment with the Churchill County Sheriff's Office, did you have contact with Mr. Giurlani and speak with him about any of the alleged improprieties that you observed while working in the Churchill County Jail?**

A. Yes, I had spoke with him about some of the

things I had seen.

**Q. That was while you were still employed by the Churchill County Sheriff's Office?**

A. Yes.

**Q. And what is it that you reported to Mr. Giurlani?**

A. I reported largely to the extent of the things that are in my complaint, the things I saw, the things I didn't feel were appropriate. I looked at Mr. Giurlani as kind of a mentor, if you will, that's what our relationship was in the academy. I respected him. I looked up to him. I asked for a little bit of advice being a new cop and new to the agency and basically a young cop at the time, which I still am, I was looking for some advice about how to handle the situations I had saw and that. I disclosed to him things that were disclosed in my complaint.

**Q. All right. How many conversations did you have with him about alleged improprieties that you observed at the Churchill County Jail?**

A. I don't recall the exact number.

**Q. Do you recall more than one?**

A. Yes, I would say it's fair to say more than one.

**Jimmy Thomas. Do you see that there?**

A. Yes.

**Q. And to Sergeant Summers pushing urine with a squeegee so that it splashed all over that inmate. Do you see that there?**

A. Yes.

**Q. To whom at the Churchill County Sheriff's Office did you report that conduct on the part of Sergeant Summers?**

A. At that time, I reported it to who was my immediate supervisor, Deputy Mike Davis. I was in my field training program under his supervision at that time, so he would have been my first supervisor in line, and he was also present for that incident.

**Q. You have him listed as a deputy, but he was an FTO, he was your FTO?**

A. Yes. For supervisory purposes, he would have been my first chain of command. I was subordinate to him during that process in time.

**Q. And Sergeant Summers at that time would have been your immediate supervisor; is that correct?**

A. Yes.

**Q. And did you ever report what you saw with respect to inmate Jimmy Thomas to Captain Matheson?**

A. No.

**Q. Did you ever report this conduct to Sheriff Trotter?**

A. No.

**Q. Did you ever make a report about the incident described here involving Jimmy Thomas to any agency outside of the Churchill County Sheriff's Office?**

A. No.

**Q. Do you know who Lacy Habberstead is?**

A. Just in relationship to this complaint, yes.

**Q. Well, I mean, do you know her?**

A. I know her as a former inmate during my employment.

**Q. Okay. There is a reference in your first amended complaint to an incident involving Ms. Habberstead where she made a complaint of conduct, which arguably would be inappropriate from a sexual standpoint. Would you agree with that?**

A. Yes.

**Q. That she was asked to drop her pants and that someone watched her urinate. Is that a summary of what that issue is about?**

A. Yes.

**and I'm only referencing the paragraph in the event you want to take a look at it. I'm not going to mark this as an exhibit.**

**It discusses or states that on numerous occasions you witnessed deputies and sergeants go through female inmates' phones while being booked to seek out and view private pornographic photos. Two inmates, Erwine can recall this took place with, were Jillian Whickem and Ashley Gokey.**

**When did you witness deputies and sergeants going through inmates' phones while being booked to look at pornographic photos?**

A. Are you asking the date or?

**Q. I'm asking you when that happened.**

A. That would have happened during the course of my employment. I don't have a specific date. I just recall it taking place in relationship to these two inmates.

**Q. How many times did you witness that occur?**

A. I believe it was just this one isolated incident that I saw occur.

**Q. Did you discuss that incident with these two inmates that you identified, Jillian Whickem and Ashley Gokey?**

A. No.

deputies because I can't recall and I don't want to make an allegation of that unless I'm certain of who was present.

**Q. If you don't recall, that's one thing. Otherwise, the fact that you might not be comfortable naming names --**

A. I would be guessing if I named anyone explicitly outside of Sergeant Summers. Because of the nature of that accusation, I'm not comfortable with guessing about who else was present that I can't vividly remember.

**Q. To whom did you report this conduct?**

A. No one, since a supervisor was there and it was apparently acceptable.

**Q. Did you report this up the chain of command to Captain Matheson?**

A. No.

**Q. Did you ever advise former sheriff Trotter of this behavior?**

A. No.

**Q. Did you ever report this behavior to any law enforcement agency outside of Churchill County?**

A. No.

**Q. Did you ever report this sort of behavior to any members of the media?**

CERTIFICATE OF REPORTER

STATE OF NEVADA )
) ss.
COUNTY OF CLARK )

I, Sherry L. Graham, CCR No. 378, do hereby certify: That I reported the remote videoconference deposition of MICHAEL ERWINE, commencing on Thursday, December 17, 2020, at 8:59 a.m.

That prior to being deposed, the witness was duly sworn by me to testify to the truth, the whole truth and nothing but the truth. That I thereafter transcribed my said shorthand notes into typewritten form, and that the typewritten transcript of said remote videoconference deposition is a complete, true and accurate transcription of my said shorthand notes. That prior to the conclusion of the proceedings, pursuant to NRCP 30(e) the reading and signing of the transcript was requested by the witness or a party.

I further certify that I am not a relative or employee of counsel of any of the parties, nor a relative or employee of the parties involved in said action, nor a person financially interested in said action.

IN WITNESS WHEREOF, I have set my hand in my office in the county of Clark, State of Nevada, this 29th day of December, 2020.

Sherry L. Graham, CCR No. 378

# EXHIBIT 2 –
# "Offer of Employment"

EXHIBIT 2 –
"Offer of Employment"

OFFICE OF THE
SHERIFF
CHURCHILL COUNTY, NV

Richard Hickox
Sheriff

March 11, 2021

**Hand Delivered**
Michael Erwine

Dear Mr. Erwine:

On behalf of the Churchill County Sheriff's Office, I am pleased to offer you employment as a deputy sheriff with the Churchill County Sheriff's Office effective immediately. Your employment will not be subject to completion of a 12 month probationary period. Your assignment will initially be in the detention center and the starting wage will be $27.30, not including any additional benefits to which you will be entitled as an employee of Churchill County and/or the Churchill County Sheriff's Office. Additionally, you will be restored your sick leave balance of 77.65 hours and your annual leave accrual rate will be set at 12 hours per month. As a condition of your employment, you are required to reside within a 25 minute response time to the Sheriff's Office and we are willing to work with you on a workable time frame for the accomplishment of this requirement.

If you agree to these terms and conditions of employment, sign where indicated below and return this letter to my attention

I look forward to you becoming a valued member of our agency.

177

Richard Hickox, Sheriff
Churchill County

Michael Erwine

# EXHIBIT 3 –
# "Memorandum dated October 10, 2016"

# EXHIBIT 3 –
# "Memorandum of October 10, 2016"

**MEMORANDUM**

**DATE:** October 10, 2016

**TO:** Personnel File

**FROM:** Benjamin D. Trotter, Sheriff

**REF:** Deputy Michael Erwine

**Failure to Follow Proper Chain of Command**

On October 7, 2016 I met with Deputy Michael Erwine to counsel him. (See Administrative Note in Spillman)

At 1420 hours on October 8, 2016 I received the following text from Sgt. Shawn Summers (not verbatim):

*Intoxicated male in security cell beating on walls and screaming obscenities at deputies. Was placed there by grave shift with an incident report. I was told today that Dep Erwine went over all the video footage of the inmate and started his own hidden Word document on the incident. Erwine appeared to be upset that the inmate was not given a drink of water. Thompson checked this same inmate at 0515 when he came on shift and was told to go fuck himself by the inmate.*

The inmate was Andrew Beaulieu and he had been book into our facility by Fallon Police Department at 0332 hours on October 8th. His security cell watch sheet was started at 0340 hours and it is attached.

I texted Sgt. Summers back after we had a short telephone conversation that we needed Thompson to write what he saw Erwine doing. Deputy Thompson's incident is attached as is Sgt. Summers's incident report.

I had Sgt. Jesse Nuckolls, who performs IT details for our agency, come into work on his day off and attempt to find this "hidden Word document" on the jail desktop computers. He was able to locate a document which appears to be the document in question. He had to log into Erwine's passworded system (each member of the agency has a unique password that allows them into the system) to find the document. The document is attached.

In reviewing this document, I note that the author, presumed to be Erwine, notes that the inmate had asked for water at 0350 hours but had not received water until Erwine gave it to him at 0551 hours. Erwine's document does not once detail the actions and behavior of the inmate but solely focuses on the fact that the inmate was not given water for two hours after he asked for it.

In Dep. Thompson's incident report he states that even Erwine contact the inmate and asked if he wanted water and was told by the inmate to "fuck off" several times. Erwine seemed to develop some rapport with the inmate. Thompson then indicates that Erwine spent 30-40 minutes reviewing the video tape. He allegedly told Thompson that if the inmate had been given water when he asked for it he would not have been an issue and his rights would not have been violated. Thompson told Erwine that if an inmate in the security cell is not compliant we do not open the cell and offer them items but wait until they become compliant. Thompson then indicates that around 1016 Erwine brought out the inmate for booking. The inmate whispered that he wanted to talk to Erwine so Erwine took the inmate to the kitchen area and they talked for several moments. Erwine also fingerprints the inmate during which they were alone and able to communicate secretly. At 1158 the inmate was released from custody after posting bail. When Sgt. Summers came on shift around 1400 hours, Thompson told him about Erwine's actions.

Sgt. Summer's incident report echoes Thompsons for a portion but then Summers mentions a phone call. At 1715 hours Summers took a call from the Mr. Beaulieu. Mr. Beaulieu told Summers he was upset at how he was treated. Per Summers, his primary complaint was not being offered water when in the security cell. Eventually, Beaulieu told Summers that Erwine had reviewed all the video and had spoken to him several times and indicated a lawsuit was winnable. "He said I'm not going to tell you that he told me; but I was told by his facial expressions that I have a good case against the jail."

Items of Concern:

- Beaulieu first asked for water at 0350, ten minutes after he was placed in the security cell for being uncooperative. According to the observation sheet he was checked on visually or verbally within the expectations of the 15-30 minute check requirement. He remained uncooperative and, therefore, was not given water.
- Deputy Erwine is a probationary employee and does not have the authority to conduct his own personnel investigations. As of the time of my writing this (October 10, 2016 at 1122 hours), Deputy Erwine has never brought his concerns to a supervisor or attempted to present his "investigative findings".
- His "investigative report" mentions nothing about the behavior of Beaulieu, even that which was initially directed toward him. It is as if Erwine is siding with the inmate against his own agency or, possibly, encouraging civil action against his own agency.
- I also find substantial concern that Deputy Erwine's investigation seems to have found and confirmed what Beaulieu alleged – that grave shift would flush the floor toilet and laugh when Beaulieu would yell for water. This will be investigated further and separately from this topic.

The proper thing for Erwine to have done would have been to report his concerns to a supervisor and, if this did not seem right or a valid avenue, to report these concerns to an administrator.

**<u>Conduct Unbecoming a Deputy and Unjustifiable Use of Force</u>**

On October 9, 2016 at about 0939 I received a text from Sgt. Summers (not verbatim):

*Received a call from the jail, Roat (Deputy Jolie Jabines) dropped some crap on the cage floor and called trustee in to pick up the stuff that slid under the counter; Erwine pulled his Taser and pointed it at inmate, pulled cartridge off, pointed it again at inmate and discharged it while laughing. Can I go into work and just send him home over this incident. Don't want him accidentally blinding our trustee.*

I asked when this happened and he indicated just before he texted me. I requested an incident from Deputy J. Jabines. I inquired about possible video showing this. I called Dispatcher Jerilyn Whitaker and asked if she had heard a Taser being deployed in the cage. She had not.

At 1613 hours, Summers texted me:

*Had Dep. (Mike) Davis check camera footage; he said at 0904 it showed Erwine light up his Taser with the trustee in the cage. Could not tell on the video if it was discharged; just see the red aiming light (laser).*

On 10/10/2016 I requested our senior Taser instructor, Sgt. Lee Orozco, pull the Tasers at the jail and download their recent usage. He did so and the Taser assigned to the jail bearing serial #X00298141 showed a "Fire" for one second at 09:04:06 hours. The other two Tasers currently at the jail did not show a test fire anytime near this time.

