

LUKE A. BUSBY, ESQ.
SBN 10319
316 California Ave.
Reno, Nevada 89509
775-453-0112
luke@lukeandrewbusbyltd.com
*Attorneys for the Plaintiff*

# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

* * *

MICHAEL ERWINE,

                Plaintiff,

vs.

CHURCHILL COUNTY, a political
subdivision of the State of Nevada,
CHURCHILL COUNTY SHERIFF
BENJAMIN TROTTER, and DOES
1 through 10 inclusive;

                Defendants.

_____/

Case No.: 3:18-cv-00461-RCJ WGC

**PLAINTIFF'S TRIAL BRIEF**

COMES NOW, Plaintiff MICHAEL ERWINE, by and through the undersigned

counsel, and hereby submits the following Trial Brief in this matter against

Defendants CHURCHILL COUNTY, a political subdivision of the State of Nevada,

and CHURCHILL COUNTY SHERIFF BENJAMIN TROTTER pursuant to the

Court's Order Establishing Trial Related Deadlines [ECF #132].

///

///

1

**Summary of the Case**

This is a case about a corrupt police department firing and blackballing a rookie Deputy for writing down that he observed his fellow deputies mistreating an inmate at the Churchill County jail.  Erwine has filed claims against Churchill County and Sheriff Trotter herein for violation of his liberty interest due process rights under the Nevada and US Constitutions, a *Monell* claim against Churchill County, tortious discharge, defamation, defamation per se, and intentional interference with prospective employment. On April 29, 2021, the parties filed a stipulation for dismissal of Erwine's procedural due process property interest claim and the Court dismissed this claim accordingly. *See* ECF #114.  Erwine was discharged without any due process and contrary to law by Defendants Churchill County and Sheriff Benjamin Trotter in response to his documentation of the misconduct of his fellow employees at the Churchill County Jail.

**I.    Factual Background**

Mr. Erwine is a former Deputy Sheriff for the Churchill County Sheriff's Office. Between December 9, 2015 and October 10, 2016, Churchill County employed Erwine in the capacity of Detention Deputy at the County Jail.  October 8, 2016, Erwine went in for the day shift and began checking cells. Erwine was informed that an inmate, Andrew Beaulieu ("Beaulieu") was in the security cell and needed to be booked. When Erwine arrived at Beaulieu' s security cell he noticed blood on the walls and asked the grave shift deputy what the blood was from. The grave shift deputy informed Erwine that Beaulieu had come in with a cut on his hand and that it ripped open while in the cell. After investigating the circumstances, Erwine discovered Beaulieu had been requesting water for hours. Erwine was informed by the inmate and later confirmed during review of surveillance footage that every time Beaulieu would request water, the grave shift deputy would flush the drain in Beaulieu's cell making Beaulieu's request inaudible over the flushing noise. Erwine

provided Beaulieu with water pursuant to his essential job functions to provide inmates with food and explained to Beaulieu what the rest of the booking process would look like. During this time, Beaulieu expressed to Erwine that the grave shift deputies were "assholes", and he would be filing a lawsuit against them.  Erwine continued to conduct his rounds in the jail. While Erwine was conducting his rounds, other inmates asked Erwine what had happened to the "guy in the security cell" the previous night and explained what the grave shift did "was messed up." Inmate Zachary White even filed a grievance request to Captain Matheson regarding the treatment of Beaulieu.  Erwine reviewed surveillance footage of the grave shift's interaction with Beaulieu before he removed him for booking, mainly to be aware of any safety concerns with Beaulieu before removing him from the security cell. Erwine did not note any alarming actions by Beaulieu wherein Erwine would need to be concerned, however, he did note concerning inappropriate acts of the grave shift deputy that he believed needed to be brought to his sergeant's attention. Since the concerns were not an immediate threat, and the sergeant did not work on weekends, Erwine chose to log the events on his computer so he could follow up with his sergeant on Monday, October 10, 2016, when his sergeant returned to work.

