# EXHIBIT 1

EXHIBIT 1

1              UNITED STATES DISTRICT COURT

2                    DISTRICT OF NEVADA

3

4    MICHAEL ERWINE, an              )
     individual,                     )
5                                    )
              Plaintiff,             )
6                                    )
         vs.                         )        CASE NO.
7                                    )     3:18-cv-00461
     CHURCHILL COUNTY, a political   )        RCJ-WGC
8    subdivision of the State of     )
     Nevada; CHURCHILL COUNTY SHERIFF)
9    BENJAMIN TROTTER; and DOES      )
     1 through 10, inclusive,        )
10                                   )
              Defendants.            )
11   _____)

12

13

14               REMOTE VIDEOCONFERENCE
          DEPOSITION OF MICHAEL ANDREW ERWINE
15

16      Taken on Thursday, December 17, 2020

17                 At 8:59 a.m.

18

19                  Reno, Nevada

20

21

22

23

24   Job No. 688466

25   Reported by:  Sherry L. Graham, CCR #378

MICHAEL ANDREW ERWINE - 12/17/2020

```
 1      Q.    When did you first obtain employment after
 2   you received your criminal justice Associate's
 3   degree?
 4      A.    That would have been -- I believe my first
 5   employment after I received that degree would have
 6   been with a company called Allied Barton Security
 7   Services.  They were a security firm.  I believe now
 8   they are referred to as Allied Universal.
 9      Q.    How long have you been employed at the
10   Washoe Tribe?
11      A.    Since November of last year.
12      Q.    And what is your position?
13      A.    Police officer.
14      Q.    Are you a probationary officer or have you
15   completed any probationary period, if there was one?
16      A.    I completed my one-year probation.
17      Q.    What are your current duties?
18      A.    I always have difficulty answering that.
19   Just general police duties.  Everything you can
20   imagine a general law enforcement officer handles.
21   We are a fairly small department, so we don't have
22   other units to do in-depth investigations or
23   anything like that.  So depending upon the incident,
24   the officer will pretty much handle it from
25   beginning to end no matter the severity.
```

MICHAEL ANDREW ERWINE - 12/17/2020

1    Q.   Who is your supervisor?

2    A.   Right now, my supervisor is Sergeant Mike

3  Hall.  But we have two different sergeants as well

4  as a deputy chief and chief, and we pretty much kind

5  of work underneath all of them depending upon who's

6  there that day.

7    Q.   How many law enforcement officers are in

8  the department or agency?

9    A.   I believe 14.

10    Q.   What is your rate of pay?

11    A.   25.85.

12    Q.   Are there any benefits that you receive in

13  addition to salary?

14    A.   That's hourly.  The 25.85 is hourly.  In

15  addition to that, I receive medical and just medical

16  benefits, including dental and vision.

17    Q.   And do you contribute something in terms of

18  premium for your benefits?

19    A.   No.

20    Q.   Is there a retirement program that is

21  available to you in connection with your employment

22  with the Washoe Tribe?

23    A.   There is not.  We don't get any of the like

24  you have for the other agencies, such as Nevada PERS

25  or something like that.  We don't have that.

MICHAEL ANDREW ERWINE - 12/17/2020

1     Q.   What shift do you currently work in your

2   job with the Washoe Tribe?

3     A.   We rotate quite frequently.  My schedule

4   currently is Saturday -- I'm sorry.  Friday through

5   Monday from 7:00 a.m. to 5:00 p.m.

6     Q.   Since going to work for the Washoe Tribe in

7   November of 2019, have you applied to any other law

8   enforcement agencies?

9     A.   No.

10     Q.   Do you enjoy your position with the Washoe

11   Tribe?

12     A.   It's not the most desirable position for

13   me, but it is a job in the field that I wish to work

14   in.

15     Q.   Prior to working for the Washoe Tribe,

16   where were you employed?

17     A.   I was employed by Triumph Protection Group.

18   They were a private security contractor based out of

19   California.

20     Q.   Mr. Erwine, I would like you to take a look

21   at, and these are -- this is an exhibit from the

22   documents that I forwarded to everyone yesterday.

