LUKE A. BUSBY, ESQ.
SBN 10319
316 California Ave.
Reno, Nevada 89509
775-453-0112
luke@lukeandrewbusbyltd.com
*Attorneys for the Plaintiff*

# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

* * *

| | |
|---|---|
| MICHAEL ERWINE,<br><br>                Plaintiff,<br><br>vs.<br><br>CHURCHILL COUNTY, a political subdivision of the State of Nevada, CHURCHILL COUNTY SHERIFF BENJAMIN TROTTER, and DOES 1 through 10 inclusive;<br><br>                Defendants.<br>_____/ | Case No.: 3:18-cv-00461-RCJ CSD<br><br>**PLAINTIFF'S RESPONSE IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT** |

COMES NOW, Plaintiff MICHAEL ERWINE, by and through the undersigned counsel, and hereby submits the following Opposition to the Motion for Summary Judgment filed by Defendants CHURCHILL COUNTY, a political subdivision of the State of Nevada, and former CHURCHILL COUNTY SHERIFF BENJAMIN TROTTER [ECF #171] on February 24, 2022.

Erwine has filed claims against Churchill County and Sheriff Trotter herein for violation of his due process rights under the Nevada and US Constitutions, tortious discharge, defamation, defamation per se, and intentional interference with

prospective employment. On April 29, 2021, the parties filed a stipulation for dismissal of Erwine's procedural due process property interest claim and the Court dismissed this claim accordingly. *See* ECF #114.

Defendants argue that the uncontested facts show that the Defendants are entitled to judgment as a matter of law on Mr. Erwine's due process liberty interest claims under the US and Nevada Constitutions based on establishing that Mr. Erwine has been able to secure employment after his termination from Churchill County.  As explained below, the Plaintiff's argument is based on a misinterpretation of the scope of what constitutes a "stigmatizing" statement under the 9th Circuit's decision in *Blantz v. California Dep't of Corr. & Rehab., Div. of  Corr. Health Care Servs.,* 727 F.3d 917, 925 (9th Cir. 2013), *Cox v. Roskelley*, 359 F.3d 1105, 1106 (9th Cir. Wash. February 20, 2004) and *Board of Regents v. Roth*, 408 U.S. 564, 569–70 quote at 573-574 (1972).  This Court has already determined that Sheriff Trotter's statements involve accusations that Mr. Erwine acted immorally. *See* ECF 126 14:19.  As explained below, even if the Court accepts Churchill County's version of events, its statement of the law is incomplete and incorrect.  Under the correct standard, Erwine has established facts sufficient to prove his claim as specifically found by this Court. The Court should deny summary judgment accordingly.

## I.      Statement of Undisputed Facts

Mr. Erwine is a former Deputy Sheriff for the Churchill County Sheriff's Office. Between December 9, 2015 and October 10, 2016, Churchill County employed Erwine in the capacity of Detention Deputy at the County Jail.  In the Plaintiff's Declaration in Exhibit 1, the Plaintiff described the facts and circumstances surrounding his termination. October 8, 2016, Erwine went in for the day shift and began checking cells. Erwine was informed that an inmate, Andrew Beaulieu ("Beaulieu") was in the security cell and needed to be booked. When Erwine arrived at Beaulieu's security cell he noticed blood on the walls and asked the grave shift

deputy what the blood was from. The grave shift deputy informed Erwine that Beaulieu had come in with a cut on his hand and that it ripped open while in the cell. After investigating the circumstances, Erwine discovered Beaulieu had been requesting water for hours. Erwine was informed by the inmate and later confirmed during review of surveillance footage that every time Beaulieu would request water, the grave shift deputy would flush the drain in Beaulieu's cell making Beaulieu's request inaudible over the flushing noise. Erwine provided Beaulieu with water pursuant to his essential job functions to provide inmates with food and explained to Beaulieu what the rest of the booking process would look like. During this time, Beaulieu expressed to Erwine that the grave shift deputies were "assholes", and he would be filing a lawsuit against them.  Erwine continued to conduct his rounds in the jail. While Erwine was conducting his rounds, other inmates asked Erwine what had happened to the "guy in the security cell" the previous night and explained what the grave shift did "was messed up." Erwine reviewed surveillance footage of the grave shift's interaction with Beaulieu before he removed him for booking, mainly to be aware of any safety concerns with Beaulieu before removing him from the security cell. Erwine did not note any alarming actions by Beaulieu wherein Erwine would need to be concerned, however, he did note concerning inappropriate acts of the grave shift deputy that he believed needed to be brought to his sergeant's attention. Since the concerns were not an immediate threat, and the sergeant did not work on weekends, Erwine chose to log the events on his computer (attached to Exhibit 1) so he could follow up with his sergeant on Monday, October 10, 2016, when his sergeant returned to work.

In the Plaintiff's Declaration in Exhibit 1 the Plaintiff also describes the events of the next day Sunday, October 9, 2016, involving inmate Matthew Maes.  During Erwine's dayshift, Deputy Jabines had dropped a container of miscellaneous tools and other items inside of a booking cage. Included in these items were screwdrivers

and other sharp instruments. Deputy Jabines did not want to pick up the items herself, so she asked an inmate to come into the booking cage and pick them up for her. Bringing in an inmate to pick up the sharp inmates created a dangerous situation for everyone involved. Erwine did not feel it was appropriate for Deputy Jabines to have an inmate, Matthew Maes, come into the booking cage to pick up items which could be easily used as weapons. Erwine questioned Deputy Jabines about this but her only response was "Senior Deputy" which Erwine understood as to mean he did not have a say in the matter. When Maes came into the cage, Erwine positioned himself between Maes and the control panel of the facility. Erwine was in an uncomfortable position with Maes being only a few feet away from Erwine and backed into a corner. Erwine removed his taser from its holster and held it in his hand with the taser pointed to the ground. Erwine removed the cartridge from the taser due to the close proximity of inmate Maes to both Erwine and Deputy Jabines. Maes cleaned up the items and left the cage without incident.

