# Exhibit 1

# Exhibit 1

## DECLARATION OF MICHAEL ERWINE

I, Michael Erwine, declare that the assertions in this Declaration are true and correct, based upon my personal knowledge, and that I am competent to testify to the facts stated below:

1.      I am the Plaintiff in the lawsuit Michael Erwine v. Churchill County andChurchill County Sheriff Benjamin Trotter currently pending before the Federal District Court in Northern Nevada;

2.      From December 9, 2015 and October 10, 2016, I was employed by Churchill County in the capacity of Detention Deputy at the County Jail. From the commencement of my employment with Churchill County, I witnessed Churchill County sheriff's deputies blatantly disregarding basic Constitutional rights of inmates at the jail, and further disregarding the essential duties of a Detention Deputy.

3.      On October 8, 2016, I went into day shift and began checking cells. I was informed that an inmate, Andrew Beaulieu ("Beaulieu") was in the security cell and needed to be booked. When I arrived at Beaulieu's security cell I noticed blood on the walls and asked the grave shift deputy what the blood was from. The grave shift deputy informed me that Beaulieu had come in with a cut on his hand and that it ripped open while in the cell.

4.      After investigating the circumstances, I discovered Beaulieu had been requesting water for hours. I was informed by the inmate and later confirmed during review of surveillance footage that every time Beaulieu would request water, the grave shift deputy would flush the drain in Beaulieu's cell making Beaulieu's request inaudible over the flushing noise. I provided Beaulieu with water pursuant to my essential job functions to provide inmates with food and explained to Beaulieu what the rest of the booking process would look like.

During this time, Beaulieu expressed to me that the grave shift deputies were "assholes" and he would be filing a lawsuit against them.

5.   I continued to conduct rounds in the jail. While I was conducting my rounds, other inmates asked what had happened to the "guy in the security cell" the previous night and explained what the grave shift did "was messed up." Inmate Zachary White even filed a grievance request to Captain Matheson regarding the treatment of Beaulieu. As previously stated, I did go back and review surveillance footage of the grave shift's interaction with Beaulieu before I removed him for booking, mainly to be aware of any safety concerns with Beaulieu before removing him from the security cell. I did not note any alarming actions by Beaulieu wherein I would need to be concerned, however, I did note inappropriate acts of the grave the shift deputy and I believed the situation needed to be brought to my sergeant's attention.

6.   Since the concerns about Mr. Beaulieu were not an immediate threat, and my sergeant did not work on weekends, I chose to log the events on my computer, so I could follow up with my sergeant on Monday, October 10, 2016, when my sergeant returned to work. A true and correct copy of the document I created is attached hereto as Attachment A.

7.   On Sunday, October 9, 2016, during my dayshift, Deputy Jabines had dropped a container of miscellaneous tools and other items inside of a booking cage. Included in these items were screwdrivers and other sharp instruments. Deputy Jabines did not want to pick up the items herself so she asked an inmate to come into the booking cage and pick them up for her. Bringing in an inmate to pick up the sharp inmates created a dangerous situation for everyone involved. I did not feel it was appropriate for Deputy Jabines to have an inmate, Matthew Maes ("Maes"), come into the booking cage to pick up items which could be easily used as weapons. I questioned

Deputy Jabines about this but her only response was "Senior Deputy" which I understood as to mean I did not have a say in the matter.

8.     When Maes came into the cage, I positioned himself between Maes and the control panel of the facility. I was in an uncomfortable position with Maes being only a few feet away and I was backed into a corner. I removed my taser from its holster and held it in my hand with the taser pointed to the ground. I chose to remove the cartridge from the taser due to the close proximity of inmate Maes to Deputy Jabines and I. Maes cleaned up the items and left the cage without incident.

