# Exhibit 11

# Exhibit 11

1                    UNITED STATES DISTRICT COURT

2                         DISTRICT OF NEVADA

3

4

5    MICHAEL ERWINE;                        )

6            Plaintiff,                     )

7        vs.                                ) Case No.:

8    CHURCHILL COUNTY, a political          ) 3:18-cv-00461-RCJ-WGC

9    subdivision of the State of Nevada;    )

10   CHURCHILL COUNTY SHERIFF BEJAMIN        )

11   TROTTER; and DOES 1-10 inclusive;      )

12            Defendants.                   )

13   _____)

14

15        RECORDED DEPOSITION OF BENJAMIN DANIEL TROTTER

16                  Taken on December 4, 2020

17                      At 10:29 a.m.

18              RECORDED VIA VIDEO CONFERENCE

19             UNDER STIPULATION BY ALL PARTIES

20

21

22

23

24

25

```
 1   APPEARANCES:

 2   For the Plaintiff:  LUKE BUSBY, ESQ.

 3                       316 California Avenue

 4                       Reno, Nevada 89509

 5

 6

 7   For the Defendants: KATHERINE F. PARKS, ESQ.

 8                       THORNDAL ARMSTRONG

 9                       6950 S. McCarran Blvd. Suite B

10                       Reno, Nevada 89509

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

MICHAEL ERWINE vs TROTTER
TROTTER BENJAMIN   12/04/2020                                                    Page 3

```
 1                         INDEX

 2  Witness                 Direct        Cross      Redirect

 3  MR. BUSBY                  5

 4

 5

 6                        EXHIBITS

 7  Number                 Description                    Page

 8  EXHIBIT 1      Job Description ERW0019                 17

 9  EXHIBIT 2      Appointment ERW0026                     25

10  EXHIBIT 3      Employee Evaluation Report ERW0029      25

11  EXHIBIT 4      Booking Sheet ERW0037                   31

12  EXHIBIT 5      Email ERW0038                           33

13  EXHIBIT 6      Letter to Sheriff Trotter ERW0039       40

14  EXHIBIT 7      Sheriff Trotter Letter ERW0041-0042     45

15  EXHIBIT 8      Incident Form ERW0043                   52

16  EXHIBIT 9      Observation Sheet ERW0044               52

17  EXHIBIT 10     Screen Grab ERW0045                     56

18  EXHIBIT 11     Jabines Report ERW0047                  69

19  EXHIBIT 12     AXON Printout ERW0048                   70

20  EXHIBIT 13     Employee Action Notice ERW0051          71

21  EXHIBIT 14     Letter of Separation ERW0052            71

22  EXHIBIT 15     Memorandum 10/16/2016 ERW0053-0055      78

23  EXHIBIT 16     Fax 12/06/2016 ERW0064-0065             98

24  EXHIBIT 17     NOT USED

25  EXHIBIT 18     Ethics (Detention) ERW0466-0467        101
```

MICHAEL ERWINE vs TROTTER
TROTTER BENJAMIN   12/04/2020                                                            Page 4

```
 1                           INDEX

 2                          EXHIBITS

 3    Number                  Description                 Page

 4    EXHIBIT 19       Use of Force (Jail) ERW0531-0534    101

 5    EXHIBIT 20       Records Retention and Maintenance   102

 6    EXHIBIT 21       Ron Wenger email                    102

 7    EXHIBIT 22       Voice Recording (not attached)

 8    EXHIBIT 23       Not Used

 9    EXHIBIT 24       Matthew Maes Affidavit               105

10    EXHIBIT 25       Andrew Allen Beaulieu Affidavit      106

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

 1              MR. IVEY:  We are now on the record in the matter

 2   of Michael Erwine v. Churchill County, et al.  My name is Mark

 3   Ivey.  I'm the videographer and deposition officer.  I work for

 4   E-Depositions, LLC, located at 730 Sandhill Road, Suite 105,

 5   Reno, Nevada 89521.  Today's date is December 4th, 2020, and the

 6   time is 10:29 a.m.  This is the video recorded deposition of

 7   Judge Benjamin Trotter, and is being recorded by video conference

 8   under stipulation by all parties.  Judge Trotter, can you please

 9   raise your right hand?  Do you solemnly affirm that the testimony

10   you are about to give will be the truth, the whole truth, and

11   nothing but the truth?

12              MR. TROTTER:  I do.

13              MR. IVEY:  Thank you, sir.  Can you please, just

14   as we spoke earlier, just hold your ID up to the camera real

15   quick just so we have that for the record as well?  Perfect.

16   Thank you very much, sir.  Can you please state your full name

17   for the record.

18              MR. TROTTER:  Benjamin Daniel Trotter.

19              MR. IVEY:  Thank you, sir.  The electronic audio

20   and visual recording of this deposition will be the official

21   record.  A transcript will be created from this recording by

22   E-Depositions, LLC.  Would all attorneys present, please identify

23   themselves, their firm, anybody with them, and the party they

24   represent beginning with the party noticing this proceeding.

25              MR. BUSBY:  Good morning.  Appearing for the

 1  plaintiff, Luke Busby, and I'm joined by the plaintiff, Michael

 2  Erwine.

 3              MS. PARKS:  Katherine Parks, on behalf of

 4  Churchill County and Ben Trotter, of Thorndal Armstrong Delk

 5  Balkenbush & Eisinger.  There is no one with me here in my

 6  office.

 7              MR. IVEY:  Thank you to all parties.  Okay, Luke.

 8  The floor is yours.

 9              MR. BUSBY:  Okay.  Thank you.

10                     DIRECT EXAMINATION

11              BY: Mr. Busby

**12         Q:  Good morning, Mr. Trotter.  Thanks for coming**

**13  today.**

14         A:  You're welcome.

15              MR. BUSBY:  Again, this is Luke Busby, and I'll be

16  taking your deposition today.  I just want to start off by

17  explaining some of the ground rules and the deposition process.

18  I'll be asking you questions, and we're going to record your

19  answers, and your answers are given under oath under penalty of

20  perjury the same as if you were testifying in a court.  Do you

21  understand that?

22              MR. TROTTER:  Yes.

23              MR. BUSBY:  And your testimony may be used later

24  in this proceeding at the trial as evidence.  Do you understand

25  that?

```
 1                MR. TROTTER:  Yes.
 2                MR. BUSBY:  Okay.  If at any time you don't
 3   understand one of my questions, please let me know and I'll be
 4   glad to explain the que stion or rephrase it.  If you answer one
 5   of my questions without asking for clarification, I'll take that
 6   to mean you understood what I meant; fair enough?
 7                MS. PARKS:  Luke, you're fading in and out on me.
 8   I can't hear you very well.
 9                MR. TROTTER:  I -- and I agree.  At the end of
10   your sentences, I'm not able to hear them.  And I'm maxed out on
11   my volume, so --
12                MR. BUSBY:  All right.  I'll try and speak up.
13   How's that?
14                MR. TROTTER:  Okay.
15                MR. BUSBY:  Better?
16                MR. TROTTER:  Much better.
17                MR. BUSBY:  Okay.  So I'll repeat that.  If at
18   anytime you don't understanding one my questions in whole or
19   part, let me know.  And I'll be glad to explain it or rephrase
20   it.  But if you don't ask for clarification on one of my
21   questions, I'll take that to mean you understood what I meant;
22   fair --
23                MR. TROTTER:  Okay.
24                MR. BUSBY:  -- enough?
25                MR. TROTTER:  Sure.
```

1            MR. BUSBY:  And the same rule applies if you don't

2  hear one of my questions.  I'd be glad to repeat it, just let me

3  know.  Okay?

4            MR. TROTTER:  (No verbal response.)

5            MR. BUSBY:  And there will be times today in the

6  middle of one of my questions that you want to jump in and

7  answer, but I just ask that you let me complete my question

8  before you respond.  And I'll try my best to do the same for you;

9  sound good?

10           MR. TROTTER:  Okay.

11      **Q:  All right.  In what city do you currently reside?**

12      A:  Fallon, Nevada.

13      **Q:  Okay.  How long have you lived in Fallon?**

14      A:  Probably 25 years.

15      **Q:  Okay.  And how old are you?**

16      A:  48.

17      **Q:  Okay.  And so why did you move to Fallon?**

18      A:  I came with a job.  I was hired by the Fallon

19  Police Department in August '95.

20      **Q:  Okay.  So your moving to Fallon corresponded with**

21  **your police career, then?**

22      A:  Correct.

23      **Q:  Okay.  And has your entire career as a police**

24  **officer been in Fallon community?**

25      A:  Yes.

**Q: All right. Have you ever been sued before?**
A: No.
**Q: Okay. And your capacity as sheriff, you were never sued?**
A: No.
**Q: Okay. Have you ever been deposed before?**
A: No.
**Q: All right. Can you tell me generally what you did to get ready for this deposition?**
A: Talk to Ms. Parks.
**Q: Okay. I'm not asking for any of your communications with your counsel, but did you talk to anybody else?**
A: No.
**Q: Okay. Have you discussed Mr. Erwine's lawsuit with anyone else besides your attorney?**
A: Uh, my wife.
**Q: Okay. I'm not going to ask any questions about that either.**
A: Okay.
**Q: Okay. Can you briefly describe your educational backgrounds?**
A: Uh, high school graduate, um, and I have four college degrees. Highest level is a Master in Business Administration.

1        Q:  Okay.  Can you tell me what each of your degrees

2   is, and when you got it, and where?

3        A:  Um, 1995, I got a general studies degree at

4   Sheridan College in Sheridan, Wyoming.  Uh, around the same time

5   I also got a police science degree, uh, both of them associates

6   at the same college.

7   Um, and then I got a bach- -- completed my bachelor, that would

8   be 2009 through Western Governors University and then completed

9   my master's in Coleman.  I completed it right before I ran for

10  sheriff.  So that was, like, early 2010, or -- uh, I don't have

11  that in front of me, so --

12       Q:  Okay.  So what is your bachelor's degree in that

13  you got in --

14       A:  Uh --

15       Q:  -- 2009?

16       A:  Bachelor of finance.

17       Q:  In finance?

18       A:  Yes.

19       Q:  Okay.  And in 2010, you mastered.  What is that in?

20       A:  Business administration.

21       Q:  Okay.  Okay.  Do you have any specialized education

22  or training in law enforcement besides what you've already

23  described?

24       A:  Um, yes.  I -- I, uh, went through what they call

25  Rural Executive Management Institute.  That was in Salt Lake.

1  That was right after I became sheriff so sometime in 2011.  Um, I

2  also went through, what'd they call it?  The Northwestern

3  University School of Police Command, um, did that online.

4  I don't remember the exact year; it was sometime when I was

5  sheriff.  And I went -- and I graduated from the FBI National

6  Academy, um, that would be, like, 2015 or something like that.

7          Q:  Okay.  Can you tell me about what -- what you

8  learned at the FBI National Academy?

9          A:  I took, uh, several classes.  One about computer,

10  um, security, cybersecurity.  Uh, health and wellness.  Uh, there

11  was a fitness thing.  There was, like, a homicide investigation.

12  Um, don't -- I didn't know I was going to be asked, or I'd had my

13  transcript here.  Um --

14          Q:  It's okay.  And --

15          A:  And there was a couple other classes.

16          Q:  Okay.  All right.  I'm not asking for an exhaustive

17  list, just the general idea of what you studied there.

18              MS. PARKS:  Luke, you're -- you're fading out on

19  me, and I can't hear the end of your questions.

20              MR. BUSBY:  Okay.  So I'm going to try and move

21  this a little bit closer.  Let's see.

22              MR. TROTTER:  And I did hear -- I did hear your

23  last question, so --

24              MR. BUSBY:  Okay.  How is that, Kathy?

25              MS. PARKS:  That's -- I think that's okay.

```
 1              Q:  Okay.  So have you ev- -- ever had any specialized
 2    education or training in constitutional law?
 3              A:  I mean, I'm sure I've -- I've had plenty of
 4    exposure to constitutional legal topics over the years, but I
 5    can't specifically remember anything that was a class about it.
 6              Q:  Okay.  And I just want to run through your career
 7    as a peace officer quickly.  What was your first job as a police
 8    officer?
 9              A:  I was a patrol officer for the Fallon Police
10    Department.
11              Q:  Okay.  And what year did you start?
12              A:  1995.
13              Q:  Okay.  And how long were you at Fallon PD?
14              A:  I worked there for 16 years.
15              Q:  And --
16              A:  Uh, a little less than 16 years.
17              Q:  Okay.  So it sounds like you left Fallon PD around
18    2010, '11; is that correct?
19              A:  Yes.  I started with the sheriff's office in 2011,
20    January 2011.
21              Q:  And that's the Churchill County Sheriff's Office,
22    right?
23              A:  Yes.
24              Q:  Okay.  All right.  You were there in 2011.  What
25    did you do when you were first hired by the Churchill County
```

1  Sheriff's Office?

2          A:  I was the sheriff.  I ran for office and was

3  elected in 2010, and started in early January 2011.

4          Q:  Okay.  And how long were you sheriff at Churchill

5  County?

6          A:  I was reelected once, so I did eight years.

7          Q:  Okay.  So it sounds like you left in 2019; is that

8  correct?

9          A:  I started judge in 2019, yes.

10         Q:  Okay.  And what kind of judge are you?

11         A:  I'm a justice of the peace.

12         Q:  Okay.

13         A:  In other words --

14         Q:  That's --

15         A:  -- the catchall.

16         Q:  JOP in Churchill County, right?

17         A:  Yes.

18         Q:  And do you remember the month you started that?

19         A:  January 2019.

20         Q:  Okay.  And that's your current position?

21         A:  Yes.

22         Q:  Okay.  All right.  So you indicated you have some

23  knowledge of constitutional law; is that correct?

24         A:  You asked if I had had some training and --

25         Q:  Yeah.

1      A:  -- so I'm -- I'm sure I've been exposed to it over

2  the years.

3      **Q:  Okay.  Can you explain to me your understanding of**

4  **due process under the federal constitution?**

5              MS. PARKS:  Objection.  Calls for a legal

6  conclusion.  Calls for expert testimony.  Go ahead.

7              MR. TROTTER:  Okay.

8      A:  Um, due process means people get a fair shot at,

9  um, um, you know, trial by jury.  Um, a Miranda warning falls

10  into that, giving people understanding, mainly letting people

11  understand their rights prior to being subjected to, um,

12  investigation or interrogation.

13     **Q:  Okay.**

14     A:  Um, uh, court procedure is essentially the due

15  process section that I'm currently working in right now.

16     **Q:  Okay.**

17     A:  Um, that's just an off the cuff.

18     **Q:  Are you finished?**

19     A:  Uh, sure.

20     **Q:  Okay.  Do you think that the government owes a**

21  **person due process of law before depriving them of life, liberty,**

22  **or property?**

23              MS. PARKS:  Objection.  Calls for a legal

24  conclusion.  Calls for expert testimony from this lay witness.

25     A:  And an answer to the question, I believe that

1  that's, um, dependent on the circumstances.

2         **Q:  Okay.  What circumstances?**

3              MS. PARKS:  Same objections.

4         A:  Uh, from a lay perspective, um, certain people are

5  probationary, um, certain people work for as at will.  For

6  instance, administrators in a sheriff's office, or -- or at

7  Fallon Police Department are typically -- they're at the will of

8  whoever the, uh, um, chief is.

9  Or in this Fallon Police Department circumstances, they're at the

10  will of, essentially, the mayor and city council.  Um, so there's

11  really not a lot of due process when you're at will would be my

12  understanding of that.

13        **Q:  Okay.  Please describe your understanding of the**

14  **due pres- -- process clause of the Nevada constitution?**

15        A:  I would have to look at it.  I don't -- I haven't

16  reviewed that in some time.

17        **Q:  Okay.  So when you were the sheriff in Churchill**

18  **County, were you in charge of personnel matters for the deputies**

19  **who worked for the sheriff's office?**

20        A:  Sure.

21        **Q:  Okay.  And have you ever -- are -- are you familiar**

22  **with the provisions of Nevada revised statutes 289?**

23        A:  I have read it.

24        **Q:  Okay.  Have you ever heard Chapter 289 referred to**

25  **as the police officers' bill of rights?**

1           A:  I have.

2           **Q:  Okay.  And what's your understanding as to whether**

3  **police officers in Nevada are entitled to the protection provided**

4  **in NRS Chapter 289?**

5                MS. PARKS:  Objection.  Calls for an improper

6  hypothetical from this lay witness.  You can answer.

7           **Q:  And Sheriff Trotter, from time to time your counsel**

8  **may objects.  And unless she directs otherwise, after she's**

9  **finished with her objection, please go ahead and answer the**

10 **question.**

11          A:  Okay.  Um, my understanding is that all peace

12 officers are covered by Chapter 289.

13          **Q:  Okay.  Can you please tell me your understanding of**

14 **why it is that Mr. Erwine is suing you?**

15          A:  Well, based on the, uh, complaint, um, seems like

16 he believes that he was not given due process, uh, prior to his

17 termination, or prior to his resignation.

18          **Q:  What's your understanding of whether he's alleged**

19 **that you also defamed him?**

20                MS. PARKS:  That he what?

21                MR. TROTTER:  Yeah, I didn't hear that.

22          **Q:  Whether you defamed him?**

23          A:  Whether I defamed him?

24          **Q:  Yes.**

25          A:  I do understand that his, uh, complaint, um,

1  indicates that he thinks that, yes.

2          Q:  What's your understanding of the allegation that

3  you and the sheriff's office intentionally interfered with his

4  ability to get a job in the future, interference with prospective

5  employment?

6          A:  I understand that's his complaint or concern.  Um,

7  my understanding of it is I strongly disagree.