I read an incident report that J. Jabines had completed on the incident. She indicates Inmate Maes, who is acting as the kitchen trustee, complied with her request to come into the cage and help her reach some items she had

dropped. Erwine was standing at the north end of the cage, leaning on the counter. Erwine "without notice, verbal command or need: drew his ECD (Electronic Control Device a.k.a. Taser) and aimed it at Inmate Maes who was, at the time kneeling on the floor. J. Jabines indicates she noticed the red laser light on the floor and looked up at Erwine who "snickered". The laser indicated the Taser was activated and J. Jabines indicates the cartridge was still attached. Erwine was still leaning against the counter so, evidently, not feeling threatened. J. Jabines states that Erwine turned off the ECD, removed the cartridge, reactivated the ECD and pulled the trigger "making a loud noise while sparking". The ECD was still aimed at Inmate Maes who was still on the floor. Erwine then deactivated the ECD, replaced the cartridge and reholstered it.

J. Jabines rightly indicates great concern about this incident. Tasers have been known, on occasion, to spontaneously discharge the cartridge when in an activated position. This could have injured both the inmate and J. Jabines. She also rightly notes the liability that this simple action creates for our agency as either real or perceived unnecessary and/or excessive force.

Items of Concern:

- This is unprofessional behavior.
- This creates liability for this agency now or for some time into the future should Inmate Maes elect to pursue civil action.
- This discredits our agency and our profession.
- In a time when scrutiny is high on all of us in law enforcement, this type of play is inexcusable.
- Deputy Erwine clearly violated our policies on Tasers and Use of Force, as well as, behavior standards.

Following my recent positive and encouraging counseling session with Deputy Erwine, this short series of behaviors from him is extremely disturbing and disappointing. The totality of concerns, of which these actions are only a part, lead me to believe that the cohesion of our Detention Division is being jeopardized by Deputy Erwine's continued employment here. It also appears that Deputy's Erwine's voiced concerns about "getting through probation" are as much a warning to me as a relief; I can only anticipate that his behavior, once he is not longer in an "at will" status, will continue to decline.

Deputy Michael Erwine will be terminated today for failing to satisfactorily complete his probation.

**EXHIBIT 4 –**
**“Deposition of Mike Matheson”**

**EXHIBIT 4 –**
**“Deposition of Mike Matheson”**

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | | |
|---|---|---|
| MICHAEL ERWINE; | ) | |
| Plaintiff, | ) | |
| vs. | ) | Case No.: |
| CHURCHILL COUNTY, a political | ) | 3:18-cv-00461-RCJ-WGC |
| subdivision of the State of Nevada; | ) | |
| CHURCHILL COUNTY SHERIFF BEJAMIN | ) | |
| TROTTER; and DOES 1-10 inclusive; | ) | |
| Defendants. | ) | |
| ______________________________________ | ) | |

RECORDED DEPOSITION OF CAP. MICHAEL MATHESON

Taken on JANUARY 7, 2021

At 2:28 p.m.

RECORDED VIA VIDEO CONFERENCE

UNDER STIPULATION BY ALL PARTIES

Page 29

document much the same as that I completed for Deputy Erwine's meeting with me.
**Q: Okay. Would it have been in the Spillman program?**
A: I -- I would believe so if I -- if I completed it there, yes.
**Q: Okay. And what did you do with the investigatory file when you completed your investigation?**
A: It would just remain in the system. I -- I -- I didn't do anything with it.
**Q: Okay. Would you refer the investigatory documents to anybody to review them? Any- -- anything like that?**
A: Um, more than likely, I would refer it to the sheriff.
**Q: Okay.**
A: She was my direct --
**Q: Because you're doing the investigation so somebody could see it, right? Presumably?**
A: For document- -- to -- so -- so that it would be documented, yes, sir.
**Q: Okay. All right. So do you remember what the outcome of your investigation of the Habertat incident was?**
A: I don't recall any -- I don't recall finding substantial evidence to corroborate her claim.
**Q: Okay. Was there any disciplinary action that was taken against any deputy at the department as a result of your**

investigation?

A: I don't recall -- I don't recall any disciplinary action.

Q: So you don't recall whether any disciplinary action was taken against Deputy Keller as a result of what happened with Lacy Haberstat?

A: I do not recall. No, sir.

Q: Okay. You don't -- you don't recall, or -- I mean -- I just want to make sure I'm clear. You don't remember, or you're saying it didn't happen?

A: I don't believe there was any disciplinary action, but I -- I don't recall.

Q: Okay. Fair enough.

A: For sure.

Q: All right. Do you remember an incident at the facility involving Andrew Beaulieu?

A: I -- I'm sorry, the name, sir?

Q: Andrew Beaulieu.

A: The -- the name doesn't sound familiar to me, no.

Q: Okay. Can you take a look at what's been marked as Exhibit No. 4? Okay. This one is pretty long, but I'm going to -- please take a moment to review it. And when you're ready to answer some questions about it, let me know. Please let me know, thanks.

MS. PARKS: I'm going to step out just for a

CERTIFICATE OF RECORDER

STATE OF NEVADA )
)
COUNTY OF WASHOE )

NAME OF CASE: MICHAEL ERWINE, PLAINTIFFS VS CHURCHILL COUNTY ET.AL. DEFENDANTS

I, Sally Fletcher, a duly commissioned Notary Public, authorized to administer oaths or affirmations in the State of Nevada, do hereby certify: That I recorded the foregoing deposition of the witness, Cap. Michael Matheson, on 01/07/2021.

That prior to being examined, the witness was duly sworn to testify to the truth. That deposition was recorded via audio and video pursuant to NRCP30(b)(3) and said deposition recording is a complete, true, and accurate recording of deposition testimony. A transcript was created by E-Depositions LLC to aid the audio video recording. A review of the deposition [ ] was [X] was not requested by the deponent and [ ] was [X] was not requested by a party of the action. If a review was requested, any changes communicated to me by the deponent during the period allowed are appended hereto.

I further certify that I am not a relative or employee of an attorney or counsel of any of the parties, nor a relative or employee of an attorney or counsel involved in said action, nor

Page 44

a person financially interested in the action.

IN WITNESS WHEREOF, I have hereunto set my hand in the City of Las Vegas.

Sally Fletcher
Notary Public
Appointment No. 16-1551-1

# EXHIBIT 5 –
# "Gilbert Coleman Initial Expert Report"

EXHIBIT 5 –
"Gilbert Coleman Initial Expert Report"

***GILBERT COLEMAN, PH.D.***
***ECONOMIC CONSULTING, INC.***

40 PINE VIEW COURT
RENO, NV 89511-2761
TELEPHONE 775-852-3259
FAX 775-852-3033
E-MAIL Grcoleman@colemaneconomics.com
WEBSITE www.colemaneconomics.com

September 2, 2020

Luke A. Busby
Attorney at Law
316 California Avenue #82
Reno, NV 89501

Dear Mr. Busby:

I have made calculations of the economics damages suffered by Michael Erwine as a result of his termination from the Churchill County Sheriff's Office. The basic loss assumption is that Mr. Erwine would have replaced this employment with a job for the Las Vegas Metropolitan Police Department (LVMPD). The basic offset employment is his current position with the Washoe Tribe of Nevada and California Law Enforcement Department. There are several assumptions that are included in the analysis. First, there is the assumption that Mr. Erwine will be able to replace the earnings he would have made with LVMPD in ten years, alternately in fifteen years, and alternately not during his work life expectancy. Second, there is the assumption that he would have remained as a police officer with LVMPD for the entirety of his loss period, alternately that he would have been promoted to the rank of sergeant after eight years with LVMPD and then remained in that position for the remainder of his loss period, and alternatately that he would have been promoted to sergeant after eight years with LVMPD and then to lieutenant after an additional four years and remain there for the remainder of his loss period. In all cases, the future offset earnings are based on his Washoe Tribe employment. For Mr. Erwine's past losses, his LVMPD earnings are offset by his actual employment which consists of three different employments. They are employment with Allied Universal during 2017 and 2018, with Triumph Protection during 2018 and 2019, and with the Washoe Tribe in 2019 and 2020.

The loss calculations are as follows:

10 Years

| | Officer | Sergeant | Lieutenant |
|---|---|---|---|
| Past Loss | $406,079 | $406,079 | $406,079 |
| Past Offset | $199,944 | $199,944 | $199,944 |
| Net Past Loss | $206,135 | $206,135 | $206,135 |
| Present Value of Future Loss | $1,706,278 | $1,949,340 | $2,001,181 |
| Present Value of Future Offset | $762,073 | $762,073 | $762,073 |
| Net Future Loss | $944,205 | $1,187,267 | $1,239,108 |
| **Total Loss** | **$1,150,340** | **$1,393,402** | **$1,445,243** |

15 Years

| | Officer | Sergeant | Lieutenant |
|---|---|---|---|
| Past Loss | $406,079 | $406,079 | $406,079 |
| Past Offset | $199,944 | $199,944 | $199,944 |
| Net Past Loss | $206,135 | $206,135 | $206,135 |
| Present Value of Future Loss | $2,834,709 | $3,359,878 | $3,693,827 |
| Present Value of Future Offset | $1,164,209 | $1,164,209 | $1,164,209 |
| Net Future Loss | $1,670,500 | $2,195,669 | $2,529,618 |
| **Total Loss** | **$1,876,635** | **$2,401,804** | **$2,735,753** |

Work Life Expectancy

| | Officer | Sergeant | Lieutenant |
|---|---|---|---|
| Past Loss | $406,079 | $406,079 | $406,079 |
| Past Offset | $199,944 | $199,944 | $199,944 |
| Net Past Loss | $206,135 | $206,135 | $206,135 |
| Present Value of Future Loss | $6,722,805 | $8,219,999 | $9,525,972 |
| Present Value of Future Offset | $2,330,822 | $2,330,822 | $2,330,822 |
| Net Future Loss | $4,391,983 | $5,889,177 | $7,195,150 |
| **Total Loss** | **$4,598,118** | **$6,095,312** | **$7,401,285** |

The attached report describes the methods used to determine these values. Please call me if you have any questions.

Sincerely,

Gilbert R. Coleman, Ph.D.
President

enclosure

**MICHAEL ERWINE**

**ASSUMPTIONS**

**Vital Statistics**

The vital statistics for the analysis are such things as Mr. Erwine's date of birth, his dates of termination from Churchill County and from other employments, his dates of hire at other employments, his age and the time since his termination.

See the Vital Statistics page of the attached spreadsheet.

**Earning Capacity**

The earning capacity calculation for Mr. Erwine's job with LVMPD is based on union contracts. The contracts report the wage rates, benefits, and employment progress for a police office, a sergeant, and a lieutenant for LVMPD.[i] Overtime and other pay rates are taken from the contracts for their descriptions and from Transparent Nevada to determine the rates of these payments.[ii] Retirement payments and conditions are taken from the Nevada Public Employment Retirement System website.[iii] Earnings and benefits for the Washoe Tribe job are taken from the job offer letter dated July 10, 2019 and an explanation of the paid leave policy provided by Mr. Erwine.

Both LVMPD and the Washoe Tribe provide a medical insurance policy for their employees. I have used the Washoe Tribe policy as a complete offset to the LVMPD policy and stopped calculating a loss for medical insurance after Mr. Erwine took the Washoe Tribe job.

See the Earnings Capacity page of the attached spreadsheet.

See the Overtime and Other Pay Analysis page of the attached spreadsheet for an analysis of these payment categories.

**Growth and Discount Rates**

The growth rate for earning from LVMPD is based on the average COLA rates agreed to in the collective bargaining agreement over 2016 to 2023. There are also step increases and longevity pay that provide earnings increases and are described in the agreement. The wage growth for the Washoe Tribe job is taken from the average annual rate of growth of wages for security jobs in the general economy over the period of the analysis.[iv]

The discount rate is a current 28 year Treasury bond rate.[v]

See the Growth and Discount Rates page of the attached spreadsheet.

**Sources**


1. Michael Erwine v. Churchill County, etc. Amended complaint August 6, 2020
2. Collective bargaining Agreement between Las Vegas Metropolitan Police Department and Las Vegas Police Protective Association and dated July 1, 2019 to June 30, 2023
3. Police Managers' and Supervisors' Association and Las Vegas Metropolitan Police Department Collective Bargaining Agreement date July 1, 2016 to June 30, 2019
4. Michael Erwine Offer Letter from the Washoe Tribe of Nevada and California dated July 10, 2019
5. https://transparentnevada.com/salaries/2019/las-vegas-metro-police-department/
6. https://www.nvpers.org/contact
7. Data.bls.gov
8. http://online.wsj.com/mdc/public/page/2_3020-treasury.html?mod=wsj_mdc_additional_interestrates
9. Michael Erwine 2018 W-2 Triumph Protective Group
10. Michael Erwine 2019 W-2 Triumph Protective Group
11. Allied Universal Verification Type Employment Plus Income Statement


**CALCULATIONS**

See the Calculations page of the attached spreadsheet.