On Sunday, October 9, 2016, involving inmate Matthew Maes.  During Erwine's dayshift, Deputy Jabines had dropped a container of miscellaneous tools and other items inside of a booking cage. Included in these items were screwdrivers and other sharp instruments. Deputy Jabines did not want to pick up the items herself, so she asked an inmate to come into the booking cage and pick them up for her. Bringing in an inmate to pick up the sharp inmates created a dangerous situation for everyone involved. Erwine did not feel it was appropriate for Deputy Jabines to have an inmate, Matthew Maes, come into the booking cage to pick up items which could be easily used as weapons. Erwine questioned Deputy Jabines

about this but her only response was "Senior Deputy" which Erwine understood as to mean he did not have a say in the matter. When the Matthew Maes ("Maes") came into the cage, Erwine positioned himself between Maes and the control panel of the facility. Erwine was in an uncomfortable position with Maes being only a few feet away from Erwine and backed into a corner. Erwine removed his taser from its holster and held it in his hand with the taser pointed to the ground. Erwine removed the cartridge from the taser due to the close proximity of inmate Maes to both Erwine and Deputy Jabines. Maes cleaned up the items and left the cage without incident.

Near the end of Erwine's shift on October 10, 2016, Erwine was confronted by Captain Matheson and Sheriff Trotter. Sheriff Trotter informed Erwine that he was aware of the booking that took place over the weekend with Beaulieu and that Erwine was intentionally trying to harm the Department. Erwine began to speak about the Beaulieu Incident as he had originally intended to do from the beginning of his shift that day, however, Erwine was not afforded any opportunity to explain what he had witnessed or discovered, nor was he provided with any notice of the meeting or that we was to be terminated at the meeting.  Instead, Trotter stated Erwine had two choices: he could resign, or the Department would terminate his employment effective immediately.  Either way, Erwine was informed his employment was not continuing after the meeting.

At the meeting with Sheriff Trotter on October 10, 2016, Erwine was informed that he would receive his vacation pay/sick pay if he chose to resign rather than be terminated, but that he would be terminated in either case.  Erwine's financial situation was not secure, and he had moved to Churchill County and signed a lease so that he could work as a deputy there. Further, the job at Churchill county was his first position in law enforcement after graduating from the academy, and a termination would have been catastrophic on his future career prospects. Erwine

was forced to make a snap decision under financial duress and Erwine signed a Letter of Separation on October 10, 2016.

Unbeknownst to Mr. Erwine, Sheriff Trotter placed a stigmatizing memorandum in Mr. Erwine's employee file, dated October 10, 2016, which was subsequently distributed to at least one law enforcement agency in Nevada with whom Erwine had filed an application for employment.  Sheriff Trotter's October 10, 2016 Memorandum is riddled with stigmatizing allegations against Mr. Erwine as it alleges that Erwine "failure to follow proper chain of command," engaged in "conduct unbecoming a deputy and unjustifiable use of force," that created "liability" for the agency, was "unprofessional," or violated the "taser and use of force" policy as well as "behavioral standards."

In the Defendant Churchill County's Responses to the Plaintiff's First Requests for Admission, the Defendants admitted to the following facts:

1.  Erwine was provided with no written notice that he had been accused of misconduct before Erwine executed the Letter of Separation on October 10, 2016 (RFA No.1);

2.  Erwine was not afforded a hearing before Erwine executed the Letter of Separation on October 10, 2016 (RFA No. 2);

3.  Sheriff Trotter authored the October 10, 2016 Memorandum (RFA No. 4);

4.  Sheriff Trotter placed the October 10, 2016 Memorandum into Erwine's personnel file (RFA No. 5);

5.  The October 10, 2016 Memorandum was not provided to Erwine before the Letter of Separation on October 10, 2016 was executed by Erwine;

6.  The October 10, 2016 Memorandum was never shown to Erwine such that he may have read and initialed the document before it was placed in his personnel file (RFA No. 8); and

7.  The October 10, 2016 Memorandum contains no notation to the effect that the document was shown to Erwine and that Erwine refused to initial the document (RFA No. 9).

Also included in Mr. Erwine's personal file at Churchill County, unbeknownst to him, were statements from Churchill County Sheriff's Office employees Deputy Thompson and Sergeant Summers describing the Beaulieu incident, and a statement from Deputy Jabines describing the Maes incident. In the statements. express reference is made to the video of the Beaulieu incident. Sergeant Summers' statement indicates that he believed that Beaulieu had spoken to Mr. Erwine about a lawsuit. Deputy Jabines' statement also expressly mentions a possible lawsuit involving Maes against the Churchill County Sheriff's Office.

Despite initially denying that the October 10, 2016 Memorandum and personnel file was shared with any outside law enforcement agency in the Defendant's Answer to the Amended Complaint, the Defendants later admitted that the October 10, 2016 Memorandum, in addition to Mr. Erwine's entire personnel file, was shared with the Washoe County Sheriff's Office, after Washoe County provided a response to a subpoena in which it was clear that Erwine's entire employee file was sent to the Washoe County Sheriff's Office.