23   That is a document from Triumph Protection Group

24   Bates stamp Erwine 000620, So the number's in the

25   bottom right-hand corner.  It is a one-page document

MICHAEL ANDREW ERWINE - 12/17/2020

1    told them what I needed and this is what they

2    provided me.

3        Q.    How long did you work for Triumph

4    Protection Group?

5        A.    It looks like 6/28 of 2018 to February 27th

6    of 2019.

7        Q.    How did you come to be employed by Triumph

8    Protection Group?

9        A.    I was looking for a job in the security

10   field -- well, law enforcement and/or security.  I

11   knew people that were working in the security field.

12   They made me aware of that job.  That was -- it's

13   actually up in Incline, Nevada is where I worked.

14   And I applied for it and got offered a position.

15       Q.    What did you do for Triumph Protection

16   Group?

17       A.    I did a couple of different assignments for

18   them.  The majority, probably 95 percent of the time

19   was working at a private residence up in Incline, in

20   Tahoe, just providing security to that residence and

21   its occupants.

22       Q.    You were paid at a rate of $25 per hour in

23   that position?

24       A.    Yes.

25       Q.    And to whom did you report?

MICHAEL ANDREW ERWINE - 12/17/2020

1            MR. BUSBY:  Okay.  Got it.  Thank you.

2     BY MS. PARKS:

3         Q.    Having you take a look at what's been

4     marked as Exhibit Number 2 to your deposition, do

5     you recognize that, Mr. Erwine?

6         A.    Yes.

7         Q.    What do you recognize Exhibit Number 2 to

8     be?

9         A.    This was my employment -- various paperwork

10    from my employment offer at the Washoe Tribe.

11        Q.    If you would please turn to page 2 of

12    Exhibit Number 2, is that your signature towards the

13    bottom of the document?

14        A.    Yes.

15        Q.    And this document is dated July 11, 2019,

16    correct?

17        A.    Yes.

18        Q.    And so is that when you accepted the job

19    with the Washoe Tribe?

20        A.    So the employment process in law

21    enforcement varies between agency and agency in my

22    experience.  I believe the way this worked out, the

23    reason the date's the way they are, I was offered

24    the employment after my interview with them, but it

25    was continent upon successfully completing their

MICHAEL ANDREW ERWINE - 12/17/2020

1    agencies, you are basically graded everyday for

2    approximately three months.  Those are pictures that

3    the program -- that they use there for grading was

4    actually electronic.  That was, that was the first

5    time I have seen such a thing.  Normally, they are

6    on paper.  They use theirs electronically on the

7    computer.  Those are broken down into dates with

8    numbers associated with -- some numbers are better

9    than others.  There were different categories, but

10   that is basically a picture of those daily reviews,

11   if you will, and its associated numbers.

12        Q.   Are these photographs that you took with

13   your phone or some other device?

14        A.   Yes.

15        Q.   So these are basically photographs that you

16   took on your phone?

17        A.   That's a picture of the computer screen,

18   yes.

19        Q.   How much was your salary or your hourly

20   rate of pay at the Paiute Tribe?

21        A.   $19.44 an hour.

22        Q.   What were your duties there?

23        A.   Same duties as I have right now, general

24   police officer duties.  Everything from minor

25   traffic enforcement to in-depth investigations of

MICHAEL ANDREW ERWINE - 12/17/2020

1    crimes.

2         Q.    Did the Paiute -- does the Paiute Tribe

3    have a detention division or were you a patrol

4    officer or both?

5         A.    No, it didn't have a detention division.  I

6    was just a patrol officer.

7         Q.    Where are the offices of the Paiute Tribe

8    located?

9         A.    Their administrative office and police

10   department are located in Nixon, Nevada.  It's just

11   south Pyramid Lake outside of Wadsworth.

12        Q.    Is that where you reported for duty?

13        A.    That was our office.  We didn't always go

14   there to report for duty.  Basically, when we hit

15   inside of our jurisdiction, that would be us

16   reporting for duty.  Me being a trainee and always

17   having a training officer, I essentially drove to

18   their house every morning and we left from their

19   house, is where I had to report personally.