As explained by Mr. Erwine in his Declaration No. 4, attached hereto as Exhibit 2, near the end of Erwine's shift on October 10, 2016, Erwine was confronted by Captain Matheson and Sheriff Trotter. Sheriff Trotter informed Erwine that he was aware of the booking that took place over the weekend with Beaulieu and that Erwine was intentionally trying to harm the Department. Erwine began to speak about the Beaulieu Incident as he had originally intended to do from the beginning of his shift that day, however, Erwine was not afforded any opportunity to explain what he had witnessed or discovered, nor was he provided with any notice of the meeting or that we was to be terminated at the meeting.  Instead, Trotter stated Erwine had two choices: he could resign, or the Department would terminate his employment effective immediately.  Either way, Erwine was informed his employment was not continuing after the meeting. *Id.*

As further explained in Exhibit 2, at the meeting with Sheriff Trotter on October 10, 2016, Erwine was informed that he would receive his vacation pay/sick pay if he chose to resign rather than be terminated, but that he would be terminated in either case. Erwine's financial situation was not secure, and he had moved to Churchill County and signed a lease so that he could work as a deputy there. Further, the job at Churchill county was his first position in law enforcement after graduating from the academy, and a termination would have been catastrophic on his future career prospects. Erwine was forced to make a snap decision under financial duress and Erwine signed a Letter of Separation on October 10, 2016.

Unbeknownst to Mr. Erwine, Sheriff Trotter placed a memorandum in Mr. Erwine's employee file that contained stigmatizing statements about Mr. Erwine, dated October 10, 2016, which was subsequently distributed to at least one law enforcement agency in Nevada with whom Erwine had filed an application for employment. *See* Exhibit 3.

Sheriff Trotter's October 10, 2016 Memorandum is riddled with false allegations and stigmatizing conclusions - that Erwine engaged in "unprofessional behavior," that he created liability for Churchill County, that he discredits Churchill County and the entire profession of law enforcement, that Erwine violated "behavior standards," and that Erwine's behavior was "extremely disturbing and disappointing." *Id*. The Memorandum also states that Erwine engaged in "conduct unbecoming a deputy" and an "unjustifiable use of force." *Id.*

In the Defendant Churchill County's Responses to the Plaintiff's First Requests for Admission, attached hereto as Exhibit 4, the Defendants admitted that Erwine received no notice that he had been accused of misconduct, nor a name clearing hearing:

a.  Erwine was provided with no written notice that he had been accused misconduct before Erwine executed the Letter of Separation on October 10, 2016 (See RFA No.1);

b.  Erwine was not afforded a hearing before Erwine executed the Letter of Separation on October 10, 2016 (RFA No. 2);

c.  Sheriff Trotter authored the October 10, 2016 Memorandum (RFA No. 4);

d.  Sheriff Trotter placed the October 10, 2016 Memorandum into Erwine's personnel file (RFA No. 5);

e.  The October 10, 2016 Memorandum was not provided to Erwine before the Letter of Separation on October 10, 2016 was executed by Erwine (RFA No. 5);

f.  The October 10, 2016 Memorandum was never shown to Erwine such that he may have read and initialed the document before it was placed in his personnel file (RFA No. 8); and

g.  The October 10, 2016 Memorandum contains no notation to the effect that the document was shown to Erwine and that Erwine refused to initial the document (RFA No. 9).

Also included in Mr. Erwine's personal file at Churchill County, unbeknownst to him, were statements from Churchill County Sheriff's Office employees Deputy Thompson and Sergeant Summers describing the Beaulieu incident (*See* Exhibits 5 and 6), and a statement from Deputy Jabines describing the Maes incident. *See* Exhibit 7.  Sergeant Summers' statement in Exhibit 6 indicates that he believed that Beaulieu had spoken to Mr. Erwine about a lawsuit and that Erwine told Beaulieu that a lawsuit would be winnable. Deputy Jabines' statement in Exhibit 7 also expressly mentions a possible lawsuit involving Maes against the Churchill County Sheriff's Office, and begins with the conclusion that Erwine violated Churchill COunty's Detention Use of Force Policy. Erwine was never provided with the ability

to contest the assertions of Sheriff Trotter in the October 10, 2016 Memorandum or the statements of the other Churchill County deputies that were placed into his file because he was not aware of the existence of the accusations against him until over a year and a half after they were placed in his file.

Despite initially denying that the October 10, 2016 Memorandum and personnel file was shared with any outside law enforcement agency (*See* the Defendant's Answer to the Amended Complaint at Doc. #71 at 9) the Defendants later admitted that the October 10, 2016 Memorandum, in addition to Mr. Erwine's entire personnel file was shared with the Washoe County Sheriff's Office, but only after Washoe County provided a response to a subpoena in which it was clear that Erwine's entire employee file was sent to the Washoe County Sheriff's Office. *See* Exhibit 4 at Response to Request for Admission Nos. 14 and 15 and Exhibit 8, which is the log from Washoe County indicating that the October 10, 2016 Memorandum and Erwine's file was sent by Churchill County.

On February 8, 2021, the undersigned counsel received the Plaintiff's background file from the Las Vegas Metropolitan Police Department ("LVMPD"), which was sought by the Defendant pursuant to a subpoena issued by the Defendants, and was provided under seal.  Included in LVMPD's response is a note from the background investigator Scott Olsen indicating that Olsen had a telephone conversation with Sheriff Trotter regarding Plaintiff Mr. Erwine's employment with Churchill County.  Sheriff Trotter indicated to Mr. Olsen that Mr. Erwine was terminated because he initiated an unauthorized investigation that was beyond his duties and that Mr. Erwine was sympathetic to an inmate who was looking to file a lawsuit against Churchill County - reiterating the gist of the false claim in the October 10, 2016 Memorandum that Erwine was disloyal, immoral, and dishonest. Mr. Olsen also indicates that Sheriff Trotter indicated that an investigation was conducted, presumably of the incident involving Mr. Beaulieu described in the

Plaintiff's motions, and that no mistreatment of the inmate took place.  See Confidential Exhibit 9.[1] Mr. Olsen concludes his notes by stating that Erwine's actions make him unsuitable for employment with LVMPD, referring to what Sheriff Trotter said.  *Id*.