9.     Near the end of my shift on October 10, 2016, I was confronted by Captain Matheson and Sheriff Trotter. Sheriff Trotter informed me that he was aware of the booking that took place over the weekend with Beaulieu and that I was trying to harm the Department. I began to speak about the Beaulieu Incident as I had originally intended to do from the beginning of my shift that day, however, I was not afforded any opportunity to explain what I had witnessed or discovered. Instead, Trotter stated I had two choices: 1) I could resign, or 2) the Department would terminate my employment effective immediately. Either way, I was informed that my employment was not continuing after the current meeting. I signed a Letter of Separation on October 10, 2016.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: _December 21st 2020_ in Reno, Nevads

By:_____

Michael Erwine

# Attachment A

# Attachment A



On 10/08/16 I arrived for day shift at approximately 0545 hours. It was passed down to me by grave shift that Andrew Beaulieu was in the security cell and need to be booked. I noted blood on the walls of the security cell and asked grave shift what it was from. They stated that Beaulieu was admitted into the detention center with a cut on his hand in which he agitated by hitting the door of the security cell. At approximately 0551 hours I made contact with Beaulieu and asked him what was going on. He stated that he had been asking for water for the previous two hours in which nobody had given to him. Beaulieu stated that he had been asking repeatedly for water and heard deputies laughing at him threw the security cell door. He stated that he did become aggravated from being laughed at and not given anything to drink so he began hitting the door of the security cell. I gave Beaulieu a drink of water and explained to him why he was in the security cell as well as what the rest of the booking process would be. At approximately 0607 hours I made contact with Beaulieu again and told him of the charges in which he had asked me on my prior contact. I also gave him another cup of water as well as had him rinse off his hand so I could get a better look at his wound. The cut on his hand did not appear to be severe as to require immediate medical attention.

I reviewed the footage of Beaulieu's booking and found that he had first started asking for water at approximately 0350 hours. At approximately 0447 hours deputy opened the door for a few seconds but did not offer Beaulieu anything to drink. Again at 0521 hours another deputy made contact for

DEF00154



noted blood on the walls of the security cell and asked grave shift what it was from. They stated that Beaulieu was admitted into the detention center with a cut on his hand in which he agitated by hitting the door of the security cell. At approximately 0551 hours I made contact with Beaulieu and asked him what was going on. He stated that he had been asking for water for the previous two hours in which nobody had given to him. Beaulieu stated that he had been asking repeatedly for water and heard deputies laughing at him threw the security cell door. He stated that he did become aggravated from being laughed at and not given anything to drink so he began hitting the door of the security cell. I gave Beaulieu a drink of water and explained to him why he was in the security cell as well as what the rest of the booking process would be. At approximately 0607 hours I made contact with Beaulieu again and told him of his charges in which he had asked me on my prior contact. I also gave him another cup of water as well as had him rinse off his hand so I could get a better look at his wound. The cut on his hand did not appear to be severe as to require immediate medical attention.

I reviewed the footage of Beaulieu's booking and found that he had first started asking for water at approximately 0350 hours. At approximately 0447 hours deputy opened the door for a few seconds but did not offer Beaulieu anything to drink. Again at 0521 hours other deputy made contact for a few seconds but no water was given. No water was given to Beaulieu for approximately 2 hours after he began asking until I made contact with him at the beginning of my shift and gave him water and inspected his bloody hand. During my review of the security cell video footage, I observed the drain being flushed numerous times while Beaulieu was asking for water. This correlates with Beaulieu's story of when asking for water he would hear deputies laughing and the drain would flush.

Document1 - Microsoft Word

File Edit View Insert Format Tools Table Window Help

Normal    Times New Roman    12    B  I  U

Getting Started

Office Online

• Connect to Microsoft Office Online
• Get the latest news about using Word
• Automatically update this list from the web
More...

Search for:

Example: "Print more than one copy"

Open
Supplies How-To
TELETYPE
INMATE HANDBOOK (final revision)
Rules and Regulations
More...

Create a new document...

Type a question for help