8          Q:  Okay.  Your understanding is that you disagree?

9          A:  Yes.

10          Q:  Okay.  What -- but what's your understanding of why

11  Mr. Erwine is suing you?

12          A:  Because he believes that he was deprived of due

13  process, um, unlawfully or unrightfully, um, uh, separated from

14  the sheriff's office.

15          Q:  Okay.  So there have been some exhibits that I

16  provided to your counsel and that Mr. Ivey has.  Do you have

17  those exhibits in front of you?

18          A:  Yes.

19          Q:  Do you have them in electronic format?

20          A:  Yes.

21          Q:  Okay.  Let me go ahead and ask you some questions

22  about those exhibits.  I'd like you to take a look at what's been

23  marked as Exhibit No. 1.

24          A:  Okay.

25          Q:  Okay.  Do you recognize this document?

1        A:  Yes.

2        Q:  Okay.  What is it?

3        A:  That's a job description for a detention deputy.

4        Q:  Okay.  And is this the job description for the

5    position that Mr. Erwine had at Churchill County?

6        A:  I'm not sure it was exactly the same, but I'm not

7    sure it was not.  So yes, this is a job description the County

8    would post those positions under.

9        Q:  Okay.  And do you recall or do you know when Mr.

10   Erwine started at Churchill County?

11       A:  Uh, when he what?

12       Q:  When he -- when he began his employment with

13   Churchill County?

14       A:  Um, I would think the time around the end of 2015,

15   beginning 2016.

16       Q:  Okay.  Did you hire Mr. Erwine?

17       A:  Yes.

18       Q:  Okay.  Did you conduct a background investig- --

19   investigation of Mr. Erwine before you employed him?

20       A:  Yes.

21       Q:  And based on that investigation did you determine

22   he's eligible for employment at Churchill County?

23       A:  Yes.

24       Q:  Okay.  Do you recall what his qualifications were,

25   generally?

1          A:  Um, not off -- I don't have that information in

2   front of me, but, um, I do remember that he had, I believe, gone

3   through the, um -- maybe the Western Nevada College, um, police

4   academy.

5          **Q:  Okay.**

6          A:  So he would have had a CAT 1 and CAT 3 post.

7          **Q:  Okay.  So he had police officers' standard of**

8   **trainings certifications of various sorts; is that right?**

9          A:  Yes.

10          **Q:  And I -- I'm -- I'm sorry to -- I'm not trying to**

11  **quiz your memory.  I'm just asking what you -- what you recall of**

12  **Mr. Erwine.  I assume you had multiple deputies working for you**

13  **at the sheriff's office when you were there; is that correct?**

14          A:  Yes.  There was -- I think, we had 47 sworn.

15          **Q:  Okay.  And how many deputies would you hire -- hire**

16  **a year?**

17          A:  It varied by year.  Some years, uh -- at one point,

18  in fact, when I hired Mr. Erwine, I was doing security in the

19  downstairs of the Justice Court 'cause we had lost a few to

20  Sparks.  And, um, so I hired several that year, and I --

21          **Q:  Okay.**

22          A:  -- was doing the background checks on them while I

23  was sitting in that post.

24          **Q:  Okay.  And were you the only person at the**

25  **sheriff's office who would do background investigations of**

1  potential hirees?

2          A:  Uh, not the only one.

3          Q:  Okay.  Who else would do that work around the time

4  Mr. Erwine was hired?

5          A:  I'm trying to remember.  I think, at one point, I

6  have had, uh, Tracey Ricks maybe did one or two.  Um,

7  Investigator Paul Loop had done one or two.  I -- I did most of

8  them.

9          Q:  Okay.  Can you tell me what kind of process you

10 would go through in doing a background investigation on a

11 potential hiree?

12         A:  Well, um, first of all, you -- when you're hiring

13 them, first of all, we do -- we do the fitness -- physical

14 fitness test.  Then we do a written test.  You have to pass each

15 -- each in sequence.  Um, then we do an oral board.  And those

16 who pass the oral board, we would give a background packet.

17 Um, we first run a preemptory criminal history on them after

18 they'd signed a waiver, and we'd give them a background packet.

19 Um, it was 20 pages or so that they have to hand -- hand to

20 complete and return to us.  And then it's essentially contacting

21 references, contacting former landlords, um, former employers,

22 uh, things of that sort --

23         Q:  Okay.

24         A:  -- just essentially inquiring about them and -- so

25 --

1          Q:  You mentioned you'd require applicants to sign a

2    waiver?

3          A:  Yes.  Uh, if we were -- when we were gonna run a

4    criminal history, we'd have them sign a waiver just saying that

5    we could do that criminal history on them.

6          Q:  Do you recall whether that waiver included any

7    provisions related to disclosure of any information that the

8    sheriff's office obtained in the course of doing their

9    investigation to third parties?

10         A:  I don't have -- I don't have the waiver in front of

11   me, so I don't really remember that --

12         Q:  Okay.

13         A:  -- exactly.

14         Q:  Do you recall whether -- I'm sorry, go ahead.

15         A:  I don't remember it exactly.

16         Q:  Okay.  Do you recall whether you had a policy about

17   providing background information obtained during the course of an

18   investigation of potential employees and third parties?

19         A:  I don't remember what the policy was on that.  It

20   might have been a County policy, too.

21         Q:  Are you aware of any provisions in Chapter 289

22   related to the dis- -- disclosure of information obtained about

23   --

24         A:  No.

25         Q:  -- potential employees?

1          A:   I'd have

2               MS. PARKS:   Wait.  I didn't --

3          A:   Sorry.

4               MS. PARKS:   I didn't get the end of Luke's

5    question.  He was fading out again.

6          **Q:   Did you -- or are you aware of any provisions in**

7    **NRS Chapter 289 related to disclosure of information that you**

8    **obtained during the course of doing background investigation of**

9    **potential employee of the sheriff's office?**

10         A:   I'm not, specifically.

11         **Q:   Okay.  All right.  So would -- do -- when you were**

12   **doing a background investigation on a potential employee, if**

13   **there were other law enforcement agencies that they had worked**

14   **bo- -- for before, was it your practice to contact those law**

15   **enforcement agencies?**

16         A:   Yes.

17         **Q:   Okay.  And would you request documentary**

18   **information from those law enforcement agencies?**

19         A:   Uh, sometimes.

20         **Q:   Okay.  When would you request documentary**

21   **information?**

22         A:   Um, you know, usually, they were such short calls.

23   Law enforcement agencies would just simply verify and refer me to

24   HR, um, for whatever entity it was.  But I don't really remember

25   if I specifically ever did request, but I think that I could have

1  requested things, um, on backgrounds.

2           Q:  Okay.

3           A:  I just don't recall if I ever really did.  Um --

4           Q:  Would you ask whoever you spoke to you at a former

5  agency of a prospective employee what they thought about the

6  performance of that potential employee?

7           A:  I would try.

8           Q:  Would you receive calls from agencies where your

9  former employees were applying for new jobs?

10          A:  For my former employees?

11          Q:  So I'm asking: When you -- when an -- an employee

12  left the Churchill County Sheriff's Office, like a sheriff's

13  deputy and applied for a new job somewhere else, would you

14  receive calls from those agencies when they were doing background

15  investigations of your former employees?

16          A:  Uh, I have received calls on those, yes.

17          Q:  Okay.  Are you the person at the Churchill County

18  Sheriff's Office that would take those calls when they came in?

19          A:  Uh, I would assume.  Um, I'm the -- I was the head

20  guy.

21          Q:  Okay.  Would you, as a general practice, share

22  information or your opinions on your former employees with other

23  agencies where they were seeking new jobs?

24          A:  No.  My typical practice was, I could verify --

25  save them a phone call.  I'd verify that this person had in- --

1 had indeed worked for us from whatever date to whatever date.  If

2 they wanted anything further, I'd refer them to HR.

3            **Q:  Okay.  What was the sheriff's office practice about**

4 **sharing employee files with other agencies?**

5            A:  When another -- when an employee left the sheriff's

6 office, I was very consistent about this.  I would, within a day

7 or two of their departure, collect all their training, all of

8 their personnel file, um, any of those, and I would send the hard

9 copy over to human resources at the -- at the, uh, Churchill

10 County Human Resources office.

11 And, uh, actually, I'll just for openness, I'll explain that when

12 we did, um -- when I had a personnel file -- in fact, I did this

13 when -- in my first couple of weeks as sheriff, I went through

14 and scanned everyone's personnel file so that we had a readily

15 accessible, um, electronic version of it for doing evaluations

16 and such.

17 Um, part of my practice when somebody would leave is I would

18 remove all of that electronic stuff from our database, uh, and

19 send the hard copies over to human resources.  I did this within

20 a couple of days of any employee who left.  So sheriff's office

21 had no access to any of that after the fact.

22            **Q:  Did you not have access to it, or was it just**

23 **stored somewhere else?**

24            A:  I -- I mean, I'd have had to go to human resources

25 to get it.  So human resources would have had copies of that.

1          Q:  Okay.  But you would been -- you would've been able

2   to obtain those copies if you requested them, for example?

3          A:  I could have, yes.

4          Q:  Okay.  They just weren't stored at the sheriff's

5   office; is it correct?

6          A:  Correct.

7          Q:  Okay.  All right.  So I'd like to turn to what's

8   been marked as Exhibit No. 2.  Okay.  All right.  Do you

9   recognize this document, Mr. Trotter?

10         A:  Yes.

11         Q:  Okay.  What is it?

12         A:  This is the oath.  Um, I almost invariably

13  personally attended the oaths of new hires.  And we did this at

14  the County Clerk's Office so that they can have an official

15  record of the oath.

16         Q:  Okay.  So -- and you -- it contains the standard

17  oaths that a law enforcement officer would -- would take when

18  they -- they get hired from an agency like Churchill County

19  Sheriff's Office; is that correct?

20         A:  Yes.

21         Q:  Okay.  So when you hired Mr. Erwine, you felt he

22  was qualified to be a police officer; is that right?

23         A:  Yes.

24         Q:  Okay.  All right.  I'd like to turn to what's been

25  marked as Exhibit No. 3.  Okay.  Do you recognize this document,

1  Mr. Trotter?

2          A:  Yes.

3              Q:  Okay.  What is it?

4          A:  Well, this is a standard evaluation form for the

5  County.  Um, this form was done -- appears to be about four

6  months after Mr. Erwine was hired.

7              Q:  Okay.

8          A:  There was 90 -- about a 90-day evaluation that the

9  County requires of any new employee.

10             Q:  Okay.  Do you recall the -- the cycle of enploy- --

11 employee evaluation reports for a newly hired deputy at the

12 Churchill County Sheriff's Office?

13         A:  You know, I recall we did 90 day and then annuals.

14 Um --

15             Q:  Okay.

16         A:  -- but I did see something where it mentioned that

17 nine months, and I -- frankly, I don't -- you'd have to check

18 with human resources, but I don't believe we ever did one of

19 those.

20             Q:  I'm sorry.  I didn't hear you.

21         A:  I don't believe we ever did a nine-month evaluation

22 on an employee.  I just don't recall ever seeing that.

23             Q:  On -- on any employee or just Mr. Erwine?

24         A:  On any employee.

25             Q:  Okay.  All right.  I want to ask you some questions

1  about -- about what's been marked as Exhibit No. 3, which you've

2  already identified.  And this is to be clear, Mr. Erwine's per-

3  -- his performance evaluation, basically?

4          A:  Yes.

5          Q:  Okay.  And do you recall who authored this -- this

6  evaluation?

7          A:  Um, in looking at it, it looks like, um, it was --

8  at that time, it was Deputy Chris Thorn and Sergeant Ron Bell are

9  the names that are on the signature line.  And I can mainly tell

10 because of their, uh, call number.

11         Q:  Okay.  And so was Deputy Thorn the person who was

12 ob- -- observing Mr. Erwine since the date of his hire at the

13 Churchill County Sheriff's Office?

14         A:  Um, I think he was field training him at the time.

15         Q:  Okay.  Do you know how long Deputy Thorn was

16 training Mr. Erwine at the time he completed this evaluation?

17         A:  Uh, I don't.

18         Q:  Okay.

19         A:  I mean, somewhere on the evaluation, I believe,

20 there was a date where they changed field training officers.  I

21 think it's --

22         Q:  Okay.

23         A:  I -- I thought I read something when I was looking

24 at these exhibits.

25         Q:  Okay.  So you looked at these exhibits before your

 1  deposition; is that correct?

 2          A:  Yes.  I just did yesterday.

 3          Q:  Okay.  So if you could turn to -- do you see those

 4  little numbers at the bottom right beginning with "ERW"?  Judge

 5  Trotter, do you see those numbers?

 6          A:  Oh, yes.  This --

 7          Q:  Okay.

 8          A:  -- file stamp -- the stamps -- Bates stamps?

 9          Q:  Right.  I'm going to refer to documents by their

10  Bates number when I -- when I ask you about them first because --

11          A:  Sure.

12          Q:  Okay.  So on what's been marked as Bates number

13  "ERW30," there's a "Job Knowledge" section there.  Do you see

14  that?

15          A:  Yes.

16          Q:  Okay.  And it -- there's an indication there that

17  Erwine was struggling with procedures regarding inmate meals?

18          A:  I see that.

19          Q:  Okay.  And to an outsider, you know, I don't really

20  understand what that means.  Can you explain to me what the

21  problem was there?

22          A:  Uh, I'm not sure what the problem was, but I can

23  tell you the inmates were served meals three times a day.  And at

24  the jail that -- where Mr. Erwine worked at that time, um, that

25  required pushing a little cart around this, um, facility and

1 handing out meals.  And, um, I never did participate in the meal

2 hand-out process, so I don't know exactly how it went.

3          Q:  Okay.  How about "ERW31"?  There's some -- the --

4 the first box there, I believe it's "professionalism." There was

5 some -- there's an indication that there was some problems with

6 accountability.  Do you see that?

7          A:  I see that.

8          Q:  Okay.  And you already reviewed this document.  So

9 can you explain to me what's your understanding what the account-

10 -- accountability issue was with Deputy Erwine?

11          A:  Uh, my understanding, and that is something I've

12 heard outside of just the evaluation, was that he would not

13 accept responsibility when he'd make a mistake.

14          Q:  Okay.  And who did you hear that from?

15          A:  Uh, my captain would -- uh, Captain Matheson.  We

16 communicated pretty regularly about various things in the jail,

17 and that would have been one of those that would have been

18 something that got to me.

19          Q:  Okay.  Was Captain Matheson in charge of the jail?

20          A:  He was the captain over what we called support

21 bureau.  So he was over the jail and dispatch --

22          Q:  Okay.

23          A:  -- and the civil division.

24          Q:  Was there anyone below Captain Matheson who ran the

25 day-to-day operations of the jail?

 1          A:  The sergeants and the deputies.

 2          Q:  Okay.  Any sergeants in particular at the time when

 3   Mr. Erwine was employed at the Churchill County Sheriff's Office?

 4          A:  I think we had three sergeants.  We had Sergeant

 5   Jesse Nuckolls, Sergeant Ron Bell, and Sergeant Shawn Summers.

 6          Q:  Okay.  All right.  So do you -- how long was

 7   Sergeant Summers working at the Churchill County Sheriff's

 8   Office?

 9          A:  Uh, he retired after I left, which was 2019.  I

10   think he retired maybe at the beginning of this year.  He had to

11   have had 20 -- at least -- it's gotta be around 25 years at that

12   time.  Maybe a little more.

13          Q:  Okay.  So he was there the entire time that you

14   were at the Churchill County Sheriff's Office, right?

15          A:  Yes.  I did not hire him.  He was hired by two

16   sheriff's prior to me.

17          Q:  Okay.  All right.  So just turning to the overall

18   evaluation of Mr. Erwine's employment in Exhibit No. 3 at the

19   bottom of page 31.  He got a -- an "F" rating; is that right?

20          A:  Yes.

21          Q:  Okay.  And what does an F rating mean?

22          A:  It stands for fair.

23          Q:  Okay.  Okay.  And it says here that his overall

24   performance is fair, "Deputy Erwine arrives for his shift early

25   and his uniform is always neat and clean.  He'd be rated a lot

 1  higher and further along in his training program if it was not

 2  for his issues with accountability.  Accountability has affected

 3  every area in his training program.  Deputy Erwine has received

 4  the training, tools, and mentoring to start a successful career."

 5  Is that right?  Sheriff Trotter; is that right?

 6          A:  Um, that's what that reads, yes.

 7          Q:  Okay.  And this -- it says that this evaluation was

 8  dated -- is it "March 9th of 2016.  "?

 9          A:  It looks like it on there, yes.

10          Q:  Okay.  And you signed it on "March 10th of 2016,"

11  right?

12          A:  Yes.

13          Q:  Okay.  But he continued to work for the sheriff's

14  office for several months after that; is that correct?

15          A:  Yes.

16          Q:  Okay.  So obviously, based on what you saw here in

17  this evaluation report, at the time you saw it, you didn't think

18  that this constituted grounds to terminite [sic] -- terminate Mr.

19  Erwine; did you?

20          A:  Correct.

21          Q:  Okay.  All right.  So I'd like you to turn to

22  what's been marked as Exhibit No. 4 here.

23          A:  Okay.

24          Q:  Do you recognize this document?

25          A:  Yes.

1      Q:  Okay.  What is this?

2      A:  This is a standard, uh, face sheet for a booking of

3  an inmate.  And this one happens to apply to a "Andrew Beaulieu,"

4  or -- I'm not sure how to pronounce the name.

5      Q:  I think it's -- we been saying Beaulieu.

6      A:  Beaulieu?

7      Q:  But I think we all will know who you're talking

8  about no matter how you say it.  So do you remember this inmate

9  at all?