---

[i] Collective bargaining Agreement between Las Vegas Metropolitan Police Department and Las Vegas Police Protective Association and dated July 1, 2019 to June 30, 2023 and Police Managers' and Supervisors' Association and Las Vegas Metropolitan Police Department Collective Bargaining Agreement date July 1, 2016 to June 30, 2019

[ii] https://transparentnevada.com/salaries/2019/las-vegas-metro-police-department/

[iii] https://www.nvpers.org/contact

[iv] Data.bls.gov

[v] http://online.wsj.com/mdc/public/page/2_3020-treasury.html?mod=wsj_mdc_additional_interestrates

# EXHIBIT 6 –
# "Gilbert Coleman Supplemental Expert Report"

EXHIBIT 6 –
"Gilbert Coleman Supplemental Expert Report"

***GILBERT COLEMAN, PH.D.***
***ECONOMIC CONSULTING, INC.***

40 PINE VIEW COURT
RENO, NV 89511-2761
TELEPHONE 775-852-3259
FAX 775-852-3033
E-MAIL Grcoleman@colemaneconomics.com
WEBSITE www.colemaneconomics.com

December 23, 2020

Luke A. Busby
Attorney at Law
316 California Avenue #82
Reno, NV 89501

Dear Mr. Busby:

I have made calculations of the economics damages suffered by Michael Erwine as a result of his termination from the Churchill County Sheriff's Office. The first basic loss assumption is that Mr. Erwine would have replaced this employment with a job for the Las Vegas Metropolitan Police Department (LVMPD). The basic offset employment is his current position with the Washoe Tribe of Nevada and California Law Enforcement Department. There are several assumptions that are included in the analysis. First, there is the assumption that Mr. Erwine will be able to replace the earnings he would have made with LVMPD in ten years, alternately in fifteen years, and alternately not during his work life expectancy. Second, there is the assumption that he would have remained as a police officer with LVMPD for the entirety of his loss period, alternately that he would have been promoted to the rank of sergeant after eight years with LVMPD and then remained in that position for the remainder of his loss period, and alternately that he would have been promoted to sergeant after eight years with LVMPD and then to lieutenant after an additional four years and remain there for the remainder of his loss period. In all cases, the future offset earnings are based on his Washoe Tribe employment. For Mr. Erwine's past losses, his LVMPD earnings are offset by his actual employment which consists of three different employments. They are employment with Allied Universal during 2017 and 2018, with Triumph Protection during 2018 and 2019, and with the Washoe Tribe in 2019 and 2020.

The loss calculations are as follows:

10 Years

| | Officer | Sergeant | Lieutenant |
|---|---|---|---|
| Past Loss | $ 401,747 | $ 401,747 | $ 401,747 |
| Past Offset | 199,944 | 199,944 | 199,944 |
| Net Past Loss | $ 201,803 | $ 201,803 | $ 201,803 |
| | | | |
| Present Value of Future Loss | $1,704,488 | $1,947,550 | $1,999,391 |
| Present Value of future Offset | 762,073 | 762,073 | 762,073 |
| Net Future Loss | $ 942,416 | $1,185,477 | $1,237,319 |
| | | | |
| **Total Loss** | **$1,144,219** | **$1,387,280** | **$1,439,122** |

15 Years

| | Officer | Sergeant | Lieutenant |
|---|---|---|---|
| Past Loss | $ 401,747 | $ 401,747 | $ 401,747 |
| Past Offset | 199,944 | 199,944 | 199,944 |
| Net Past Loss | $ 201,803 | $ 201,803 | $ 201,803 |
| | | | |
| Present Value of Future Loss | $2,832,919 | $1,947,550 | $1,999,391 |
| Present Value of future Offset | 1,164,209 | 1,164,209 | 1,164,209 |
| Net Future Loss | $1,668,710 | $2,193,880 | $2,527,828 |
| | | | |
| **Total Loss** | **$1,870,513** | **$2,395,683** | **$2,729,631** |

Work Life Expectancy

| | Officer | Sergeant | Lieutenant |
|---|---|---|---|
| Past Loss | $ 401,747 | $ 401,747 | $ 401,747 |
| Past Offset | 199,944 | 199,944 | 199,944 |
| Net Past Loss | $ 201,803 | $ 201,803 | $ 201,803 |
| Present Value of Future Loss | $6,721,015 | $8,218,209 | $9,524,182 |
| Present Value of future Offset | 2,330,822 | 2,330,822 | 2,330,822 |
| Net Future Loss | $4,390,194 | $5,887,387 | $7,193,360 |
| **Total Loss** | **$4,591,997** | **$6,089,190** | **$7,395,163** |

The second basic loss assumption is that Mr. Erwine would have replaced this employment with a job for the Washoe County Sheriff's Department (Washoe). The basic offset employment is his current position with the Washoe Tribe of Nevada and California Law Enforcement Department. There are several assumptions that are included in the analysis. First, there is the assumption that Mr. Erwine will be able to replace the earnings he would have made with Washoe in ten years, alternately in fifteen years, and alternately not during his work life expectancy. Second, there is the assumption that he would have remained as a deputy with Washoe for the entirety of his loss period, alternately that he would have been promoted to the rank of sergeant after eight years with Washoe and then remained in that position for the remainder of his loss period, and alternately that he would have been promoted to sergeant after eight years with Washoe and then to lieutenant after an additional four years and remain there for the remainder of his loss period. In all cases, the future offset earnings are based on his Washoe Tribe employment. For Mr. Erwine's past losses, his Washoe earnings are offset by his actual employment which consists of three different employments. They are employment with Allied Universal during 2017 and 2018, with Triumph Protection during 2018 and 2019, and with the Washoe Tribe in 2019 and 2020.

The loss calculations are as follows:

10 Years

| | Officer | Sergeant | Lieutenant |
|---|---|---|---|
| Past Loss | $ 404,533 | $ 404,533 | $ 404,533 |
| Past Offset | 199,944 | 199,944 | 199,944 |
| Net Past Loss | $ 204,590 | $ 204,590 | $ 204,590 |
| Present Value of Future Loss | $1,470,050 | $1,757,873 | $1,790,221 |
| Present Value of future Offset | 762,073 | 762,073 | 762,073 |
| Net Future Loss | $ 707,977 | $ 995,800 | $1,028,149 |
| **Total Loss** | **$ 912,567** | **$1,200,390** | **$1,404,979** |

15 Years

| | Officer | Sergeant | Lieutenant |
|---|---|---|---|
| Past Loss | $ 404,533 | $ 404,533 | $ 404,533 |
| Past Offset | 199,944 | 199,944 | 199,944 |
| Net Past Loss | $ 204,590 | $ 204,590 | $ 204,590 |
| Present Value of Future Loss | $2,382,344 | $2,998,361 | $3,204,867 |
| Present Value of future Offset | 1,164,209 | 1,164,209 | 1,164,209 |
| Net Future Loss | $1,218,135 | $1,834,152 | $2,040,657 |
| **Total Loss** | **$1,422,725** | **$2,038,741** | **$2,245,247** |

Work Life Expectancy

| | Officer | Sergeant | Lieutenant |
|---|---|---|---|
| Past Loss | $ 404,533 | $ 404,533 | $ 404,533 |
| Past Offset | 199,944 | 199,944 | 199,944 |
| Net Past Loss | $ 204,590 | $ 204,590 | $ 204,590 |
| Present Value of Future Loss | $5,453,342 | $7,442,497 | $8,271,043 |
| Present Value of future Offset | 2,330,822 | 2,330,822 | 2,330,822 |
| Net Future Loss | $3,122,521 | $5,111,675 | $5,940,221 |
| **Total Loss** | **$3,327,110** | **$5,316,265** | **$6,144,811** |

The attached report describes the methods used to determine these values. Please call me if you have any questions.

Sincerely,

Gilbert R. Coleman, Ph.D.
President

enclosure

**MICHAEL ERWINE**

**ASSUMPTIONS**

**Vital Statistics**

The vital statistics for the analysis are such things as Mr. Erwine's date of birth, his dates of termination from Churchill County and from other employments, his dates of hire at other employments, his age and the time since his termination.

See the Vital Statistics page of the attached spreadsheet.

**Earning Capacity**

The earning capacity calculations for Mr. Erwine's job with LVMPD and Washoe are based on union contracts. The contracts report the wage rates, benefits, and employment progress for a police office, a sergeant, and a lieutenant for LVMPD.[i] The contracts report similar information for a deputy, sergeant, and lieutenant for Washoe.[ii]Overtime and other pay rates are taken from the contracts for their descriptions and from Transparent Nevada to determine the rates of these payments.[iii] Retirement payments and conditions are taken from the Nevada Public Employment Retirement System website.[iv] Earnings and benefits for the Washoe Tribe job are taken from the job offer letter dated July 10, 2019 and an explanation of the paid leave policy provided by Mr. Erwine.

LVMPD, Washoe, and the Washoe Tribe provide a medical insurance policy for their employees. I have used the Washoe Tribe policy as a complete offset to the LVMPD and Washoe policies and stopped calculating a loss for medical insurance after Mr. Erwine took the Washoe Tribe job.

See the Earnings Capacity page of the attached spreadsheet.

See the Overtime and Other Pay Analysis page of the attached spreadsheet for an analysis of these payment categories.

**Growth and Discount Rates**

The growth rate for earning from LVMPD is based on the average COLA rates agreed to in the collective bargaining agreement over 2016 to 2023. There are also step increases and longevity pay that provide earnings increases and are described in the agreement. The wage growth for the Washoe Tribe job is taken from the average annual rate of growth of wages for security jobs in the general economy over the period of the analysis.[v]

The discount rate is a current 28 year Treasury bond rate.[vi]

See the Growth and Discount Rates page of the attached spreadsheet.

**Sources**


1. Michael Erwine v. Churchill County, etc. Amended complaint August 6, 2020
2. Collective bargaining Agreement between Las Vegas Metropolitan Police Department and Las Vegas Police Protective Association and dated July 1, 2019 to June 30, 2023
3. Police Managers' and Supervisors' Association and Las Vegas Metropolitan Police Department Collective Bargaining Agreement date July 1, 2016 to June 30, 2019
4. Michael Erwine Offer Letter from the Washoe Tribe of Nevada and California dated July 10, 2019
5. https://transparentnevada.com/salaries/2019/las-vegas-metro-police-department/
6. https://www.nvpers.org/contact
7. Data.bls.gov
8. http://online.wsj.com/mdc/public/page/2_3020-treasury.html?mod=wsj_mdc_additional_interestrates
9. Michael Erwine 2018 W-2 Triumph Protective Group
10. Michael Erwine 2019 W-2 Triumph Protective Group
11. Allied Universal Verification Type Employment Plus Income Statement
12. Agreement between The County of Washoe State of Nevada and the Washoe County Sheriff Deputies Association, 2019 – 2022
13. Agreement between The County of Washoe State of Nevada and the Washoe County Sheriff's Supervisory Deputies Association, 2019 – 2022
14. Agreement between The County of Washoe State of Nevada and the Washoe County Sheriff Deputies Association, 2017 – 2019
15. Staff Report Board Meeting Date September 22, 2015
16. Staff Report Board Meeting Date December 13, 2016


**CALCULATIONS**

See the Calculations page of the attached spreadsheet.