On February 8, 2021, the undersigned counsel received the Plaintiff's background file from the Las Vegas Metropolitan Police Department ("LVMPD"), which was sought by the Defendant pursuant to a subpoena issued by the Defendants.  Included in LVMPD's response is a note from the background investigator Scott Olsen indicating that Olsen had a telephone conversation with Sheriff Trotter regarding Plaintiff Mr. Erwine's employment with Churchill County. Sheriff Trotter indicated to Mr. Olsen that Mr. Erwine was terminated because he initiated an unauthorized investigation that was beyond his duties and that Mr. Erwine was sympathetic to an inmate who was looking to file a lawsuit against

Churchill County.  Mr. Olsen also indicates that Sheriff Trotter indicated that an investigation was conducted, presumably of the incident involving Mr. Beaulieu described in the Plaintiff's motions, and that no mistreatment of the inmate took place.  Mr. Olsen concludes his notes by stating that because of what Sheriff Trotter said, Erwine was "unsuitable" for employment with LVMPD.

Mr. Beaulieu will testify at trial that Erwine did nothing to encourage Mr. Beaulieu to file a lawsuit against Churchill County nor did Erwine provide Mr. Beulieu with legal advice.

Mr. Maes, Erwine's supposed victim of the use of force incident referred to in Sheriff Trotter's October 16, 2016 Memorandum, will testify that the idea that Erwine used excessive force on him was untrue, and that it never happened and that its is clear that Mr. Erwine is being framed.

Subsequent to Erwine's departure from the Churchill County Sheriff's Office, after Erwine sought other law enforcement jobs, Erwine was rejected from multiple police agencies for failing to pass background investigations. On January 17, 2017, Erwine received a letter from the Washoe County Sheriff informing him that, "…the Sheriff's Office has determined that you do not meet the established standards for a position as Deputy Sheriff and therefore you have not been selected at this time." On February 7, 2017, Erwine received an email from Las Vegas Metropolitan Police in response to his application for employment informing him, "…based on review of your background history, you will no longer be considered for the position(s) of Police Recruit C 16-001 November with the Las Vegas Metropolitan Police Department. Candidate does not meet LVMPD hiring standards based on Employment History" and "You are not eligible to apply with LVMPD for any position indefinitely." On September 8, 2017, Erwine received a letter from the Carson City Department of Alternative Sentencing informing him that he is, "…no longer being considered in the current recruitment due to failing on or more portions of the

selection process" which included the Background Investigation and Chiefs Review, and "Based on our recruitment standards you are precluded from reapplying with our agency in the future." On September 12, 2017, Erwine received from Douglas County Sheriff a letter informing him that he, "…did not successfully complete the background evaluation/testing and therefore are no longer considered an eligible applicant for employment.... " On November 14, 2017, Erwine received a letter from North Las Vegas Police informing him he was "...ineligible to continue in the employment process for the position of Police Officer ... " for character Issues and his employment history," and "You are disqualified indefinitely.    On March 1, 2018, Erwine received a letter from Reno Police Department informing him that his, " ... application for employment with the Reno Police Department for [Police Recruit] was rejected, based on your pre-employment background investigation."

Upon requesting and receiving his employee file from Churchill County on April 13, 2018, Erwine discovered the existence of the October 10, 2016 Memorandum and the statements regarding the incidents with Maes and Beaulieu were placed in his employment file by Sheriff Trotter.

## II.    Erwine's Claims

### a.  14th Amendment Procedural Due Process – Liberty Interest – Against Sheriff Trotter

Sheriff Trotter is sued in his individual capacity for his acts under color of Nevada law.  "A public employee acts under color of state law while acting in his official capacity or while exercising his responsibilities pursuant to state law." *West v. Atkins*, 487 U.S. 42, 49, 108 S. Ct. 2250, 101 L. Ed. 2d 40 (1988). Because Sheriff Trotter fired Erwine, Trotter's conduct was the actionable cause of Erwine's claimed injury. *Harper v. City of Los Angeles*, 533 F.3d 1010, 1026 (9th Cir.2008) "Where a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are