20        Q.    How many members or officers did the Paiute

21   Tribe have at the time that you worked there?

22        A.    I don't recall specifically, but I do

23   believe it was even less than the department I have

24   now, so I would say less than ten.

25        Q.    Your answers to interrogatories, written

MICHAEL ANDREW ERWINE - 12/17/2020

```
 1    questions that I asked you through your attorney,

 2    are included in the exhibits that I provided

 3    previously, if you could look for those.

 4        A.   Yes, I have them.

 5        Q.   Those are going to be marked as Exhibit

 6    Number 5 to your deposition.  It appears that maybe

 7    the page numbers at the bottom were cutoff in the

 8    course of these being copied, Mr. Erwine, but if you

 9    look to page 5 -- actually page 6, answer to

10    Interrogatory Number 9.

11             MR. BUSBY:  For the record, I'm going to

12    preserve our objection as stated in the answer to

13    the interrogatory.

14             Go ahead.

15             MS. PARKS:  And you can let me know when

16    you get there.

17             THE WITNESS:  I'm there.

18             MS. PARKS:  All right.

19    BY MS. PARKS:

20        Q.   According to your interrogatory responses,

21    you worked for the Paiute Tribe from January 8th of

22    2018 to April 4th of 2018.  Do you see that there?

23        A.   Yes.

24        Q.   And your last day of employment with the

25    Churchill County sheriff's office was when?
```

MICHAEL ANDREW ERWINE - 12/17/2020

1    interrupt.  I actually -- do you mind if we take a

2    quick bathroom break?

3            MS. PARKS:  Yeah.  That's fine.

4                  (Brief recess.)

5    BY MS. PARKS:

6        Q.   Mr. Erwine, according to your response

7    to Interrogatory Number 9, your last day of

8    employment with the Pyramid Lake Paiute Tribe was

9    April 4, 2018.  Does that sound right to you?

10       A.   Yes.

11       Q.   Tell me the reasons why you were informed

12   that you would no longer be working for the Paiute

13   Tribe.

14       A.   Basically, according to what they told me,

15   I just did not complete the training process

16   successfully.

17       Q.   Okay.  Did you ask for any particulars with

18   respect to how you failed to complete the field

19   training program?

20       A.   I did inquire a little bit.  I didn't

21   really get much answers other than I just was not at

22   the level that they expected me to be at.

23       Q.   Did you have any issues or difficulties,

24   any particular incidents that stick out in your mind

25   during your training program at the Paiute Tribe

MICHAEL ANDREW ERWINE - 12/17/2020

```
1       A.   I apologize.  I spoke over you.

2            This was provided to me by the employer as

3   a request just to provide my wages while I worked

4   there.

5       Q.   All right.  You worked for Allied Universal

6   then prior to working for the Pyramid Lake Paiute

7   Tribe?

8       A.   Yes.

9       Q.   What did you do for Allied Universal?

10      A.   I was an armed security guard.  I worked

11  various different assignments and locations in the

12  Reno area.

13      Q.   And when did you become employed with

14  Allied Universal?

15      A.   Oh, boy.  I'm not sure if it's -- I believe

16  it is referenced in this document on page 1.

17  January 4th of 2018, I believe.  No.  That's when I

18  had left.  Sorry.  April 25th of 2017.  Just to be

19  clear, the reason there are a couple dates there, I

20  worked for Allied Universal more than once.

21      Q.   All right.  Immediately prior to going to

22  work for the Pyramid Lake Paiute Tribe when you

23  worked for Allied Universal, what was your rate of

24  pay?

25      A.   15.30 an hour is what the document states.
```

MICHAEL ANDREW ERWINE - 12/17/2020

Page 72

1          MS. PARKS:   Thank you.

2     BY MS. PARKS:

3       Q.    Looking at what's been marked as Exhibit

4     Number 7 to your deposition, Mr. Erwine, do you

5     recognize that?

6       A.    Yes.

7       Q.    What is it Exhibit Number 7?

8       A.    Background investigation packet I filled

9     out for the Washoe County Sheriff's Office.