The Defendants argue that the Reno Police Department and the North Las Vegas Police Department responded to a subpoena indicating that they did not receive the Trotter memorandum or any other information from Churchill County in connection with Erwine's applications for employment with those agencies.  See Motion at 10:2.  This is a mischaracterization of what the subpoena response indicates.  The subpoena in question, attached hereto as Exhibit 10 only requested, "The complete employment file of Michael Erwine as provided to your office by the Churchill County Sheriff's Office upon your request." Nothing in the subpoena responses from the City of Reno or NLVPD states that they do not have "or any other information from Churchill County in connection with Erwine's applications for employment with those agencies," as described by the Defendants, just that they do not have his employee file from Churchill County.  As was the case with LVMPD, a phone call like the call between Sheriff Trotter and Officer Olsen described in Confidential Exhibit 9 may obviate the need for a background investigator to obtain an entire file, that is the background investigation process does not always reach the phase where a file from another agency may be obtained.  In fact, Sheriff Trotter described this very process at his deposition:

> Q:· Okay.· All right.· So would -- do -- when you were doing a background investigation on a potential employee, if there were other law enforcement agencies that they had worked  bo- -- for before, was it your practice to contact those law enforcement agencies?
> A:· Yes.
> Q:· Okay.· And would you request documentary information from those law enforcement agencies?

---

[1] This Motion is accompanied by a motion for leave to file Exhibit 9 under seal per LR-10-5.

> A:· Uh, sometimes.
> Q:· Okay.· When would you request documentary information?
> A:· Um, you know, usually, they were such short calls. Law enforcement agencies would just simply verify and refer me to HR, um, for whatever entity it was.·

See Exhibit 11 at 22:11.

According to the Affidavit of Mr. Beaulieu attached hereto as Exhibit 12, Erwine did nothing to encourage Mr. Beaulieu to file a lawsuit against Churchill County, as he was accused of doing by Sheriff Trotter in the October 10, 2016 Memorandum. If Sheriff Trotter had done the flimsiest of investigations, such as asking Mr. Erwine, Mr. Beaulieu, or Mr. Maes what happened, he would have discovered that the allegations against Mr. Erwine, which he knew would be disseminated to other law enforcement agencies, were false.

Further, at the deposition of Matthew Maes, Erwine's supposed victim of the use of force incident referred to in Sheriff Trotter's October 16, 2016 Memorandum, Maes testified that the idea that Erwine used excessive force on him was untrue, and that "it never happened:"

> Q:· Okay.· And you're -- can you tell me what your knowledge of the facts and circumstances of this case are generally?
> A:· Um, my knowledge of it is that Mike Erwine was fired for excessive use of force with a taser, and I was named a victim.· But it never happened.· So, um, here we are, and we're going to talk about the reasons why, um, or what happened.· Why why, um -- why -- why did they say that -- that -- that he -- that he tased me, you know, when -- when it never happened?· So, I don't know.

See Exhibit 13 at 7:1

When shown Sheriff Trotter's Memorandum attached hereto as Exhibit 3 describing Deputy Jabines' account of what happened in the case with Mr. Erwine,

Mr. Maes states that it appeared to him that Jabines may be trying to frame Mr.

Erwine because the description of what happened was so bizarre:

> A:· -- I was asked to go in the cage.· That's all true. But
> there was never a taser pointed at me, and I -- I don't ever
> hear a taser going off.· And so, um, the fact that she says
> that those are -- are something that happened and asking
> to relieve him or to send him home, you know, it just -- it
> just really doesn't -- doesn't -- doesn't seem right as far as
> I'm concerned. You know, I mean –
> Q:· Okay.· Do you see where it says "Items of concern" on
> page 3, and there's a couple of bullet points under that?
> A:· Yes.
> Q:· Okay.· It states, "This is unprofessional behavior."
> A:· Yes.
> Q:· What do you think of that statement and --
> A:· I think that --
> Q:· -- what happened that day in general?
> A:· -- I think that had -- that that day in general, I think that
> maybe Jabines is, um -- maybe she was unprofessional
> with her behavior.· You know, because there was, um,
> obviously some tools that were probably thrown on the
> ground on purpose. You know, I mean, to -- to -- and have
> me come in there and to -- to set this guy up to make him
> seem like he tased me, like, it's just completely crazy, you
> know. I -- I mean, and these are people that are supposed
> to be, uh, upholding our laws and stuff.· You know, that's --
> that's crazy to me, and it's unprofessional.

Exhibit 13 at 40:7.

Subsequent to Erwine's departure from the Churchill County Sheriff's Office,

after Erwine sought other law enforcement jobs, Erwine was rejected from multiple

police agencies for failing to pass background investigations. As described

Declaration No. 2 of Michael Erwine in Exhibit 14 and the documents in Attachment

A thereto, on January 17, 2017, Erwine received a letter from the Washoe County

Sheriff informing him that, "…the Sheriff's Office has determined that you do not

meet the established standards for a position as Deputy Sheriff and therefore you

have not been selected at this time."  On February 7, 2017, Erwine received an email

from Las Vegas Metropolitan Police in response to his application for employment

informing him, "…based on review of your background history, you will no longer be considered for the position(s) of Police Recruit C 16-001 November with the Las Vegas Metropolitan Police Department. Candidate does not meet LVMPD hiring standards based on Employment History" and "You are not eligible to apply with LVMPD for any position indefinitely." On September 8, 2017, Erwine received a letter from the Carson City Department of Alternative Sentencing informing him that he is, "…no longer being considered in the current recruitment due to failing on or more portions of the selection process" which included the Background Investigation and Chiefs Review, and "Based on our recruitment standards you are precluded from reapplying with our agency in the future." On September 12, 2017, Erwine received from Douglas County Sheriff a letter informing him that he, "…did not successfully complete the background evaluation/testing and therefore are no longer considered an eligible applicant for employment...." On November 14, 2017, Erwine received a letter from North Las Vegas Police informing him he was "...ineligible to continue in the employment process for the position of Police Officer..." for character Issues and his employment history," and "You are disqualified indefinitely.    On March 1, 2018, Erwine received a letter from Reno Police Department informing him that his, "... application for employment with the Reno Police Department for [Police Recruit] was rejected, based on your pre-employment background investigation."  The rejection letters quoted above are all attached to Mr. Erwine's declaration in Exhibit 14.