10     A:  No. I mean, I -- I remember the incident, um, the

11  allegations, but I don't remember the inmate.  Never knew him.

12     Q:  Okay.  When you -- when you say "the allegations,"

13  what do you mean?

14     A:  Uh, the, um, allegations that were brought on by,

15  um, Mr., um, Erwine.

16     Q:  Okay.  Against who?

17     A:  Uh, I think it's been against the sheriff's office,

18  uh --

19     Q:  Okay.

20     A:  -- or -- or against staff at the sheriff's office.

21     Q:  Okay.  It wasn't just the deputies who were

22  involved in the situation with Mr. Beaulieu; was it?

23     A:  Uh, I don't recall.

24     Q:  Okay.  So do you -- do you know why Mr. Beaulieu

25  was in the jail on the night in question?

1           A:  Uh, from reading the, uh, information, um, it looks

2    like he was arrested for a vandalism.

3           **Q:  Okay.  Do you know anything about Mr. Beaulieu's**

4    **backgrounds?**

5           A:  Mr. -- how -- what are you saying the name is?

6           **Q:  Beaulieu.**

7           A:  Beaulieu?  Uh, no, I don't know anything about him.

8           **Q:  Okay.  Have you ever met him?**

9           A:  You know, I've met thousands of people 'cause I run

10   for office three times now, and -- so I may have knocked on his

11   door.  I wouldn't specifically remember.

12          **Q:  Yeah.  That was an inartful question on my part.  I**

13   **guess what I should say is: Do you recall ever meeting Mr.**

14   **Beaulieu?**

15          A:  No.

16          **Q:  Okay.  All right.  So I would -- I want you to take**

17   **a look at what's been marked as Exhibit No. 5.**

18          A:  Okay.

19          **Q:  Do you recognize this document?**

20          A:  Not necessarily, but I may have seen it in the

21   past.

22          **Q:  Okay.**

23               MS. PARKS:  It's only -- an it's only what you

24   recall.  You're not required to guess.

25          A:  At this point, I'm gonna say I don't recall

1  necessarily reading this until it showed up in the exhibits.

2          Q:  Okay.  Do you know who Zachary -- Zachary White is?

3          A:  No.

4          Q:  Okay.  When you read this, does the situation

5  that's described here seem to fit with any other situation that

6  occurred at the jail with which you are familiar?

7               MS. PARKS:  Objection.  Vague and ambiguous.

8          A:  Um, it looks, uh -- what I can say is that the, uh,

9  jail that Mr. Erwine worked in and that -- that we used to be in,

10 um -- if you were in the padded cell -- we had one padded cell

11 that was essentially located right in the center of that jail,

12 and there's no soundproofing.  Um, it was really -- very old jail

13 --

14         Q:  Okay.

15         A:  -- of 40-some years old when we moved out of it.

16 And, um, so inmates quite frequently had their good night sleep

17 disturbed by individuals that were put in the padded cell for

18 their own protection.

19         Q:  Okay.  So I guess -- do you see the date there?

20 "October 8th, 2016"?

21         A:  Yes.

22         Q:  Are you aware of any other incidents that occurred

23 at the jail on that same date?  Around that same time?

24         A:  Uh, this was the same date, I believe, that Mr.

25 Beaulieu was in the cell.

1        Q:  Okay.  Does the description provided in this

2   document seem to match allegations about what happened to Mr.

3   Beaulieu at the jail that night?

4        A:  Uh, it matches what seems to have been the

5   incident, um, loudness and, uh, issues with an individual in a

6   padded cell.

7        Q:  Okay.  Do you see where it says here, "For

8   two-and-half to three hours, a man in the blueroom begged for

9   water while the deputies made jokes about him and antagonized

10  him."?  Is that correct?

11       A:  I see that.

12       Q:  Okay.  Do you think they were referring to Mr.

13  Beaulieu there?

14       A:  Uh, based on the date and the, uh, time,

15  potentially.

16       Q:  Okay.  Do you see where it says, "The deputies

17  refused to give him water or make his allowed phone call to make

18  bail."?  Is that right?

19       A:  I see where it says that, yes.

20       Q:  Okay.  All right.  So -- okay.  Are you familiar

21  whether Mr. White ever filed a grievance about what occurred with

22  Mr. Beaulieu on the night in question, October 8th, 2016?

23       A:  No. I don't believe so.  This would have been

24  what's called a kite.  It's complaint from an inmate to the

25  captain.  This would have been the initiation of any grievance if

1  he did, and I believe this was the only thing that was filed.

2  But once again, I don't recall ever seeing this.

3          **Q:  Okay.  Did you ever conduct an investigation as to**

4  **what happened with Mr. Beaulieu on, you know, October 8th, 2016**

5  **at the jail?**

6          A:  We did verify or verified the facts and the

7  information on the next exhibit, um, about checking the, uh,

8  inmate.  Well, not the next exhibit.  It was Exhibit 9.  Um, I

9  did not do that.  But yes, um, the inf- -- the allegations were

10  looked into.

11          **Q:  Okay.  By who?**

12          A:  It would've been Captain Matheson.

13          **Q:  Okay.  Did the sheriff's office ever respond to**

14  **this kite by Mr. White?**

15          A:  I don't know.

16          **Q:  Okay.  If the sheriff's office had responded to**

17  **this kite, would there be a record of it at the sheriff's office?**

18          A:  Probably, yeah.  Um, uh, typically, if -- it was

19  very rarely that I wouldn't respond necessarily to a kite.  Um,

20  it's, typically, handled by the administrator over that, uh,

21  bureau.  Um --

22          **Q:  And --**

23          A:  -- and I --

24          **Q:  -- do you what -- I'm sorry.  Go ahead.**

25          A:  I -- I would expect that, had I responded, it would

1  be kept in that inmate's, uh, jacket.

2  **Q:  Off the cuff, are you familiar with the policy at**

3  **the sheriff's office for retaining kites and grievances from**

4  **inmates at the jail?**

5  A:  Not off -- not off the top of my head, so --

6  **Q:  Okay.  Do you have a general understanding of**

7  **whether there is such a policy?**

8  A:  I understand record of retention when it comes to,

9  uh, bookings and -- and things of that sort.

10  **Q:  Okay.**

11  A:  And I have -- and mainly, I was refreshed by, uh --

12  my memory was refreshed by seeing your exhibit.

13  **Q:  Okay.  And what's your understanding of the policy**

14  **behind document retention policies for inmates and how they're**

15  **treated at jail, such as the Churchill County Sheriff's Office?**

16  A:  Um, the only thing I have specific knowledge of is

17  what was in your exhibit on, um, records retention policy.

18  **Q:  Okay.  But I'm asking you what's your -- your**

19  **thoughts about why such policies exist?**

20  A:  I'd have to make -- be making an assumption on why

21  they exist, but I would expect you would wanna, um, retain

22  information on use-of-force issues and things of that sort.

23  **Q:  Okay.**

24  A:  Um --

25  **Q:  And why would you want to retain that information?**

 1          A:  Um, I guess potentially for -- uh, and here I am
 2   guessing.  As I have just said --
 3               MS. PARKS:  You're not required to guess.  It's
 4   what you know.
 5               MR. TROTTER:  Okay.
 6          A:  So I don't know why they exist.  I'll just go with
 7   that, why they have retention policy on those type of things
 8   exists.
 9          **Q:  Okay.  Do you think it's a fair statement to say**
10   **that it's important to keep records of what happens at a jail in**
11   **case there is a dispute over whether an inmate was treated**
12   **properly at the jail?**
13               MS. PARKS:  Objection.  Relevance.  Improper
14   hypothetical to this lay witness, fact witness.
15          A:  Yes.  I think there's some valid -- validity to
16   keeping records.
17          **Q:  So it's -- an inmate claims he's mistreated at the**
18   **jail.  The Churchill County Sheriff's Office keeps records so it**
19   **can show that it complied with appli- -- applicable rules and**
20   **regulations of how inmates are -- are supposed to be treated; is**
21   **that right?**
22               MS. PARKS:  Same objections.
23          A:  Yes.
24          **Q:  And do you know what those records include?**
25               MS. PARKS:  Objection.  Vague and ambiguous.

1          A:  Um, uh, I would say that, that would be -- very
2   much dependent on the circumstance.
3          **Q:  Okay.  If you knew that an inmate had a -- had made**
4   **you aware of a potential claim against the jail, would you**
5   **disregard records?  Have that inmate mistreated at the jail?**
6               MS. PARKS:  Objection.  Relevance.  Improper
7   hypothetical to this witness.
8          A:  I would never ignore information if I was -- I
9   would not ignore information if I was, uh, um, looking into an
10  objection, or, uh -- not an objection, sorry, into a complaint.
11  I apologize.
12         **Q:  Inmates routinely sue prisons and jails for how**
13  **they treated them, right?**
14              MS. PARKS:  Objection.  Relevance.
15         A:  I've heard about suits.
16         **Q:  Okay.  Are you aware of any suits against the**
17  **Churchill County Sheriff's Office from inmates at the time you**
18  **were there?**
19              MS. PARKS:  Objection.  Relevance.  You mean ever?
20              MR. BUSBY:  When he was employed there?
21              MS. PARKS:  Objection.  Relevance.
22         A:  I'm trying to remember, but I don't recall any
23  suits when I was there.
24         **Q:  Okay.  Do you recall whether Mr. Beaulieu**
25  **threatened to sue about how he was treated at the jail the night**

1  he was there?

2          A:   I never heard that he had threatened to sue.

3          Q:   Okay.  All right.  I'd like to take a look at the

4  next exhibit, which has been marked as Exhibit No. 6.

5          A:   Okay.

6          Q:   Sheriff Trotter, do you recognize this exhibit?

7          A:   Um, yes.

8          Q:   Okay.  What is it?

9          A:   This is a statement written by Deputy Thompson

10  about the Beaulieu situation.

11         Q:   Okay.  And do you recall why Deputy Thompson

12  authored this?

13         A:   I'm gonna need to look at my memo, I believe.  I'm

14  not sure if i asked for it.  Um, uh, yes, it appears -- it

15  appears that I had had Sergeant Summers have Thompson do one of

16  these.

17         Q:   Okay.  And do -- so was it routine practice for you

18  to write memorandums about situations that occurred with inmates

19  at the jail?

20         A:   If there was an alleg- -- alleged issue, we would

21  certainly want to, um, have it explained.

22         Q:   Okay.  So what's your understanding of what the

23  issue was with Mr. Beaulieu?

24         A:   My understanding is that Mr. Beaulieu was highly

25  intoxicated, um, uncooperative, which is typically what led --

1 what would lead to someone being placed in the padded cell.  Um,

2 he was there for -- he was in the padded cell it seems about five

3 or six hours.

4 I'd have to look at that check log.  Um, and Mr. Erwine

5 apparently came in and, uh, took off- -- took issue with how the

6 deputies had allegedly, uh, treated him or deprived him or

7 something of that sort.

8          Q:  Okay.  Do you know what Mr. Erwine's concerns were?

9          A:  That he had not received water for a couple hours,

10 um --

11          Q:  Okay.

12          A:  -- which was the primary one that I'm familiar

13 with.

14          Q:  Okay.  Are inmates entitled to receive water if

15 they requested it?

16              MS. PARKS:  Objection.  Improper hypothetical to

17 this witness.

18          A:  Um, everybody is entitled to receive water.

19          Q:  Okay.

20          A:  Um, the circumstances may not necessarily allow

21 that, specifically in a padded cell situation where you have an

22 inebriated, uncooperative individual who may have subsequently

23 been cooperative at a later time when another employee came in

24 and first encountered them.

25          Q:  Okay.  So the first paragraph of Exhibit 6 states

1  that Beaulieu was verbally aggressive towards them; is that

2  right?  Do you see that in the last sentence of the first

3  paragraph of the Exhibit 6?

4          A:  Yes.

5              Q:  Okay.  What do you think that means?

6                  MS. PARKS:  Objection.  Calls for speculation on

7  the part of this witness.  He was not present.

8              Q:  I'd be glad to rephrase.  What was your

9  understanding of what that meant when you read this --

10         A:  Um --

11             Q:  -- the first time?

12         A:  -- that the -- that the defendant, or the inmate,

13  was yelling, cussing, uncooperative, wouldn't answer questions.

14  Those are the type of things that typically lead to somebody

15  being considered verbally aggressive, possibly threatening.

16             Q:  Okay.  So -- so here it indicates in the third

17  para- -- the sird [sic] -- third sentence of -- of paragraph 2

18  that when Deputy Thompson returned to the booking cage, he was

19  yelling again and he wanted water; is that right?

20                 MS. PARKS:  Are you asking him if that's what the

21  document states?

22                 MR. BUSBY:  Yeah.  I'm asking if he see that in

23  the document.

24         A:  I see that line.

25             Q:  Okay.  So -- and the next sentence states, "Deputy

1  Erwine came on shift and made contact with Beaulieu around 6:07

2  hours.  He asked Beaulieu if he wanted water several times to

3  which he was also told 'fuck off'," right?

4          A:  I see that.

5          Q:  Okay.  Do you know if there was a video recording

6  system in the jail at the time Mr. Beaulieu was in custody there?

7          A:  There was.

8          Q:  Okay.  Was it recording this interaction between

9  Beaulieu and the deputies?

10          A:  Uh, the video would have certainly been recorded.

11  The videos were running all the time.

12          Q:  Okay.  Would it record video and audio?

13          A:  Um, if I remember right, the, um, audio

14  specifically around the booking cage had to be manually turned

15  on.  Uh, so I don't know if there was audio at this specific

16  incident.

17          Q:  Okay.  Did you ever review audio or video of this

18  specific incid- -- incident?

19          A:  I -- I did not.

20          Q:  Okay.  So it looks like in the third paragraph --

21  I'd like you to just read that so I don't have to read it to you.

22  I just want to ask you some questions about it.  So can you take

23  a look and let me know when you're finished reading it?

24          A:  Okay.  I've read it.

25          Q:  Okay.  So based on what you just read, does it

1  appear that Erwine seemed to be pointing out some issues with how

2  Mr. Beaulieu was treated at the jail?

3          A:  Here's a Mr. Erwine was pointing out issues he

4  believed or perceived existed.

5              MS. PARKS:  Right.  I'm just going to object that

6  that's vague and ambiguous with respect to whether or not Deputy

7  Erwine pointed this out to anybody.  That's my objection.

8          Q:  Okay.  And it -- it says here that Mr. Erwine --

9  Deputy Erwine spent 30 to 40 minutes reviewing the videos; is

10 that correct?

11         A:  That's what it says.

12         Q:  And you never looked at the videos?

13         A:  No.

14             MS. PARKS:  Objection.  Asked and answered.

15         Q:  Okay.  I'd like you to take a look at the last

16 paragraph on the page marked "ERW39." Do you see where it states

17 there, "After booking Beaulieu, I heard him whisper to Erwine

18 that he wanted to talk to him.  Erwine escorted him to the

19 kitchen and talked to him for several moments."?

20         A:  I see that.

21         Q:  Okay.  Do you have any idea what Beaulieu and

22 Erwine discussed?

23         A:  No.

24         Q:  You have no knowledge of that?

25         A:  No.

```
 1              Q:  Okay.  So do you see at the bottom there in the
 2   last paragraph above the signature where it says -- the last
 3   sentence, "When Sergeant Summers came on shift, I went back to
 4   his office to talk to him about the incident because I felt
 5   uneasy about how Deputy Erwine had handled everything."?
 6              A:  I see that.
 7              Q:  Okay.  Did you ever talk to Deputy Thompson about
 8   why he felt uneasy about how Erwine handled everything?
 9              A:  I did not.
10              Q:  Okay.  All right.  So I'd like you to turn to
11   what's been marked as Exhibit No. 7.
12              A:  Okay.
13              Q:  Okay.  Do you recognize this document?
14              A:  Yes.
15              Q:  Okay.  What is it?
16              A:  This is a report, or, I guess, memo from Sergeant
17   Shawn Summers about the same incident.
18              Q:  The incident involving Mr. Beaulieu?
19              A:  Yes.
20              Q:  Okay.  All right.  So just backing up for a moment.
21   As -- when you were sheriff, what was your expectation about how
22   a deputy should handle a situation where they observed another
23   deputy at the jail treating an inmate in a way that he feels
24   appropriate or lawful?
25                   MS. PARKS:  Objection.  Relevance.  Improper
```

1  hypothetical.

2          A:  Okay.  So I can tell you that, uh, we have a chain

3  of command.  You have deputy, potentially he may have a field

4  training officer.  That, uh, field training officer would have a

5  sergeant.  The sergeant would have a captain.  The captain would

6  have a sheriff.  Um, however, every new employee that I brought

7  in, I would talk to when I'd be taking him over to give him the

8  oath about my open-door policy.

9  So if they didn't believe that their concern was being answered

10 appropriately at the sergeant level or even the captain level,

11 they were welcome to come to me.  In fact, they could come to me

12 before they ever went to them.

13 And if I believed it needed to go back down to the level, the

14 proper level, many times I sent people back down to their

15 sergeant or their captain.  And that was how I handled it.  I

16 would not tolerate the kind of behaviors that were -- that Mr.

17 Erwine has alleged for a minute, if I was to know about them.

18         **Q:  Okay.  Just I'm having a pop up here.  Okay.  So**

19 **according to this -- this letter from Sergeant Summers, he was**

20 **approached by Deputy Thompson after the incident involving Mr.**

21 **Beaulieu; is that right?**

22         A:  I'm not sure where you're seeing that, but --- oh,

23 yes.  I see that in the first paragraph.  Okay.