---

[i] Collective bargaining Agreement between Las Vegas Metropolitan Police Department and Las Vegas Police Protective Association and dated July 1, 2019 to June 30, 2023 and Police Managers' and Supervisors' Association and Las Vegas Metropolitan Police Department Collective Bargaining Agreement date July 1, 2016 to June 30, 2019

[ii] Agreement between The County of Washoe State of Nevada and the Washoe County Sheriff Deputies Association, 2019 – 2022; Agreement between The County of Washoe State of Nevada and the Washoe County Sheriff's Supervisory Deputies Association, 2019 – 2022; Agreement between The County of Washoe State of Nevada and the Washoe County Sheriff Deputies Association, 2017 – 2019; Staff Report Board Meeting Date September 22, 2015; Staff Report Board Meeting Date December 13, 2016

[iii] https://transparentnevada.com/salaries/2019/las-vegas-metro-police-department/

[iv] https://www.nvpers.org/contact

# EXHIBIT 7 –
# "Michael Giurlani Initial Expert Report"

EXHIBIT 7 –
"Michael Giurlani Initial Expert Report"

Michael S. Giurlani

Background Investigation Review Regarding:

***Michael Erwine vs. Churchill County Case No. 3:18-cv-00461RCJWGC***

Michael Erwine

Luke A, Busby, Ltd.

316 California Ave. #82

Reno, Nv. 89509

**Introduction:**

The following is comprised of information and facts gathered from conversations and reviews of documentation provided by Michael Erwine and Luke Busby, Ltd.

Mr. Erwine was employed at a Deputy Sheriff for Churchill County Nevada, in Fallon, Nevada. Mr. Erwine began describing to me issues that concerned him regarding, what he deemed obvious civil rights violation. Mr. Erwine stated he witnessed firsthand and had video and audio recordings of civil rights violations against inmates incarcerated in the Churchill Co. Jail. Mr. Erwine stated that the violations he witnessed occurred during his employment and were committed by sworn law enforcement personnel.

I advised Mr. Erwine that he needed to keep a journal regarding his findings. I added, if at all possible he needed to record such information to add corroboration to his verbal statements. Mr. Erwine indicated that he began looking into a specific event involving a man who was incarcerated. It was this event that lead to actions being taken again Mr. Erwine.

Mr. Erwine stated that he began to get write ups for alleged performance issues after he began questioning such practices against incarcerated persons. The rejection of background applications is a result of that documented conduct by Churchill County person.

**Qualifications: (see attached resume)**

I served as State Trooper with the Nevada Highway Patrol from 10/1988 until 12/2013. During my career, I performed many duties including but not limited to, Field Training Officer, Training Officer (Corporal) at the Academy, Background Investigator, along with criminal case investigations. I personally conducted and/or handled over 100 background investigations for the purpose of employment. I have intimate knowledge of the process regarding hiring and rejecting applicants from the background process. During my employment, I had intimate working and applicable knowledge of department policies and procedures that I followed. I have also instructed hired applicants that attained

the rank of cadet. This instruction was in the Academy in class room instruction as well as outside in simulation drills.

Over my 23 yrs. tenure, I received training in criminal investigations, narcotic cases, traffic accidents, and limited civil liability. I have a working knowledge of the Nevada Revised Statues as well as policies and procedures established by the Department of Public Safety. At the time of my retirement, I was recipient of five medals. Two for valor, one for life saving, one for Trooper of the year and a meritorious medal for my actions during the IHOP shooting incident in 2011. I was also issued Badge 1, signifying that I had attained the highest seniority of any state trooper at the time working for the highway patrol. These accomplishments I consider a testament to my character and integrity to the field for which I served.

I also served as President of the Nevada State Law Enforcement Officers Association from 2014 to 2018. We represented 23 state law enforcement agencies and over 450 members during that time. I was also a member of the Nevada Law Enforcement Coalition in which we represented over 10000 members. During my tenure, I assisted our legal team with numerous Internal Affairs Investigations. During the Nevada State Legislature, sessions 2015 and 2017, I testified several time regarding budget, police officers rights, and Public Employees Retirement.

**Depositions or recent court case testimonies:**

I have not published any related documents within the past ten years nor have I testified in any court case in the past 4 years.

**Material Reviewed Thus Far:**

1. Michael Erwine vs. Churchill County, Case No. 3:18-cv-00461 RCJ WGC
2. Michael Erwine's employee file
3. Affidavit of Matthew Maes
4. Affidavit of Andrew Beaulieu
5. Nevada Department Of Public Safety background letter
6. Washoe County Sheriff's Office background letter
7. Las Vegas Metropolitan Police Department background letter
8. Carson City Department Of Alternative Sentencing background letter
9. Douglas County Sheriff's Office background letter

**10.** North Las Vegas Police Department background letter

**11.** Reno Police Department background letter

**12.** Employee Action Notice

**13.** North Las Vegas Muni Code 2.68.090 Applications

**14.** Churchill County Sheriff's Office policies, Administration, Rules and Regulations, and Use of Force (Jail)

**15.** Statement from Zachary White, regarding misconduct and mistreatment of inmate

**16.** **NRS 289.060 Notification and requirements for interview, interrogation or hearing relating to investigation; prohibition against use of certain statements or answers in subsequent criminal proceedings.**

1. Except as otherwise provided in this subsection, a law enforcement agency shall, not later than 48 hours before any interrogation or hearing is held relating to an investigation conducted pursuant to NRS 289.057, provide a written notice to the peace officer who is the subject of the investigation. If the law enforcement agency believes that any other peace officer has any knowledge of any fact relating to the complaint or allegation against the peace officer who is the subject of the investigation, the law enforcement agency shall provide a written notice to the peace officer advising the peace officer that he or she must appear and be interviewed as a witness in connection with the investigation. Any peace officer who serves as a witness during an interview must be allowed a reasonable opportunity to arrange for the presence and assistance of a representative authorized by NRS 289.080. Any peace officer specified in this subsection may waive the notice required pursuant to this section.

**2. The notice provided to the peace officer who is the subject of the investigation must include:**

(a) A description of the nature of the investigation;
(b) A summary of alleged misconduct of the peace officer;
(c) The date, time and place of the interrogation or hearing;
(d) The name and rank of the officer in charge of the investigation and the officers who will conduct any interrogation or hearing;
(e) The name of any other person who will be present at any interrogation or hearing; and
(f) A statement setting forth the provisions of subsection 1 of NRS 289.080.

**3. The law enforcement agency shall:**

(a) Interview or interrogate the peace officer during the peace officer's regular working hours, if reasonably practicable, or revise the peace officer's work schedule to allow any time that is required for the interview or interrogation to be deemed a part of the peace officer's regular working hours. Any such time must be calculated based on the peace officer's regular wages for his or her regularly scheduled working hours. If the peace

officer is not interviewed or interrogated during his or her regular working hours or if his or her work schedule is not revised pursuant to this paragraph and the law enforcement agency notifies the peace officer to appear at a time when he or she is off duty, the peace officer must be compensated for appearing at the interview or interrogation based on the wages and any other benefits the peace officer is entitled to receive for appearing at the time set forth in the notice.

(b) Immediately before any interrogation or hearing begins, inform the peace officer who is the subject of the investigation orally on the record that:

(1) The peace officer is required to provide a statement and answer questions related to the peace officer's alleged misconduct; and

(2) If the peace officer fails to provide such a statement or to answer any such questions, the agency may charge the peace officer with insubordination.

(c) Limit the scope of the questions during the interrogation or hearing to the alleged misconduct of the peace officer who is the subject of the investigation. If any evidence is discovered during the course of an investigation or hearing which establishes or may establish any other possible misconduct engaged in by the peace officer, the law enforcement agency shall notify the peace officer of that fact and shall not conduct any further interrogation of the peace officer concerning the possible misconduct until a subsequent notice of that evidence and possible misconduct is provided to the peace officer pursuant to this chapter.

(d) Allow the peace officer who is the subject of the investigation or who is a witness in the investigation to explain an answer or refute a negative implication which results from questioning during an interview, interrogation or hearing.

4. If a peace officer provides a statement or answers a question relating to the alleged misconduct of a peace failing to provide the statement or answer may result in punitive action against him or her, the statement or answer must not be used against the peace officer who provided the statement or answer in any subsequent criminal proceeding.

(Added to NRS by 1983, 2097; A 1993, 2379; 2005, 622; 2011, 1750)

17. **NRS 289.040 Law enforcement agency prohibited from placing unfavorable comment or document in administrative file of peace officer; exception; right to respond; provision of copy of comment or document; right to review administrative file under certain circumstances**

1. Except as otherwise provided in subsection 3, a law enforcement agency shall not place any unfavorable comment or document in any administrative file of a peace officer maintained by the law enforcement agency unless:

(a) The peace officer has read and initialed the comment or document; or

(b) If the peace officer refuses to initial the comment or document, a notation to that effect is noted on or attached to the comment or document.

2. If the peace officer submits to the law enforcement agency a written response within 30 days after the peace officer is asked to initial the comment or document, the peace officer's response must be attached to and accompany the comment or document.

3. If a peace officer is the subject of an investigation of a complaint or allegation conducted pursuant to NRS 289.057, the law enforcement agency may place into any administrative file relating to the peace officer only:

(a) A copy of the disposition of the allegation of misconduct if the allegation is sustained; and

(b) A copy of the notice of or statement of adjudication of any punitive or remedial action taken against the peace officer.

4. A peace officer must be given a copy of any comment or document that is placed in an administrative file of the peace officer maintained by the law enforcement agency.

5. Upon request, a peace officer may review any administrative file of that peace officer maintained by the law enforcement agency that does not relate to a current investigation.

(Added to NRS by 1983, 2097; A 1991, 2213; 2005, 621)

**Opinions:**

It was brought to my attention during Mr. Erwine's employment with Churchill County Sheriff's Department, Mr. Erwine was being subjected to "discriminatory actions", by his employer/supervisor(s). Via a phone conversation I had with Mr. Erwine, he felt he was being retaliated against for defending an inmate who he thought was being severely mistreated his coworkers. **(Affidavit provided by Andrew Allen Beaulieu)** Mr. Erwine gave me detailed information and examples of several incidents that I personally recognized as civil rights violations and I felt at the time he advised me of these issues, he was obligated by law to verify the incidents and report them.

- It was this reporting that subsequently began a retaliatory action by Sheriff Benjamin Trotter of Churchill County, and the subsequent rejection process of employment from many Nevada law enforcement agencies.
- Mr. Erwine was hired as a detention Deputy by Churchill County in 2015. He successfully passed a thorough background investigation with that agency. Mr. Erwine was placed in the detention center in Fallon Nevada and assigned customary duties as a detention deputy.
- During his employment Mr. Erwine began observing civil rights violations and potential criminal violations committed by fellow deputies against in custody detention persons. Mr. Erwine felt compelled to corroborate the allegations that he was witness too and advised of by detention inmates. As such Mr. Erwine began to document his contacts and findings, to the point of audio recording events and review facility video recordings.
- During this time, the administration became aware of Mr. Erwines activities and subsequently terminated him for conducting his "Own investigation". This action was documented in Mr. Erwines personnel file.
- This file is subjected to review by outside law enforcement agencies that would conduct a background investigation for employment. Due to Mr. Erwine's concerns for mistreatment and what he deemed as unlawful and "inhumane treatment" to persons incarcerated, he was terminated from employment with Churchill County Sheriff's Department.
- The letter which was written by Sheriff Benjamin Trotter and placed in Mr. Ermine's personnel file contained information that should have been verified and obtained during and Internal Affairs Investigation. It was noted in this letter that information gathered to "terminate" Mr. Erwine was obtained through text messages and verbal statements.
- It was this documentation that led to the subsequent rejection for employment from the mentioned law enforcement agencies for which Mr. Erwine applied for after his dismissal from

Churchill County. These items in my opinion were detrimental to a fair and successful background investigation for employment by any outside law enforcement agency.

**Rejections letters from respected Law Enforcement Agencies:**

- January 4, 2017, Mr. Erwine was rejected from the background investigation process from the Department of Public Safety. (no reason given)
- January 17, 2017, Washoe county Sheriff's Department rejected Mr. Erwine from the background process. (no reason given)
- February 7, 2017, Las Vegas Metropolitan Police Department, rejected Mr. Erwine from the background process. They indicated the reason for rejection was employment history. They additionally stated **"You are not eligible to apply with LVMPD for any position indefinitely, and your name will be removed from all eligibility list(s) and processes."**
- September 9, 2017. Mr. Erwine was rejected from the background process for employment with Carson City Department of Alternative Sentencing.
- September 12, 2017, Mr. Erwine was rejected from the Douglas County Sheriff's Department. No reason was given.
- November 14th, 2017, North Las Vegas Police Department, rejected Mr. Erwine from background process. They indicated the reason for rejection was "character issues" and "employment history". They added that he was "disqualified indefinitely" from employment with the North Law Vegas Police Department.
- March 1, 2018, Mr. Erwine was rejected from the background process from the Reno Police Department. Reno Police Department added that Mr. Erwine was not precluded from applying again for the position of police officer.