essential." *Wisconsin v. Constantineau*, 400 U.S. 433, 437, 91 S. Ct. 507, 510 (1971).  Mr. Erwine has a right to be free of official stigmatization, and even threatened stigmatization requires due process that "foreclose[s] his freedom to take advantage of other employment opportunities." *Board of Regents v. Roth*, 408 U.S. 564, 569–70 quote at 573-574 (1972); *Goss v. Lopez*, 419 U.S. 565 (1975).  While reputational harm alone does not trigger a right to due process, if coupled with a concurrent loss of employment, the 14th Amendment requires a "name clearing" hearing under the "stigma-plus" doctrine*.  Paul v. Davis*, 424 U.S. 693, 712 (1976).  Even if a police officer is a "probationary employee" they have a right to a name clearing hearing if stigmatizing information is to be placed in their employment file. "Although a probationary employee, has no protected "property" interest in his employment with a city, a public employer cannot deprive a probationary employee of his freedom to take advantage of other employment opportunities." *Sciolino v. City of Newport News*, 480 F.3d 642, 644 (4th Cir. Va. March 12, 2007).  A hearing for a probationary or nontenured employee based on stigmatization is required "if the employer creates and disseminates a false and defamatory impression about the employee in connection with his termination." *Codd v. Velger*, 429 U.S. 624, 628, 97 S. Ct. 882 (1977) (per curiam).

"[A] terminated employee has a constitutionally based liberty interest in clearing his name when stigmatizing information regarding the reasons for the termination is publicly disclosed." *Cox v. Roskelley*, 359 F.3d 1105, 1106 (9th Cir. Wash. February 20, 2004).  An employee's liberty interest is at issue if a charge of improper conduct impairs the employee's reputation for honesty or morality or if the charge effectively excluded, or caused a prolonged interruption of, Plaintiff Erwine's employment in the law enforcement field. *Vanelli v. Reynolds School District No. 7*, 667 F.2d 773 (9th Cir. 1982). See also *Blantz v. Cal. Dep't of Corr. & Rehab*., 727 F.3d 917, 925 n.6 (9th Cir. 2013) "Accusations of dishonesty or immorality are

sufficiently stigmatizing to implicate a liberty interest, but less severe accusations must be analyzed on a case-by-case basis, and allegations of mere incompetence or inability are not sufficient."

In order to prevail on his claim, Erwine must show that (1) the accuracy of the charge of Churchill County against Erwine is contested; (2) there is some public disclosure of the charge against Mr. Erwine; and (3) the charge by Sheriff Trotter is made in connection with termination of Mr. Erwine's employment. *Mustafa v. Clark Cty. Sch. Dist*., 157 F.3d 1169, 1179 (9th Cir. 1998).

In his October 10, 2016 Memorandum, Sheriff Trotter accused Erwine of "conduct unbecoming an officer," for conducting an "unauthorized investigation" into the Beaulieu incident and taking sides with an inmate against his own agency. "Conduct unbecoming an officer" is a term that inarguably calls into question the moral character of a person against whom such a charge is leveled.  In his October 10, 2016 Memorandum, Sheriff Trotter also states that Erwine's actions are, "unprofessional" and "discredits our agency and our profession."

"The public-disclosure element requires that the defendant actually disseminate the stigmatizing comments in a way that would reach ***potential future employers*** or the community at large." *Palka v. Shelton*, 623 F.3d 447, 454 (7th Cir. 2010). [***emphasis added***] Based on the admissions of the Defendants there is no genuine dispute of material fact that stigmatizing statements were made about Erwine by Sheriff Trotter and that they were disclosed to Erwine's potential future employers, including Washoe County and to LVMPD, and that Mr. Erwine was never given a name clearing hearing, much less any notice that the defamatory and stigmatizing information was to be placed in his file.  Further, under NRS 239B.020(1), disclosure of Mr. Erwine's employment file at the Churchill County Sheriff's Office to any other public safety agency where he applied for employment was required to be provided if requested: "Upon the request of a public safety agency, an employer shall provide

to the public safety agency information, if available, regarding a current or former employee of the employer who is an applicant for the position of firefighter or peace officer, as applicable…"  There is no genuine issue of material fact as to whether Mr. Erwine's personal file and the stigmatizing comments there were publicly disclosed to his potential future employers in the law enforcement community as is required by law.  Under *Cox v. Roskelley,* where state law requires disclosure of an employee file, merely placing stigmatizing information into an employee's file without due process constitutes publication. *Id.* at 1112.