10      Q.    When did you fill out this packet?

11      A.    I filled this out as an application

12    pursuant to an application I filled out prior to my

13    employment with Churchill County.

14      Q.    That is your handwriting there on the first

15    page of Exhibit Number 7?

16      A.    Yes.

17      Q.    It appears that you submitted this

18    background packet on or about October 5th of 2015;

19    is that correct?

20      A.    Correct.

21      Q.    If you would look -- and I'm going to refer

22    to Bates stamp numbers on this document as well as

23    there are some page numbers as well.  So if you look

24    at page number 9 to Exhibit 7, it's WC 0089 at the

25    bottom.

MICHAEL ANDREW ERWINE - 12/17/2020

1    agencies you have applied to."

2            Do you see that there?

3    A.    Yes.

4    Q.    The first such agency listed says Sparks

5    Police Department, correct?

6    A.    Yes.

7    Q.    It says that you applied to the Sparks

8    Police Department on June 15th -- excuse me.  June

9    of 2015, correct?

10   A.    Yes.

11   Q.    In connection with your application to the

12   Sparks Police Department, did you fill out a written

13   application for that agency?

14   A.    I don't recall if it would have been

15   written or online.  This was quite some time ago.

16   Q.    Sorry.

17           Did you keep any written documents related

18   to your application for employment with the Sparks

19   Police Department in June of 2015?

20   A.    No.  All application documents related to

21   law enforcement applications I believe you already

22   requested.  Everything in my possession has already

23   been disclosed.

24   Q.    Were you interviewed for a law enforcement

25   position with the Sparks Police Department?

MICHAEL ANDREW ERWINE - 12/17/2020

```
 1      A.   Yes.
 2      Q.   And if you applied in June of 2015, do you
 3  recall when you were interviewed?
 4      A.   I don't recall.  It would have been within
 5  a year.
 6      Q.   Sorry.  I didn't mean to interrupt you
 7  there.
 8           Do you recall the name of the individual
 9  who interviewed you?
10      A.   I do recall that interview panel was
11  actually about the biggest interview panel I have
12  ever had.  It was probably about ten people.
13      Q.   How were you notified that you were not
14  selected for a law enforcement position with the
15  Sparks Police Department?
16      A.   I was brought back in after the interview
17  to the panel and they told me that I wasn't
18  selected.
19      Q.   Did they give you any reasons as to why you
20  were not selected for that position?
21      A.   They said, at that time during that
22  application pool, they had a lot of other candidates
23  that were previous or current law enforcement
24  officers looking to go to that agency and they
25  wanted someone that had more experience.  At that
```

MICHAEL ANDREW ERWINE - 12/17/2020

```
 1   time, I did not really have any, so they were
 2   looking for someone that was a little bit more
 3   experienced.
 4       Q.   Did you provide the Sparks Police
 5   Department with information about the DUI you got in
 6   June of 2011 --
 7       A.   Yes.
 8       Q.   -- in connection with your application?
 9       A.   Yes.  I disclose that to all law
10   enforcement agencies.
11       Q.   The next agency on the list is the Lyon
12   County Sheriff's Office, it indicates that you
13   applied in April of 2015.  Do you see that there?
14       A.   Yes.
15       Q.   Were you interviewed by the Lyon County
16   Sheriff's Office for a deputy sheriff position?
17       A.   I don't recall.
18       Q.   You were not selected for a position with
19   the Lyon County Sheriff's Office though, correct?
20       A.   Yes, I was not selected there.  From my
21   recollection of that application, the list of
22   applicants, we were notified by the human resources
23   department that they expired.  It's not like I was
24   disqualified.  The list had just expired.  If I
25   wished to apply again, I could.
```