After receiving the rejection letters, Erwine became suspicious that there was something in his employee file at Churchill County about which he was unaware. Upon requesting and receiving his employee file from Churchill County on April 13, 2018, Erwine discovered the existence of the October 10, 2016 Memorandum and the statements regarding the incidents with Maes and Beaulieu were placed in his employment file by Sheriff Trotter. *Id.*  As such, Erwine was unaware that he had

been accused of misconduct and that the stigmatizing statement was placed in his file for a year and a half.  As indicated in the declaration of Michael Erwine in Exhibit 15, prior to being terminated by Churchill County in 2016, Mr. Erwine had never failed a background investigation.  In that same affidavit, Mr. Erwine describes that he received an email from LVMPD indicating that he was ranked 21st in the selection process out of 50 available slots, and that Mr. Erwine was not selected because of the statements of Sheriff Trotter to Mt. Olsen described in Confidential Exhibit 9.

As to the effects of Sheriff Trotter's statements on Mr. Erwine's career, it is clear from the contents of Confidential Exhibit 9 that Erwine was found to be "unsuitable" for employment at LVMPD specifically because of what Sheriff Trotter told the LVMPD background investigator.  Further, Erwine has retained a police practices expert, Mr. Ron Dreher, whose expert report is attached hereto as Exhibit 16, to opine as to the harm that was done to Mr. Erwine's career as a result of the actions of Sheriff Trotter. As is clear from his resume in Exhibit 16, Mr. Dreher has extensive experience in law enforcement and in representing police unions in negotiations and before the Nevada Legislature, whose report opines as to the issue of fact as to the impact on Mr. Erwine's career by the statements and actions of Sheriff Trotter:

> Sheriff Trotter's memorandum tainted Mr. Erwine's background by labeling him a "liability". It is abnormal for a Nevada Law Enforcement department to indefinitely ban an applicant for any employment. In today's law enforcement world being labeled a "liability" and being terminated for that reason is a law enforcement career killer in my opinion.

*Id.* at page 13.

## II.    Standard of Review

Pursuant to Federal Rule of Civil Procedure 56, an order granting summary judgment should be issued only when there are no genuine issues of material fact

and the moving party is entitled to judgment as a matter of law. "The purpose of summary judgment is to avoid unnecessary trials when there is no dispute as to the facts before the court." *Nw. Motorcycle Ass'n v. U.S. Dep't of Agric*., 18 F.3d 1468, 1471 (9th Cir. 1994).

In a summary judgment motion, the trial court is to perform a "threshold inquiry of determining whether there is a need for a trial." *Taybron v. City and County of San Francisco*, 341 F.3d 957, 959 (9th Cir. 2003) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986)).  Summary judgment should be granted if, taking the evidence and all reasonable inferences drawn therefrom in the light most favorable to the non-moving party, there are no genuine issues of material fact. *Furnace v. Sullivan*, 705 F.3d 1021, 1026 (9th Cir. 2013).  An issue of material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party. *Thomas v. Ponder*, 611 F.3d 1144, 1150 (9th Cir. 2010).

The court must not weigh the evidence or determine the truth of the matter but only determine whether there is a genuine issue for trial.  See *Balint v. Carson City*, 180 F.3d 1047, 1054 (9th Cir. 1999).

### a.  14th Amendment Procedural Due Process – Liberty Interest – Against Sheriff Trotter

Sheriff Trotter is sued in his individual capacity for his acts under color of Nevada law.  "A public employee acts under color of state law while acting in his official capacity or while exercising his responsibilities pursuant to state law." *West v. Atkins*, 487 U.S. 42, 49, 108 S. Ct. 2250, 101 L. Ed. 2d 40 (1988). Because Sheriff Trotter fired Erwine, Trotter's conduct was the actionable cause of Erwine's claimed injury. *Harper v. City of Los Angeles*, 533 F.3d 1010, 1026 (9th Cir.2008) "Where a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential." *Wisconsin v. Constantineau*, 400 U.S. 433, 437, 91 S. Ct. 507, 510 (1971).

It is well established that: (1) a terminated employee has a constitutionally based liberty interest in clearing his name when stigmatizing information regarding the reasons for the termination is placed in his employee file and then published; (2) Failure to provide a "name-clearing" hearing in such a circumstance is a violation of the due process clause; and "[A]n employee's liberty interest is implicated if a charge of improper conduct impairs the employee's reputation for honesty or morality." *Cox v. Roskelley,* 359 F.3d 1105, 1112 (9th Cir. 2004) citing *Vanelli v. Reynolds School District No. 7*, 667 F.2d 773 (9th Cir. 1982).

Mr. Erwine has a right to due process to protect his reputation and to be free of official stigmatization, and even threatened stigmatization requires due process. *Board of Regents v. Roth*, 408 U.S. 564, 569–70 quote at 573-574 (1972); *Goss v. Lopez*, 419 U.S. 565 (1975). While reputational harm alone does not trigger a right to due process, if coupled with a concurrent loss of employment, the 14th Amendment requires a "name clearing" hearing under the "stigma-plus" doctrine. *Paul v. Davis*, 424 U.S. 693, 712 (1976).

Even if a police officer is a "probationary employee" they have a right to a name clearing hearing if stigmatizing information is to be placed in their employment file. "Although a probationary employee has no protected "property" interest in his employment with a city, a public employer cannot deprive a probationary employee of his freedom to take advantage of other employment opportunities." *Sciolino v. City of Newport News*, 480 F.3d 642, 644 (4th Cir. Va. March 12, 2007). A hearing for a probationary or nontenured employee based on stigmatization is required "if the employer creates and disseminates a false and defamatory impression about the employee in connection with his termination." *Codd v. Velger*, 429 U.S. 624, 628, 97 S. Ct. 882 (1977) (per curiam).