24         **Q:  Okay.**

25         A:  That's what it says.

1        Q:  I'm just trying to get a time- -- a timeline

2   together here about what happened.

3        A:  I see that.

4        Q:  Okay.  So Deputy Thompson spoke with Sergeant

5   Summers.  And then I think it's the -- these paragraphs are kind

6   of bunched together, but the first paragraph, after which there

7   is a space, it says, "Prior to Deputy Erwine leaving the shift, I

8   pulled him into my office.  And I asked him if he had any issues

9   with the way things were handled.  He relayed to me that he was

10  worried about a lawsuit." Do you see that?

11       A:  I see where that's written, yes.

12       Q:  Okay.  So this indicates that Deputy Erwine relayed

13  to Sergeant Summers that he had some concerns about Mr. -- how

14  Mr. Beaulieu was treated; is that right?

15       A:  That seems to be the gist.

16       Q:  Okay.  And this is dated "October 8th, 2016,"

17  right?  It's the same day that the incident involving Mr.

18  Beaulieu occurred; is that right?

19       A:  Yes.

20       Q:  It also it says, at the bottom, I think it's the

21  fifth paragraph there, "He has no authority at all in his current

22  position to view/review videotapes and consult with inmates about

23  their care and custody." Do you see that?

24       A:  I see where that's written, yes.

25       Q:  Okay.  So did Mr. Erwine lack authority to review

1 video of inmates and how they were treated at the jail?

2          A:  Not specifically.

3          Q:  Okay.  So -- so if a deputy hears from an inmate

4 that he was treated improperly or unfairly by another deputy

5 previously in the day, it would be inappropriate for that deputy

6 to go and review video to verify the claims of the inmate?

7          A:  I believe there is a correct procedure for that, a

8 correct method of handling that.  And that would be to go to your

9 supervisor, not to initiate your own investigation.

10          Q:  Okay.  But they can -- if there's some alleged

11 misconduct, a deputy can't just verify whether what the inmate is

12 saying is true to determine whether he needs to have the matter

13 addressed any further or not?

14          A:  No.  Deputies --

15          Q:  That's the --

16          A:  -- deputies had the ability to review video in the

17 jail.

18          Q:  Okay.  So Mr. Erwine didn't do any- -- do anything

19 inappropriately, right?

20          A:  I'm not going to, uh, necessarily speculate on

21 that, but he --

22          Q:  But you're --

23          A:  -- did have --

24          Q:  -- his boss, right?

25               MS. PARKS:  Don't -- don't interrupt him, Luke,

1  please.

2          Q:  I'm sorry to interrupt you.  Go ahead.

3          A:  But he did have access to videos and could review

4  videos in the jail because he worked there.

5          Q:  Okay.  So Sergeant Summers' statement here that

6  Erwine had no authority in his current position to review

7  videotapes is just simply incorrect; is that right?

8          A:  Uh, possibly.

9          Q:  Okay.  I'd like you to turn to the next page,

10  what's been marked at Exhibit 42.  In -- oh, I'm sorry, Exhibit

11  7, page 42.

12          A:  Okay.

13          Q:  Do you see there where it says, "Beaulieu told me

14  that the younger black- haired deputy had reviewed all the video

15  footage and spoken to him several times, and indicated that a

16  lawsuit would be winnable." Do you see that?

17          A:  I see that.

18          Q:  Okay.  That's probably pretty concerning for the

19  sheriff's office, right?

20          A:  Certainly.

21              MS. PARKS:  Objection.

22          Q:  Okay.

23              MS. PARKS:  Objection.

24          Q:  Did you --

25              MS. PARKS:  Improper hypothetical.  Assumes facts

 1  not in evidence.

 2          Q:  Okay.  Did you ever interview Mr. Beaulieu about

 3  what happened to him at the jail?

 4          A:  I did not.

 5          Q:  Did you interview Sergeant Summers about what

 6  happened to Mr. Beaulieu at the jail?

 7          A:  I did not.

 8          Q:  Okay.  See at the bottom where it says, "Called

 9  Sheriff Trotter and discussed the call with him."?

10          A:  Yes.

11          Q:  Okay.  So Sergeant Summers called you about his

12  call with Mr. Beaulieu; is that right?

13          A:  Uh, I don't remember the specific of -- the

14  specifics of our call, but I do see where he says he did discuss

15  that call with him, or with me, yeah.

16          Q:  Okay.  You know, and I'm not -- I'm not trying to

17  give you a memory test.  I understand this stuff happened a long

18  time ago, but I just want to be clear about what happened.

19          A:  Okay.

20          Q:  And so it's clear from this document that Sergeant

21  Summers called you about what happened with Mr. Beaulieu, right?

22  And you discussed with him?

23              MS. PARKS:  Objection.  Asked and answered.

24  That's what this document said, and the win- -- and the witness

25  has answered that question.

1        Q:  Go ahead, Sheriff Trotter.

2        A:  I did receive a call from Sergeant Summers on that

3  date.

4        Q:  Okay.  So -- and it states here, "Was told to have

5  Sergeant Nuckolls access Erwine's computer for any sign of the

6  incident and report that Deputy Thompson had seen," right?

7        A:  Yes, I see that.

8        Q:  Do you recall ordering Sergeant Summers to look in

9  Erwine's computer?

10       A:  Oh, and the fact is wouldn't have been his

11  computer, they all -- uh, there is, I think, two computers in the

12  booking cage.  And I -- I believe it was two.  And so everybody

13  shared the same computer.  So yes, I did ask, uh, Sergeant

14  Nuckolls to come in and, uh, look in the computers.

15       Q:  Okay.  But what -- what were you looking for?

16       A:  Well, based on the current exhibit, um, a Word

17  document that had been reportedly seen that Mr. Erwine was

18  allegedly drafting, um, uh, potentially was related to his

19  personal investigation of our agency.

20       Q:  Okay.  What do you mean by personal investigation

21  of your agency?

22       A:  Oh, it appears Mr. Erwine was investigating

23  whatever had happened with Mr. Beaulieu and -- and what was

24  reported was that there was a, uh -- he had developed a document

25  --

1          Q:  Okay.

2          A:  -- and -- on one of those computers.

3          Q:  Okay.  Did you ever ask Mr. Erwine why he was

4   creating a document based on what happened to Mr. Beaulieu?

5          A:  I did not.

6          Q:  Okay.  So it states here, "Sergeant Nuckolls was

7   able to locate a screenshot of a Word document written by Deputy

8   Erwine outlining his 'investigation' into the security cell

9   incident." Is that right?

10          A:  That's what it says.

11          Q:  Okay.  All right.  So turning to the next document

12   which has been marked as Exhibit No. 8.  Do you recognize this

13   document?

14          A:  Yeah.  This appears to be a standard form in

15   Spillman for jail incidents, um, which would be written by the

16   on-duty staff.

17          Q:  Okay.  Do you know who wrote this?

18          A:  It appears, uh, Deputy Chris Burton.

19          Q:  And do you know if Mr. Burton was involved at all

20   in -- in the situation where Mr. Beaulieu was noncompliant or

21   requesting water?

22          A:  Um, based on the -- which -- which exhibit is it?

23   Your -- Exhibit 9, he was involved in checking on him some, um,

24   after he had been placed in the, um, cell --

25          Q:  Okay.

1          A:  -- padded cell.

2          Q:  Okay.  So Burton is a detention deputy?

3          A:  Yes.

4          Q:  Okay.  As was Mr. Erwine, right?

5          A:  Yes.

6          Q:  Okay.  All right.  So turning to Exhibit No. 9, do

7   you recognize this document?

8          A:  Yes.  I don't recall necessarily having seen it

9   before, but I -- I have -- uh, and I recognize what the document

10  is.

11         Q:  Okay.  So it seems like there's lots of different

12  people's handwriting here.  Is that reasonable to assume that?

13         A:  It appear so.

14         Q:  Okay.  Do you recognize whose handwriting this is

15  of the different entries given here?

16         A:  No. I don't recognize anybody's handwriting,

17  specifically.

18         Q:  Okay.  Do you see the entry at "521," where it

19  says, "Offered water refused."?

20         A:  Yes.

21         Q:  Okay.  Do you know whose handwriting that is?

22         A:  No. I don't even recognize the -- remember the, uh,

23  call number.  Uh --

24         Q:  Okay.  And so there's no way to really know who was

25  handwriting these things based on this document by its own terms,

1  right?

2          A:  I don't know.  I mean --

3          Q:  Okay.  So you're talking --

4          A:  -- they -- they put their --

5          Q:  I'm sorry.  Go ahead.

6          A:  The officers are supposed to put their call number

7  next to it, and that's what those numbers on the second

8  filled-out column are.

9          Q:  Okay.

10         A:  Uh, you just --

11         Q:  Do you recognize --

12         A:  -- would have to --

13         Q:  I'm sorry.  Go ahead.

14         A:  You go ahead.

15         Q:  Do you recognize badge number 644?

16         A:  I'm not sure who that was.  Um, that could've been

17 Mr. Erwine.  The only reason I know Mr. Burton was, uh -- Deputy

18 Burton was badge 682 is 'cause it was on his name under Exhibit

19 8.

20         Q:  Okay.

21         A:  But I don't remember their badge numbers.

22         Q:  Okay.  Do you know whether Dep- -- Burton's badge

23 number was 521?

24              MS. PARKS:  Objection.  Asked and answered.

25              MR. BUSBY:  No --

1           A:  I didn't -- I didn't really hear that.

2           **Q:  Do you know whether Burton's badge number was 521**

3  **[sic]?**

4           A:  Uh, no, that's a time.  Um, Deputy Burton's badge

5  number should have been 682 based on Exhibit 9 where he filled

6  out that report.

7           **Q:  Okay.  So and 645, do you know who that was?**

8           A:  I do not remember.

9           **Q:  So you don't know whether 645 was Deputy Thompson?**

10              MS. PARKS:  Objection.  Asked and answered.

11          A:  Correct.  I don't remember any of their badge

12  numbers.

13          **Q:  Okay.  Do you see the entry at "6:07"?**

14          A:  I see it.

15          **Q:  By 644, badge number 644.  It says --**

16          A:  It's --

17          **Q:  -- "Gave water and cleaned hands." Is that right?**

18          A:  It does say that, and I'm assuming that that's a

19  644.  It could be a 699, 694, also.

20          **Q:  Okay.  All right.  So based on this, Beaulieu was**

21  **placed in the security cell at "3:40." And it looks like the**

22  **first "gave water" indication is at -- is at around "5:51"; is**

23  **that correct?**

24              MS. PARKS:  Objection.  Misstates what this

25  document says.  Did you say 5:51?

1      Q:  Yeah.

2      A:  I see that as the first time that it was a

3  successful water transfer.

4      **Q:  Okay.  All right.  So let's turn to Exhibit No. 10.**

5  **Do you recognize this document?**

6      A:  I really did not until, um -- but -- but I mean --

7  when I saw the exhibit, that I can see it.  But I don't

8  necessarily re- -- necessarily remember looking at it prior, uh,

9  but I may have.

10     **Q:  Okay.  So is this the Word document that was**

11  **referred to in Sergeant Summers' letter in Exhibit 8?**

12     A:  Um, I would expect maybe it is.

13     **Q:  Okay.**

14     A:  Uh --

15        MS. PARKS:  Don't --

16     A:  -- based on --

17        MR. TROTTER:  Go ahead, Ms., uh, Parks.

18        MS. PARKS:  You are not required to guess.  It's

19  what you recall.

20     A:  Um, just in read- -- reading it, it does appear to

21  possibly be that.

22     **Q:  Okay.  All right.  So it states here -- I think**

23  **it's the third sentence, and this is authored by Deputy Erwine.**

24  **That is your understanding?**

25        MS. PARKS:  Objection.  Asked and answered.

1          A:  I don't have information on who authored this.

2          Q:  Okay.

3          A:  But that is the information I had at that time.

4          Q:  Oh, okay.  So do you see where it states, "At

5  approximately 0551 hours, I made contact with Beaulieu and asked

6  him what was going on.  He stated that he had been asking for

7  water for the previous two hours, in which nobody had given -- in

8  which nobody had given to him."

9          A:  I see that.

10         Q:  Okay.  Do you think that type of situation is one

11  that would raise a red flag for a detention deputy?

12         A:  I didn't hear the end of that.

13         Q:  Is that -- is that allegation a red flag for a

14  detention deputy?

15         A:  That somebody has asked for water for, uh, two

16  hours and wasn't given any?

17         Q:  Yeah.

18         A:  Um, I think that's very dependent on the

19  circumstance.  And, uh -- and it depends very much on the

20  circumstance for the deputy.  Does the deputy actually know the

21  circumstances on why that subject was not given water?

22         Q:  Okay.  Do you see next sentence where it states,

23  "Beaulieu stated that he had been asking repeatedly for water and

24  heard deputies laughing at him through the security door cell."?

25         A:  I see that.

1      Q:  Okay.  Is that appropriate behavior by sheriff's

2  deputies of Churchill County?

3              MS. PARKS:  Objection.  Improper hyp- --

4  hypothetical.  Assumes facts not in evidence.

5      A:  I would say that it's not professional behavior to

6  laugh at inmates.

7      Q:  Okay.  Do you see the next paragraph there where it

8  states, "I reviewed the footage of Beaulieu's booking and found

9  that he had first started asking for water at approximately 0350

10  hours."?

11     A:  I see that.

12     Q:  Okay.  So in order to know that, the person who was

13  writing this would had to heard those requests, right?

14     A:  That would be the expectation.

15             MS. PARKS:  What was the end of that question?

16  Sorry.  Luke, I couldn't hear you.

17             MR. BUSBY:  I'm just asking whether a person who

18  is making that statement would have had to have heard those

19  requests on audio.

20             MS. PARKS:  And that calls -- that calls for

21  speculation.  It's argumentative.

22     Q:  Okay.  And Mr.- -- Sheriff Trotter, your answer was

23  yes; is that correct?

24     A:  That would be the expectation, yes.

25     Q:  Okay.  Okay.  All right.  And I'd like you to turn

1  to the next page marked as Exhibit 10 at 046, ERWINE046.

2          A:  Okay.

3          Q:  Do you see where it states, in the second paragraph

4  there, "No water was given to Beaulieu for approximately two

5  hours after he began asking until I made contact with him at the

6  beginning of my shift, gave him water and inspected his bloody

7  hand."?

8          A:  I see that.

9          Q:  Okay.  "During my review of the security cell video

10  footage, I observed the drain being flushed numerous times while

11  Beaulieu was asking for water.  This correlates with Beaulieu's

12  story, when asking for water, he'd hear deputies laughing and the

13  drain would flush." Do you see that?

14          A:  I see that.

15          Q:  Okay.  So did you ever ask to review the video

16  footage of what happened to Mr. Beaulieu at the night -- the

17  night  in question at the Churchill County jail?

18          A:  I did not review the video.

19          Q:  Does this indicate anywhere in this document that

20  this was an investigation of the Churchill County Sheriff's

21  Office or the jail?

22          A:  No.

23          Q:  Does it indicate -- does the author indicate

24  anywhere why he's writing these things down?

25          A:  No.

1          Q:  All right.  I'd like you to turn to Exhibit No. 11.

2   Do you recognize this document, Sheriff Trotter?

3          A:  I do.

4          Q:  Okay.  What is it?

5          A:  It appears to be a memo from Deputy Jolie Jabines,

6   um, about a incident involving Mr. Erwine.

7          Q:  Okay.  And this is dated "October 9th, 2016"; is

8   that right?

9          A:  Yes.

10         Q:  Okay.  And did you review this document as part of

11  your preparation for this deposition?

12         A:  Yes.

13         Q:  Okay.  So can you describe to me your understanding

14  of what this document communicates?

15         A:  Um, this was a document, uh, or a memo done by

16  Deputy Jabines about where she dropped some items on the floor.

17  The booking cage called in, uh, I guess what they called the

18  house mouse in the old jail.  That was an inmate that cleaned up

19  around the place.  That was a trustee.  Uh, apparently, this

20  inmate was Inmate Maes to pick up some items that she couldn't

21  get to and then she alleges that Mr. Erwine inappropriately used

22  his taser.

23         Q:  Okay.  Have you ever spoken with Mr. Maes about

24  this incident?

25         A:  No.

1       Q:  Have you ever spoken with Mr. Erwine about this

2  incident?

3       A:  No.

4       Q:  Okay.  So --

5       A:  Well, I need -- and I need to quantify that.  Um --

6       Q:  Go ahead.

7       A:  When it comes to speaking to Mr. Erwine about this

8  or the note, I think I should do it since I'm thinking of it

9  right now.  Um, I did have a conversation with Mr. Erwine, um, at

10  the separation meeting that we had, a resignation meeting.  And,

11  um, these items may have been part of that conversation, but I

12  can't specifically remember the conversation.

13       Q:  Okay.  So what was improper about what Mr. Erwine

14  did in the situation described here by Deputy Jabines, I believe,

15  you said?  That's how you pronounce her name?  Can  you hear me?

16       A:  Uh, uh, you fade out at the end of your sentences

17  --

18       Q:  Okay.

19       A:  -- some.  Jabines -- Jabines is the way we

20  pronounce that, yes.

21       Q:  Okay.  So what was inappropriate about what Mr.

22  Erwine did in this situation with Mr. Maes?

23       A:  Based on this memo, um, it would seem that Mr.

24  Erwine pointed a taser at the inmate, allegedly in a potentially

25  joking manner.  Um, and then removed the actual cartridge, uh,

1  and dis- -- didn't discharge but activated the taser.  Um, fired

2  it, I guess you could call it.

3          **Q:  Okay.  When you say "fired it," does that mean just**

4  **turn it on?**

5          A:  No.  That would be activating it.  Firing it would

6  be when you pull the trigger, and it actually, uh, does the shot.