It is clear in my opinion that the investigators from these agencies, contacted the Churchill County Sheriff's Department and inquired as to why Mr. Erwine was terminated. Based on those answers given by Churchill County Sheriff's Department, Mr. Erwine was denied a fair and unbiased process to employment.

It is common practice in the background investigation process, when an investigator sees a rejection from another law enforcement agency, it presents a so called "red flag" for the applicant and the investigator will in most cases cease any further investigative activities. Thus it is not possible to obtain a fair background investigation for employment. This practice is commonly used as a time saving means to expedite "viable" background investigations through to the hiring process. Mostly due to high case load or the need to "rush" certain applicants through the process.

Additionally through the background process investigators will contact agencies of prior employment as well as agencies which an applicant applied for. In each case there is a waiver of liability and release of information signed by the applicant. As such this allows information that would not normally be shared to be disseminated amongst background investigators. In reviewing Mr. Erwines personnel file, I noted a facsimile from the Washoe County Sheriff's office in addition to a waiver authorization form releasing information signed by Mr. Erwine. This was dated November 9th 2016. This form is standard with the law enforcement background process. It is commonly used in sharing and disseminating confidential employee file information to outside law enforcement agencies that an applicant has applied for. In

reviewing this form, I noted no obvious indicators for rejecting Mr. Erwine from the background process. Nor did I note any indications that he would not be able to reapply for the same position in the future. In a separate rejection letter dated February 7, 2017, issued by the Las Vegas Metropolitan Police Department. They indicated Mr. Erwine would not be eligible for employment for an indefinite period. This is unusual as both agencies have a high standard of requirements to be employed as a sworn peace officer.

**Summary:**

The information contained in Mr. Erwines personnel file regarding the two separate events that occurred over the weekend of October 7th 2016 is not documented in a fashion consistent with a standard investigation into an officer's alleged misconduct, as per NRS 289.060, **(see item number 16)** It appears that Mr. Erwine was accused of several general misconduct violations however no specific policy violations were mentioned. Furthermore it appears that most all of the information published in Mr. Erwines personnel file was obtained in a fashion not consistent with the Peace Officer Bill of Rights. **(See number 17).** This would normally be indicated in Mr. Erwines personnel file and thus be easily noted that an investigation was conducted and such investigation indicated policy violations. These are normally how a background investigation are carried out. I did not observe this to be the case in Mr. Erwines personnel file.

Most times a background investigator will follow all leads and references regarding an applicant. However due to time and case load this is not always the case. Due to the current information sharing process, there often are times when a thorough complete and unbiased investigation is NOT conducted. This is because an investigator doesn't want to put in the effort in in doing a thorough report, due to case load, or more important issues or perhaps lack of attention by the investigator. This can often be accountable for the lack of finding a viable candidate through a completed background investigation. Or perhaps the investigator may simply take an appointing agencies word for such items placed in a personnel file, thus leading to untrue or inaccurate information being written.

It would be extremely difficult if not impossible for Mr. Erwine to gain future employment with the above mentioned agencies or any major law enforcement agency that would give him the same opportunities for career progression to include rank, investigations, narcotics or any other field of specialty. As I indicated before, I feel because of the current investigative practices it is very likely that Mr. Erwin has been black balled from ever applying to these aforementioned departments because of the poor comments and documentation provided by Churchill County.

Once a "red flag" has been noted in a file, that applicant is dead in the water when reapplying for employment. ***Specifically noted in North Las Vegas Municipal Code 2.68.090 Applications, (7) Which indicates termination or resignation from other employment because of failure, omission, violation, of duty and/or job related crime or misconduct, which is substantially related to the qualifications, functions, or duties of the job for which application is made.*** However in regards to Mr. Erwine, he did not have a due process with his alleged misconduct and subsequent release from service. This would be obvious with the statements noted in the rejection letters from LVMPD, Carson City Alternative Sentencing, and North Las Vegas Police. This is due to the reasons noted. Mr. Erwine would not be faced with the issue of employment had the Churchill County Sheriff's Department maintained a

thorough personnel file, conducted a proper investigation, and followed the police officer bill of rights. Mr. Erwine would have the same opportunities to apply and move through a background investigation based on accurate and truthful descriptions of his character and performance.

I declare under the penalty of perjury that the aforementioned is true and correct. Executed August 31, 2020, In Carson City, Nev.

/s/Michael Sean Giurlani

*Michael S. Giurlani*

**MICHAEL S. GIURLANI**

**1496 Chimney Drive**

**Carson City, Nevada 89701**

Luke Andrew Busby, Ltd.
316 California Ave. #82
Reno, NV 89509

***Regarding: Michael Erwine vs. Churchill County, Case No. 3:18-cv-00461 RCJ WGC***

Dear Mr. Busby:

Me fee schedule is as follows:

- Travel time as the rate of $50.00 per hour.\
- All case review, consulting, and writing of expert opinions at $200.00 per hour.
- All testimony (either at trial or deposition) at $350.00 per hour, with two hour minimum required.
- An invoice will be submitted periodically upon request reflecting the activities and charges associated with the account. Payment is due upon receipt of the invoice unless other arrangements are made and agreed upon.

There is no formal contract required

Sincerely,

Michael S. Giurlani

# MICHAEL S. GIURLANI

**1496 Chimney Drive**

**Carson City, Nevada 89701**

***OBJECTIVE***

PROFESSIONAL RESUME

***FUNCTIONAL SUMMARY***

I am candidate for the position of Security Professional. Based on my experience, knowledge, and eagerness to move forward in my livelihood and the constant drive to better myself and personal growth. I strive to share my knowledge with others and educate people around me. As well as provide a high level of security for the persons, property and product of the client.

As a State Trooper, I learned investigations and instructing techniques which I shared with those around me. I have actively sought out new assignments to enhance my skills and advance my career; such as field training officer, background investigator, field sobriety instructor, and warrant service team coordinator. I developed a warrant service program to assist and excel the apprehension process of wanted persons.

I learned leadership and mentoring as a senior Trooper. I shared my experiences with other Troopers both new and veteran. I have taught Standardized Field Sobriety, Juvenile Law, Probable Cause, and Patrol Procedures at the DPS Training Division. I developed training scenarios and met with individual's one on one, and in groups to assist with their success. I lead by example and reinforce with teamwork.

I have a moderate knowledge base regarding dignitary protection. I have worked on four United State Presidential details as well as numerous state Governor Dignitary assignments.

***EXPERIENCE:***

**NEVADA HIGHWAY PATROL**

**Traffic Operations, State law enforcement officer, October 10, 1988 to December 13, 2013 *(Honorable Retiree)***

Perform general police traffic management and enforcement of local and state laws. Educate and assist the public.

**PDI Security Systems**

2001-2002 Installing residential and commercial security systems including closed circuit video and audio. As well as passive infrared motion sensors, glass breaks, and controlled access readers.

**NEVADA STATE LAW ENFORCEMENT OFFICERS ASSOCIATION (PRESIDENT)**

2015 / September, 2018. Oversee the daily operations and representation threw labor attorneys, for 22 state law enforcement agencies and 475 sworn members. Full time Legislative Lobbyist. Testify during Legislative Session regarding Bill Draft Requests. Team building and recruiting sworn and non-sworn personnel.

**TRIUMPH PROTECTION GROUP**

February 2, 2018 to September 2, 2018. Shift lead supervisor. Assist manager and supervisor with daily operations for a multimillion dollar, "Cascade Project". Directly supervise six employees. Write evaluations, commendations, as well as disciplinary documentation. Team building and mentoring the shift as well as giving positive direction to employees. Scanning in/out of subcontractors on the site. Maintaining a vendor roster and list of personnel who are first time entrants to the site. Maintaining a high level of visible protection and observation for the client as well as supporting the daily operations set forth by Triumph Protection Group.

**CARSON CITY BOARD OF SUPERVISORS, RANGE TASK FORCE**

February 2019 to present. I was selected by Carson City Board of Supervisors member Stacy Giomi, to sit on the Range Task Force. This Task Force was developed to address public safety concerns and design flaws that existed at the Carson City Rifle and Pistol Range. I am assigned to Head of Operations for the range. This duty entailed, fees, community outreach and sponsorship, safety issues, range designs, sign usage, range management current and future plans.

**Background Investigator, Part time 1996-2013. Assigned fulltime to Background Investigation Unit, October 1, 2005 to October 1, 2006.**
Conducted in-depth and comprehensive investigations into the backgrounds of applicants for the Department of Public Safety. Through personal contacts with the applicant and their present and past employers, neighbors, family members, and friends.

Drug Recognition Expert,
Recognition, identification, and enforcement of persons who have used and/or are under the influence of a controlled substance.

Criminal Investigations Analyst,
Certified by the Rocky Mountain Information Network Analyze, track and construct time lines and chart the criminal activities of persons from criminal investigations using time line data, environmental data, and suspect information. As well as comprehensive background investigations.

Narcotic Identification Instructor, By Bendix/Dickson
Using Narcotic Identification Kits, properly identifying all known narcotics in the field.

Field Sobriety Test; Instructor
Instruct, train, and assist new officers from allied agencies as well as from the Nevada Highway Patrol in the proper detection and identification of impaired persons. Using the Standard Field Sobriety Tests.

Field Training Officer,
Instruct, train, and assist new Troopers in the proper use of enforcement skills learned in the Academy and the proper use of Departmental Policy and Procedure.

Technical Accident Investigation and Vehicle Dynamics Investigator,
Conducting investigations at an intermediate level. Assisting NHP personnel as well as allied agencies with their investigations by using speed computations, diagraming, and other technical skills related to accident investigations.

***AWARDS/RECOGNITION:***

1994: Commendation from the Douglas County Sheriffs Dept. for coming to the aide of two injured officers from a domestic incident.

1995: Survivors Award / Service Above and Beyond the Call of Duty from the James D. Hoff Peace Officers Memorial, for a shooting incident on May 31, 1994.

1995: Vocational Award from the Sunset Rotary Club of Carson City.

1997: Awarded the Gold Medal of Valor from the Nevada Highway Patrol, for a shooting incident April 24, 1994.

1997: Letter of recognition for service from United States Senator Richard Bryan.

1997: Recognition from Caliber Press Street Survival (shooting incident published in international brochure).

1998: Commendation from Sgt. Pete Onorado NHP, for the capture of a kidnaping suspect and high speed chase, assistance provided to child victim.

1998: Commendation from Sgt. Camilla Munns NHP, for care and attention given to several neglected children located during a traffic stop.

1999: Commendation from Sgt. Dan Luke NHP, for in-depth Investigation regarding Fatality accident and discovery of the cause of death unrelated to the accident. This was over looked by other investigators.

1999: Commendation from Sgt. Robert Conti NHP, for keeping a fast moving brush fire from burning two houses and a motor home in Pleasant Valley.

2000: Commendation from Captain Larry Whitson NHP, for service during the New Year's Eve riot control at S. Lake Tahoe.

2000: Commendation from Nevada Division of Forestry during the Arrow Creek Fire, assisting fire personnel in saving several homes and evacuations.

2002: Commendation from Sgt. John Lewis NHP, for the capture of an auto theft suspect wanted by an allied agency

2003: Awarded the Silver Medal of Valor, by the Nevada Highway Patrol, for an officer involved shooting and apprehension of a dangerous person on December 13, 2002.

2003: Survivors Award / Service Above and Beyond the Call of Duty, from James D. Hoff, Peace Officers memorial, for shooting incident December 13, 2002.

2004: Commendation from Lt. Roger Vind, regarding my ability to take command of NHP Troopers and direct resources during a major incident; wildland fire and road closure of I-80 at the California State line.

2004: Commendation from Sgt. Ron Larson, for high activity during the month of May.

2004: Commendation from Sgt. Allen Stout, for helping evacuations and assisting residence during the Andrew Ln. fire.

2004: Letter of Appreciation from Deputy District Attorney, Roger Holmes, regarding an officer involved shooting incident, December 13, 2002. Suspect sentenced to 44 plus years.

2007: Trooper of the Year award

2007: Recognition from Lt. Kevin Bailey, for assisting a family and paying to have their heat turned back on in December. A Christmas gift drive was put together for this family for the holiday.