Further, the statements of Sheriff Trotter in the October 10, 2016 about Mr. Erwine were made "incident to" his termination from Churchill County, as it was authored on the same day but before Erwine was terminated, "As of the time of my writing this (October 10, 2016 at 1122 hours)," and unequivocally states, "Deputy Michael Erwine will be terminated today for failing to satisfactorily complete his probation." Even if this Court were to determine that Mr. Erwine's resignation from the Churchill County's Sheriff's office were voluntary, the October 10, 2016 Memorandum clearly states that Erwine was fired for failing to complete his probation, and this is what was communicated to his potential future employers. Erwine's loss of employment was contemporaneous with and coincided with the harm to his reputation and the stigmatic injury arose as the result of his being terminated*. Siegert v. Gilley*, 500 U.S. 226, 233-34 (1991). Defamatory statements made at time of termination qualify under the stigma-plus test.  See *Brandt v Board of Cooperative Educational Services*, 820 F2d 41, 45 (2d Cir.1987).

As to the effects of Sheriff Trotter's statements on Mr. Erwine's career, it is that Erwine was found to be "unsuitable" for employment at LVMPD specifically because of what Sheriff Trotter told the LVMPD background investigator.  Further, Erwine has retained a police practices expert, Mr. Ron Dreher, to opine as to the harm that was done to Mr. Erwine's career as a result of the actions of Sheriff Trotter. Mr. Dreher

has extensive experience in law enforcement and in representing police unions in negotiations and before the Nevada Legislature, whose report clearly opines that Mr. Erwine's career and reputation have been irrevocably tarnished by the statements and actions of Sheriff Trotter.

Further, qualified immunity defense is not available to Sheriff Trotter for this claim because the Court in *Cox v. Roskelley* ruled in 2004 that, "the contours of the right to a name-clearing hearing upon placement of stigmatizing material in a personnel file were clearly established." *Id.* at 1113.

### b. 14th Amendment Procedural Due Process – Liberty Interest – Against Churchill County (Monell Claim)

Churchill County is independently liable to Mr. Erwine under *Monell v. Dep't. of Social Services of City of New York*, 436 U.S. 658, 690-691, 98 S. Ct. 2018, 2035-2036 (1978), because Erwine suffered a deprivation of his constitutional right by Sheriff Trotter, who was the final policymaker for Churchill County for such decisions.  Under Monell, "[l]ocal governing bodies . . . can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where, as here, the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Monell*, 436 U.S. at 690.

Trotter, as Churchill County Sheriff, deprived Erwine of his rights under the law, and acting under color of state law and was the officer with final policymaking authority over personnel matters within the Sheriff's Office, including over the decision to fire Erwine and to place stigmatizing information into his employee file. *Lytle v. Carl*, 382 F.3d 978, 981 (9th Cir.2004) and *Goldstein v. City of Long Beach*, 715 F.3d 750, 753 (9th Cir.2013).

Under NRS 248.040, Sheriffs in Nevada have authority to appoint and remove deputies, but a sheriff may not confer to a deputy, '…. policymaking authority for the

office of the sheriff or the county by which the deputy sheriff is employed." The actions of Sheriff Trotter are a policy or custom of Churchill County.  See *Jett v. Dallas Independent School District*, 491 U.S. 701, 737 (1989), a policy or custom becomes official when it results from the decision or acquiescence of the municipal officer or body with final policymaking authority over the subject matter of the offending policy.  Local governments are liable for underlying 42 U.S.C. 1983 claims if the deprivation is the result of the agency's custom, policy, or practice. *Anderson v. Warner,* 451 F.3d 1063, 1070 (9th Cir. 2006).  Trotter, as Sheriff, deprived Erwine of his rights under the law, and acting under color of state law and was the officer with final policymaking authority over personnel matters within the Churchill County Sheriff's Office, including over the decision to fire Erwine. *Lytle v. Carl,* 382 F.3d 978, 981 (9th Cir.2004) and *Goldstein v. City of Long Beach*, 715 F.3d 750, 753 (9th Cir.2013).

A "policy" is a deliberate choice to follow a course of action made from among various alternatives by the official or officials responsible for establishing final policy. *Fogel v. Collins*, 531 F.3d 824, 834 (9th Cir.2008).   The "function" of firing Erwine was carried out by Sheriff Trotter (See Exhibit 30) and was done in coordination with her team at WCSD, including WCSD's Office of General Counsel. Churchill County is liable for the acts of Sheriff Trotter if these acts caused a constitutional violation, even if the constitutional violation occurs only once. *Pembaur v. City of Cincinnati,* 475 U.S. 469, 478 & n.6 (1986). In light of the facts in this case, Churchill County is independently liable to Mr. Erwine under Monell because there is no genuine issue of material fact as to whether Sheriff Trotter was the policymaker for the Churchill County Sheriff's Office.