MICHAEL ANDREW ERWINE - 12/17/2020

Page 78

```
 1      Q.    Well, did you receive some sort of
 2   correspondence that outlined that information or
 3   contained that information?
 4      A.    That would have been a verbal phone call
 5   from human resources, from the best of my
 6   recollection.
 7      Q.    Did you reapply to the Lyon County
 8   Sheriff's Office at any time?
 9      A.    No.
10      Q.    Why did you not reapply to the Lyon County
11   Sheriff's Office after that point?  Perhaps they
12   didn't have any openings, but why had you not
13   reapplied there?
14      A.    It could have been because they didn't have
15   very many openings or, honestly, it's not one of the
16   agencies I would wish to work at right now.
17      Q.    This also indicates that you had applied at
18   Fallon Tribal Police; is that correct?
19      A.    Yes.
20      Q.    I believe it said you applied in April of
21   2015, correct?
22      A.    Yes.
23      Q.    And you were not selected for a position as
24   a police officer with the Fallon Tribal Police;
25   correct?
```

MICHAEL ANDREW ERWINE - 12/17/2020

1      A.    Yes.

2      Q.    **Were you given any information as to why**

3  **you were not selected for that position?**

4      A.    Yes.  It was between me and another

5  candidate who was actually Native American from that

6  tribe.  In my experience, the tribal police

7  departments, Native Americans get preference for

8  employment over non-natives.  Being he was living in

9  Fallon as well as a Native American member of that

10  tribe, he was selected over me.

11      Q.    **Who told you that?  How did you come by**

12  **that information?**

13      A.    I believe I had a friend that worked at the

14  tribe at that time.

15      Q.    **What's the friend's name?**

16      A.    Bradley Harris.  It would have been

17  Officer Harris.  He was a police officer.

18      Q.    **Are you still friends with Bradley Harris?**

19      A.    Yes.

20      Q.    **When is the last time you talked to him?**

21      A.    Yesterday.

22      Q.    **Do you have a telephone number for him?**

23      A.    I do.  I should, just in full disclosure,

24  he is actually a current coworker of mine.  He now

25  works for the Washoe Tribal Police Department as a

MICHAEL ANDREW ERWINE - 12/17/2020

1    police officer.

2         Q.    The next agency on the list is the Washoe

3    Tribal Police.  Do you see that there?

4         A.    Yes.

5         Q.    And it states that you applied in 2011,

6    correct?

7         A.    Yes.

8         Q.    And you were not selected for a position,

9    correct?

10        A.    Correct.

11        Q.    Were you given any information as to why

12   you were not selected as a police officer for the

13   Washoe Tribal Police?

14        A.    That determination, from my recollection,

15   was after an interview.  That was right after I

16   graduated the police academy, and I believe, like,

17   ten of us out of the academy applied there.  They

18   were only taking one person.  I was not that one

19   person selected at that time out of, like, the ten

20   of us that applied.  There had been other people

21   that had a lot more experience than me at that time.

22        Q.    Did you apply for that position before or

23   after you got a DUI?

24        A.    That probably would have been before.  I

25   wouldn't have applied anywhere right after just from

MICHAEL ANDREW ERWINE - 12/17/2020

```
 1     Q.    Right.
 2           Underneath Number 2 there, it says, "Your
 3     starting wage will be 21.44 per hour."
 4           Do you see that there?
 5     A.    Yes.
 6     Q.    That was your starting salary with the
 7     Churchill County Sheriff's Office, correct?
 8     A.    Yes.
 9     Q.    Did you ever receive an increase in pay
10     while you worked for the Churchill County Sheriff's
11     Office?
12     A.    I don't believe so.  I think it would have
13     been at my annual that I would have received a
14     category bump as well as an annual bump.
15     Q.    But throughout then your period of
16     employment with Churchill County that was your
17     hourly wage?
18     A.    Yes.  I believe so.
19     Q.    If you look at the bottom there, is that
20     your signature at the bottom right of Exhibit
21     Number 10?
22     A.    Yes.
23     Q.    If you could look at the next exhibit,
24     Mr. Erwine.  It's called Acknowledgement of
25     Acceptance.  It's Churchill County Human Resources
```

MICHAEL ANDREW ERWINE - 12/17/2020

1      Q.   All right.  Have you ever gone out for

2   drinks or other social interaction with

3   Mr. Giurlani?

4      A.   Just the dinner or the dinners.

5      Q.   Can you think of how many dinners you have

6   attended with him?

7      A.   I don't know off the top of my head.

8      Q.   Have you ever participated in any other

9   social activities with him, such as going to

10   sporting events or playing sports or anything like

11   that?