"[A] terminated employee has a constitutionally based liberty interest in clearing his name when stigmatizing information regarding the reasons for the

termination is publicly disclosed." *Cox v. Roskelley*, 359 F.3d 1105, 1106 (9th Cir. Wash. February 20, 2004).  An employee's liberty interest is at issue if a charge of improper conduct impairs the employee's reputation for honesty or morality or if the charge effectively excluded, or caused a prolonged interruption of, Plaintiff Erwine's employment in the law enforcement field. *Vanelli v. Reynolds School District No. 7*, 667 F.2d 773 (9th Cir. 1982). See also *Blantz v. Cal. Dep't of Corr. & Rehab*., 727 F.3d 917, 925 n.6 (9th Cir. 2013):  "***Accusations of dishonesty or immorality are sufficiently stigmatizing to implicate a liberty interest, but less severe accusations must be analyzed on a case-by-case basis***, and allegations of mere incompetence or inability are not sufficient."  [Emphasis added]. "The Constitution requires timely notice and a meaningful opportunity to be heard when a public employee is terminated on a contested charge of dishonesty if it imposes a stigma through public dissemination which forecloses his freedom to take advantage of other employment opportunities." *Llamas v. Butte Cmty. Coll. Dist.*, 238 F.3d 1123, 1131 (9th Cir. 2001).

In his October 10, 2016 Memorandum, Sheriff Trotter accused Erwine of "conduct unbecoming an officer," for conducting an "unauthorized investigation" into the Beaulieu incident and taking sides with an inmate against his own agency. Sheriff Trotter also states that Erwine's actions are, "unprofessional" and "discredits our agency and our profession."  Sheriff Trotter is accusing Mr. Erwine of being disloyal to and deceptive by accusing him of an attempt to harm his own employer, i.e. to assist an inmate with suing his employer.  The use of these terms by Sheriff Trotter inarguably calls into question the moral character and trustworthiness or honesty of Mr. Erwine, and Mr. Erwine had the right to set the record straight in a name clearing hearing before he was fired by Sheriff Trotter.

"The public-disclosure element requires that the defendant actually disseminate the stigmatizing comments in a way that would reach ***potential future***

*employers* or the community at large." *Palka v. Shelton*, 623 F.3d 447, 454 (7th Cir. 2010). [*emphasis added*] Based on the admissions of the Defendants there is no genuine dispute of material fact that stigmatizing statements were made about Erwine by Sheriff Trotter and that they were disclosed to Erwine's potential future employers, including Washoe County and to LVMPD, and that Mr. Erwine was never given a name clearing hearing, much less any notice that the defamatory and stigmatizing information was to be placed in his file.  Further, under NRS 239B.020(1), disclosure of Mr. Erwine's employment file at the Churchill County Sheriff's Office to any other public safety agency where he applied for employment was required to be provided if requested: "Upon the request of a public safety agency, an employer shall provide to the public safety agency information, if available, regarding a current or former employee of the employer who is an applicant for the position of firefighter or peace officer, as applicable…"  Mr. Erwine's personal file and the stigmatizing comments there were publicly disclosed to his potential future employers in the law enforcement community as is required by law.  Under *Cox v. Roskelley,* where state law requires disclosure of an employee file, merely placing stigmatizing information into an employee's file without due process constitutes publication. *Id.* at 1112.

Further, the statements of Sheriff Trotter in the October 10, 2016 about Mr. Erwine were made "incident to" his termination from Churchill County, as it was authored on the same day but before Erwine was terminated, "As of the time of my writing this (October 10, 2016 at 1122 hours)," and unequivocally states, "Deputy Michael Erwine will be terminated today for failing to satisfactorily complete his probation." Even if this Court were to determine that Mr. Erwine's resignation from the Churchill County's Sheriff's office were voluntary, the October 10, 2016 Memorandum clearly states that Erwine was fired for failing to complete his probation, and this is what was communicated to his potential future employers.

Erwine's loss of employment was contemporaneous with and coincided with the harm to his reputation and the stigmatic injury arose as the result of his being terminated. *Siegert v. Gilley*, 500 U.S. 226, 233-34 (1991).

In the Court's Order denying the Plaintiff's Motion for Summary Judgment at *See* ECF 126, the Court addressed the issue of the level of the stigmatizing statement, finding that the plaintiff was required to meet both parts of a two-part test to prove the statements at issue were stigmatizing:

> To be sufficiently stigmatizing, it must "impair[] a reputation for honesty or morality." *Tibbetts v. Kulongoski*, 567 F.3d 529, 535–36 (9th Cir. 2009) (quoting *Brady v. Gebbie*, 859 F.2d 1543, 1552 (9th Cir. 1988)). The statements must also be so severe as to "effectively exclude the employee completely from [his] chosen profession." *Blantz v. California Dep't of Corr. & Rehab., Div. of Corr. Health Care Servs.*, 727 F.3d 917, 925 (9th Cir. 2013).

*See* Order at ECF 126, 14:3.

Plaintiff believes that the issue of law is subtly different. In footnote 6 of the decision in *Blantz* the Court clarified that:

> Accusations of dishonesty or immorality are sufficiently stigmatizing to implicate a liberty interest, but less severe accusations must be analyzed on a case-by-case basis, and allegations of mere incompetence or inability are not sufficient. See *Roth v. Veteran's Admin.*, 856 F.2d 1401, 1411 (9th Cir. 1988), overruled on other grounds by *Garcetti v. Ceballos*, 547 U.S. 410, 126 S. Ct. 1951, 164 L. Ed. 2d 689 (2006*); Stretten v. Wadsworth Veterans Hosp.*, 537 F.2d 361, 365-66 (9th Cir. 1976).

*Id.* at fn. 6.