7          **Q:  Okay.  So by fire it you mean it's like sparking or**

8  **something?**

9          A:  Yes.  If you remove the, uh, cartridge -- the

10 cartridge would put out, uh, eject probes.  Um, so if you remove

11 the cartridge, you can still do what they call a contact stun,

12 where you just remove the cartridge and fire it.  And it'll spark

13 between the two probes at the end of the, uh, taser device.

14         **Q:  Okay.  So it states here that, in the second**

15 **paragraph, "While removing inmate property from the booking cage,**

16 **I accidentally knocked over a can containing numerous tools and**

17 **screws which fell under the shelving." Okay.  Tools and screws?**

18 **Do you think those are items that can be potentially dangerous in**

19 **the hands of an inmate at the jail?**

20         A:  Yes.

21         **Q:  Okay.  What was Churchill County's policy about**

22 **when it was appropriate for a deputy to -- to fire their taser in**

23 **the conducts of the jail?**

24         A:  Uh, it would have fallen within our use of force

25 continuum, which I don't have in front of me.  Um, it's

1  considered a -- uh, they come -- they go by levels, so it's

2  considered a -- I believe a Level 4 --

3          Q:  I'm sorry --

4          A:  -- Use --

5          Q:  -- you faded out a little bit there.

6          A:  Level 4 Use of Force, maybe.  That's --

7          Q:  Okay.

8          A:  -- what I believe I -- I remember from the policy.

9          Q:  So what's your understanding of when it's

10  appropriate to use a Level 4 Use of Force?

11          A:  Uh, when verbal commands and hand command -- hand,

12  um, efforts have not worked.  Um, when your presence hasn't

13  worked, which are low- -- lower levels of force.

14          Q:  Okay.  Are you always going to have time to give a

15  verbal command before you fire up your taser when there's a

16  situation involving an inmate?

17          A:  Oh, no.  Not necessarily.

18          Q:  These can be very quick dynamic processes with

19  people who are in custody; is that correct?

20          A:  Sure.

21          Q:  Okay.  So if an inmate [sic] feels that there's a

22  potential danger to them, other inmates or people around them, is

23  it appropriate for them to arm their taser --

24              MS. PARKS:  Object- --

25          Q:  -- as self-defense mechanism?

1              MS. PARKS:  Objection.  Improper hypothetical.

2         A:  So you're saying if an inmate felt that another

3    inmate was going to harm them, could the inmate arm their taser?

4         **Q:  No. I'm saying if -- if a deputy feels that there's**

5    **a risk of harm to the deputy, other inmates or other deputies, is**

6    **it appropriate for them to -- to arm their taser?**

7              MS. PARKS:  Same objection.

8         A:  Depending on the circumstances.

9         **Q:  Okay.  Did you ever give Deputy Erwine an**

10   **opportunity to respond to the allegations here by Deputy Jabines**

11   **in writing?**

12        A:  No.

13        **Q:  All right.  And this was the day after the incident**

14   **involving Mr. Beaulieu; is that correct?**

15        A:  Uh, based on the date here, yes.

16        **Q:  Did you have any communications other than this**

17   **document with Deputy Jabines about this incident?**

18        A:  Um, yeah.  I received a call -- um, not remembering

19   if it was from her.  I'm looking at my memo.  It looks like it

20   was actually from Summers advising about this.

21        **Q:  So Sergeant Summers contacted you about this**

22   **incident with Deputy Jabines?**

23        A:  Correct.  I believe she contacted him.

24        **Q:  Okay.  And this is the day after Sergeant Summers**

25   **authored the memorandum in Exhibit 7 in which he accuses Deputy**

 1  Erwine of misconduct; is that right?

 2          A:  Yes.

 3          Q:  Okay.  Of improperly investigating the situation

 4  with the inmate Beaulieu; is that correct?

 5          A:  This looks to be the day after.

 6          Q:  Okay.  All right.  I want you to turn to what's

 7  been marked as Exhibit No. 12.

 8          A:  Okay.

 9          Q:  Do you recognize this document?

10          A:  Um, I recognize what it is, yes.

11          Q:  Okay.  What is it?

12          A:  Uh, this would be a software report on a taser for

13  -- which would -- essentially, the tasers document or use

14  internally.  And then when you plug them into the specific

15  software relevant to them, you can get a report like this

16  generated.

17          Q:  Okay.  So do you know whether the taser that's --

18  what the log is indicated here, do you know whether this was Mr.

19  Erwine's taser?

20          A:  Uh, there was no specific taser assigned to, uh,

21  detention deputies.  There was, um -- we didn't have enough

22  tasers, so there was, like, I think, three tasers, maybe, in the

23  jail, two or three.  And so you just come in and pick one when

24  you begin --

25          Q:  Did you ever ask --

1          A:  -- your --

2          Q:  I'm sorry.  Go ahead.

3          A:  When you begin your shift.

4          Q:  Did you ever ask Mr. Erwine which taser he was

5    carrying at the time of the incident with Mr. Maes?

6          A:  I did not.

7          Q:  Okay.  And so just so I understand, when a deputy

8    comes on shift, you have three tasers there.  You pick one up.

9    You carry it with you during your shift.  And then when your

10   shift is over, you put it back; is that right?

11         A:  That's how it would work if you're not assigned

12   one.

13         Q:  So did you ever verify whether Mr. Erwine actually

14   fired his taser on the date in question with Mr.- -- Mr. Maes?

15         A:  Uh, that's what this report does, and that's also

16   what my understanding of the video review did.

17         Q:  Okay.  So there was a video of this incident?

18         A:  Yes.

19         Q:  Did you review that video?

20         A:  I did not.

21         Q:  Okay.  So do you have any, you know, personal

22   knowledge that the taser listed here was the one Mr. Erwine was

23   actually carrying that day?

24         A:  I believe it was listed in a memo, one of those

25   memos.  But no, I don't specifically know how we -- how are Mr.

1  Orozco, or Sergeant Orozco, uh, got that specific taser.

2          **Q:  Sergeant Orozco?**

3          A:  Yeah.  Sergeant Lee Orozco developed this, uh,

4  software report.

5          **Q:  Okay.**

6                  MS. PARKS:  Okay.  I need a short break.  Five

7  minutes?  I just need --

8                  MR. BUSBY:  Okay.

9                  MS. PARKS:  -- to go to the ladies' room, if we

10  can take a short break.

11                 MR. BUSBY:  Fair enough.

12                 MR. IVEY:  Okay.  We're going off the record.  The

13  time is 12:00 o'clock p.m.

14                 MR. IVEY:  We're back on the record in the matter

15  of Michael Erwine v.  Churchill County, et al., in the deposition

16  of Benjamin Daniel Trotter.  The time is 12:05 p.m.  Go ahead,

17  Luke.

18                 MR. BUSBY:  Okay.  Thank you.

19         **Q:  Mr. Trotter, when we left off we were talking about**

20  **Exhibit 12, which is the Axon document describing, you know, what**

21  **happened with a particular taser at the jail.  So this report was**

22  **generated by Officer Orozco.  Is that how you say it?**

23         A:  Orozco, yes.

24         **Q:  Orozco.  Okay.  And do you know whether Orozco**

25  **determined that this was actually Mr. Erwine's taser that he was**

1  using that day?

2          A:  Um, as I said, the, uh, tasers aren't really

3  assigned to anybody specific.  I don't know how it was determined

4  that, um -- well, I actually -- it seems to me that they were all

5  checked for use, that the jail tasers were checked for use.  If I

6  remember, my memo said that the other two tasers at the --

7  current -- at the jail currently did not show a test fire anytime

8  near the time of this one.  And so he must have checked all three

9  of them.

10         Q:  Okay.  So it looks like this device was fired on

11  "October 7th at 5:47"; is that right?

12         A:  It looks right.

13         Q:  "October 9th at 5:46"; is that right?

14         A:  Correct.

15         Q:  Okay.  So, I mean, how often were you -- were you

16  -- would a deputy been using a taser at the jail, or firing?

17         A:  Well, and here -- here's going to be a slight

18  speculation, but October 7th and October 9th, both of those

19  appear to be right at the beginning of a day shift.  So whoever

20  tested those, and -- typically, you're supposed to come in,

21  activate the taser, remove the cartridge, do a test fire for a

22  second to verify that the battery is still good.

23         Q:  Okay.

24         A:  Um, and so that would -- those would -- those two

25  would probably have been done at the beginning of a shift, um, by

1  a conscientious employee.

2          Q:  Okay.  And the allegation is that in Deputy

3  Jabines' memo in Exhibit 11, that Erwine fired his taser and

4  pointed it at Maes, right?

5          A:  Correct.

6          Q:  And that would have taken a few seconds, right?  At

7  least?

8          A:  Um, if you have it pointed and you just pull the

9  trigger, you can do that for a second, just like you would be --

10 do if you were just testing the battery.

11         Q:  Okay.  So -- but when it's in the fire mode, when

12 it's ready to be sh- -- to be deployed, isn't it recording how

13 long it's ready to be deployed?

14         A:  No.  It deploys how long it's discharged.

15         Q:  Okay.  So when you just activate it, it says fired

16 for one seconds; is that right?

17         A:  If you activate it for one second, you can fire it

18 and then turn it off.

19         Q:  Okay.

20         A:  So you do not -- the actual tur- -- uh, time before

21 it turns itself off is seven seconds.  Um --

22         Q:  Okay.

23         A:  -- so you -- but you can't manually turn them off.

24 So you don't have to do what we call the full ride, you know,

25 full seven-second ride, um, on the taser.

1          Q:  Okay.  Do you see here in Exhibit 12 -- I mean,

2   there is a star marked in number 3 there, right?

3          A:  Yes.

4          Q:  Did you put that there?

5          A:  I did not.

6          Q:  Okay.  Do you know who did?

7          A:  I don't.

8          Q:  Okay.  But this is allegedly when Mr. Erwine lit up

9   his taser and pointed it at Maes, right?

10             MS. PARKS:  Objection.  Asked and answered.

11         A:  That's what it appears to be.

12         Q:  Do you see where it's says "duration, one second"?

13         A:  Yes.

14         Q:  Okay.  All right.  All right.  Do you remember

15  whether Mr. Erwine was wearing a taser on -- at the October 10th,

16  2016 meeting when he resigned?

17         A:  I don't specifically remember.

18         Q:  Okay.  All right.  So turning to Exhibit 13.  Do

19  you recognize this document?

20         A:  Yes.

21         Q:  Okay.  What is this?

22         A:  This is an Employee Action for standard document

23  used by the County to, uh, document various employee pay, higher,

24  promotion-related activities.

25         Q:  Okay.  Is that your signature at the bottom there?

1          A:  Yes.

2          Q:  Okay.  And under "employee signature," it says,

3   "Not available to sign"; is that correct?

4          A:  Correct.

5          Q:  Okay.  And this is basically the paperwork involved

6   with terminating Mr. Erwine's employment from the County, right?

7          A:  It is the paperwork documenting his separation,

8   yes.

9          Q:  Okay.  And it was effective "10/10/2016," right?

10         A:  Yes.

11         Q:  Okay.  All right.  Turning to the next Exhibit No.

12   14.  Do you recognize this exhibit?

13         A:  Yes.

14         Q:  Did you write this?

15         A:  I typed it, yes.

16         Q:  Okay.  Is that your signature?

17         A:  Yes.

18         Q:  Okay.  And that's -- Mr. Erwine signed this in your

19   presence?

20         A:  Yes.

21         Q:  And Mr. Matheson, Captain Matheson, signed this in

22   your presence?

23         A:  We were all present at the same time.

24         Q:  Okay.  Do you recall calling Mr. Erwine into your

25   office on October 10, 2016?

1        A:  Uh, you kind of --

2        Q:  I'm sorry.

3        A:  [Overlapped Talking]

4        Q:  Do you recall -- I'll repeat it.  Do you recall

5   summoning Mr. Erwine to your office on October 10th, 2016?

6        A:  I don't believe we went to my office.

7        Q:  Okay.  Do you --

8        A:  I believe --

9        Q:  -- know where you were?

10       A:  -- we went to one of the sergeants' offices at the

11   sh- -- over by the jail.

12       Q:  Okay.  Was there a recording device in that office?

13       A:  No.

14       Q:  Okay.  Did you make a recording of this meeting

15   with Mr. Erwine?

16       A:  I did not.

17       Q:  Do you know whether anybody else made a recording

18   of this interview with Mr. Erwine?

19       A:  I do not.

20       Q:  Okay.  Did you determine whether or not you were

21   going to terminate Mr. employ- -- Mr. Erwine's employment with

22   the County before you had this meeting?

23       A:  Yes.

24       Q:  Well, so you had already determined that you were

25   going to fire him?

1          A:  I determined we were going to offer him an

2  opportunity to resign or he would probably be terminated.  Well,

3  he --

4          **Q:  Okay.**

5          A:  -- would be terminated.

6          **Q:  So when he came into the room, you gave him a**

7  **choice, "Resign or you're terminated." Is that a fair**

8  **characterization of what you told him?**

9          A:  I can't remember what I necessarily told him.  I'm

10  pretty sure it was not that short.  Um, but yes, that was the

11  options.

12          **Q:  Okay.  Did Mr. Erwine have any notice of this**

13  **meeting before it occurred?**

14          A:  No.

15          **Q:  Okay.**

16          A:  Well, okay.  I'm going to quantify that.  He was

17  not given notice that he was going to be either resigning or

18  terminated, so he did not know that I was bringing this letter of

19  separation.

20          **Q:  Okay.  Did you dis- -- discuss with him the**

21  **incidents with Beaulieu or Maes before you terminated him?**

22          A:  I don't specifically remember the conversation.

23          **Q:  Okay.  Did you give him an opportunity to justify**

24  **what he'd done --**

25          A:  I --

1      Q:  -- before you terminated him?

2      A:  -- don't specifically remember how the conversation

3  went.

4      Q:  Okay.  All right.  Did you tell him he wouldn't be

5  entitled to any of his benefits, or any other pay, or anything

6  like that if he refused to resign?

7      A:  No. I don't believe that was ever part of the

8  conversation.  But I -- once again, I don't remember exactly what

9  it was.  That is not something I would typically have actually

10  had memorized.

11      Q:  Okay.  Just as a general -- based on your general

12  knowledge of how employee situations, you know, at the sheriff's

13  office worked, was there a difference in between what a -- a

14  deputy would receive when they resigned as opposed to when they

15  were fired?

16      A:  Um, I don't know about that.  I -- I think they're

17  probably, you know, kinda dependent on how long you were there.

18  The County had some policies and still has some policies in

19  relation to whether you get paid out sick time, um, and things of

20  that sort.  Um, I mean, the option between resigning and being

21  terminated, it was more about what you can put on your next job

22  application.

23      Q:  Okay.  All right.  Let's take a look at what's been

24  marked as Exhibit No. 15.

25      A:  Okay.

1      Q:  Do you recognize this document?

2      A:  Yes.

3      Q:  Okay.  What is it?

4      A:  It's a memorandum I did on the day of separation.

5      Q:  Okay.  And there are several allegations against

6  Mr. Erwine that are included in this document; is that right?

7      A:  Yes.

8      Q:  Okay.  "Failure to follow proper chain of command."

9  Is that right?

10     A:  Yes.

11     Q:  "Conduct unbecoming of a deputy and unjustifiable

12  use of force." Is that correct?

13     A:  Yes.

14     Q:  Okay.  So those are the two major categories of --

15  of the allegations against him; is that right?

16     A:  In this document, yes.

17     Q:  Okay.  So -- so you described here that --

18  generally that -- what happened with Mr. Beaulieu at the

19  beginning, right?  On October 8th, 2016?  But -- and it says here

20  that, "I texted Sergeant Summers after we had a short telephone

21  conversation that we needed Thompson to write what he saw Erwine

22  doing." Is that right?

23     A:  Um, where are you seeing this?

24     Q:  I'm seeing that on the -- the one, two, three, four

25  -- the fifth paragraph, under the "Failure to follow proper chain

1  of command," allegation.

2          A:  Um --

3          Q:  **I'm sorry.**

4              MR. BUSBY:  Mark, this is Exhibit 15.

5          A:  Yeah, Exhibit 15.  Are you on page 53 or 54?

6          Q:  **53.**

7              MR. IVEY:  Sorry, Luke.  Let me pull that up on.

8  For some reason, it wasn't loaded.  One second --

9              MR. BUSBY:  Okay.

10             MR. IVEY:  -- please.

11         A:  And I do see where you are, um, mentioning that I

12 texted Sergeant Summers' back.

13         Q:  **Okay.  Did you retain those text messages?**

14         A:  I don't even have that phone anymore, no.

15         Q:  **Okay.  Was that your phone that was issued by the**

16 **sheriff's office?**

17         A:  Yes.

18         Q:  **Okay.  Does the sheriff's office still have that**

19 **phone?**

20         A:  Doubtful.  It's been some years.

21         Q:  **Okay.  Did you guys have a policy about preserving**

22 **and not preserving text message communications on devices that**

23 **are used by Churchill County Sheriff's Office employees at that**

24 **time?**

25         A:  No.

1      Q:  Do you remember what -- what the exchange in those

2  text messages was about?

3      A:  I have to base it on what's in this memo.  So I

4  don't specifically remember.  Um --

5      Q:  Okay.  So the -- the italicized text there, right?

6  Is -- it states that that's a not  verbatim copy of the text you

7  received from Sergeant Summers, right?

8      A:  Yes.  But I -- I believe it's pretty verbatim, but

9  putting "not verbatim" in case I mistype.