2008: Minden/Douglas Elks Lodge #2670 Trooper of The Year Award.

2008: Life Saving Award, Saved a man after full cardiac arrest.

2011: Meritorious Service Award, for Service above and beyond the call of duty regarding the IHOP Shooting Incident.

2013: Senior Trooper Recognition and Award. Becoming the highest senior trooper in Nevada. Awarded Badge # 1.

2013: Letter of recognition from United States Senator Harry Reid, for becoming the highest senior trooper in Nevada.

2013: Certificate of Recognition of Service, for 25 yrs. of dedication to the Nevada Highway Patrol and State of Nevada.

2017: Recognition award from the AFL/CIO, for my efforts and lobbying during the 78th Nevada Legislative Session.

****** Numerous citizen commendations and letters of thanks for service to the public.**

***EDUCATION:***

Graduated from Carson City High School, June 1985

Attended Truckee Meadows Community College, 1985-1987

Attended Western Nevada Community College,
1985-1987

NEVADA HIGHWAY PATROL ACADEMY
#24,1989 P.O.S.T. Basic Category I, Peace Officer
Training,1989.

***ADDITIONAL TRAINING & EDUCATION:***

Interview and Interrogation (Florida National Guard and St. Petersburg Junior College)
Instructor Development (Nevada P.O.S.T.)
Criminal Investigations Analyst (Rocky Mountain Intelligence Network)
First Responder (NHP), Former E.M.T. I (NDF / CCFD)
Southeast Asian Gangs Seminar, (San Francisco Police Dept., NDI)
Northern Nevada Youth Gang Taskforce, (NDI)
Intoxilyzer 5000 certification, (Washoe County Sheriffs Department)
Major Crime Interdiction Commercial Vehicle Drug Interdiction, (DEA, US Customs, Nevada National Guard, Florida National Guard, Federal Highway Administration)
Emergency Vehicles Operations Course, (California Highway Patrol and Nevada Highway Patrol), with re-certifications every three years. (Current)
Traffic Enforcement Aircraft Observer (NHP)
Standardized Field Sobriety Testing Instructor (NHTSA, and Nevada P.O.S.T.) BAC Verifier Certification (Washoe County Sheriffs Department)
PR 24 Defensive Tactics, (NHP)
ASP Baton
Team Arrest, (NHP)
Weapon Retention, (NHP)
Advanced Highway Drug Interdiction Phase I, (California Highway Patrol)
Advanced Highway Drug Interdiction Phase II, (California Highway Patrol)
Advanced Highway Drug Interdiction Phase III, (California Highway Patrol) The above course was attended in 1991 and 1994.
Police Traffic Radar, (NHP)
Corporal, assigned at the DPS Academy/ Supervise and evaluate 7 person squad as well at teach Juvenile law and patrol procedures along with DUI detection.

**Continued Training and Education:**

Radiological Emergency Response Course, (United States Dept. Of Energy).
Hazardous Materials Compliance and Enforcement
Internal Affairs Orientation, (NHP)
Vehicle Arson, (State of Nevada, Fire Marshall)
Certified Firefighter I / II, 1986 (State of Nevada, Fire Marshall)
Transportation of Radioactive Materials
Preliminary Breath Test, (NHP)
North American Standard Driver Vehicle Inspection Course
Domestic Drug Interdiction, Multi-Jurisdictional Narcotic Task Force, (FBI, DEA, U.S. Customs).
Disabled Persons, Dealing with Difficult People
Cultural Awareness/Sexual Harassment
Basic File Management
Basic Windows Interface
Riot Control, Douglas County Sheriffs Department
Truck/Bus Accident Investigations
Infectious Disease
Highway Drug Interdiction, DEA, US Customs
Highway Drug Interdiction, Lyon County Sheriffs Department
CAPSTUN Training
Search and Seizure
Fire Shelter Training/Instruction, Nevada Division of Forestry
Firearms Training
Caliber Press Street Survival Seminar phases I, II, and III (1994 and 1998)
Recognition of Explosive Devices for Patrol Officers (1999 North Dakota National Guard, Reno Fire Department)
Field Force Training ie; Riot / Crowd Control Reno Police Dept.
Basic Narcotic Investigators Course (DEA)
High Risk Building Entry Course (DEA)
Scooters 1999, Out Law Motorcycle Gangs Seminar
California Attorney General's Organized Crime Seminar:
- Out Law Motorcycle Gangs
- Hispanic Street Gangs
- Weapons of Mass Destruction
- International Terrorism
- Anti-Government Extremists
- Violent Crimes-Serial Killers
- Nazi Low Riders White Supremacists Groups

**Continued Training and Education:**

Blood Borne Pathogens, State Fire Marshall Office
Nevada Gang Investigators Association Conference, Organized Gangs and Crime, Reno, Nevada.

- Basic and Advanced Course
- Out Law Motorcycle Gangs
- Hispanic Gangs
- Officer Safety Tactics / Gang Member Tactics
- Expert Testimony
- Prison Gangs
- Nazi Low Riders

Warrant Service Program
Interview / Interrogation / Forensic Hand writing Analysis, Florida Multi-Jurisdictional Narcotics Task Force - St. Petersburg Jr. College
Rapid Response to the Active Shooter; (Reno Police Department)
Police Officer Survival Training; Carson City Sheriffs SWAT, Aug 2005 (DEA) Clandestine Labs Detection / Recognition Course, Nov. 2005
EPIC Highway Drug Interdiction three day course, Las Vegas, Nev. 4-13-2006

***ORGANIZATIONS and/or ASSOCIATIONS***

Northern Nevada Outlaw Motorcycle Gang Investigators, Board Member.
Consolidated Gang Task Force – Chairman 2010
Nevada Highway Patrol Association, Board Member, Secretary/Treasurer 2000.
Nevada Narcotic Officers Association, Member
State of Nevada Employees Association, Member
Nevada State Law Enforcement Officers' Association: Association President, 2015 / 09-2018
Retired Public Employees of Nevada (RPEN) 2017 / present.

***RECOMMENDATIONS / REFERENCES Produced if needed***

# EXHIBIT 8 –
# "Letter of Recommendation from Michael Giurlani"

EXHIBIT 8 –
"Letter of Recommendation from Michael Giurlani"

Dear Sir or Madam,

I am writing to recommend Michael Erwine, whom I have known for six years, as a candidate for Police Officer with your agency,

I have no doubt Michael Erwine would be a valuable asset to your department. He has demonstrated strong character, which I have taken notice of over the past few years. Michael has a strong desire and commitment to serve the public and is eager to learn. During my contacts with Michael, he had never hesitated to ask for advice or give common sense solutions to issues we had to deal with on a personal and professional level.

I spent 25 years as a state trooper in Nevada. I was the highest decorated trooper in the Nevada Highway Patrol at the time of my retirement in December of 2013. I was also the first trooper in the NHP history to receive the Gold Medal of Valor. I took a tremendous amount of pride in my job. I have a solid understanding of what we need in law enforcement today. I feel Michael Erwine has the ability to fulfill those requirements.

If you have any questions regarding Michael Erwine, please don't hesitate to contact me.

Sincerely,

Michael Sean Giuriani

Retired State Trooper

775-720-4304 michaelgiuriani@sbcglobal.net

**EXHIBIT 9 –**
**"Plaintiff's FRCP 26 Eighteenth Supplemental Disclosure"**

**EXHIBIT 9 –**
**"Plaintiff's FRCP 26 Eighteenth Supplemental Disclosure"**

LUKE A. BUSBY, ESQ
Nevada Bar No. 10319
LUKE ANDREW BUSBY, LTD.
316 California Ave 82
Reno, Nevada 89509
775-453-0112
luke@lukeandrewbusbyltd.com
*Attorney for the Plaintiff*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

* * *

MICHAEL ERWINE,

Plaintiff,

vs.

CHURCHILL COUNTY, a political subdivision of the State of Nevada and CHURCHILL COUNTY SHERIFF BENJAMIN TROTTER; and DOES 1 through 10 inclusive;

Defendants.
_______________________________/

Case No.: 3:18-cv-00461-RCJ WGC

**PLAINTIFF'S FRCP 26 EIGHTEENTH SUPPLEMENTAL DISCLOSURES**

Pursuant to Rule 26(a)(1) of the Federal Rules of Civil Procedure, Plaintiff MICHEAL ERWINE ("Plaintiff") hereby provides the following supplemental disclosures:

A. The name and, if known, the address and telephone number of each individual likely to have discoverable information—along with the subjects of that information—that the disclosing party may use to support its claims or defenses, unless the use would be solely for impeachment.

Disclosure:

1. Leslie Hawley, Human Resources Department, Pyramid Lake Paiute Tribe, PO Box 256, Nixon, Nevada 89424. 775-574-1000.

   Ms. Hawley is a human resources manager at the Pyramid Lake Paiute Tribe and authored the letter disclosed at ERW 690. Ms. Hawley

conducted Mr. Erwine's background investigation during his hiring process. Ms. Hawley can testify to her knowledge of the facts in this case, including but not limited to Mr. Erwine's background investigation.

B. A copy—or a description by category and location—of all documents, electronically stored information, and tangible things that the disclosing party has in its possession, custody, or control and may use to support its claims or defenses, unless the use would be solely for impeachment. The following documents or files are included in the enclosed CD.

Disclosure:

1. N/A

**DATED** this Thursday, September 9, 2021:

By: [signature]

LUKE BUSBY, ESQ.
NEVADA STATE BAR NO. 10319
316 CALIFORNIA AVE #82
RENO, NV 89509
775-453-0112
LUKE@LUKEANDREWBUSBYLTD.COM
*ATTORNEY FOR PLAINTIFF*

**CERTIFICATE OF SERVICE**

Pursuant to FRCP 5, I certify that on the date shown below, I caused service to be completed of a true and correct copy of the foregoing pleading by:

______ personally delivering;

______ delivery via Reno/Carson Messenger Service;

______ sending via Federal Express (or other overnight delivery service);

______ depositing for mailing in the U.S. mail, with sufficient postage affixed thereto; or,

__X__ delivery via electronic means (fax, eflex, NEF, etc.) to:

Katherine F. Parks, Esq.
Thorndal Armstrong
6590 S. McCarran Blvd. Suite B.
Reno, NV 89509
Attorney for the Defendant

**DATED** this Thursday, September 9, 2021

By:________________

LUKE BUSBY, ESQ.
NEVADA STATE BAR NO. 10319
316 CALIFORNIA AVE #82
RENO, NV 89509
775-453-0112
LUKE@LUKEANDREWBUSBYLTD.COM
*ATTORNEY FOR PLAINTIFF*

**EXHIBIT 10 –
"Plaintiff's FRCP 26 Twenty-First Supplemental
Disclosure"**

**EXHIBIT 10 –
"Plaintiff's FRCP 26 Twenty-First Supplemental
Disclosure"**

LUKE A. BUSBY, ESQ
Nevada Bar No. 10319
LUKE ANDREW BUSBY, LTD.
316 California Ave 82
Reno, Nevada 89509
775-453-0112
luke@lukeandrewbusbyltd.com
*Attorney for the Plaintiff*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

* * *

MICHAEL ERWINE,

Plaintiff,

vs.

CHURCHILL COUNTY, a political subdivision of the State of Nevada and CHURCHILL COUNTY SHERIFF BENJAMIN TROTTER; and DOES 1 through 10 inclusive;

Defendants.
______________________________/

Case No.: 3:18-cv-00461-RCJ WGC

**PLAINTIFF'S FRCP 26 21 SUPPLEMENTAL DISCLOSURES**

Pursuant to Rule 26(a)(1) of the Federal Rules of Civil Procedure, Plaintiff MICHEAL ERWINE ("Plaintiff") hereby provides the following supplemental disclosures:

A. The name and, if known, the address and telephone number of each individual likely to have discoverable information—along with the subjects of that information—that the disclosing party may use to support its claims or defenses, unless the use would be solely for impeachment.

Disclosure: N/A

B. A copy—or a description by category and location—of all documents, electronically stored information, and tangible things that the disclosing party has in its possession, custody, or control and may use to support its claims or defenses,

unless the use would be solely for impeachment. The following documents or files are included in the enclosed CD.