///

///

///

### c. Nevada Liberty Interest Due Process Violation – Against Sheriff Trotter and Churchill County

Article 1 Section 8(5) of the Nevada Constitution provides that no person shall be deprived of life, liberty, or property without due process of law. Due process forbids action which is fundamentally unfair and shocking to the universal sense of justice. *Summers v. Warden of Nev. State Prison*, 84 Nev. 326, 329, 440 P.2d 388, 390 (1968).  Nevada law very clearly requires that a state agency must follow procedures required by statute governing employee discipline. *McCracken v. Elko County Sch. Dist*., 103 Nev. 655, 747 P.2d 1373 (1987). A violation of the Nevada Due Process Clause occurs when a state actor deprives a person of a right granted by the state without due process of law. *Saticoy Bay LLC Series 350 Durango 104 v. Wells Fargo Home Mortg*., 133 Nev. Adv. Rep. 5, 388 P.3d 970, 971 (Nev. 2017). "First, it must be determined whether the deprivation was caused by the exercise of some right or privilege created by the state. Second, it must be determined whether the party charged with the deprivation is a person who may fairly be said to be a state actor." Id. at 28.  "The Supreme Court of Nevada has relied on federal precedent in determining the scope of Nevada's Due Process clause. Therefore, the analysis for both counts is the same." *Armstrong v. Reynolds*, No. 2:17-cv-02528-APG-CWH, 2019 U.S. Dist. LEXIS 36058, at *4 n.16 (D. Nev. Mar. 6, 2019) citing *Saticoy Bay LLC Series 350 Durango 104 v. Wells Fargo Home Mortgage*, 388 P.3d at n.3 (Nev. 2017).

Sheriff Trotter, as a state actor, made stigmatizing comments about Erwine and deprived Erwine of statutorily granted due process rights designed to protect his reputation from stigmatizing allegations, i.e., the protections provided in NRS Chapter 289, by placing the October 10, 2016 Memorandum and related materials into his employee file without any due process and without Erwine's knowledge.

"The protections of due process only attach when there is a deprivation of a protected property or liberty interest." *Pressler v. City of Reno*, 118 Nev. 506, 508, 50 P.3d 1096, 1097 (2002) "The liberty interest protected by the due process clause encompasses an individual's freedom to work and earn a living." *State v. Eighth Judicial Dist. Court*, 118 Nev. 140, 145, 42 P.3d 233, 236 (2002). In Nevada, the due process rights of peace officers are codified in NRS Chapter 289.020 *et sq*., which is commonly referred to as "The Police Officer's Bill of Rights." Among the protections provided to peace officers in Nevada are protections against placing "unfavorable comments or documents" in a peace officer's file without notice and an opportunity to comment on the material.  Under NRS 289.010(3) the Police Officer's Bill of Rights applies to, "any person upon whom some or all of the powers of a peace officer are conferred pursuant to NRS 289.150 to 289.360…" It does not exclude "probationary employees' from protection.  Under NRS 289.150(1), sheriff deputies have the powers of a peace officer.

NRS 289.040(1) provides a straightforward procedure for the placing of unfavorable comments or documents in the administrative file of a peace officer and associated rights of a peace officer to contest the comments or documents before the information is placed in the officer's file.  The statute is not unclear as to what is required:

> [A] law enforcement agency shall not place any unfavorable comment or document in any administrative file of a peace officer maintained by the law enforcement agency unless: (a)The peace officer has read and initialed the comment or document; or (b)  If the peace officer refuses to initial the comment or document, a notation to that effect is noted on or attached to the comment or document.

Despite this clear duty under the law, Sheriff Trotter did not follow the procedure in NRS 289.040(1) before placing the unfavorable comments at issue in this case in Erwine's file in October of 2016.  The Defendants admit that Erwine was not shown the October 10, 2016 Memorandum before it was placed in Erwine's file.

Further, NRS 289.060(1), a peace officer is required to receive 48 hours' written notice before any interrogation or hearing is held relating to an investigation of a peace officer's conduct.