12           MR. BUSBY:  I'm going to object.  This

13   question has been asked, I think, three different

14   times already, different forms, and the witness has

15   already provided an answer.

16           Go ahead, Mike.

17           THE WITNESS:  No.  I don't recall any

18   activities of those types that we attended together.

19   BY MS. PARKS:

20      Q.   Prior to your termination from employment

21   with the Churchill County Sheriff's Office, did you

22   have contact with Mr. Giurlani and speak with him

23   about any of the alleged improprieties that you

24   observed while working in the Churchill County Jail?

25      A.   Yes, I had spoke with him about some of the

MICHAEL ANDREW ERWINE - 12/17/2020

1    things I had seen.

2        Q.    **That was while you were still employed by**

3    **the Churchill County Sheriff's Office?**

4        A.    Yes.

5        Q.    **And what is it that you reported to**

6    **Mr. Giurlani?**

7        A.    I reported largely to the extent of the

8    things that are in my complaint, the things I saw,

9    the things I didn't feel were appropriate.  I looked

10   at Mr. Giurlani as kind of a mentor, if you will,

11   that's what our relationship was in the academy.  I

12   respected him.  I looked up to him.  I asked for a

13   little bit of advice being a new cop and new to the

14   agency and basically a young cop at the time, which

15   I still am, I was looking for some advice about how

16   to handle the situations I had saw and that.  I

17   disclosed to him things that were disclosed in my

18   complaint.

19       Q.    **All right.  How many conversations did you**

20   **have with him about alleged improprieties that you**

21   **observed at the Churchill County Jail?**

22       A.    I don't recall the exact number.

23       Q.    **Do you recall more than one?**

24       A.    Yes, I would say it's fair to say more than

25   one.

MICHAEL ANDREW ERWINE - 12/17/2020

1      A.    I did speak with him briefly, yes.

2      Q.    **Did you ask him any questions about your**

3 **separation from employment?**

4      A.    Yeah.  From what I can recall -- because I

5 was -- I always had a very good working relationship

6 with him.  He always treated me fairly.  I remember

7 basically asking him, you know -- I think I even

8 called him Mike because we were on kind of a

9 first-name basis with a lot of people out there.  I

10 said, Mike, what happened.  What did I do.  I will

11 never forget his response.  He said, I think you

12 were just trying to be a cop too hard or too much.

13      Q.    **Did you ask him what he meant by that?**

14      A.    I might have inquired into it, but I didn't

15 get an answer.

16      Q.    **Did you ask him if there was any way they**

17 **might reconsider their decision?**

18      A.    No.  It was evident from the demeanor that

19 day that there was no reconsidering that.

20      Q.    **Did you ask them if there was a possibility**

21 **that you could have some sort of hearing to further**

22 **state your perspective on what had taken place?**

23      A.    No.  I had tried in the previous meeting

24 and I was cutoff.

25      Q.    **Which previous meeting?**

MICHAEL ANDREW ERWINE - 12/17/2020

Page 190

1    A.    The meeting we just discussed in the office

2    with -- in Sergeant Nuckolls' office with Trotter

3    and Matheson.

4    **Q.    I don't think that I, I don't think that I**

5    **gleaned that from your testimony, that you had asked**

6    **them for some sort of hearing.**

7    A.    No.

8         MR. BUSBY:  Objection.  Argumentative.

9         Go ahead.

10        THE WITNESS:  What I stated earlier is I

11   began to speak about the Beaulieu incident, but I

12   was immediately cutoff --

13        COURT REPORTER:  I'm sorry --

14        MS. PARKS:  I didn't catch that.  You were

15   fading out.

16        THE WITNESS:  When I began to speak about

17   the Beaulieu incident that day, I was immediately

18   cutoff and said the decision's already made.  It was

19   evident to me that there was nothing I could say

20   that would change anything.

21   BY MS. PARKS:

22   **Q.    Have you ever reviewed the Collective**

23   **Bargaining Unit in place between Churchill County**

24   **Sheriff's Office and Churchill County?**

25   A.    I have reviewed it during my employment