In *Blantz*, the Plaintiff alleged that she was deprived of a liberty interest without due process because she was given negative job references that effectively barred her from any employment in a particular department with the California Department of Corrections and Rehabilitation  *Id.* at 925. Blantz suffered no unconstitutional deprivation of liberty because she only alleged that she was "barred from employment with one division of the state government," and the Court found that

she did not have a liberty interest in employment with a particular agency. *See* Id. at 926. This case doesn't just involve negative job references after the fact of discharge or less severe accusations must be analyzed on a case-by-case basis, but rather the placement of stigmatizing information in Mr. Erwine's file in connection with his termination that involve his reputation for honesty or morality, which falls under a separate category of inquiry of 9th Circuit cases under *Cox v. Roskelley,* 359 F.3d 1105, 1113 (9th Cir. 2004) and *Kramer v. Cullinan*, 878 F.3d 1156, 1163 (9th Cir. 2018). As recently explained by the Honorable Judge Gordon in this District there are two separate but similar avenues for making a liberty interest Due Process claim:

> There are two primary ways that a liberty interest may be implicated when an employer terminates an employee: (1) the employer "makes a charge that might seriously damage [the terminated employee's] standing and associations in h[er] community" or (2) the employer "impose[s] on [a terminated employee] a stigma or other disability that foreclose[s] h[er] freedom to take advantage of other opportunities." *Blantz v. California Dep't of Corr. & Rehab., Div. of Corr. Health Care Servs*., 727 F.3d 917, 925 (9th Cir. 2013) (quotations omitted); see also *Llamas v. Butte Cmty. Coll. Dist.*, 238 F.3d 1123, 1128 (9th Cir. 2001) (treating these as separate bases for a liberty interest). In the first situation, a plaintiff may be entitled to a name-clearing hearing if the employer "levels a charge . . . that impairs [her] reputation for honesty or morality, . . . the accuracy of the charge is contested, there [was] some public disclosure of the charge, and the charge [was] made in connection with the termination of employment." *Kramer v. Cullinan*, 878 F.3d 1156, 1162 (9th Cir. 2018) (quotations omitted). In the second situation, "the government's stigmatizing statements [must] effectively exclude the employee completely from her chosen profession" to implicate a liberty interest. *Blantz*, 727 F.3d at 925.

*See Watson v. City of Henderson*, No. 2:20-cv-01761-APG-BNW, 2021 U.S. Dist. LEXIS 182001, at *33-34 (D. Nev. Sep. 23, 2021)

Thus, if Plaintiff proves that Sheriff Trotter's statements involve "accusations of dishonesty or immorality," Erwine is not required to also show that the statements

were so severe as to effectively exclude him from his profession. The second prong is required in cases where the accusations do not ride to the level of accusations involving dishonesty or immorality.  This is the error of law on which the Defendants base their Motion, i.e. that they assert they are entitled to judgment if they can show that Mr. Erwine was not entirely excluded from his chosen profession as a matter of fact, while never addressing the correct standard under the law, i.e. whether Sheriff Trotter's statements about Mr. Erwine involve accusations of honesty or morality.  As the Court found in its Order denying the Plaintiff's Motion for Summary Judgment, statements in the memo are more than accusations of incompetence and go towards morality:

> At least some of the statements in the memo are more than mere accusations of incompetence and go towards morality. For example, the Trotter Memo describes Plaintiff as "unprofessional" and a "liability" and a "discredit" to the agency and appears to side with Deputy Jabines's version of the Mae's Incident that Plaintiff "snickered" as if he were engaging in reckless behavior with the taser in some sort of "play" in violation of "behavior standards." referring to the October 10, 2016 Memorandum.

See ECF 126 14:19.

Even if the Court were to apply the *Blantz* test to this case, Erwine can still show "effective exclusion" based on the facts, i.e. he was rejected from several positions based on the statements in Sheriff Trotter's memorandum. In the expert report of Ron Dreher, who has extensive experience in law enforcement in Nevada, Dreher states that being labeled as a "liability," as Trotter did in his October 10, 2016, Memorandum, is a "career killer." *Id.* at 13. Dreher also opined that, "On October 10, 2016, Mr. Erwine's career in law enforcement in Nevada, that he trained for and worked for ended." Id. at 12.  Further, a jury could independently conclude that the statements of Sheriff Trotter ``effectively exclude" Mr. Erwine from employment as a peace officer, based on the substance of the statements alone.

In order to prevail on his claim, Erwine must show that (1) the accuracy of the charge of Churchill County against Erwine is contested; (2) there is some public disclosure of the charge against Mr. Erwine; and (3) the charge by Sheriff Trotter is made in connection with termination of Mr. Erwine's employment. *Mustafa v. Clark Cty. Sch. Dist.*, 157 F.3d 1169, 1179 (9th Cir. 1998).  A qualified immunity defense is not available to Sheriff Trotter for this claim because the Court in *Cox v. Roskelley* ruled in 2004 that, "the contours of the right to a name-clearing hearing upon placement of stigmatizing material in a personnel file were clearly established" in denying qualified immunity to a defendant in a similar case. *Id.* at 1113.

While the Defendants argue that Erwine's tribal employment shows that he was not effectively excluded from employment as a peace officer, the Defendants present no evidence that the Pyramid Lake Paiute Tribe or the Washoe Tribe of California and Nevada ever saw the October 10, 2016, Memorandum or spoke with any of the Defendant's employee about Mr. Erwine.  In the Pretrial Order issued by the Court, the Defendants stipulated to the fact that they never sent Erwine's personnel file to the Pyramid Lake Paiute Tribe or the Washoe Tribe of Nevada and California. Further, the Plaintiff obtained declarations from the background investigators from both of these agencies, Ms. Leslie Hawley and Sergeant Casey Ryan, attached hereto as Exhibits 17 and 18, where they indicate that they did not receive any derogatory information about Mr. Erwine, in the case of Ms. Hawley, or did not contact Churchill County at all about Mr. Erwine, in the case of Sergeant Ryan.  In order to show whether statements "effectively exclude" a person from employment based on subsequent employment, it is only logical to require that the subsequent employment decision be made with knowledge of the statements at issue.  The Defendants failed to meet the burden under FRCP 56(c)(1)(A) to cite materials in the record to support this assertion of fact, and the Court should not

consider it in ruling on the motion - at a minimum, a material issue of fact exists as to this issue that should be within the jury's province to decide.