10     Q:  Okay.

11     A:  So -- and the italicized text here states that --

12  in the second sentence, "I was told today that Deputy Erwine went

13  over all the video footage for the inmate and started his own

14  hidden Word document on the incident." Is that right?

15     A:  Uh, that's what that reads, yes.

16     Q:  Okay.  So where you discussed the propriety of the

17  deputy reviewing video footage, did you verify whether Erwine had

18  created a hidden Word document?

19     A:  Uh, that's one of these exhibits, um --

20     Q:  Okay.

21     A:  -- that Sergeant Summers -- uh, Sergeant Nuckolls

22  found.

23     Q:  Okay.  Well, how did he hide it?

24     A:  Oh, I don't know.

25     Q:  Okay.  But you already said that these are

1  computers that the deputy sheriff, they're computers that are

2  owned by the sheriff's office, right?

3           A:  Yes.  There's, I think, two computers used by the

4  detention deputies.

5           Q:  Okay.  Okay.  Do you see the paragraph that starts

6  with, "I had Sergeant Nuckolls, who performs IT for our agency,

7  come into work on his day off and attempt to find this 'hidden

8  Word document' on the jail desktop computers."?

9           A:  I see that.

10          Q:  Okay.  So -- and that document was attached to his

11 report?

12          A:  Um, I've -- it in -- I indicated that, yes.

13          Q:  Okay.  So was that the document in -- that's been

14 marked here as Exhibit 10?  Is that the same document you're

15 referring to here in your report in Exhibit 15?

16          A:  Yes.  I believe that's the same document.

17          Q:  Okay.  So why -- why refer to the document as a

18 hidden Word document?  What about it was hidden?

19          A:  Well, that was in quotes from, um -- because that's

20 what Mr. Summers, uh, had said -- had called it.

21          Q:  Okay.  Did you ever find out how it was hidden?

22          A:  No.

23          Q:  Okay.  So in the next paragraph, do you see where

24 it states, "Erwine's document does not once detail the actions

25 and behavior of the inmate.  It solely focuses on the fact that

1  the inmate was not given water for two hours after he asked for

2  it."?

3          A:  I see that.

4          Q:  Okay.  So -- so wh- -- why did you put that in

5  there?

6          A:  Well, typically, I would think if you did an

7  investigation, you would put all the information in.  Not just

8  the information that maybe supports your cause, I guess.  But

9  maybe once --

10         Q:  I'm sorry.

11         A:  [Overlapped Talking]

12         Q:  I'm sorry.  I didn't hear that.  Your what?

13         A:  Your cause.

14         Q:  Okay.

15         A:  Why -- why you're looking at something.

16         Q:  Well, how did you know why Mr. Erwine was looking

17  into this situation?

18         A:  Oh, I can't read his mind.  I didn't know that.

19             MS. PARKS:  Vague and ambiguous.

20         Q:  Okay.

21             MR. BUSBY:  I'm sorry.  Kathy, that was fuzzy.

22             MR. TROTTER:  Was there an objection there?  I

23  didn't hear that.

24             MS. PARKS:  Yes.  There was an objection that that

25  was vague and ambiguous.  The question, I didn't understand it.

1              MR. TROTTER:  Okay.

2              MR. BUSBY:  Okay.

3         Q:  So and -- I mean, there's several allegations here

4   about the way Mr. Erwine handled the situation with Beaulieu,

5   right?

6         A:  Was there a question there?

7         Q:  I'm just asking you whether that's a correct

8   characterization of what's in the document.

9         A:  Um, yes.

10        Q:  Okay.  Do you recall in Sergeant Summers'

11  memorandum in Exhibit 7 where Sergeant Summers asked Erwine about

12  what happened and Erwine told him?

13        A:  I'd have to go back to Exhibit 7 and look.

14        Q:  Okay.

15        A:  Should I do that?

16        Q:  No. I just want you --

17        A:  Okay.

18        Q:  Keep going if you don't mind.  So you say here that

19  you don't de- -- you -- you never detailed the actions that

20  Erwine -- one of your complaints about what he did was he never

21  detailed the actions of Beaulieu, right?

22        A:  Okay.

23        Q:  So, I mean, I'm -- I'm just trying to get a sense

24  of what your meaning was here.  I mean, was it your impression

25  that Erwine was out to get his -- his, you know, his employer and

1  his for- -- fellow employees by being an -- an unfair advocate

2  for Beaulieu?

3          A:  Um, it was a concern.

4          Q:  Okay.  Do you see in Exhibits 10 where it states

5  numerous times that Beaulieu was hitting the door of the security

6  cell and that he was aggravated?

7          A:  I'd have to go back to Exhibit 10.

8          Q:  Okay.  Did you see any other -- other video of the

9  incident of Beaulieu, like, in your review of what happened with

10 Mr. Erwine and Mr. Beaulieu, such as the interview that Erwine

11 did in the kitchen at the jail?

12         A:  I did not watch any video from the jail.

13         Q:  Okay.  So was Sergeant Summers Mr. Erwine's superv-

14 -- supervisor on the shift where the incident with Mr. Beaulieu

15 occurred?

16         A:  I don't remember who the supervisor was.

17         Q:  Okay.  As a sergeant, was Mr. Summers Mr. Erwine's

18 supervisor, generally?

19         A:  If they were -- yes, generally, if they were on the

20 same shift.

21         Q:  And Sergeant Summers' memorandum in Exhibit 7

22 states that he and Erwine discussed the incident with Beaulieu,

23 right?

24         A:  Once again, I'd have to go back and look at 7.  I'd

25 -- I'll have to take your word for that at this point.  I just

1  don't -- I just saw these yesterday, so I don't have them, uh --

2          Q:  Okay.

3          A:  -- uh, taken to heart yet.  So -- okay.  So I do

4  see where, in Exhibit 7, um, Sergeant Summers indicates that he

5  pulled him into his office and asked him if he had issues or

6  something of that sort.

7          Q:  Okay.  I'd like you to take a look at the items of

8  concern in Exhibit 15 on page 54.

9          A:  Okay.

10          Q:  Do you see where it says, "An item of concern is

11  that Deputy Erwine is a probationary employee and does not have

12  authority to conduct his own personal" -- "personnel

13  investigations."?

14          A:  Correct.  I see that.

15          Q:  Were you ever told by Deputy Erwine that he was

16  conducting a personnel investigation?

17          A:  No.

18          Q:  Okay.  Do you see where it says, "Deputy Erwine has

19  never brought his concerns to a supervisor or attempted to

20  present his investigative findings."?

21          A:  I see that.

22          Q:  Okay.  Well, he was fired two days after this

23  occurred, right?

24          A:  Um, yes.  He was -- he resigned two days after this

25  occurred.

1          Q:  Okay.  And he did discuss his concerns with

2    Sergeant Summers who was his supervisor on shift that day, right?

3          A:  It appears so.

4          Q:  Okay.  And then you say, "His investigative report

5    mentions nothing about the behavior of Beaulieu, even that which

6    was initially directed towards him." But as we discussed, Erwine

7    noted in his, you know, Word document that Beaulieu was banging

8    on the door and yelling, right?

9          A:  I --

10          MS. PARKS:  You're asking if that's what was noted

11    in -- in Mr. Erwine's document?

12          MR. BUSBY:  Yes.

13          A:  Yes, that was noted in his documents.

14          Q:  Okay.  And then the last bullet point says, "I also

15    find substantial concern that Deputy Erwine's investigation seems

16    to have found and confirmed what Beaulieu alleged, that grave

17    shift would flush the floor toilet and laugh when Beaulieu would

18    yell for water.  This will be investigated further and separately

19    from this topic."

20          A:  I see that.

21          Q:  Okay.  So did you conduct an investigation of what

22    happened with Mr. Beaulieu?

23          A:  I did not conduct an investigation.

24          Q:  Did anyone else at the sheriff's office conduct an

25    investigation, to your knowledge?

1          A:  Captain Matheson would have been the one to conduct

2   that investigation.

3          **Q:  Okay.  So do you -- are you aware of whether he**

4   **conducted that investigation?**

5          A:  I am -- I believe, I remember, but I would have to

6   just guess that I got information back that it had been done.

7   And I don't know what that information was.

8          **Q:  Okay.  Was it in writing?**

9          A:  I don't believe it amounted to needing to be in

10  writing.  Um, but I don't know.

11         **Q:  Okay.**

12         A:  And I -- you know, if it's of any use, um, I was

13  the sheriff.  So I was part of the appeals process in

14  investigations.  So I did not personally conduct them.

15         **Q:  Okay.**

16         A:  Just so --

17         **Q:  So if you became aware of misconduct within your**

18  **agency, you would report it to the captain, or some other person**

19  **who would do the investigation and report it to somebody else; is**

20  **that right?**

21         A:  Correct.

22         **Q:  Okay.  But here you're -- you're basically saying**

23  **that an investigation of what happened to Mr. Beaulieu would take**

24  **place; is that right?**

25         A:  I can't --

1              MS. PARKS:  I --

2         A:  -- hear the end of your sentence.

3         Q:  Oh, I'm sorry.  In this document you're saying that

4    an investigation of what occurred with Mr. Beaulieu would take

5    place?

6         A:  Yes.

7         Q:  Did you order Matheson to conduct such an

8    investigation?

9         A:  Quite certain I did.

10        Q:  All right.  Let's turn to the second allegation.

11   Actually, I'm sorry, backing up just one more sec- -- one more

12   second.  Are you aware of whether anybody from the department

13   interviewed Mr. Beaulieu about what happened to him on October 8,

14   2016 at the jail?

15        A:  I am not.

16        Q:  Okay.  Did anybody -- are you aware of whether

17   anybody interviewed Mr. Erwine about it?

18        A:  I am not.

19        Q:  So turning to the next allegation on "Conduct

20   unbecoming of the deputy and unjustifiable use of force." And

21   there's another text year from Sergeant Summers in -- in the

22   italicized texture; is that correct?

23        A:  Correct.

24        Q:  Okay.  And this is the day after you received a

25   text from Summers the day before about the incident with

 1  Beaulieu, right?

 2          A:  It appears to be the day after.

 3          Q:  Okay.  Do you see where it says, "Erwine pulled his

 4  taser and pointed it at inmate, pulled cartridge off, pointed it

 5  again at inmate, and discharged it while laughing."?

 6          A:  I see that.

 7          Q:  Okay.  What do you -- what does that mean by

 8  "discharged"?

 9          A:  That is firing a taser when you pull the trigger

10  and make it spark.

11          Q:  Okay.  Is that an inappropriate way to check to see

12  if it's working?

13          A:  Yes.

14          Q:  Okay.  Do you see where it says, "Can I go into

15  work and just send him home over this incident?"

16          A:  I didn't hear at the end of that, but I do see that

17  sentence.

18          Q:  Okay.  "Don't want him accidentally blinding our

19  trustee."?

20          A:  I see that.

21          Q:  Okay.  What does that mean?

22          A:  Well, tasers, when you turn them on active and they

23  have the cartridge in, they have been known to spontaneously

24  discharge.  Um, and that puts out two fishhook-like probes.  Uh,

25  certainly could blind somebody.

1          Q:   And by "trustee," he means an inmate at the jail?

2          A:   Yes.

3          Q:   Okay.

4          A:   Um, those who are designated trustees to get to do

5   certain duties --

6          Q:   [Overlapped Talking]

7          A:   -- around the jail.

8          Q:   Okay.  Can you ask about --

9          A:   They --

10         Q:   I'm sorry.

11         A:   They earn money for it.

12         Q:   I'm sorry.  Go ahead.

13         A:   They earn a little money for it.  Trustees do.

14         Q:   Oh, okay.  So -- and after you received this text

15   from Sergeant Summers, it indicates here that you requested a

16   report from Deputy Jabines, right?

17         A:   Yes.

18         Q:   Okay.  And you inquired about a video; is that

19   right?

20         A:   Yes.

21         Q:   Okay.  Did you ever receive a copy of the video?

22         A:   I did not.

23         Q:   Okay.

24         A:   I inquired whether there would be one.

25         Q:   Do you agree that the video would have confirmed or

1  denied the allegations about what happened here with Mr. Maes?

2        A:  In part.  Um --

3        Q:  Okay.

4        A:  -- this occurred in the booking cage.  So if the

5  audio was not turned on, um, there may not have been an actual

6  audio sound.

7        Q:  Okay.  It states next, "I called Dispatcher Jerilyn

8  Whitaker and asked her if she'd heard a taser being deployed in

9  the cage.  She had not."

10        A:  I see that.

11        Q:  Okay.  So did you do any further investigation

12  about the facts underlying the accusation that, you know, Erwine

13  deployed his taser in the cage?

14        A:  I did not.

15        Q:  Okay.  Do you see at 16:13 hours, Summers texted

16  you, "Had Deputy Mike give his check camera footage?  He said at

17  9:04, Sheriff Erwine light up his taser with the trustee in his

18  cage."?

19        A:  I see that.

20        Q:  Okay.  So did -- you never discussed this incident

21  with Mr. Maes?

22        A:  With who?

23        Q:  Maes, the inmate?

24           MS. PARKS:  Asked and answered.

25        A:  No, I did not.

1            Q:  And you never discussed this incident with Mr.

2   Erwine of --

3                MS. PARKS:  Objection.  Asked and answered.

4            A:  I believe I answered that about the, uh, separation

5   interview.

6            Q:  Okay.  So let's turn to the bullet point "Items of

7   concern" here.

8            A:  Okay.

9            Q:  Item number one, you state, "This is unprofessional

10  behavior."

11           A:  I see that.

12           Q:  And that's on page 55, ERW55.  Okay.  And then you

13  state, "This creates civil liability for this agency now or for

14  sometime in the future should Inmate Maes elect to pursue civil

15  action," right?

16           A:  I -- I see that.

17           Q:  So at the time you wrote this, you were aware that

18  there was potential pursuable action involving the matter with

19  Mr. Maes?

20           A:  Involving Mr. Maes?

21           Q:  Yeah.

22           A:  Um, sure.

23           Q:  How about --

24           A:  Anytime --

25           Q:  Okay.

1          A:  Anytime you use force -- anytime you use force

2    there could be civil action.

3          **Q:  Okay.  How about for Mr. Beaulieu?  Were you --**

4    **well, were you concerned about potential liability for the agency**

5    **and that Mr. Beaulieu might elect to pursue civil action?**

6          A:  After the, um, investigation into what actually

7    occurred, I was not concerned about the civil liability but that

8    you could still face civil action whether you end up liable or

9    not.

10         **Q:  Okay.  But you were concerned that Beaulieu might**

11   **con- -- might pursue a civil action against the agency?**

12         A:  Yes.

13         **Q:  Okay.  You state here, "Deputy Erwine clearly**

14   **violated our policies on tasers and use of force."**

15         A:  I see that.

16         **Q:  What was the policy on tasers that he violated?**

17         A:  Well, it was -- we have a Use of Force policy and

18   we have a taser policy at the sheriff's office.  I believe you've

19   included one of those in your exhibits.  Um, I don't have those

20   in front of me, so I can't really, um, recite the policy.

21         **Q:  Okay.  Was there a taser policy?**

22         A:  I don't specifically remember.

23         **Q:  Okay.**

24         A:  Um, there -- I'm -- I'm gonna suppose there

25   probably was.  But --

1          MS. PARKS: Don't guess.

2          A: -- once again -- once again, I'm supposing, so I'm

3  -- I don't know.

4          MS. PARKS: It is what you recall. Don't guess.

5          A: So I don't recall whether we had a specific policy

6  for tasers or if it was part of the Use of Force policy.

7          **Q: Okay. And do you think it's fair to say that Mr.**

8  **Erwine used force on Mr. Maes?**

9          A: Based on the information, yes.

10         **Q: Okay. Can you explain what you mean by that?**

11         A: Well, uh, in our trainings over my career, you

12 showing up, it -- your presence is a use of force, your voice is

13 a use of force, your hands are a use of force, pointing a taser

14 at someone is a use of force, turning the taser on is another

15 step in that use of force.

16 Um, activating or discharging it, it's another step in that use

17 of force. So it all -- it's continuum. It starts at the bottom

18 with you showing up, presence, and it ends at deadly force. And

19 so --

20         **Q: Okay.**

21         A: -- certainly pointing a taser would be a use of

22 force.

23         **Q: So do you indicate in this document which Use of**

24 **Force policy Mr. Erwine violated?**

25         A: I don't have it in that sentence that you were

 1  reading.

 2          Q:  **Is it anywhere here?**

 3          A:  I don't specifically see it.

 4          Q:  **Okay.  And that's true for the taser policy as**

 5  **well, right?**

 6          A:  Correct.

 7          Q:  **Okay.  And what about behavior standards?  What**

 8  **behavior standards did he violate?**

 9              MS. PARKS:  Luke, I can't hear.  You keep --

10              MR. BUSBY:  I'm sorry.

11              MS. PARKS:  -- fading out.

12          Q:  **The behavior standards provision.  Was there a**

13  **behavior standard policy that was in writing at the sheriff's**

14  **office at the time he was employed there?**

15          A:  I'm going to say that most of our policies are

16  behavior standard policies.

17          Q:  **Okay.**

18          A:  Um --

19          Q:  **But this doesn't indicate which specific behavior**

20  **standard policy he violated, right?**

21          A:  I do see that it does not.

22          Q:  **Okay.  Turning to the next sentence -- well, just**

23  **-- just one second.  So do you have any knowledge of what**

24  **happened to the video of the incident involving Mr. Beaulieu?**

25          A:  Um, no, I don't.  But I can tell you that we've --

1  we're in a completely different facility now.  Uh, the -- so the

2  video system is changed.  Um --

3              Q:  Okay.

4              A:  -- our video system in the jail, the hard drive, I

5  believe, it would start, like, eliminating stuff after a certain

6  period of time 'cause of the size of the hard drive.  Um, so it

7  -- I don't know specifically what that time frame was.  It

8  could've been 30 or 60 days.  I think that's what we went for in

9  the new facility was, I think -- I believe 60 days.  I was

10 involved in that process.