Disclosure:

1. Declaration of Leslie Hawley: 1733
2. Certified Copy of COR Rejection Letter: 1734

**DATED** this Monday, September 27, 2021:

By: [signature]
LUKE BUSBY, ESQ.
NEVADA STATE BAR NO. 10319
316 CALIFORNIA AVE #82
RENO, NV 89509
775-453-0112
LUKE@LUKEANDREWBUSBYLTD.COM
*ATTORNEY FOR PLAINTIFF*

**CERTIFICATE OF SERVICE**

Pursuant to FRCP 5, I certify that on the date shown below, I caused service to be completed of a true and correct copy of the foregoing pleading by:

______ personally delivering;

______ delivery via Reno/Carson Messenger Service;

______ sending via Federal Express (or other overnight delivery service);

______ depositing for mailing in the U.S. mail, with sufficient postage affixed thereto; or,

__X__ delivery via electronic means (fax, eflex, NEF, etc.) to:

Katherine F. Parks, Esq.
Thorndal Armstrong
6590 S. McCarran Blvd. Suite B.
Reno, NV 89509
Attorney for the Defendant

**DATED** this Monday, September 27, 2021

By:____________

LUKE BUSBY, ESQ.
NEVADA STATE BAR NO. 10319
316 CALIFORNIA AVE #82
RENO, NV 89509
775-453-0112
LUKE@LUKEANDREWBUSBYLTD.COM
*ATTORNEY FOR PLAINTIFF*

## DECLARATION OF LESLEY HAWLEY

I, Lesley Hawley, declare that the assertions in this Declaration are true and correct, based upon my personal knowledge, and that I am competent to testify to the facts stated below:

1. I am the human resources manager at Pyramid Lake Paiute Tribe. I have been employed at the Pyramid Lake Paiute Tribe for 6 years;

2. I conducted the background investigation for Mr. Erwine during his hiring process in my capacity as the human resources manager at the Pyramid Lake Paiute Tribe;

3. I have specialized training and experience doing background investigations in my capacity at the Pyramid Lake Paiute Tribe; and

4. While conducting Mr. Erwine's background investigation at the Pyramid Lake Paiute Tribe, I only confirmed his dates of employment, I never received any materials from Churchill County nor received any derogatory information about him;

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: September 27, 2021 in Nixon, Nevada

By: Lesley Hawley

Lesley Hawley

***Reno Police Department***
***"Your Police, Our Community"***

***Jason Soto***
***Chief of Police***

March 1, 2018

Erwine, Michael
5409 Greenview Court
Reno, Nevada 89502

Re: Police Recruit

Dear Mr. Erwine:

I regret to inform you that your application for employment with the Reno Police Department for the position listed above was rejected, based on your pre-employment background investigation.

The reason for disqualification will not be discussed as stated in the Pre-employment Investigation Discovery Waiver, which you signed and had notarized. It specifically states, "I hereby waive my right, now and in the future, to examine, review or otherwise discover the contents of this investigation and all related documents thereto".

This rejection does not preclude you from applying again for this position. Thank you for your interest in a position with the City of Reno.

Sincerely,

Detective Bowden
Reno Police Department
Background Investigation Unit
775-657-4682

I hereby certify that this is a copy of the original on file in the Bureau of Records, Reno Police Department, Reno, NV.

By: J. Arnold R10231
CUSTODIAN OF RECORDS

# EXHIBIT 11 –
# "Plaintiff's FRCP 26 Nineteenth Supplemental Disclosure"

EXHIBIT 11 –
"Plaintiff's FRCP 26 Nineteenth Supplemental Disclosure"

LUKE A. BUSBY, ESQ
Nevada Bar No. 10319
LUKE ANDREW BUSBY, LTD.
316 California Ave 82
Reno, Nevada 89509
775-453-0112
luke@lukeandrewbusbyltd.com
*Attorney for the Plaintiff*

RECEIVED
SEP 16 2021
THORNDAL, ARMSTRONG, DELK, BALKENBUSH & EISINGER

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

* * *

MICHAEL ERWINE,

Plaintiff,

vs.

CHURCHILL COUNTY, a political subdivision of the State of Nevada and CHURCHILL COUNTY SHERIFF BENJAMIN TROTTER; and DOES 1 through 10 inclusive;

Defendants.

______________________________/

Case No.: 3:18-cv-00461-RCJ WGC

**PLAINTIFF'S FRCP 26 NINETEENTH SUPPLEMENTAL DISCLOSURES**

Pursuant to Rule 26(a)(1) of the Federal Rules of Civil Procedure, Plaintiff MICHEAL ERWINE ("Plaintiff") hereby provides the following supplemental disclosures:

A. The name and, if known, the address and telephone number of each individual likely to have discoverable information—along with the subjects of that information—that the disclosing party may use to support its claims or defenses, unless the use would be solely for impeachment.

Disclosure:

1. Scott Olson, Las Vegas Metropolitan Police Department 400 S. Martin L. King Boulevard, Las Vegas, Nevada, 89106, 702-828-3111. Mr. Olson is a background investigator at LVMPD. Mr. Olson conducted Mr. Erwine's background investigation during his hiring process. Mr. Olson can testify to his knowledge of the facts in this case, including but not limited to Mr. Erwine's background investigation.

B. A copy—or a description by category and location—of all documents, electronically stored information, and tangible things that the disclosing party has in its possession, custody, or control and may use to support its claims or defenses, unless the use would be solely for impeachment. The following documents or files are included in the enclosed CD.

Disclosure:

1. N/A

**DATED** this Tuesday, September 14, 2021:

By:____________________

LUKE BUSBY, ESQ.
NEVADA STATE BAR NO. 10319
316 CALIFORNIA AVE #82
RENO, NV 89509
775-453-0112
LUKE@LUKEANDREWBUSBYLTD.COM
*ATTORNEY FOR PLAINTIFF*

## CERTIFICATE OF SERVICE

Pursuant to FRCP 5, I certify that on the date shown below, I caused service to be completed of a true and correct copy of the foregoing pleading by:

______ personally delivering;

______ delivery via Reno/Carson Messenger Service;

______ sending via Federal Express (or other overnight delivery service);

______ depositing for mailing in the U.S. mail, with sufficient postage affixed thereto; or,

__X__ delivery via electronic means (fax, eflex, NEF, etc.) to:

Katherine F. Parks, Esq.
Thorndal Armstrong
6590 S. McCarran Blvd. Suite B.
Reno, NV 89509
Attorney for the Defendant

**DATED** this Tuesday, September 14, 2021

By: [signature]
LUKE BUSBY, ESQ.
NEVADA STATE BAR NO. 10319
316 CALIFORNIA AVE #82
RENO, NV 89509
775-453-0112
LUKE@LUKEANDREWBUSBYLTD.COM
*ATTORNEY FOR PLAINTIFF*

# EXHIBIT 12 -
# "Plaintiff's FRCP 26 Sixteenth Supplemental Disclosure"

EXHIBIT 12 -
"Plaintiff's FRCP 26 Sixteenth Supplemental Disclosure"

LUKE A. BUSBY, ESQ
Nevada Bar No. 10319
LUKE ANDREW BUSBY, LTD.
316 California Ave 82
Reno, Nevada 89509
775-453-0112
luke@lukeandrewbusbyltd.com
*Attorney for the Plaintiff*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

* * *

MICHAEL ERWINE,

Plaintiff,

vs.

CHURCHILL COUNTY, a political subdivision of the State of Nevada and CHURCHILL COUNTY SHERIFF BENJAMIN TROTTER; and DOES 1 through 10 inclusive;

Defendants.

/

Case No.: 3:18-cv-00461-RCJ WGC

**PLAINTIFF'S FRCP 26 SIXTEENTH SUPPLEMENTAL DISCLOSURES**

Pursuant to Rule 26(a)(1) of the Federal Rules of Civil Procedure, Plaintiff MICHEAL ERWINE ("Plaintiff") hereby provides the following supplemental disclosures:

A. The name and, if known, the address and telephone number of each individual likely to have discoverable information—along with the subjects of that information—that the disclosing party may use to support its claims or defenses, unless the use would be solely for impeachment.

Disclosure:

1. NA

B. A copy—or a description by category and location—of all documents, electronically stored information, and tangible things that the disclosing party has in its possession, custody, or control and may use to support its claims or defenses,

unless the use would be solely for impeachment. The following documents or files are included in the enclosed CD.

Disclosure:

1. Jimmy Thomas Declaration -1599

The documents or things produced reflect the Plaintiff's understanding of the issues in this case and are limited to the documents and persons with knowledge currently known or available to the Plaintiff. Plaintiff reserves the right to supplement or correct this disclosure with additional names, documents and information if such additional information becomes available to the Plaintiff.

**DATED** this Tuesday, January 5, 2021;

By:______________________
LUKE BUSBY, ESQ.
NEVADA STATE BAR NO. 10319
316 CALIFORNIA AVE #82
RENO, NV 89509
775-453-0112
LUKE@LUKEANDREWBUSBYLTD.COM
*ATTORNEY FOR PLAINTIFF*

## CERTIFICATE OF SERVICE

Pursuant to FRCP 5, I certify that on the date shown below, I caused service to be completed of a true and correct copy of the foregoing pleading by:

______ personally delivering;

______ delivery via Reno/Carson Messenger Service;

______ sending via Federal Express (or other overnight delivery service);

______ depositing for mailing in the U.S. mail, with sufficient postage affixed thereto; or,

__X__ delivery via electronic means (fax, eflex, NEF, etc.) to:

Katherine F. Parks, Esq.
Thorndal Armstrong
6590 S. McCarran Blvd. Suite B.
Reno, NV 89509
Attorney for the Defendant

**DATED** this Tuesday, January 5, 2021

By: ____________________
LUKE BUSBY, ESQ.
NEVADA STATE BAR NO. 10319
316 CALIFORNIA AVE #82
RENO, NV 89509
775-453-0112
LUKE@LUKEANDREWBUSBYLTD.COM
*ATTORNEY FOR PLAINTIFF*

# DECLARATION OF JIMMY THOMAS

I, Jimmy Thomas, declare that the assertions in this Declaration are true and correct, based upon my personal knowledge, and that I am competent to testify to the facts stated below:

1. My name is Jimmy Thomas.
2. I am a resident of the State of Nevada, and currently incarecerated at the Stewart Conservation Camp in Carson City, Nevada.
3. I am over 18 years of age.
4. I was incarcerated at Churchill County Detention Center in 2016.

MY NAME IS JIMMY G. THOMAS AND it HAS BEEN Brought to MY Attention IF I RECALLED WHAT Sgt. SUMMERS Did to ME at the Old County JAIL IN 2016. WEll the time IN Quest-ion I CAME to JAIL AN I WAS DRINKING THEREFORE they threw ME IN the PADDED Cell. I WAS upset AN MAD AN WAS BEING Difficult AN I PISSED By the Door IN the Cell AND it RAN out into the Hallway. I then LAYED DOWN AN Fell ASleep, When the Door opened it woke me up. I looked up AN SEEN Sgt. SUMMERS SQUEEGEE MY PISS INTO MY FACE. He then SLAMMED the Door. IN conclusion IM GLAD SOMEONE WITNESSED this CAUSE it WAS WRONG to the fullest, HAVING HUMAN WASTE THROWN IN YOUR FACE!!! AND then Sit IN it for Hours.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: JAN. 01, 2021 in CARSON City, Nevada

By: Jimmy G. Thomas

# EXHIBIT 13 - "Plaintiff's FRCP 26 Twentieth Supplemental Disclosure"

EXHIBIT 13 - "Plaintiff's FRCP 26 Twentieth Supplemental Disclosure"

LUKE A. BUSBY, ESQ
Nevada Bar No. 10319
LUKE ANDREW BUSBY, LTD.
316 California Ave 82
Reno, Nevada 89509
775-453-0112
luke@lukeandrewbusbyltd.com
*Attorney for the Plaintiff*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

* * *

MICHAEL ERWINE,

Plaintiff,

vs.

CHURCHILL COUNTY, a political subdivision of the State of Nevada and CHURCHILL COUNTY SHERIFF BENJAMIN TROTTER; and DOES 1 through 10 inclusive;

Defendants.

_______________________________/

Case No.: 3:18-cv-00461-RCJ WGC

**PLAINTIFF'S FRCP 26 20TH SUPPLEMENTAL DISCLOSURES**

Pursuant to Rule 26(a)(1) of the Federal Rules of Civil Procedure, Plaintiff MICHEAL ERWINE ("Plaintiff") hereby provides the following supplemental disclosures:

A. The name and, if known, the address and telephone number of each individual likely to have discoverable information—along with the subjects of that information—that the disclosing party may use to support its claims or defenses, unless the use would be solely for impeachment.