**d. Tortious Constructive Discharge**

Mr. Erwine's resignation from Churchill County was a product of two factors: that Erwine was to be fired whether he resigned or not and that Erwine would suffer financially if he refused to resign.  Thus, Mr. Erwine's resignation was not "voluntary," but was the result of coercion. When evaluating whether an employee's resignation is voluntary, Court's apply the *Knappenberger* factors:

> In evaluating such claims of coercion, we determine voluntariness by an objective standard, rather than by the employee's purely subjective evaluation; reject cases in which the employee did have a choice, even if between comparatively unpleasant alternatives; and consider additional case-specific factors that cut against a finding of coercion, such as whether the employee was given an alternative to resignation or retirement, understood the choice, had a reasonable time in which to decide, or could select the timing of the retirement or resignation.

*Knappenberger v. City of Phx*., 566 F.3d 936, 941 (9th Cir. 2009).

Under the *Knappenberger* factors, Mr. Erwine's "resignation" was clearly not voluntary considering the totality of the circumstances, i.e., and reasonable person in Mr. Erwine's position would feel "he had no choice but to" resign.  *Id.* at 941.  In Erwine's First Amended Complaint, Erwine clearly alleged that he was constructively discharged.  Sheriff Trotter told Erwine he would impose a financial penalty on Erwine if he chose to be terminated as opposed to resigning.

In order to prevail on his tortious constructive discharge claim, Erwine must prove (1) that his resignation was induced by an action and conditions that violate public policy; (2) a reasonable person in Erwine's position at the time of the resignation would have also resigned because of the aggravated and intolerable employment action and conditions; (3) Churchill County and Sheriff Trotter had actual or

constructive knowledge of the intolerable actions and conditions and their impact on Erwine; and (4) the situation could have been remedied. *Dillard Dept. Stores, Inc. v. Beckwith*, 115 Nev. 372, 377, 989 P.2d 882, 885 (1999); *Martin v. Sears, Roebuck & Co.*, 111 Nev. 923, 925-26, 899 P.2d 551, 553 (1995).

**e.    Defamation**

In order to prevail on his defamation claim, Erwine must prove (1) that Trotter made a false and defamatory statement concerning Erwine, (2) an unprivileged publication of the statement was made to a third person; (3) Sheriff Trotter was at least negligent in making the statement; and (4) Erwine sustained actual damages as a result of the statement.

A false statement is defamatory when it would tend to lower the subject in the estimation of the community, excite derogatory opinions about the subject, or hold the subject up to contempt. Words or conduct, or the combination of words and conduct, must be reviewed in their entirety and in context to determine whether they are susceptible of a defamatory meaning. *Lubin v. Kunin*, 117 Nev. 107, 17 P.3d 422 (2001).

**f.    Defamation Per Se**

Defamation per se occurs when:  1. Defendant published a statement about plaintiff's goods, services, business, or professional ability; 2. The statement was one that would tend to disparage the title or quality of plaintiff's goods, services, business, or professional ability; 3. The statement was false; and 4. Defendant was at least negligent in making the statement. *Bongiovi v. Sullivan*, 122 Nev. 556, 138 P.3d 433 (2006); *Chowdry v. NLVH, Inc.*, 109 Nev. 478, 851 P.2d 459 (1993).  If a finding is made that Trotter's statements injured Erwine's business or profession, he is entitled to an award of presumed damages in an amount reasonably calculated to compensate him for injury to reputation, loss of business, shame, mortification, hurt feelings, and any consequential physical illness or pain. Damages are to be

presumed because it is impossible to affix an exact monetary amount to these injuries.  *Id.*

### g.  Intentional Interference with Prospective Employment

In order to establish a claim of interference with prospective economic advantage, Erwine must prove the following elements by a preponderance of the evidence: (1) A prospective contractual relationship between Erwine and a third party; (2) Sheriff Trotter's knowledge of this prospective relationship; (3) The intent to harm Erwine by preventing the relationship; (4) The absence of privilege or justification by the defendant; and (5) Actual harm to the plaintiff as a result of the defendant's conduct.  The intent to harm requires only an intention to interfere with Erwine's prospective employment relations and does not require malice, ill will or malevolent spite by Sheriff Trotter. See *Wichinsky v. Mosa*, 109 Nev. 84, 88, 847 P.2d 727 (1993); *Las Vegas-Tonopah-Reno Stage Line, Inc. v. Gray Line Tours of Southern Nevada*, 106 Nev. 283, 287, 792 P.2d 386 (1990).