In at least one instance, the evidence will show that in the case of LVMPD, the background investigator expressly stated that Erwine was unfit for the job because of the statements that Trotter made to the investigator during a phone call. *See* Confidential Exhibit 9. Further Mr. Erwine was hired by Churchill County in late 2015 after passing a background investigation by Churchill County that was conducted by Sheriff Trotter, at his deposition attached hereto as Exhibit 11, Sheriff Trotter admitted to as much:

> Q:· Okay.· Did you hire Mr. Erwine?
> A:· Yes.
> Q:· Okay.· Did you conduct a background investig- --
> investigation of Mr. Erwine before you employed him?
> A:· Yes.
> Q:· And based on that investigation did you determine
> he's eligible for employment at Churchill County?
> A:· Yes.

Exhibit 11 at 18:16

A reasonable jury could conclude that Erwine's rejection from employment from at least Washoe County and LVMPD was caused by the placement of the memorandum in his employee file due to the contents of the memorandum itself, and Sheriff Trotter's statements to Olsen, leading Olsen to believe that Erwine was out to sabotage his own employer. "[C]ircumstantial evidence can be used to prove any fact." *United States v. Ramirez-Rodriquez*, 552 F.2d 883, 884 (9th Cir. 1977) (quoting *United States v. Nelson*, 419 F.2d 1237, 1239-41 (9th Cir. 1969)). See also *United States v. Kelly*, 527 F.2d 961, 965 (9th Cir. 1976); and *Payne v. Borg*, 982 F.2d 335, 339 (9th Cir. 1992) (citing *United States v. Stauffer*, 922 F.2d 508, 514 (9th Cir. 1990)).

///

**b.  14th Amendment Procedural Due Process – Liberty Interest – Against Churchill County (Monell Claim)**

Churchill County is independently liable to Mr. Erwine under *Monell v. Dep't. of Social Services of City of New York*, 436 U.S. 658, 690-691, 98 S. Ct. 2018, 2035-2036 (1978), because Erwine suffered a deprivation of his constitutional right by Sheriff Trotter, who was the final policymaker for Churchill County for such decisions.  Under Monell, "[l]ocal governing bodies . . . can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where, as here, the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Monell*, 436 U.S. at 690.

Trotter, as Churchill County Sheriff, deprived Erwine of his rights under the law, and acting under color of state law, and was the officer with final policymaking authority over personnel matters within the Sheriff's Office, including over the decision to fire Erwine and to place stigmatizing information into his employee file. *Lytle v. Carl*, 382 F.3d 978, 981 (9th Cir.2004) and *Goldstein v. City of Long Beach*, 715 F.3d 750, 753 (9th Cir.2013).

Under NRS 248.040, Sheriffs in Nevada have authority to appoint and remove deputies, but a sheriff may not confer to a deputy, '…. policymaking authority for the office of the sheriff or the county by which the deputy sheriff is employed." The actions of Sheriff Trotter are a policy or custom of Churchill County.  See *Jett v. Dallas Independent School District*, 491 U.S. 701, 737 (1989), a policy or custom becomes official when it results from the decision or acquiescence of the municipal officer or body with final policymaking authority over the subject matter of the offending policy.  Local governments are liable for underlying 42 U.S.C. 1983 claims if the deprivation is the result of the agency's custom, policy, or practice. *Anderson v. Warner,* 451 F.3d 1063, 1070 (9th Cir. 2006).  Trotter, as Sheriff, deprived Erwine of

his rights under the law, and acting under color of state law and was the officer with final policymaking authority over personnel matters within the Churchill County Sheriff's Office, including over the decision to fire Erwine. *Lytle v. Carl,* 382 F.3d 978, 981 (9th Cir.2004) and *Goldstein v. City of Long Beach*, 715 F.3d 750, 753 (9th Cir. 2013).

A "policy" is a deliberate choice to follow a course of action made from among various alternatives by the official or officials responsible for establishing final policy. *Fogel v. Collins*, 531 F.3d 824, 834 (9th Cir.2008).   The "function" of firing Erwine was carried out by Sheriff Trotter.  Churchill County is liable for the acts of Sheriff Trotter if these acts caused a constitutional violation, even if the constitutional violation occurs only once. *Pembaur v. City of Cincinnati,* 475 U.S. 469, 478 & n.6 (1986). In light of the facts in this case, Churchill County is independently liable to Mr. Erwine.

### c. Nevada Liberty Interest Due Process Violation – Against Sheriff Trotter and Churchill County

Article 1 Section 8(5) of the Nevada Constitution provides that no person shall be deprived of life, liberty, or property without due process of law. Due process forbids action which is fundamentally unfair and shocking to the universal sense of justice.  *Summers v. Warden of Nev. State Prison*, 84 Nev. 326, 329, 440 P.2d 388, 390 (1968).  Nevada law very clearly requires that a state agency must follow procedures required by statute governing employee discipline.  *McCracken v. Elko County Sch. Dist*., 103 Nev. 655, 747 P.2d 1373 (1987). A violation of the Nevada Due Process Clause occurs when a state actor deprives a person of a right granted by the state without due process of law. *Saticoy Bay LLC Series 350 Durango 104 v. Wells Fargo Home Mortg*., 133 Nev. Adv. Rep. 5, 388 P.3d 970, 971 (Nev. 2017). "First, it must be determined whether the deprivation was caused by the exercise of some right or privilege created by the state. Second, it must be determined whether

the party charged with the deprivation is a person who may fairly be said to be a state actor." Id. at 28.