11             Q:  Okay.  Would the same go for the videotape of this

12 -- the situation involving Mr. Erwine and Mr. Maes?

13             A:  It would.

14             Q:  Okay.  To your knowledge, were those videos

15 deleted?

16             A:  I don't believe there was a way to go in and delete

17 them.  The system would auto delete them after a period of time.

18             Q:  Okay.  Was there a way you could preserve them if

19 you needed them for a court case or something like that?

20             A:  There was.

21             Q:  Okay.  Are you aware of whether these videos were

22 preserved?

23             A:  I'm not aware of that.

24             Q:  Okay.  You didn't keep a copy of the videos in your

25 file?

1           A:  I did not.

2           Q:  Okay.  Are you aware of whether copies of these

3    videos were kept in the files of either Mr. Beaulieu or Mr. Maes?

4               MS. PARKS:  Objection.  Asked and answered.

5           A:  I'm not.

6           Q:  Okay.  All right.  Turning to the second to last

7    paragraph here, it states, "Following my recent positive and

8    encouraging counseling sessions with Deputy Erwine." So you were

9    having counseling sessions with Erwine?

10          A:  I had one, yes.

11          Q:  Okay.  And you say it was positive and encouraging,

12   right?

13          A:  I felt -- I felt so.

14          Q:  Okay.  So, I mean, does that mean his performance

15   as a deputy was a improving?

16          A:  Uh, not necessarily.

17          Q:  Okay.  What was --

18          A:  This was --

19          Q:  I'm sorry.  Go ahead.

20          A:  This was two days prior -- uh, actually three days

21   prior to separation.  And the day before the Bay- -- what --

22   however he pronounce his -- Beaulieu incident and two days before

23   the taser incident.

24          Q:  Okay.  What was positive about the counsng session?

25          A:  Well, I had gone in, and I'd been hearing

1  perpetually things coming back, be it my captains, sergeants, and

2  things, about Mr. Erwine for quite some time.  And, um, I heard

3  he was really discouraged.  So I wanted to go in and just see if

4  there was anything I could do to help him out, see if I-- there

5  was anything I could do to -- oh, I don't know.  Um, uh, uh,

6  we're too small an agency to not try to salvage people.

7  We lost people to, uh, age  ncies that paid better, uh, all the

8  time.  Mr. Erwine was hired under a time when we had lost, I

9  think, one to somebody in Washington and three to Sparks because

10 of pay.  Um, and so, uh, I -- I really wanted to salvage my staff

11 and to be able to keep them, and help them succeed, and so that's

12 what I did.  I went over, and met with --

13          Q:  So --

14          A:  -- Mr. Erwine.

15          Q:  I mean, it sounds like the sentence that you had a

16 good talk about his job and the situation there; is that -- is

17 that fair?

18          A:  Yeah.  Uh, I, uh -- not 100 percent sure how

19 effective it was, but I believed it went well.  I believed that

20 we understood what we were talking about when we left the -- the

21 meeting.  I thought it --

22          Q:  Okay.

23          A:  -- was positive.

24          Q:  Okay.  What was your impression about whether, you

25 know, Mike really wanted to be a cop?

1          A:  Um, I believe he did.

2          **Q:  Okay.**

3          A:  He interviewed well when we hired him.

4          **Q:  So he's enthusiastic.  He wanted to -- you know, he**

5   **wanted to be -- get into law enforcement.  He'd spent plenty of**

6   **time going to school for it.  It was basically a dream job,**

7   **right?**

8              MS. PARKS:  Objection.  Calls for speculation.

9   Asked and answered.

10         A:  I can't, you know, assess his mental status or

11  mental state about it.  All I know is he had put in the work.

12         **Q:  Okay.  Do you remember at that meeting at the**

13  **recent positive and encouraging counseling session, Mr. Erwine**

14  **discussing some of his concerns about Sergeant Summers' with you?**

15         A:  I don't specifically remember.  I did do a -- a

16  notation about this meeting after the fact.  Um, I'd have to look

17  at that, see if it addresses that.  But I don't specifically

18  remember much --

19         **Q:  Okay.  I don't think --**

20         A:  -- of --

21         **Q:  -- we have been provided with a notation of that --**

22             MS. PARKS:  You have.

23         **Q:  [Overlapped Talking]**

24             MS. PARKS:  They're -- they're -- they've been

25  produced.  It's counseling session notes from several days prior

1  to the 10th of October.

2                MR. BUSBY:  Okay.  Okay.

3        A:  I think --

4        **Q:  Do you recall saying he was doing a good job?**

5        A:   No. I don't recall that.

6        **Q:  All right.  Do you see where you state in Exhibit**

7  **15 at 55, "The cohesion of our detention division is being**

8  **jeopardized by Deputy Erwine's continued employment here."?**

9        A:  I see that.

10        **Q:  Okay.  What did you mean by that?**

11        A:  We're -- when we're working with a -- a staff of 13

12  or so people in a jail, which is just already problematic on its

13  own, tThe staff needs to be a team.  You have to be able to work

14  together.

15        **Q:  Okay.  But do you think it's a fair**

16  **characterization that Mr. Erwine was concerned about how Mr.**

17  **Beaulieu was treated, right?**

18                MS. PARKS:  Objection.  Asked and answered.

19        A:  I -- do I think it's a fair characterization that

20  he was concerned about that?

21        **Q:  Yeah.**

22        A:  Well --

23                MS. PARKS:  Objection.

24        A:  -- yes.

25        **Q:  And you state on ERW54, at the last bullet point**

1  that, "I find substantial concern that Deputy Erwine's

2  investigation seems to have found and confirmed what Beaulieu

3  alleged."

4              MS. PARKS:  Objection --

5         Q:  Is that correct?

6              MS. PARKS:  Objection.  Asked and answered.

7         A:  Where am I looking?

8         Q:  The last bullet point on --

9         A:  54?

10        Q:  -- page 54.

11        A:  Yes, I see that sentence.

12        Q:  Okay.  So based on those two sentences, do you

13 think it's a -- a reasonable conclusion that Mr. Erwine was fired

14 for discovering and then writing about alleged misconduct of his

15 fellow employees at the detention facility?

16        A:  No.

17        Q:  Okay.  All right.  Let's turn to Exhibit 16.

18        A:  Okay.

19        Q:  I -- just one more question about Exhibit 15, I'm

20 sorry.  We don't have to look at it, but -- so who was your

21 intended audience when he wrote the memorandum in Exhibit 15?

22        A:  I was.

23        Q:  Did you have any --

24        A:  I was --

25        Q:  -- knowledge about whether a future employer of Mr.

1  Erwine might see that document?

2          A:  It was not intended to be seen by others.  It was

3  just intended to remind me in case something like this came up

4  down the road.

5          Q:  Okay.

6          A:  I did not --

7          Q:  [Overlapped Talking]

8          A:  -- feel like --

9          Q:  I'm sorry.  Go ahead.

10         A:  I did not feel like keeping this in my personal

11  possession, um, was the way to do that.

12         Q:  So it was placed in Mr. Erwine's employee file?

13         A:  Yes.

14         Q:  All right.  I would like you to take a look at

15  Exhibit 16.

16         A:  Okay.

17         Q:  Do you recognize this document?

18         A:  No.

19         Q:  Okay.  You've never seen this before?

20         A:  Not until I saw it in the exhibits.

21         Q:  Okay.

22         A:  And the phone numbers on there would not be to the

23  sheriff's office.

24         Q:  Okay.  Do you think it's fair to characterize this

25  as a fax to -- from the Washoe County Sheriff's Office to the

1  Churchill County Sheriff's Office?

2        A:  Uh, it's not to the sheriff's office.  But yes, I

3  can see that it is a fax from the Washoe County Sheriff's Office.

4        Q:  And it's dated --

5        A:  It is not to Churchill County.

6        Q:  I'm sorry.  Go ahead.

7        A:  It is not to Churchill County.

8        Q:  Who is it to?

9        A:  Uh, uh, it's not to the Churchill County Sheriff's

10  Office.  It may be to, um, human resources.

11        Q:  Okay.  And it's dated "December 6th, 2016," at the

12  top there, right?

13        A:  Yes.

14        Q:  Okay.  Do you have any knowledge that Washoe County

15  ever requested any background information on Mr. Erwine from

16  Churchill County?

17        A:  I don't have any knowledge about that.

18        Q:  Okay.  Do you know who at Churchill County

19  responded to faxes like this that would come in about former

20  employees at the sheriff's office?

21        A:  Um, I don't.  Um, theoretically, it would be human

22  resources.

23        Q:  Okay.  Who -- who  ran the Human Resources at

24  Churchill County at this time?

25        A:  Geof Stark.  He still does.

1      Q:  Okay.  And how long has Mr. Stark been there, to

2  your knowledge?

3      A:  I don't know.  He's gotta -- he's gotta be around

4  20 years or more.

5      Q:  Okay.  All right.  So I think we're going to skip

6  over Exhibit 17, and I want you to look at Exhibit 18.  Do you

7  recognize this document?

8      A:  I should recognize what it is, yes.

9      Q:  Okay.  Is that your signature at the top there?

10      A:  It is.

11      Q:  Is this the policy that was in force at the time

12  Mr. Erwine was employed at -- employed at the sheriff's office?

13      A:  I would anticipate so.

14      Q:  Okay.  Would he have been provided a copy of this

15  when he was hired?

16      A:  When he was what?

17      Q:  When he was hired?

18      A:  Um, I don't -- I don't specifically remember how we

19  handled policy.  I believe there was -- we had them on the, uh,

20  um, intranet for the agency.

21      Q:  Okay.  Was he expected to comply with this policy?

22      A:  Yes.

23      Q:  All right.  Let's turn to Exhibit No. 19.  Do you

24  recognize this document?

25      A:  Yes.  It's the same way as the last.

1        Q:   Okay.  So that's your signature at the top there?

2        A:   Yes.

3        Q:   And this would be the Use of Force policy for the

4    jail at Churchill County at the time Mr. Erwine was employed

5    there; is that correct?

6        A:   Uh, I would expect so.

7        Q:   Okay.  All right.  How about Exhibit 20?

8        A:   Sorry.  I'm not that fast at flipping through

9    these, so --

10       Q:   Oh, it's okay.  Take your time.

11       A:   This is another policy from the sheriff's office.

12       Q:   Okay.  It doesn't look like this one is signed.

13   But to your knowledge, was this the retention -- record retention

14   maintenance policy of the sheriff's office at the time Mr. Erwine

15   worked there?

16       A:   Um, to my knowledge, yes.

17       Q:   Okay.  All right.  I'd like you to take a look at

18   what's been marked as Exhibit No. 21.

19       A:   Okay.

20       Q:   Did you review this prior to your deposition?

21       A:   Um, yes.  It's -- this e-mail?  Yes.

22       Q:   Okay.  And do you think it's fair to characterize

23   this is an e-mail from Jessica Zamora alleging some misconducts

24   on behalf of Sergeant Summers and how he treated an inmate, Sammy

25   Davis, at -- at the Churchill County jail?

 1            A:  That would be a fair characterization of the

 2  e-mail, yes.

 3            **Q:  Were you aware of the situation at the time it was**

 4  **occurring?**

 5                 MR. TROTTER:  I'm sorry.  I'm moving around.  My

 6  back is getting stilled [sic] up, so --

 7                 MR. BUSBY:  Oh, no.  No problem.  If you need a

 8  break at any time, just let me know.  And we can --

 9            A:  Um, I was not aware of the e-mail specifically.  I

10  was aware of the allegation.

11            **Q:  Okay.  What was your understanding of what the**

12  **allegation was?**

13            A:  I understood that, uh, uh, officer from the Fallon

14  police had complained to their supervisor about Sergeant Summer

15  [sic], um, on intaking a prisoner.

16            **Q:  Okay.  Did you receive any other complaints about**

17  **Sergeant Summers at the time he was employed with the sheriff's**

18  **office about how he treated inmates?**

19                 MS. PARKS:  Objection.  Relevance.

20            A:  And I would not specifically off the top of my head

21  know.

22            **Q:  Okay.**

23            A:  Um, I did handle plenty of complaints over -- I

24  mean --

25            **Q:  Yeah.**

1      A:  It is -- it goes with the job.

2      Q:  Okay.  So was an investigation conducted of this

3  complaint against Sergeant Summers?

4      A:  A fact check was, yes.

5      Q:  Okay.  And who did the fact check?

6      A:  Um, I would expect that I would've had Captain Mike

7  Matheson do that.

8      Q:  Okay.

9      A:  He was -- he was over the jail.

10     Q:  Okay.  Do you recall whether there were any

11 findings or conclusions that were reached about how Sammy Davis

12 was treated by Sergeant Summers?

13     A:  Not the specifics.  Um, I do have an impression

14 that it was found that it couldn't be verified what the noise was

15 that she was hearing.  And that it could've been the seat belt,

16 um, hitting the -- they had hard plastic seats in the back of

17 their cars.  Um, I don't really know.  Uh --

18     Q:  Okay.

19     A:  -- that's my -- that's just my recollection.  But

20 as my attorney keeps saying, I shouldn't be guessing.

21     Q:  Okay.  Fair enough.  I'm going to play an audio

22 clip for you.  I'm going to ask the deposition agent to play an

23 auto -- audio clip that's been marked as Exhibit 22.  And after

24 we'd listened to it, I will ask you some questions about it.

25 Okay?

1          A:  Sure.

2                  MR. BUSBY:  Okay.  Mr. Ivey, if you could please

3   play Exhibit 22 for the witness?

4                  MR. IVEY:  Yes.  One second, Luke.

5   (AUDIO PLAYED)

6          Q:  Okay.  Sheriff Trotter, do you recognize any of the

7   people whose voices are on that recording?

8          A:  Uh, the one I could hear was Shawn Summers.

9          Q:  Okay.

10         A:  The others were not loud enough.

11         Q:  Okay.  Was that the Sergeant Summers who worked at

12  Churchill County in the jail with Mr. Erwine?

13         A:  Yes.

14         Q:  Okay.  And you know his voice --

15         A:  Yes.

16         Q:  -- because you have worked with him for a long

17  time?

18         A:  Yes.

19         Q:  Okay.  All right.  I'm going to skip over Exhibit

20  23 and turn to Exhibit 24.

21         A:  24, you said?

22         Q:  24.  Yeah.  Do you recognize this document, Sheriff

23  Trotter?

24         A:  Oh, 24.  Okay.

25         Q:  Yeah.

1        A:  Sorry.  Uh, yes.  I just saw that yesterday.  Um --

2        Q:  Okay.  Before yesterday, you've never seen this

3   document before?

4        A:  Exhibit 24?  No.

5        Q:  Okay.  Do you see on page 2 of Exhibit 24 in

6   paragraph 13 where it states, ''Approximately two weeks after the

7   incident, I was told by Deputy Jabines that Deputy Erwine was

8   terminated from his employment with the Churchill County

9   Sheriff's Office because 'he was a rat'."?

10       A:  I see that.

11       Q:  Okay.  Did you ever hear anyone at the Churchill

12  County Sheriff's Office describing Mr. Erwine as a rat?

13       A:  I did not.

14       Q:  Okay.  All right.  I'd like you to take a look at

15  what's been marked as Exhibit 25.  Do you recognize this exhibit?

16       A:  No. I just saw it yesterday.  Um --

17       Q:  Okay.

18       A:  -- review.

19       Q:  So can you describe for me your impressions of

20  what's described in Exhibit 25?

21            MS. PARKS:  Objection.  Calls for a narrative

22  answer.  Calls for speculation as to the intent of the person

23  drafting this affidavit.

24       A:  Well, it appears to be a affidavit drafted by --

25  apparently by Mr. Beaulieu, um, about that incident that we've

1  talked about earlier.

2          Q:  Okay.

3          A:  And such -- and also, uh, approximately two years

4  after the fact.

5          Q:  Okay.  So do you think the information in Exhibits

6  25 or 24, if you had had that at the time you wrote your

7  memorandum in Exhibit 15, they may have influenced your decision

8  to terminate Mr. Erwine?

9              MS. PARKS:  Objection.  Lack of foundation.  Calls

10  for speculation.  Assumes facts not in evidence, including that

11  the information in Exhibits 25 and 26 [sic] is true.

12          A:  I mean, I -- I would have to, as indicated,

13  speculate on how this would even affect it or even if these had

14  -- would've been the same at that time.

15          Q:  Okay.  Well, I mean, my question is, basically, if

16  you'd had the informations, these two affidavits, would that have

17  influenced your decision or weighed on whether or not it was

18  appropriate for you to fire Mr. Erwine?

19              MS. PARKS:  Objection.  Calls for speculation.

20  Lack of foundation.  Assumes facts not in evidence.

21          A:  I would have taken these, uh, documents under

22  consideration, but it still would be a totality of the

23  circumstances on these specific incidents.  So I can't assume how

24  they would have mattered.

25          Q:  Okay.  So have you ever seen a memorandum like the

1  memorandum you authored in Exhibit 15 in a job application for

2  anybody who's seeking to be an officer for the Churchill County

3  Sheriff's Office?

4          A:  You -- you said Exhibit 15?

5          Q:  Yeah.  That's your memorandum, the October 10th

6  memorandum.

7          A:  Have I ever seen that in an application for someone

8  trying to get a job?

9          Q:  Yeah.  Have you ever seen an aff- -- a memorandum,

10  similar memorandum, in anyone else's application?