Disclosure: N/A

B. A copy—or a description by category and location—of all documents, electronically stored information, and tangible things that the disclosing party has in its possession, custody, or control and may use to support its claims or defenses,

unless the use would be solely for impeachment. The following documents or files are included in the enclosed CD.

Disclosure:

1. Declaration of Casey Ryan: 1732

**DATED** this Tuesday, September 21, 2021:

By:________________________

LUKE BUSBY, ESQ.
NEVADA STATE BAR NO. 10319
316 CALIFORNIA AVE #82
RENO, NV 89509
775-453-0112
LUKE@LUKEANDREWBUSBYLTD.COM
*ATTORNEY FOR PLAINTIFF*

**CERTIFICATE OF SERVICE**

Pursuant to FRCP 5, I certify that on the date shown below, I caused service to be completed of a true and correct copy of the foregoing pleading by:

_____ personally delivering;

_____ delivery via Reno/Carson Messenger Service;

_____ sending via Federal Express (or other overnight delivery service);

_____ depositing for mailing in the U.S. mail, with sufficient postage affixed thereto; or,

__X__ delivery via electronic means (fax, eflex, NEF, etc.) to:

Katherine F. Parks, Esq.
Thorndal Armstrong
6590 S. McCarran Blvd. Suite B.
Reno, NV 89509
Attorney for the Defendant

**DATED** this Tuesday, September 21, 2021

By:_______________

LUKE BUSBY, ESQ.
NEVADA STATE BAR NO. 10319
316 CALIFORNIA AVE #82
RENO, NV 89509
775-453-0112
LUKE@LUKEANDREWBUSBYLTD.COM
*ATTORNEY FOR PLAINTIFF*

# DECLARATION OF SERGEANT CASEY RYAN

I, Casey Ryan, declare that the assertions in this Declaration are true and correct, based upon my personal knowledge, and that I am competent to testify to the facts stated below:

1. I am a sergeant at the Washoe Tribe of Nevada and California. I have been employed at the Washoe Tribe in total for 16 years;

2. I conducted the background investigation for Mr. Erwine during his hiring process in my capacity as sergeant at the Washoe Tribe;

3. I have specialized training and experience doing background investigations in my capacity at the Washoe Tribe; and

4. While conducting Mr. Erwine's background investigation at the Washoe Tribe, I never received any materials from Churchill County and did not contact Churchill County about Mr. Erwine.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: 2-22-21 in Reno, Nevada

By: ______________________
Casey Ryan

**EXHIBIT 14 -**
**"Affidavit of Matthew Maes"**

**EXHIBIT 14 –**
**"Affidavit of Matthew Maes"**

**AFFIDAVIT OF MATTHEW MAES**

**STATE OF NEVADA )**
**) ss.**
**COUNTY OF WASHOE )**

Under penalty of perjury, I, Matthew Maes, hereby swear that the information contained in this Affidavit is true and accurate:

1. My name is Matthew Maes.
2. I am a resident of the State of Nevada.
3. I am over 18 years of age.
4. I was incarcerated at Churchill County Detention Center during Michael Erwine's tenure as Deputy Sheriff.
5. As a trustee, I worked 7 days per week under the supervision of all detention staff.
6. Deputy Erwine was one of my supervisors during my period of incarceration including, but not limited, transportation and work functions.
7. On October 9, 2016, I was asked to enter the jail control room, known as "the cage", to retrieve tools that had fallen and could not be retrieved by Deputy Jabines (the "Incident").
8. I was aware Deputy Erwine removed his taser from the holster; however, the taser was never pointed in my direction.
9. The taser was never discharged. No sound nor sparks were produced by the instrument.
10. I did not feel threatened or intimidated in any way during the Incident on October 9, 2016.
11. Following the Incident, I was not contacted by correctional staff to substantiate the claims made of the improper use of force against Deputy Erwine.
12. Deputy Erwine was fair and professional during his period of supervision over me.

13. Approximately 2 weeks after the Incident I was told by Deputy Jabines that Deputy Erwine was terminated from his employment with the Churchill County Sheriff's Office because "he was a rat."

14. Subsequent to my release, I reached out to Michael Erwine via Facebook to inform him of the conversation I had with Deputy Jabines regarding his improper termination.

DATED: This 5th day of June 2018.

Matthew Maes

**SUBSCRIBED and SWORN to before me This 5th day of June 2018.**

**NOTARY PUBLIC**

BERNADETTE FRANCIS
NOTARY PUBLIC
STATE OF NEVADA
My Commission Expires: 2-17-2020
Certificate No: 16-1661-2

# EXHIBIT 15 –
# "Affidavit of Andrew Beaulieu"

EXHIBIT 15 –
"Affidavit of Andrew Beaulieu"

**AFFIDAVIT OF ANDREW ALLEN BEAULIEU**

**STATE OF NEVADA )**
**) ss.**
**COUNTY OF WASHOE )**

Under penalty of perjury, I, Andrew Allen Beaulieu, hereby swear that the information contained in this Affidavit is true and accurate:

1. My name is Andrew Allen Beaulieu.
2. I am a resident of the State of Nevada.
3. I am over 18 years of age.
4. On October 8, 2016, at approximately 3:30 a.m., I was brought into the Churchill County Detention Center on injury to property of another charges (case: F16-07696).
5. Upon arrival to the Detention Center I was taken to a holding cell.
6. Prior to my booking, I sustained a cut on my hand. The cut was not addressed when first admitted and blood was spilled on the door and wall of the cell.
7. I began requesting water starting at approximately 3:50 a.m. During each request, and in an attempt to antagonize me, the guards would flush the drain to make my request inaudible.
8. Deputy Erwine approached my cell at approximately 5:50 a.m. and inquired about the blood and cut on my hand. It was at this time I told Deputy Erwine I had been requesting water for hours and that the other officers would flush the toilet and laugh at each of my previous requests, which resulted in my punching of the door.
9. Deputy Erwine provided me with water and medical attention and explained what the rest of the booking process would look like.
10. I was then taken to be fingerprinted by Deputy Erwine and returned to the holding cell.

11. Deputy Erwine did not provide me with legal advice regarding how I had been treated by the other deputies.

12. Deputy Erwine was fair and professional during his period of supervision over me.

13. The day following the incident and my release, I contacted the Detention Center and requested a copy of the videotape and recording.

14. I did not see or hear from Deputy Erwine until June 5, 2018, when he approached me and asked if I would provide an affidavit of my experience.

DATED: This 16th day of June 2018.

Andrew Allen Beaulieu

**SUBSCRIBED and SWORN to before me This 16th day of July 2018.**

**NOTARY PUBLIC**

BERNADETTE FRANCIS
NOTARY PUBLIC
STATE OF NEVADA
My Commission Expires: 2-17-2020
Certificate No: 16-1861-2

# EXHIBIT 16 –
# "Declaration of Jimmy Thomas"

EXHIBIT 16 –
"Declaration of Jimmy Thomas"

# DECLARATION OF JIMMY THOMAS

I, Jimmy Thomas, declare that the assertions in this Declaration are true and correct, based upon my personal knowledge, and that I am competent to testify to the facts stated below:

1. My name is Jimmy Thomas.

2. I am a resident of the State of Nevada, and currently incarecerated at the Stewart Conservation Camp in Carson City, Nevada.

3. I am over 18 years of age.

4. I was incarcerated at Churchill County Detention Center in 2016.

MY NAME IS JIMMY G. THOMAS AND IT HAS BEEN BROUGHT to MY ATTENTION IF I RECALLED WHAT SGT. SUMMERS DID to ME AT the Old County JAIL IN 2016. WELL the time IN QUEST-ION I CAME to JAIL AN I WAS DRINKING THEREFORE they THREW ME IN the PADDED CELL. I WAS UPSET AN MAD AN WAS BEING DIFFICULT AN I PISSED BY the DOOR IN the CELL AND it RAN OUT INTO the HALLWAY. I THEN LAYED DOWN AN FELL ASLEEP, WHEN the DOOR OPENED it WOKE ME UP, I LOOKED UP AN SEEN SGT. SUMMERS SQUEEGEE MY PISS INTO MY FACE. HE THEN SLAMMED the DOOR. IN CONCLUSION IM GLAD SOMEONE WITNESSED this CAUSE it WAS WRONG to the fullest HAVING HUMAN WASTE THROWN IN YOUR FACE!!! AND THEN Sit IN it for HOURS.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: JAN. 01, 2021 in CARSON City, Nevada

By: Jimmy G. Thomas

# EXHIBIT 17 –
# "Declaration of Casey Ryan"

EXHIBIT 17 –
"Declaration of Casey Ryan"

# DECLARATION OF SERGEANT CASEY RYAN

I, Casey Ryan, declare that the assertions in this Declaration are true and correct, based upon my personal knowledge, and that I am competent to testify to the facts stated below:

1. I am a sergeant at the Washoe Tribe of Nevada and California. I have been employed at the Washoe Tribe in total for 16 years;

2. I conducted the background investigation for Mr. Erwine during his hiring process in my capacity as sergeant at the Washoe Tribe;

3. I have specialized training and experience doing background investigations in my capacity at the Washoe Tribe; and

4. While conducting Mr. Erwine's background investigation at the Washoe Tribe, I never received any materials from Churchill County and did not contact Churchill County about Mr. Erwine.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: 2-22-21 in Reno, Nevada

By: ____________________

Casey Ryan

# EXHIBIT 18 –
# "Declaration of Lesley Hawley"

EXHIBIT 18 –
"Declaration of Lesley Hawley"

**DECLARATION OF LESLEY HAWLEY**

I, Lesley Hawley, declare that the assertions in this Declaration are true and correct, based upon my personal knowledge, and that I am competent to testify to the facts stated below:

1. I am the human resources manager at Pyramid Lake Paiute Tribe. I have been employed at the Pyramid Lake Paiute Tribe for 6 years;

2. I conducted the background investigation for Mr. Erwine during his hiring process in my capacity as the human resources manager at the Pyramid Lake Paiute Tribe;

3. I have specialized training and experience doing background investigations in my capacity at the Pyramid Lake Paiute Tribe; and

4. While conducting Mr. Erwine's background investigation at the Pyramid Lake Paiute Tribe, I only confirmed his dates of employment, I never received any materials from Churchill County nor received any derogatory information about him;

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: September 27, 2021 in Nixon, Nevada

By: Lesley Hawley

Lesley Hawley

**EXHIBIT 19 –**
**"Letter Purportedly written by inmate Jimmy Thomas"**

**EXHIBIT 19 –**
**"Letter Purportedly written by inmate Jimmy Thomas"**

DEC. 10, 2020

TO WHOM it MAY CONCERN;

MY NAME IS JIMMY G. THOMAS. AND it HAS BEEN BRAUGHT TO MY ATTENTION IF I RECALLED WHAT Sgt. SUMMERS DID TO ME AT THE OLD COUNTY JAIL. (73 NORTH MAINE St.) 2016.

WELL THE TIME IN QUESTION I CAME TO JAIL AN I WAS DRINKING THEREFORE THEY THREW ME IN THE PADDED CELL. I WAS UPSET AN MAD AN WAS BEING DIFFICULT AN I PISSED BY THE DOOR IN THE CELL AND it RAN OUT INTO THE HALLWAY.

I THEN LAYED DOWN AN FELL ASLEEP WHEN THE DOOR OPENED it WOKE ME UP. I LOOKED UP AND SEEN Sgt. SUMMERS SQUEEGEE MY PISS INTO MY FACE. HE THEN SLAMMED THE DOOR.

IN CONCLUSION IM GLAD SOMEONE WITNESSED THIS CAUSE it WAS WRONG.

SINCERELY,

JIMMY G. THOMAS

Jimmy G. Thomas.
#55004

JIMMY THOMAS - #55004
S.C.C.
P.O. BOX 5005
CARSON City, NV 89702



LUKE BUSBY
LUKE ANDREW BUSBY, LTD.
316 CALIFORNIA AVE.
RENO, NV 89509 - 1650

ERWINE - 001340

OUTGOING
MAIL

STEWART
CONSERVATION CAMP