### III.  Key Issues for Trial

The fundamental underlying issues in this case were extensively briefed in the Plaintiff's Motion for Partial Summary Judgment [ECF #115].  In the Court's Order on the Motion [ECF# 126], the Court identified the following two primary disputes of fact and law to be resolved at trial.

### a.  "And" vs. "Or" – the *Blantz* decision

In the Court's Order, the Court addressed the issue of the level of the stigmatizing statement, finding that the plaintiff had to meet a two-part test to prove the statements at issue were stigmatizing under the "stigma-plus" test:

> To be sufficiently stigmatizing, it must "impair[] a reputation for honesty or morality." *Tibbetts v. Kulongoski*, 567 F.3d 529, 535–36 (9th Cir. 2009) (quoting *Brady v. Gebbie*, 859 F.2d 1543, 1552 (9th Cir. 1988)). The statements must also be so severe as to "effectively exclude the employee completely from [his] chosen profession." *Blantz v. California Dep't of Corr. & Rehab., Div. of Corr. Health Care Servs.*, 727 F.3d 917, 925 (9th Cir. 2013).

See Order at ECF 126, 14:3.

Plaintiff believes that the issue of law is subtly different. In footnote 6 of the decision in *Blantz* the Court clarified that:

> Accusations of dishonesty or immorality are sufficiently stigmatizing to implicate a liberty interest, but less severe accusations must be analyzed on a case-by-case basis, and allegations of mere incompetence or inability are not sufficient. See *Roth v. Veteran's Admin*., 856 F.2d 1401, 1411 (9th Cir. 1988), overruled on other grounds by *Garcetti v. Ceballos*, 547 U.S. 410, 126 S. Ct. 1951, 164 L. Ed. 2d 689 (2006*); Stretten v. Wadsworth Veterans Hosp*., 537 F.2d 361, 365-66 (9th Cir. 1976).

*Id.* at fn. 6.

Thus, if Plaintiff proves that Sheriff Trotter's statements involve "accusations of dishonesty or immorality," Erwine is not required to also show that the statements were so severe as to effectively exclude him from his profession. The second prong is only required in cases where the accusations do not involve, "dishonesty or immorality."

As the Court found in its Order, "At least some of the statements in the memo are more than mere accusations of incompetence and go towards morality," referring to the October 10, 2016 Memorandum. *See* ECF 126 14:19. Even if that were not the case, Erwine can still show "effective exclusion" based on the facts, i.e. he was rejected from several positions based on the statements in Sheriff Trotter's memorandum.

**b. Whether Erwine was denied employment because of Trotter's statements.**

In the Court's Order, the Court found that the Jury must decide whether Erwine was denied employment as a police officer because of the stigmatizing statements of Sheriff Trotter. *See* ECF 126 14:19. Plaintiff believes that this question is one of damages and is only relevant for the claims in which Erwine must prove that he suffered actual damages as a result of the statements of Sheriff Trotter. For

Mr. Erwine's constitutional claims, as well as his defamation per se claim, the Jury may award damages to Erwine even if it does not conclude that his inability to get a job was a result of Sheriff Trotter's statements.

As to the issue of fact, in at least one instance, the evidence will show that in the case of LVMPD, the background investigator expressly stated that Erwine was unfit for the job because of the statements that Trotter made to the investigator. Further, Plaintiff will present uncontested expert witness testimony that Erwine's rejection from the employers in question was caused by the placement of the memorandum in his employee file.

**DATED** this  Feb 9, 2022

By:   /s/  Luke Busby, Esq.
LUKE A. BUSBY, ESQ.
Nevada Bar No. 10319
316 California Ave.
Reno, Nevada 89509
775-453-0112
luke@lukeandrewbusbyltd.com
*Attorneys for the Plaintiff*

## **CERTIFICATE OF SERVICE**

I certify that on the date shown below, I caused service to be completed of a true and correct copy of the foregoing document by:

_____ personally delivering;

_____ delivery via Reno/Carson Messenger Service;

_____ sending via Federal Express (or other overnight delivery service);

_____ depositing for mailing in the U.S. mail, with sufficient postage affixed thereto; or,

___X___ delivery via electronic means (fax, eflex, NEF, etc.) to:

      Katherine F. Parks, Esq.
      Thorndal Armstrong
      6590 S. McCarran Blvd. Suite B.
      Reno, NV 89509
      Attorney for the Defendant

**DATED** this  Feb 9, 2022

By:    /s/  Luke Busby, Esq.