Sheriff Trotter, as a state actor, made stigmatizing comments about Erwine and deprived Erwine of statutorily granted due process rights designed to protect his reputation from stigmatizing allegations, i.e., the protections provided in NRS Chapter 289, by placing the October 10, 2016 Memorandum and related materials into his employee file without any due process and without Erwine's knowledge. "The protections of due process only attach when there is a deprivation of a protected property or liberty interest." *Pressler v. City of Reno*, 118 Nev. 506, 508, 50 P.3d 1096, 1097 (2002) "The liberty interest protected by the due process clause encompasses an individual's freedom to work and earn a living." *State v. Eighth Judicial Dist. Court*, 118 Nev. 140, 145, 42 P.3d 233, 236 (2002). In Nevada, the due process rights of peace officers are codified in NRS Chapter 289.020 *et sq*., which is commonly referred to as "The Police Officer's Bill of Rights." Among the protections provided to peace officers in Nevada are protections against placing "unfavorable comments or documents" in a peace officer's file without notice and an opportunity to comment on the material.  Under NRS 289.010(3) the Police Officer's Bill of Rights applies to, "any person upon whom some or all of the powers of a peace officer are conferred pursuant to NRS 289.150 to 289.360…" It does not exclude "probationary employees' from protection.  Under NRS 289.150(1), sheriff deputies have the powers of a peace officer.

NRS 289.040(1) provides a straightforward procedure for the placing of unfavorable comments or documents in the administrative file of a peace officer and associated rights of a peace officer to contest the comments or documents before the information is placed in the officer's file.  The statute is not unclear as to what is required:

> [A] law enforcement agency shall not place any unfavorable comment or document in any administrative file of a peace

officer maintained by the law enforcement agency unless:
(a)The peace officer has read and initialed the comment or
document; or (b)  If the peace officer refuses to initial the
comment or document, a notation to that effect is noted on
or attached to the comment or document.

Not only did Sheriff Trotter did not follow the procedure in NRS 289.040(1)
before placing the stigmatizing comments at issue in Erwine's file in October of
2016 - Sheriff Trotter did not provide Mr. Erwine with any due process whatsoever
despite the guarantees in the Nevada Constitution.  There is also no genuine issue
of fact that Mr. Erwine was not provided with any process, much less the Due
Process required by the Nevada Constitution and statutes.  Erwine had a clear right
under the Nevada Constitution to notice and a name clearing hearing and to contest
the accusations against him, but he was not even aware that he was being accused
of wrongdoing or that the October 10, 2016 Memorandum was to be placed into his
file. *See* Exhibit 12 and Exhibit 4, generally.  A violation of the Nevada Due Process
Clause occurred because Trotter, a state actor, deprived Mr. Erwine of his rights
granted by the state without due process. *Saticoy Bay LLC Series 350 Durango 104
v. Wells Fargo Home Mortg*., 133 Nev. Adv. Rep. 5, 388 P.3d 970, 971 (Nev. 2017).
Erwine was completely blindsided by what he discovered when he finally received
his employee file from Churchill County in April of 2018.

**Mr. Erwine's State Law Claims**

The Defendants argue that under 28 U.S.C. 1367(c) the Court should decline
to exercise supplemental jurisdiction over state law claims if the court determines
that the federal claims warrant dismissal. *See* Motion at 13.  The Court should not
"dismiss" any of Mr. Eriwne's federal claims on a motion for summary judgment
under FRCP 56.  Given that this case has been pending before this Court for more
than three and a half years, the Court should allow Mr. Erwine's pendent state law
claims to proceed to trial even if it dismissed his federal claims. ""[C]onsiderations of
judicial economy, convenience[,] fairness to litigants,' and comity" should be

weighed in deciding whether to exercise supplemental jurisdiction over pendent state law claims where underlying federal claims are dismissed. *Ingram v. Sch. Bd*., 167 F. App'x 107, 108 (11th Cir. 2006) quoting *United Mine Workers v. Gibbs*, 383 U.S. 715, 726, 86 S. Ct. 1130, 1139 (1966).  Hitting the reset button on Mr. Erwine's state law claims at this point in the litigation between the parties is simply unfair to both the Plaintiff and the Defendant, as it will require the parties to engage in further litigation over the same issues before this Court for years to come.

WHEREFORE, the Plaintiff requests that the Defendant's Motion for Summary Judgment be denied in its entirety and this case proceed to trial.

**DATED** this  Mar 4, 2022

By:   /s/  Luke Busby, Esq.
LUKE A. BUSBY, ESQ.
Nevada Bar No. 10319
316 California Ave.
Reno, Nevada 89509
775-453-0112
luke@lukeandrewbusbyltd.com
*Attorneys for the Plaintiff*

## **EXHIBITS**

1. ERWINE DECLARATION
2. ERWINE DECLARATION NO. 4
3. OCTOBER 10, 2016 MEMORANDUM
4. RESPONSE TO FIRST RFAS
5. DEPUTY THOMPSON STATEMENT
6. ST. SUMMERS STATEMENT
7. DEPUTY JABINES STATEMENT
8. WASHOE COUNTY PRIVILEGE LOG
9. CONFIDENTIAL LVMPD RESPONSE (FILED UNDER SEAL)
10. SUBPOENA
11. DEPOSITION OF BENJAMIN TROTTER
12. BEAULIEU AFFIDAVIT
13. DEPOSITION OF MATTHEW MAES
14. ERWINE DECLARATION NO. 2
    A.  ERW 66, WASHOE COUNTY SHERIFFS OFFICE LETTER - ERW 67, LVMPD LETTER - ERW 68, CC ALTERNATIVE SENTENCING LETTER - ERW 69, DOUGLAS COUNTY LETTER - ERW 71, NLVPD LETTER - ERW 72, RPD LETTER
15. ERWINE DECLARATION
16. DECLARATION AND EXPERT REPORT OF RON DREHER
17. DECLARATION OF LESLIE HAWLEY
18. DECLARATION OF SERGEANT CASEY RYAN

## CERTIFICATE OF SERVICE

I certify that on the date shown below, I caused service to be completed of a true and correct copy of the foregoing document by:

_____ personally delivering;

_____ delivery via Reno/Carson Messenger Service;

_____ sending via Federal Express (or other overnight delivery service);

_____ depositing for mailing in the U.S. mail, with sufficient postage affixed thereto; or,

__X___ delivery via electronic means (fax, eflex, NEF, etc.) to:

      Katherine F. Parks, Esq.
      Thorndal Armstrong
      6590 S. McCarran Blvd. Suite B.
      Reno, NV 89509
      Attorney for the Defendant

                    **DATED** this  Mar 4, 2022

                          By:___/s/  Luke Busby, Esq._____