11              MS. PARKS:  I can't --

12          A:  No.  But I have also not, um --

13              MS. PARKS:  Wait.  Just a second, Ben.  I --

14  first, I can't hear Luke.  So I need you to repeat that question.

15              MR. BUSBY:  Okay.  Sure.

16          Q:  Have you ever seen a memorandum similar to the

17  memorandum in Exhibit 15 --

18              MS. PARKS:  Obje- --

19          Q:  I'm sorry, in anybody's file who had implied --

20  applied for employment at the Churchill County Sheriff's Office?

21              MS. PARKS:  An objection.  Calls for a

22  hypothetical of this witness.

23          A:  The answer is no.

24          Q:  Okay.  Would you agree that the information

25  contained in that memorandum, if true, would generally preclude

1  anyone from obtaining a law enforcement job with another state

2  agency in Nevada?

3              MS. PARKS:  Objection.  Calls for speculation.

4  Improper hypothetical.

5         A:  I don't know the answer to that.

6         Q:  Okay.  Is the information contained in your October

7  10th memorandum complimentary of Mr. Erwine?

8         A:  It's factual.

9         Q:  Okay.  But I'm asking you if it -- if it  portrays

10  him in a negative or positive light?

11        A:  I -- I would not say it's a positive.

12        Q:  Okay.  So anybody looking at that, any reasonable

13  person doing any background investigation of Mr. Erwine, having

14  seen that memorandum, might be dubious about offering him

15  employment as a police officer with their agency?

16             MS. PARKS:  Objection.  Vague and ambiguous.

17  Calls for speculation.  Improper hypothetical.

18        A:  It may influence their perspective of Mr. Erwine.

19        Q:  Okay.  Would it influence their impression of him

20  in a negative or positive way?

21             MS. PARKS:  Same objections.

22        A:  I would not say positive.

23        Q:  Okay.  Would you agree that it contains derogatory

24  information about Mr. Erwine?

25        A:  I would not agree to that.

1        Q:  No?  What do you -- what's your understanding of

2   what the word derogatory means?

3        A:  Offensive and false.

4        Q:  So derogatory just doesn't mean cast in a negative

5   light?

6        A:  Well, if -- if that's the way you're going to

7   define it, then, potentially it is derogatory.  But if -- if

8   you're --

9        Q:  Okay.

10       A:  -- gonna define -- if you're gonna define it as --

11  um, it's like slander, then I would object.  Uh, well, I would

12  disagree that it is derogatory in that term, but I --

13       Q:  Do you think --

14       A:  -- haven't looked up the definition of derogatory.

15       Q:  Okay.  Do you believe that the information in the

16  October 10th memorandum is critical of Mr. Erwine's performance

17  at the Churchill County Sheriff's Office?

18       A:  Yes.

19       Q:  Okay.  Do you think it reflects a -- a serious

20  performance with Mr. Erwine in his -- his job as a detention

21  deputy at the sheriff's office?

22       A:  That memorandum reflects a couple incidents that

23  were job-related.

24       Q:  Okay.  So just to be clear, is it accurate to say

25  that your only confirmation of those -- the incidences addressed

1  in the October 10th, 2016 memorandum, was the information listed

2  in that document; is that true?

3         A:  I'm -- uh, and I -- I'm just thinking about whether

4  there was any other information, and it's just been too long.

5  Um, that document summarizes the information I had.

6         Q:  Okay.  Did you actively seek to obtain additional

7  information about the allegations contained in the memorandum?

8              MS. PARKS:  Objection.  Asked and answered.

9         A:  Uh, where I indicated that there was going to be an

10  investigation, there was.  It was after this memorandum was, uh,

11  drafted.

12              MR. BUSBY:  Okay.  All right.  I'm going to ask to

13  take a quick break and then I'm going check my notes.  And I

14  think we're almost done.  So sorry to keep you through lunch, but

15  I think we're almost done.

16              MR. TROTTER:  It's all right.

17              MR. BUSBY:  Okay.

18              MR. IVEY:  Okay.  We're going off the record.  The

19  time is 1.09 p.m.

20              MR. IVEY:  We're back on the record in the matter

21  of Michael Erwine v. Churchill County, et al., in the deposition

22  of Benjamin Daniel Trotter.  The time is 1:14 p.m.  Okay, Luke.

23         Q:  Sheriff Trotter, I just have a few brief questions

24  for you.  Then we'll be done with my questions, at least.  Have

25  you taken a look at Mr. Erwine's complaint that he filed in this

1  matter?

2           A:  Yes.

3           Q:  Okay.  Did you see the allegations involving a

4  woman name Lacey Haberstad (phonetic)?

5           A:  I'd have to remember.  Um, put me in the specific

6  page, maybe?

7           Q:  Do you have the complaint in front of you?

8           A:  I do have a hard copy here, yes.

9           Q:  Okay.  Please take a minute to review it.  And just

10 to be clear.  It's the Mr. Erwine's most recent amended

11 complaints.  I mean, it's dated --

12          A:  The amended -- amended jury trial demand, correct?

13          Q:  Amended complaint jury -- with jury trial demand,

14 yes.

15          A:  And it's 29 pages long, correct?

16          Q:  Correct.

17          A:  If you would point me to the location where that

18 is?

19          Q:  Sure.  Just give me a second.

20          A:  Because I'm not gonna memorize the 29 pages.

21          Q:  Okay.

22          A:  So --

23          Q:  Paragraph 15, starting on page 5.

24          A:  Yes.  I've -- I see that.

25          Q:  Okay.  Were you at any time made aware of the

1  allegations Mr. Erwine makes here regarding how Ms. Haberstad was

2  treated?

3         A:  Yes.

4         Q:  Okay.  Did you do -- was -- are you aware of

5  whether any investigation ever took place into those allegations?

6         A:  I know an investigation took place on those

7  allegations.

8         Q:  Okay.  Do you know what the outcome of that

9  investigation was?

10         A:  No.  If -- if I had Deputy Keller's personnel file,

11  I could remember.  Um, but I know he was -- it was, uh, found to

12  be inappropriate.

13         Q:  Okay.  So the investigation that you're referring

14  to confirmed Mr. Erwine allegations as to what happened with Ms.

15  Haberstad ?

16              MS. PARKS:  Objection --

17         A:  I --

18              MS. PARKS:  Objection.  Misstates his testimony.

19              MR. TROTTER:  Right.

20         A:  I'm not alleging that Mr. Erwine was the reporter

21  of this in the first place.

22         Q:  Do you know who was the reporter?

23         A:  I do not know.  I believe it -- my understanding it

24  was, uh -- it was Ms. Haberstad.

25         Q:  Okay.  Do you know the --

1      A:  But I don't --

2      Q:  -- substances of -- I'm sorry.  Go ahead.

3      A:  Uh, but I don't remember how it -- where it came

4  from.  I don't recall Mr. Erwine, um, being the source.

5      Q:  Okay.  Are you -- do you recall whether Ms.

6  Haberstad reported the allegations to Mr. Erwine?

7      A:  I don't recall how this was brought up.

8      Q:  Okay.  Are you aware of whether Mr. Erwine reported

9  it to someone else?

10     A:  I don't know how this was, uh, brought up.  I just

11  remember hearing about it and --

12     Q:  Okay.

13     A:  -- so --

14     Q:  But your recollection is that Deputy Keller was

15  disappointed as a result of what happened with Ms. Haberstad?

16          MS. PARKS:  Objection.  Misstates his testimony.

17     A:  Yes.  I couldn't confirm what happened, um, what

18  the discipline was, if there was any, um, 'cause I don't have his

19  file.

20     Q:  Okay.  Are you -- turn to page 6, paragraph 18.

21     A:  Okay.

22     Q:  There are two inmates listed there, Gillian Wickkin

23  and Ashley Gokey (phonetic).

24     A:  Okay.

25     Q:  Are you familiar with Gillian Wickkin?

 1          A:  I'm familiar with neither of these ladies.

 2          Q:  Okay.  Do you know if there were -- were ever any

 3  investigations that took place in the conduct [inaudible

 4  02:40:49] by Mr. Erwine against Ms. Wickin?

 5               MS. PARKS:  I can't -- I can't hear your question.

 6               MR. BUSBY:  I'm sorry.

 7          Q:  Are you aware of whether there were any

 8  investigations that took place at the sheriff's office resolving

 9  -- involving Ms. Wickin?

10          A:  I am not.

11          Q:  Okay.  How about Ms. Gokey?

12          A:  I am not.  First I ever heard of anything of this

13  sort was when I read it in this complaint.

14          Q:  Okay.  But you were the sheriff of Churchill County

15  during the time at which Mr. Erwine alleges these incidents

16  occurred, correct?

17               MS. PARKS:  Objection.  Asked and answered.

18          A:  I was the sheriff when Mr. Erwine was employed at

19  the sheriff's office.

20          Q:  Okay.  All right.  Okay.  In your capacity as

21  sheriff, were you in charge of all personnel decisions at the

22  sheriff's office regarding deputies?

23          A:  Ultimately.

24          Q:  Okay.  Did you have total control over the hiring

25  and firing of deputies?

1          A:  Um, I didn't have to go to a board for it, yes.

2          Q:  **Okay.**

3          A:  The sheriff is fairly autonomous.

4          Q:  **So the County had delegated to you the authority to**

5  **make these decisions about whether to retain or not to retain**

6  **deputies?**

7                    MS. PARKS:  I -- I cannot --- you're fading out,

8  Luke.  I'm sorry.  I can't hear the end of your ques- --

9                    MR. BUSBY:  I'm terribly sorry, Kathy.  I'll try

10  again.

11         Q:  **So did Churchill County delegate to you, in your**

12  **capacity as sheriff, responsibility to retain or not retain**

13  **deputies who worked at the sheriff's office?**

14         A:  Yes.

15         Q:  **Okay.  Would you set the policies as to whether to**

16  **retain a sheriff's deputy or not?**

17         A:  It was a decision.  I don't know that we had

18  policies.

19         Q:  **Okay.  Did you have any -- did you have a custom**

20  **that you followed?**

21         A:  On whether to retain somebody or not?

22         Q:  **Yeah.**

23         A:  Uh, no. It was very much a case-by-case thing.

24         Q:  **Okay.  But you were the official with final**

25  **policy-making authority over personnel manners at the sheriff's**

1  department, right?

2              MS. PARKS:  Objection.  Calls for a legal

3  conclusion.

4         A:  I was the sheriff.  I was the department

5  administrator.  We wrote policies.

6         Q:  Okay.  So is the answer to my question "yes"?

7              MS. PARKS:  Same objection.

8         A:  Uh, um, could you re- -- restate the question just

9  a second?

10        Q:  Sure.  Were you the officer with final

11 policy-making authority over personnel matters at the Churchill

12 County Sheriff's Office when you were sheriff?

13             MS. PARKS:  Objection.  Calls for a legal

14 conclusion.

15        A:  I believe I was.

16             MR. BUSBY:  Okay.  I have no further questions.

17 Ms. Parks?

18             MS. PARKS:  I have no questions for this witness.

19             MR. BUSBY:  Okay.  Sheriff Trotter --

20             MR. IVEY:  Okay.

21             MR. BUSBY:  Go ahead, Mark.

22             MR. IVEY:  No. I was just going to conclude the

23 deposition for you, Luke --

24             MR. BUSBY:  Okay.

25             MR. IVEY:  -- if that's okay?  This concludes the

1  recorded deposition of Benjamin Daniel Trotter.  Before going off

2  the record, Kathy, do you want a copy of today's deposition?

3            MS. PARKS:  Yes.  I do.

4            MR. IVEY:  Okay.  We'll get that over to your

5  office.  We are going off the record.  The time is 1:23 p.m.

6        (Deposition adjourned at 1:23 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    CERTIFICATE OF RECORDER
 2  STATE OF NEVADA        )
 3                         )
 4  COUNTY OF WASHOE       )
 5
 6  NAME OF CASE:  MICHAEL ERWINE, PLAINTIFFS VS CHURCHILL COUNTY
 7  ET.AL. DEFENDANTS
 8
 9       I, Mark Ivey, a duly commissioned Notary Public,
10  authorized to administer oaths or affirmations in the State of
11  Nevada, do hereby certify: That I recorded the foregoing
12  deposition of the witness, Benjamin Daniel Trotter, on 12/04/2020.
13       That prior to being examined, the witness was duly sworn to
14  testify to the truth. That deposition was recorded via audio and
15  video pursuant to NRCP30(b)(3) and said deposition recording is a
16  complete, true, and accurate recording of deposition testimony.
17  A transcript was created by E-Depositions LLC to aid the audio video
18  recording. A review of the deposition [ ] was [X] was not
19  requested by the deponent and [ ] was [X] was not requested by a
20  party of the action. If a review was requested, any changes
21  communicated to me by the deponent during the period allowed are
22  appended hereto.
23       I further certify that I am not a relative or employee of
24  an attorney or counsel of any of the parties, nor a relative or
25  employee of an attorney or counsel involved in said action, nor
```

1  a person financially interested in the action.

2      IN WITNESS WHEREOF, I have hereunto set my hand in the City

3  of Reno.

4

5

6

7  Mark Ivey

8  Notary Public

9  Appointment No. 20-1364-05

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

JOHN L. THORNDAL
JAMES G. ARMSTRONG
STEPHEN C BALKENBUSH
PAUL F. EISINGER
CHARLES L. BURCHAM
BRIAN K TERRY
ROBERT F BALKENBUSH
PHILIP GOODHART
KATHERINE F PARKS
KEVIN R DIAMOND
MICHAEL C HETEY
GREGORY M SCHULMAN
MEGHAN M. GOODWIN
EBAN M MILMEISTER

W. RANDOLPH PATTON*
THIERRY V BARKLEY*
JOHN D HOOKS
DOUGLAS J DUESMAN
DANIEL J McCAIN
CHRISTY LYN M GALLIHER
VINCENT M GODINHO
AILEEN E COHEN*
HARRY J ROSENTHAL*
JUSTIN H PFREHM*
RYAN J McELHINNEY*
MATTHEW D PETERDY*

Of Counsel*



# THORNDAL
# ARMSTRONG
## DELK BALKENBUSH & EISINGER
A PROFESSIONAL CORPORATION
ATTORNEYS
www.thorndal.com

## KATHERINE F. PARKS, ESQ.
## RENO OFFICE
## kfp@thorndal.com

**June 8, 2021**

LAS VEGAS

1100 E BRIDGER AVENUE
LAS VEGAS, NV 89101
MAILING
P.O. BOX 2070
LAS VEGAS, NV 89125-2070
(702) 366-0622
FAX (702) 366-0327

RENO

6590 S MCCARRAN BLVD., SUITE B
RENO, NV 89509
(775) 786-2882
FAX (775) 786-8004

CRAIG R. DELK
Retired Former Shareholder

JAMES J. JACKSON
(1958-2014)

_**Via electronic mail only**_
Luke Busby, Esq.
136 California Avenue #82
Reno, NV 89509

          Re:    _**Michael Erwine vs. Churchill County**_

Dear Luke:

          Enclosed for your file is a copy of the revisions to Mr. Trotter's deposition.  If you have any
questions, please feel free to contact me.

                                                  Yours truly,

                                                  Katherine F. Parks

                                                  Katherine F. Parks

KFP:psb
Enclosure

---

Attorneys also licensed to practice in
Arizona, California, Maryland, New York, North Carolina and Oregon

```
1                           ERRATA SHEET
2    Case Name: MICHAEL ERWINE, PLAINTIFFS VS CHURCHILL COUNTY
3    ET.AL. DEFENDANTS
4    Deposition Date: 12/04/2020
5    Deponent: Benjamin Daniel Trotter
6    REASON CODES:  1. To clarify the record.
7                   2. To conform the facts.
8                   3. To correct transcription errors if reviewed
9    with the official audio video recording. Understanding the
10   transcript reviewed is not the official record and is an aide to
11   the audio video recording. Transcription errors will be
12   corrected to match the audio video recording.
13   Page   10   Line   9   Reason        3   (Non-Sensical word)
14   From   Coleman        to  Unknown w/o hearing recording
15   Page   20   Line   6   Reason        3
16   From   Tracey         to        Tracy
17   Page   33   Line   9   Reason        3
18   From   ...I run...    to     ...I've run...
19   Page   44   Line   3   Reason        3
20   From   Here's a...    to   Appears that...
21   Page   102  Line   6   Reason        3
22   From       Shot       to        Shock
23   Page   69   Line  14   Reason     1, 2 or 3
24   From      cleploys    to      records
25                                  Benjamin Daniel Trotter
```

MICHAEL ERWINE vs TROTTER
TROTTER BENJAMIN   12/04/2020                                              Page 123

1   Page____609____ Line____23____ Reason_____2, 3_____

2   From_____Can't_____ to_____Can_____

3   Page____77____ Line__11-14__ Reason_____1, 2, 3_____

4   From__Lines are Questions not__ to__Answers_____

5   Page____86____ Line____13____ Reason_____2____

6   From_____Yes_____ to_____No_____

7   Page____114____ Line____15____ Reason_____3____

8   From__disappointed_____ to_____disciplined____

9   Page_____ Line_____ Reason_____

10  From_____ to_____

11  Page_____ Line_____ Reason_____

12  From_____ to_____

13  Page_____ Line_____ Reason_____

14  From_____ to_____

15  Page_____ Line_____ Reason_____

16  From_____ to_____

17  Page_____ Line_____ Reason_____

18  From_____ to_____

19  Page_____ Line_____ Reason_____

20  From_____ to_____

21  Page_____ Line_____ Reason_____

22  From_____ to_____

23  Page_____ Line_____ Reason_____

24  From_____ to_____

25                              Benjamin Daniel Trotter