# Exhibit 13

# Exhibit 13

```
 1                  UNITED STATES DISTRICT COURT

 2                       DISTRICT OF NEVADA

 3

 4

 5  MICHAEL ERWINE;                          )

 6          Plaintiff,                       )

 7      vs.                                  ) Case No.:

 8  CHURCHILL COUNTY, a political            ) 3:18-cv-00461-RCJ-WGC

 9  subdivision of the State of Nevada;      )

10  CHURCHILL COUNTY SHERIFF BEJAMIN         )

11  TROTTER; and DOES 1-10 inclusive;        )

12          Defendants.                      )

13  _____)

14

15            RECORDED DEPOSITION OF MATTHEW MAES

16                 Taken on JANUARY 25, 2021

17                       At 2:27 p.m.

18            RECORDED VIA VIDEO CONFERENCE

19            UNDER STIPULATION BY ALL PARTIES

20

21

22

23

24

25
```

Page 2

```
 1   APPEARANCES:
 2   For the Plaintiff:    LUKE BUSBY, ESQ.
 3                         316 California Avenue
 4                         Reno, Nevada 89509
 5
 6
 7   For the Defendants:   KATHERINE F. PARKS, ESQ.
 8                         THORNDAL ARMSTRONG
 9                         6950 S. McCarran Blvd. Suite B
10                         Reno, Nevada 89509
```

Page 3

```
                        INDEX
Witness              Direct      Cross      Redirect
MR. BUSBY              5                       55
MRS. PARKS                         45

                       EXHIBITS
Number          Description                        Page
EXHIBIT 1       Report by Deputy Jabines ERW0047     28
EXHIBIT 2       Memorandum ERW0053 - ERW0055         36
EXHIBIT 3       Declaration of Matthew Maes           7
```

Page 4

  1  MS. FLETCHER: We are now on the record in the
  2  matter of Michael Erwine v. Churchill County, et al. My name is
  3  Sally Fletcher. I'm the videographer and deposition officer. I
  4  work for E-Depositions, LLC, located at 730 Sandhill Road, Suite
  5  105, Reno, Nevada 89521. Today's date is January 25th, 2021, and
  6  the time is 2:27 p.m. This is a video recorded deposition of
  7  Matthew Maes, and is being recorded via video conference under
  8  stipulation by all parties. Mr. Maes, Mr. Ivey will swear you
  9  in.
 10          MR. IVEY: Can you please raise your right hand?
 11  Do you solemnly affirm that the testimony you're about to give
 12  will be the truth, the whole truth, and nothing but the truth?
 13          MR. MAES: I do.
 14          MR. IVEY: Thank you. Can you please state your
 15  full name for the record.
 16          MR. MAES: Matthew John Maes.
 17          MR. IVEY: Okay. You -- okay, Sally.
 18          MS. FLETCHER: Thank you. The electronic audio
 19  and visual recording of this deposition will be the official
 20  record. A transcript will be created as an aid to the
 21  audio-video recording by E-Depositions, LLC. Would all attorneys
 22  present, please identify themselves, their firm, anybody with
 23  them, and the party they represent beginning with the party
 24  noticing this proceeding.
 25          MR. BUSBY: Luke Busby, appearing for plaintiff,

Page 5

  1  Michael Erwine, who's also attending via video.
  2          MS. PARKS: Katherine Parks, Thorndal Armstrong,
  3  on behalf of the defendants. There's no one with me at this
  4  deposition.
  5          MS. FLETCHER: Thank you. You may proceed.
  6          MR. BUSBY: Okay.
  7                  DIRECT EXAMINATION
  8          BY: Mr. Busby
  9      Q: Good afternoon, Mr. Maes. Thank you for coming
 10  today.
 11      A: Yeah.
 12          MR. BUSBY: Again, my name is Luke Busby. I'm Mr.
 13  Erwine's attorney. And I want to take a few minutes just to
 14  explain the deposition process. So we're going to -- I'm going
 15  to be asking you questions today, and we're videotaping your
 16  responses. And we're going to transcribe them later. Do you
 17  understand that?
 18          MR. MAES: Yes.
 19          MR. BUSBY: Okay. And your answers are given
 20  under oath, subject to penalty of perjury, the same as if you
 21  were testifying in a court of law. Do you understand that?
 22          MR. MAES: Yes, I do.
 23          MR. BUSBY: And your testimony can be used later
 24  in this proceeding at the trial for example as evidence. Do you
 25  understand that?

Page 6

1  MR. MAES: Yes, I do.
2  MR. BUSBY: Okay. If at any time today you don't
3  understand one of my questions, just let me know. And I'll be
4  glad to rephrase or explain the question.
5  MR. MAES: Okay.
6  MR. BUSBY: But if you answer one of my questions
7  without asking for clarification, I'll take that to mean that you
8  understood what I meant; fair enough?
9  MR. MAES: Fair enough.
10  MR. BUSBY: Okay. And there will be times today
11  in the middle of one of my questions where you might feel like
12  you know the answer. And I'll just ask that you let me complete
13  my question before responding for clarity of the record, and I'll
14  try and do the same for you; sounds good?
15  MR. MAES: Good.
16  Q: Okay. And can you just tell me where you live
17  currently?
18  A: Um, I'm --
19  Q: In what city?
20  A: -- I'm, uh, in Fallon, Nevada.
21  Q: Okay. And how long have you lived there?
22  A: Um, since 2013.
23  Q: Okay. And you're -- can you tell me what your
24  knowledge of the facts and circumstances of this case are
25  generally?

Page 7

1  A: Um, my knowledge of it is that Mike Erwine was
2  fired for excessive use of force with a taser, and I was named a
3  victim. But it never happened. So, um, here we are, and we're
4  going to talk about the reasons why, um, or what happened. Why
5  -- why, um -- why -- why did they say that -- that -- that he --
6  that he tased me, you know, when -- when it never happened? So,
7  I don't know.
8  Q: Okay. Backing up, do you remember signing a
9  declaration that Mr. Erwine provided for you?
10  A: Yes.
11  Q: Okay. You were handed a few exhibits before this
12  deposition began, and I just -- we're going to go backwards with
13  them. I just ask that you take a look at what's been marked as
14  Exhibit number 3.
15  A: Okay.
16  Q: If you could take a minute to review that document,
17  and let me know when you're done taking a look. And I'm going to
18  ask you some questions about it.
19  A: Okay.
20  Q: Okay. Do you recognize this document, Mr. Maes?
21  A: Absolutely.
22  Q: Okay. What is it?
23  A: It is a declaration of -- of the events that
24  happened on 2000 -- or October 9th, 2016.
25  Q: Okay. Is this a declaration that you signed?

Page 8

1  A: Yes.
2  Q: Okay. Do you see your signature on page 2 there?
3  A: Um, hold on. Oh, yes, I do.
4  Q: Page --
5  A: Yes. Yes, I do. Oh, yes.
6  Q: Okay.
7  A: Page 2, yeah. Okay.
8  Q: First one, Exhibit 3. Yeah.
9  A: Yeah, yep.
10  Q: That's fine. So I just want to go through the
11  points listed in this declaration, and ask you some questions
12  about what happened, okay?
13  A: Okay.
14  Q: Okay. Do you see paragraph 3, where it says -- or
15  paragraph 4 where it says, "I was incarcerated at Churchill
16  County," -- county, it's misspelled, "detention center during
17  Michael Erwine's tenure as deputy sheriff?
18  A: Yes.
19  Q: Okay. Can you tell me how long you were at
20  Churchill County --
21  A: Altogether --
22  Q: -- Jail?
23  A: -- or just in this instance?
24  Q: Altogether.
25  A: Um, probably close to three years.

Page 9

1  Q: Okay. And were you there in the October 2016 time
2  period?
3  A: Yes.
4  Q: Okay. And were you familiar with Michael Erwine
5  when he worked there?
6  A: I mean, yeah, I was familiar with all the deputies,
7  so --
8  Q: Okay.
9  A: Because I was a trustee, so I worked with all of
10  them. So --
11  Q: Okay. What do you mean you were a trustee?
12  A: Um, I was given tasks to do for the -- the -- so
13  that the deputies wouldn't have to do them such as feeding the
14  inmates, doing the laundry, cleaning the units, stuff like that;
15  janitorial's, uh, stuff.
16  Q: Okay. And how long were you incarcerated for that
17  time period in which October 2016 was apart?
18  A: I'm pretty sure that I was incarcerated 10 months
19  for that, that incident offense that I was in jail for.
20  Q: Okay. And do you recall how often you saw Mr.
21  Erwine in a typical day when you were there?
22  A: Um, no, I mean, I, uh -- my, uh -- where I was at
23  was right across the -- the hallway from the -- the guards' cage.
24  So I -- I would see them pretty much nonstop all day, you know,
25  so --

Page 10

1  Q: Okay.
2  A: I mean --
3  Q: Is that it?
4  A: Yeah. Yes.
5  Q: Okay.
6  A: Yeah.
7  Q: All right. So turning to paragraph 5, it states,
8  "As a trustee, I worked seven days per week under the supervision
9  of all the detention staff."
10  A: Yes.
11  Q: Is that correct?
12  A: Yes.
13  Q: Okay. So in detention staff, are you referring to
14  the deputies mostly over there?
15  A: Yeah, the -- yes.
16  Q: Okay.
17  A: The deputies and, um -- that was it. The deputies.
18  Those only --
19  Q: Okay.
20  A: -- are the only people allowed back in the back
21  there, so --
22  Q: Okay. Do you recall a gentleman by the name of
23  Sergeant Summers?
24  A: Yes, sir.
25  Q: Okay. Were you familiar with him when you worked

Page 11

1  -- when you were at Churchill County?
2  A: Yes, I was.
3  Q: Okay. How about Matthew -- or Captain Matheson?
4  Did you ever deal with him?
5  A: Uh, a couple of times, I've seen him in -- in -- in
6  passing. But I never really had any, um, direct interactions
7  with him, I think, other than maybe cleaning his car once or
8  twice.
9  Q: Cleaning his squad car?
10  A: Yes.
11  Q: Okay. How about Sergeant Nuckolls?
12  A: Yes, I --
13  Q: Okay. Do you recall any of the names of any of the
14  other deputies who were there at the around that time period that
15  Mr. Erwine was there?
16  A: Deputy Miller, um, Deputy Davis, Deputy Keller,
17  Deputy Jabines, Sergeant Bell, um, Deputy Rigney. And I think at
18  the very end was Deputy Stritenberger.
19  Q: Okay.
20  A: I don't remember if he had started by the time that
21  Mike was, uh, fired, but --
22  Q: Okay.
23  A: -- I know he was there around the same time.
24  Q: All right. You state in paragraph 6 that Deputy
25  Erwine was one of your supervisors during your period of

Page 12

1  incarceration at Churchill County; is that correct?
2  A: Yes.
3  Q: Okay. And you say, "Including, but not limited to
4  transportation and work functions." What does that mean?
5  A: So in order to go get the -- the food for the
6  inmates, they would drive to the hospital. At which point, I
7  would ride with them and go to the hospital. And then I would
8  load the food into the, uh -- into the van and then we would take
9  it back and dispense it to the -- to the inmates. So --
10  Q: Okay.
11  A: -- they were responsible for driving me there to
12  pick up the food.
13  Q: Okay. Turning to paragraph 7, it states, "On
14  October 9th, 2016, I was asked to enter the jail control room
15  known as the cage." Okay. Do you recall who asked you to enter
16  the control room?
17  A: Yes. Um, I think it was Deputy Jabines.
18  Q: Okay. And can you just describe for me what a
19  control room is?
20  A: So it's a -- a -- a little room with a bunch of,
21  um, buttons on a -- on a desk. And it basically controls all the
22  different cell doors, the sally ports, everything in the jail.
23  So it's like a -- a desk with a -- with a metal cage all the way
24  around it.
25  Q: Okay. So by controlling the doors, does that mean

Page 13

1  a person who is in that room is able to control the kind of flow
2  of people through the jail, like where inmates are --
3  A: Uh --
4  Q: -- going? Is that -- go head.
5  A: Absolutely. That's what -- that's what that --
6  that is exactly what that means.
7  Q: Okay. So the -- is that a -- I mean, is that a --
8  it's -- it's interesting to me that you'd have an inmate in the
9  control room. Is that normal to have inmates in there?
10  A: I don't know if it's normal, but I mean, it
11  happened, you know.
12  Q: Okay.
13  A: I mean, we would clean the -- we would clean the
14  control cage with a --
15  Q: Oh, okay.
16  A: -- officer standing there with us, you know, so --
17  Q: Okay. Would any inmate be allowed in there, or
18  would just be trustees?
19  A: Just trustees.
20  Q: Okay.
21  Q: And just for clarification, what's the difference
22  between someone who's a trustee as an inmate and someone who's
23  not?
24  A: So somebody that's a trustee is, um, they're given
25  certain work detail or -- or work duties that they -- they do

Page 14

1 every day. And, um, they're given a lot more freedoms as -- as
2 opposed to being just a regular inmate where you're not getting
3 to go move around, you're not going outside, you're not going to
4 the hospital every day to pick up meals. You're not dispensing
5 them to people. You're basically just sitting in a cell all day.
6 So it's -- it -- it's -- it's a reward for the -- the -- the work
7 you do, really, as -- as you get to be out of your cell, you get
8 to be, um, doing something other than sitting, so --
9      Q: Okay. So it's kind of a relative position of
10 privilege within the jail?
11     A: Absolutely.
12     Q: Okay. And it's -- I assume you are held to a high
13 standard of conduct --
14     A: Yes.
15     Q: -- when you're acting in that capacity; is that
16 correct?
17     A: Absolutely.
18     A: Okay. So it's --
19        MS. PARKS: Counsel, objection. Vague and
20 ambiguous with respect to use of the term "high standard."
21        MR. BUSBY: Okay.
22     Q: And Mr. Maes just so to explain, from time-to-time,
23 opposing counsel may object to one of my questions. Unless we
24 had a discussion about -- or objection that calls for you not to
25 answer the question after she's done, just go ahead.

Page 15

1     A: Um, could you repeat the question?
2     Q: Sure. I was just asking you about, you know, what
3 the differences between someone who is a trustee as an inmate and
4 someone who isn't. And I think the last question I have about
5 that is: As a trustee, you are held to a high standard of conduct
6 within the jail. Is that a fair statement?
7        MS. PARKS: Same objection.
8     A: Absolutely. It's -- it's a -- it's you held to a
9 higher standard as the rest of the inmates because you're
10 supposed to act, um, accordingly. When you're out in public,
11 you're not supposed to be catcalling or -- or, uh, you know,
12 being disrespectful, or, uh, speaking, uh, to the deputies or
13 anybody else. That's a free staff at that point, you know. Um,
14 so yeah, you're -- you're absolutely held to a higher standard of
15 -- of conduct.
16     Q: Okay. And what happens if a trustee violates one
17 of those standards of conduct?
18     A: You would be fired, and you would be sent to the
19 main side of the jail where you would be in a cell for 24 hours
20 at a time. And then out for 24 hours at a time, so --
21     Q: Okay. Turning back to paragraph 7 of Exhibit 3, it
22 states that you were asked to enter the jail control room known
23 as the cage to retreat tools that had fallen and cannot be
24 retrieved by deputy. Is that Jabines?
25     A: Jabines, yeah.

Page 16

1     Q: Jabines? Okay. Okay. So you stated earlier that
2 Deputy Jabines asked you into the control room, right?
3     A: Yes.
4     Q: Okay. Can you just describe the circumstances?
5 Why she asked you to go in there?
6     A: So there was a -- a coffee can full of
7 miscellaneous tools, screwdrivers, razor blades. Um, I think
8 there was even a couple of pairs of pliers, maybe, perhaps. I --
9 I don't really recall exactly all the tools that were in the --
10 in the, um, can, but they had fallen underneath of the control
11 desk. So she had asked me to come in and pick them up. And so I
12 went in the cage and picked them up.
13     Q: Okay. And was that kind of normal request? I
14 mean, was this something that had happened before?
15     A: No. I'd never been asked to go into cage and pick
16 up tools prior to this, yeah.
17     Q: Okay.
18     A: I had cleaned the cage prior to this, but never to
19 pick up tools.
20     Q: Okay. Had you ever been asked to do anything like
21 that by deputy before?
22     A: Um, no. Not that I can remember, no.
23     Q: Okay. So turning to the next paragraph of Exhibit
24 3, it states, "I was aware Deputy Erwine removed his taser from
25 the holster."

Page 17

1     A: Yes.
2     Q: Okay. So Deputy Erwine was there, obviously?
3     A: Yes, he was in the cage, also.
4     Q: Was he in the cage when you walked in?
5     A: Um, I think they all were in the cage, or he
6 might've been outside the cage and came in with me, but, um, they
7 were all in that same area. So I don't --
8     Q: Okay.
9     A: -- I don't recall if he was in the cage or outside
10 of it when -- when I was asked to go in, but, um, he was in the
11 cage when I went into the cage, yes.
12     Q: Okay. So besides Deputy Jabines, Deputy Erwine,
13 and yourself, was anybody else in the cage?
14     A: I think Deputy Miller might've been in there, too,
15 um, if my memory doesn't fail me, but --
16     Q: Okay.
17     A: Yeah.
18     Q: And it states in paragraph 8 that you were aware of
19 the Deputy Erwine removed his taser from the holster. Can you
20 describe your recollection of that happening?
21     A: Um, yes. So I -- I went in the cage and was going
22 to perform the -- the duties that I was asked to perform. And
23 Deputy Erwine pulled his taser out of its holster and held it in
24 his hand, and, um, I picked up the tools and left the cage.
25     Q: Okay. So it states next to, "However, the taser

Page 18

1  was never appointed in my direction."?
2       A: No.
3       Q: Okay. Can you just describe your recollection of
4  what the taser look like?
5       A: Um, kind of like a small -- small size handgun, I
6  guess, with a -- a yellow, uh, tip. That like, uh -- yeah.
7       Q: Okay. So what were your thoughts when Deputy
8  Erwine removed his taser from his holster?
9       A: That he was probably just making sure in case I
10 acted stupid, that, you know, he wouldn't get himself hurt, you
11 know --
12      Q: Okay.
13      A: -- or something like that. I didn't know.
14      Q: Can you explain just what you mean by that?
15      A: Well, I mean, if -- if -- if I were to -- to try to
16 escape, for instance, or something like that, something that I --
17 I wouldn't have tried to do, but if I had, then, you know, I've
18 got these tools in my hands, and -- and, um, I'm in close
19 quarters with you, I'm -- I mean, you don't -- you never know
20 what could happen, I think, you know, in that situation, you
21 know.
22      Q: Okay. So was it your -- and did you believe that
23 the tools you're picking up could've been used as weapons?
24      A: I don't believe it. I know it. They can --
25      Q: Okay.

Page 19

1       A: -- definitely been used as weapons, yes.
2       Q: Okay.
3       A: I believe there --
4       Q: And --
5       A: -- was even a razor knife in there, to -- to be
6  honest with you. Um --
7       Q: Okay. So these were objects that a nefarious
8  person could use to do harm, if they intended to. Is that a fair
9  statement?
10          MS. PARKS: Objection.
11      A: Absolutely.
12          MS. PARKS: Objection. Vague and ambiguous.
13      Q: Mr. Maes, go ahead.
14      A: Yes. They were absolutely, um, tools that could've
15 been used as -- as a weapon and caused great bodily harm.
16      Q: Okay. You state next that, "The taser was never
17 pointed in my direction."
18      A: Yeah. No --
19      Q: Okay.
20      A: -- it wasn't.
21      Q: So were you in a position where you can see what
22 Mr. Erwine was doing when you were picking up the tools?
23      A: Well, yeah, I -- I was -- I was bent down on my
24 hands and knees underneath of this desk, and he was standing
25 behind me to my right, I think, and just stood there. So he was

Page 20

1  kind of, uh, to my side, but above me. You know, just sitting --
2  standing there and watching me do the -- the task that were asked
3  to do.
4       Q: Did Mr. Erwine ever say anything to you during this
5  occurrence?
6       A: Not a word. I don't think.
7       Q: Okay. Did he threatened you?
8       A: No.
9       Q: Did you feel threatened?
10      A: Nope.
11      Q: Did you think he was going to tase you?
12      A: Never. Uh, if I --
13      Q: Okay.
14      A: -- would've acted up, maybe yes. But not -- not --
15 I wasn't gonna do nothing stupid, so no. I wasn't worried about
16 getting tased.
17      Q: Okay. Did he ever discharge his taser?
18      A: No, sir.
19      Q: During this occurrence?
20      A: No.
21      Q: So was it a normal occurrence for a deputy to pull
22 out a taser in similar circumstances at Churchill County Jail
23 when you were there?
24      A: I mean, if there was a combative inmate, maybe,
25 yeah. But, um -- you know, but then -- the -- other than that,

Page 21

1  no. I've never really saw too much.
2       Q: Okay. Did you ever hear the taser spark, or make
3  any noise, or anything like that?
4       A: No.
5       Q: Okay. So what happened after you finished picking
6  up the tools?
7       A: I put them into can, handed them to Deputy Jabines,
8  and left the cage, and went back to the kitchen.
9       Q: Okay. When was the next time you heard anything
10 about what have occurred in the cage?
11      A: So after that had happened, um, I never heard about
12 what had happened in the cage until, um -- until Mike contacted
13 me and asked me, um, to talk to him about this -- the -- the --
14 the events of that day.
15      Q: Okay.
16      A: So it had been, I think, about two years until I --
17 I heard anything, or anything about the cage, um, even brought up
18 to me, so --
19      Q: Okay. So during the remainder of your time at
20 Churchill County Jail after October 9th, 2016, you hadn't heard
21 anything about what happened with Mr. Erwine in the cage that
22 day; is that correct?
23      A: No. I -- I mean, I -- he'd -- he had gotten
24 terminated, and I had asked what -- what he had gotten terminated
25 for, but they never did specify that it was about the cage, or

Page 22

1  anything like that.
2       Q: Okay. So do you know the time period where Mr.
3  Erwine got terminated?
4       A: Um, I think the next day, or maybe that day
5  possibly. Um --
6       Q: Okay.
7       A: But I didn't see him again after that, so --
8       Q: Okay. Did you hear anything about what happened to
9  Mr. Erwine?
10      A: Well, yeah. The -- like I said, I asked, um -- a
11 couple weeks went by, and I asked Deputy Jabines. Um, we had a
12 good rapport, and I said, "What -- what did that guy got fired
13 for, you know?" And she had informed me that he got fired because
14 he was a rat.
15 And I don't know. I just figured that, you know, maybe some
16 politics between people in their -- in their -- in their
17 respective positions in the jail, like maybe caused him to have
18 to go bye-bye. I don't know, you know, but --
19      Q: Did you ever have any other conversations about Mr.
20 Erwine after the incident --
21      A: Other than --
22      Q: -- on October 9th?
23      A: Other --
24      Q: Go ahead.
25      A: -- than the -- other than the conversation with

Page 23

1  Deputy Jabines, no.
2       Q: Okay. Did you ever feel that Deputy Erwine treated
3  inmates inappropriately when you were at the jail?
4       A: No. He was actually pretty, um, fair to the most
5  of the inmates.
6       Q: Okay. Do you think that was the case with most of
7  the deputies that worked there?
8       A: Some of them. Some of them, yes. Some of them,
9  no.
10           MS. PARKS: Objection -- Counsel, objection.
11 Vague and ambiguous with respect to who you're referring to in
12 your question.
13      Q: Okay.
14      A: Yeah.
15      Q: Mr. Maes, did you understand who I was referring
16 to?
17      A: Um, yeah, the other deputies, if they were -- if
18 they all had the same, uh, disposition on things, and no. Um,
19 some of them did, some of them didn't. But --
20      Q: Okay.
21      A: -- that's going to have with anybody's attitudes
22 are different, um, times, uh, events are different, you know, uh,
23 you know.
24      Q: Okay. So turning to paragraph 14 of your
25 declaration.

Page 24

1       A: Uh-huh.
2       Q: It says subsequent to your release, you reached out
3  to Mr. Erwine via Facebook; is that correct?
4       A: Yeah. I wanted to tell him what Deputy Jabines had
5  told me, you know, um --
6       Q: Okay.
7       A: -- but he never did answer me, or respond to me, or
8  anything. So I didn't talk to him, so --
9       Q: And do you know when you were at released
10 approximately?
11      A: Um, I wanna say, maybe January, but I can't really
12 remember. I -- I'm -- I mean, uh, I've done a lot of jail time,
13 and they kind of all flow together.
14      Q: Okay.
15      A: Um, as far as my releases and booking, and
16 whatever, but --
17      Q: Okay. So just to the best of your recollection --
18      A: I think it was --
19      Q: -- do you know --
20      A: -- about January 17th.
21      Q: Okay. So it wasn't -- it was a few months after
22 what happened with Mr. Erwine in the cage in October of --
23      A: Yes.
24      Q: -- 2016 --
25      A: Yes.

Page 25

1       Q: -- is that correct?
2       A: Yes --
3       Q: Okay.
4       A: -- that's correct.
5       Q: And you reached out to him. Do you remember how
6  long after it was you were released that you reached out to him?
7       A: I -- I think it might've been that same day. The
8  -- like, right when I got out and got my phone in my hands, I --
9  I had just send him a text on Facebook, or friend request stating
10 that, um, what -- what, uh, my -- my, um, reasoning for
11 contacting him was, so --
12      Q: Okay. Did you contact any of the other deputies
13 who worked at the jail?
14      A: No.
15      Q: Okay. Can you tell me why you wanted to reach out
16 to Mr. Erwine?
17      A: Well, because, um, you know, doing a lot of jail
18 time like I've done, um, you get to see the deputies and the COs,
19 and things of that nature for what they are, you know. And, um,
20 I felt like he got a bum deal. You know, I mean, the guy wasn't
21 -- wasn't ever mistreating any of the inmates. He was, um -- he
22 was fair. If you -- if you had something coming, he would give
23 it to you. If you didn't, he would tell no.
24 And so, you know, like when you find somebody in a -- in a
25 occupation like that, that has that interest in people, you know,

Page 26

1 as far as not degrading, or not shaming, or bringing down, or
2 trying to belittle, you know, um, and they get fired. And
3 somebody tells you it's 'cause they're a rat.
4 Like, you know, I -- I -- I felt to compelled to, um, share my
5 conversation with him so that he could maybe move forward, or --
6 or know something more about the situation, you know.
7     Q: Okay. So just to be clear, Mr. Erwine never
8 reached out to you before you reached out to him on Facebook; is
9 that correct?
10    A: That is correct, yes.
11    Q: Okay. Do you recall when or if he got back to you
12 after you messaged him?
13    A: Uh, like I said, it was, uh, almost two years down
14 the road, I think. You know, it was --
15    Q: Okay.
16    A: -- right before, um -- it was -- it was in 2018, I
17 believe. So it was --
18    Q: Uh-huh.
19    A: -- year-and-a-half, year -- almost two years.
20    Q: Oh, okay. Do you recall what you talked about with
21 Mr. Erwine?
22    A: Um, so he had contacted me back and said that, um
23 -- asked, if -- if I was, um, still in the Fallon area. And I --
24 I had told him yes, that I was. He asked me, if, um, he could
25 meet up with me and talked to me about the situation that

Page 27

1 happened with his termination at the Churchill County Sheriff's
2 Department. And I said, "Yeah, absolutely. I -- I -- I -- I
3 will meet with you and talk to you."
4 And -- and, um -- so we met. And he told me that he was, um,
5 terminated for excessive use of force with a taser, and I was
6 named the victim. And at that time, I told him that things that
7 Deputy Roat had told me.
8 And, um, you know, I -- I -- I asked him, "How -- how is it that
9 you -- you could be fired for tasing me, but I never got tased?"
10 And he said, "Well, yeah, that's why I'm trying -- trying to talk
11 to you is because, um, I -- I got fired for tasing you, and you
12 know I never did." So at that point, he asked me to come talk to
13 -- with his attorneys and -- and -- and, um, to say my side of
14 the story. And so that's what I -- I did.
15    Q: Okay. You mentioned Roat.
16    A: Oh, Deputy Roat is Jabines. They're the same --
17    Q: Okay.
18    A: -- person. It's just her name got changed because
19 she got married and then --
20    Q: Okay.
21    A: -- she got divorced. So it's -- I think it's
22 Jabines, or Roat. Roat again, not Jabines no more.
23    Q: Okay. So to your knowledge, Jabines was her
24 married name, and now she's Deputy Roat again; is that correct?
25    A: Correct.

Page 28

1     Q: Okay. All right. So I'd like you to take a look
2 at what's been marked as Exhibit number 1, and it's a one-page
3 document.
4     A: Okay.
5     Q: And if you could just take a minute to go ahead and
6 read that. And when you're finished, let me know.
7          MR. BUSBY: In fact, Kathy, if you'd like, we can
8 take a five-minute break while he's reading the document, if
9 you'd like.
10         MS. PARKS: I don't need a break. It doesn't
11 matter.
12         MR. BUSBY: No? Okay. We will wait unless
13 everybody else wants a break.
14         MS. FLETCHER: I'm good.
15         MR. BUSBY: Okay.
16    A: Okay.
17    Q: All right. So Mr. Maes, do you recognize this
18 document? Have you ever seen it before?
19    A: No.
20    Q: Okay.
21    A: I --
22    Q: All right. By reading its contents, are you
23 familiar with the situations described in the document?
24    A: I'm familiar with it, but it's not exactly
25 accurate.

Page 29

1     Q: Okay. Can you direct me to the statements in the
2 document that you feel are not accurate?
3     A: Um, yes. So, um, it says that the red light on the
4 floor indicated that the, um -- the ECD was activated, but I
5 never saw any red dots on the floor. And, um --
6     Q: Okay.
7     A: -- so I -- that's -- that's one thing that's --
8 that's not accurate. Also --
9     Q: Okay. Did you -- I'm sorry, just a minute. What's
10 an ECD?
11    A: Um, I believe that's a taser.
12    Q: Okay. All right. Go ahead.
13    A: Um, there was also no, um, um -- just going off a
14 taser, I mean, it makes it very loud, distinctive
15 clicking-clacking noise. You know, and, um, that was never
16 anything that I heard. So --
17    Q: Okay.
18    A: -- the -- those two things are -- are not facts.
19    Q: Okay. Do you see the first paragraph under the
20 conclusions and recommendations section where it states, "I
21 observed Deputy Erwine display use of force to an inmate which
22 was based on my knowledge, training, experience, not reasonable
23 or necessary." I mean, did you feel like Mr. Erwine you used any
24 force against you on that day?
25    A: No. Absolutely not. Um, it's just --

Page 30

1  Q: And just to be clear, this is describing the
2  interaction in the cage that you had on October 9, 2016 what
3  you're describing earlier, correct?
4  A: Yes, sir.
5  Q: Okay. Go ahead.
6  A: Um, no, I -- I did not feel threatened, or -- or,
7  um, fear of getting tased at any point in the -- in the, um -- in
8  the incident -- incident. I --
9  Q: Okay.
10 A: -- I would've if -- I would've maybe acted up, like
11 I said earlier, but I wasn't gonna do anything like that. So I
12 had no -- no concern at all.
13 Q: Okay. Did you ever hear Mr. Erwine sneaker during
14 this --
15 A: No.
16 Q: -- occurrence as described --
17 A: No.
18 Q: -- in this document?
19 A: No, sir. I -- I did not hear anybody sneaker. Um
20 --
21 Q: Okay. Okay. Did you feel like Mr. Erwine was
22 joking with you at any point during the occurrence?
23 A: No. No, not at all.
24 Q: Okay. All right. Did Deputy Jabines ever discuss
25 what occurred in the cage after you picked up the tools and left?

Page 31

1  Did she ever talked to you about it?
2  A: No, sir.
3  Q: Okay.
4  A: Other --
5  Q: Did anybody --
6  A: -- than when I asked the question about why that
7  guy got fired. And that's when she told me that he was a rat.
8  But there was never --
9  Q: Okay.
10 A: -- any, um, correlation to this instance, you know,
11 so --
12 Q: Okay. So she never asked you if you felt
13 threatened?
14 A: Not at all.
15 Q: Okay. So what's your general impression when you
16 read this document?
17 A: Um, when I read this document, I -- I -- I feel
18 like there's some -- definitely some -- some -- not so, um -- on
19 the up and up, things is going on in this department, maybe, you
20 know.
21 Q: Okay. Can you describe what you mean by that?
22 A: Um, well, I mean, if I'm to be, um, all the way
23 honest, uh, they are stating that I was, um, a victim of a crime
24 or of a -- of a excessive use of force. And, um, if I was in
25 fact a victim of excessive use of force, why wasn't I informed of

Page 32

1  this? Why was I not given an option to, um, maybe file a lawsuit
2  or maybe not file a lawsuit, or given the opportunity to say my
3  side of things or put a statement into the situation, you know.
4  Um, and it boils down to is they -- they -- they ended up firing
5  some guy that didn't do anything to me because of whatever
6  differences they had as -- as far as, um -- as far as, uh,
7  professionalism with the people you work with. And, um -- and
8  yeah, I -- I just feel like that's not on the -- that's not on --
9  on a professional basis with anything I've ever experienced and
10 incarcerated. So yeah, that's what I think.
11 Q: Okay. Did you ever hear any other employee of
12 Churchill County refer to any other deputy as a rat when you were
13 incarcerated there?
14 A: Never once. They never bad talk -- they never bad
15 mouthed each other, um, for nothing. You know, I mean, uh, quite
16 the opposite really. If somebody did something stupid, they
17 kinda hushed it up so that nobody knew, you know, or whatever,
18 you know. So it was kind of, um -- it was kind of odd that --
19 that that went down the way it did, you know.
20 Q: Okay. You ever witnessed any other deputies at
21 Churchill County maltreating any other inmates?
22 A: Oh, yeah. Absolutely.
23     MS. PARKS: Objection. Objection. Relevance.
24 Q: Okay. You said earlier you were familiar with
25 Sergeant Summers.

Page 33

1  A: Yes, I --
2  Q: Did you --
3  A: -- was familiar --
4  Q: -- ever witness Sergeant -- I'm sorry, go ahead.
5  A: Yes, I was familiar with Sergeant Summers. Sorry.
6  Go ahead.
7  Q: Did you ever witness Sergeant Summers maltreat any
8  inmates?
9      MS. PARKS: Objection. Relevance.
10 A: Yes, I did. Um, I witnessed Sergeant Summers take
11 a squeegee to a man that, um, had urinated in the security cell,
12 and the urine had flown out into the -- into the hallway where we
13 were feeding lunch. And Sergeant Summers took a squeegee on a
14 mop handle and squeegeed it in on the passed out inmate's face
15 and threw his lunch in the security cell.
16 And we went on about serving break, uh -- lunch like it was, uh,
17 just another day in -- in the job, like it was, um, very
18 unprofessional, very, um, disrespectful, and completely out of
19 line as far as I'm concerned.
20 Q: Okay. Do you recall the name of that inmate?
21 A: Yeah, Jimmy Thomas.
22 Q: Do you know Mr. Thomas?
23 A: Yes, sir. I do.
24 Q: Okay. How do you know him?
25 A: Through different incarcerations with each other.

Page 34

Q: Okay. Have you ever talked with Mr. Thomas about what happened?

A: Yes, I did. I -- I -- actually, um, I -- I was, um, uh, incarcerated with him in prison, and -- and we had -- we had, uh -- I had asked him if he remembered that, and he said he had -- did remember that -- that instance happened.

Q: Do you recall if anybody else was there when that occurred?

A: Um, I don't think that anybody else was there because we were serving meals. And usually, one officer would take me to serve the meals. And so -- I mean -- but the -- the security cell in the cage are -- are right next to each other. So absolutely, there was another deputy that saw the -- the -- the events happen, you know, but nothing was said. Nobody batted an eyelash at it, so --

Q: Okay. Are you familiar with any other occurrences where you saw Sergeant Summers maltreating inmates?

MS. PARKS: Objection. Relevance.

A: Um, let me think for a second. Um, you know, I -- I can't really recall another instance with that, um, deputy, but I -- I -- I do remember definitely, um, some instances where people were mistreated and weren't -- weren't, um, shown any kinda professionalism as far as the law is concerned.

Q: Okay. But Sergeant Summers in particular, do you recall --

Page 35

A: I --

Q: -- any other events where Sergeant Summers in particular mistreated an inmate?

A: I mean, yeah --

MS. PARKS: Objection.

A: -- he -- he would yell up --

MS. PARKS: Just a minute. Just a minute. Objection. Relevance. Objection. Asked and answered.

Q: Go ahead, Mr. Maes.

A: Um, yes, I -- I mean, he would -- he would scream at people, um, at the top of his lungs like he was a drill sergeant and just with no kind of, um, uh -- no -- no -- no type of, um, concern about what like he was saying, you know. It was just like -- it was like he was drunk half the time, it seemed like. You know, he was screaming at people, calling them, uh, names, and stuff like that. You know, uh, just -- just very not professional at all.

Q: Okay. But any particular instances, you recall anything in particular?

MS. PARKS: Same --

A: No.

MS. PARKS: -- objection.

A: Not really that I can think of.

MS. PARKS: Just a minute, sir. Objection. Asked and answered. Objection. Relevance.

Page 36

Q: Okay. Mr. Maes, just one more Exhibit number 2. As with the previous exhibit, I just ask that you, take a look at it.

A: Okay.

MR. BUSBY: And after you've done -- after you're done reading it, let me know. And actually, I want to take a quick break. I want to take five minutes. So, Mr. Maes, if you can review the exhibit during the break, we'll be back in a sec, okay?

MR. MAES: Okay.

MS. FLETCHER: We are going off the record, and the time is 3:04 p.m.

MS. FLETCHER: We are back on the record in the matter of Michael Erwine v. Churchill County, and the time is 3:09 p.m.

Q: All right. Mr. Maes, before we went off the record, I asked you to take a look at what's been marked as Exhibit 2. Have you had a chance to review that document?

A: Yes, sir.

Q: Okay. Have you ever seen it before you just read it now?

A: No, sir.

Q: Okay. And I just want to ask you some questions about some of the facts inserted here. Did you read in that document the description of a situation involving Mr. Beaulieu?

Page 37

A: Yes, sir.

Q: Okay. But do you have any knowledge of that situation?

A: Uh, yes, sir.

Q: Okay.

A: The -- the guy was in the security cell and was screaming back-and-forth with the deputies, um; Deputy Miller and Deputy, uh -- I can't remember his name, big fellow. Uh, what's his name? Hold on. I'll remember it. Uh, um, White. It was Miller and White were in the cage. And, um, when I went on shift to -- to serve breakfast, and they were like flushing his toilet. And the guy was screaming about water. He's thirsty. He wanted water, you know. And, um, these guys kind of antagonized him with the -- the -- the hole in the floor that has human feces all over in it, and they're flushing it so it's making a water noise. And they're saying, "Oh, there's your water," you know. And just was kind of really, uh, picking on the guy, you know, through a door.

Q: Okay. And so just to be clear, is your recollection of those events that you just described, is that independent from what you just read in this document?

A: Yes. That's, um, my recollection of when I went to work that morning.

Q: Okay. So you actually witnessed the deputies flushing the toilet whenever this guy would ask for water?

Page 38

1   A: Yes.
2   Q: Okay. All right. When you said filled with feces,
3   I'm not sure what you meant. Can you describe --
4   A: So in a security --
5   Q: -- the --
6   A: -- cell, it's a padded cell with, um, a hole in the
7   floor. That is your place of -- of -- of relieving yourself of
8   your bowels. So there's a hole in the floor that is used for
9   flushing feces and urine down the drain. And, um, it's the only
10  thing in the cell other than a camera up in the corner, and it's,
11  um -- that's -- that's -- that's the whole cell.
12  It's just a security cell, you know, for inmates that are -- that
13  are combative, or that are not of, uh, uh, uh, sane mind or, um,
14  might hurt themselves, or others, you know.
15  Q: Okay. So there's no sink in the -- in the cell?
16  A: No, there's nothing in this room except for a hole
17  in the floor that you use to use the bathroom.
18  Q: Okay. Did you interact at all with Mr. Beaulieu
19  when he was there?
20  A: Uh, no. Um, well, when he was in the cell, yes.
21  Um, the -- the deputy White and Miller asked me to flush the
22  toilet once or twice, too, I believe, as I was walking doing my
23  duties.
24  Q: Okay. So did they tell you to --
25  A: Uh, "Hey, hit" --

Page 39

1   Q: Can you --
2   A: -- "that flusher" --
3   Q: -- describe the --
4   A: -- "real quick." That's what I was told.
5   Q: Okay. And would you hit the flusher in response to
6   anything, or -- ?
7   A: No, I just hit the flusher 'cause, uh, I was told
8   to.
9   Q: Okay. All right. So turning to page 2 of Exhibit
10  2.
11  A: Uh-huh.
12  Q: Do you see under the heading where it says,
13  "Conduct unbecoming of a deputy and unjustifiable use of force."?
14  A: Yes.
15  Q: Okay. Before when I asked you about Exhibit 1 --
16  A: Uh-huh.
17  Q: -- Deputy Jabines' statement, does this basically
18  recount in your mind what Deputy Jabines have written in her
19  statement?
20  A: It, um -- yeah. It -- it's -- it's almost the same
21  thing. Like it was kind of, um, put together already before the
22  -- the -- the situation 'cause I mean, it's completely not
23  factual. So like -- it seems to me like it's a setup to me to --
24  as far as I'm concerned, you know.
25  Q: This may seem redundant, but can you describe again

Page 40

1   what's not -- what's not factual about what's described here in
2   Exhibit 2?
3   A: Well --
4   Q: About the situation with you in the cage on --
5   A: So, um --
6   Q: -- October 9th?
7   A: -- I was asked to go in the cage. That's all true.
8   But there was never a taser pointed at me, and I -- I don't ever
9   hear a taser going off. And so, um, the fact that she says that
10  those are -- are something that happened and asking to relieve
11  him or to send him home, you know, it just -- it just really
12  doesn't -- doesn't -- doesn't seem right as far as I'm concerned.
13  You know, I mean --
14  Q: Okay. Do you see where it says "Items of concern"
15  on page 3, and there's a couple of bullet points under that?
16  A: Yes.
17  Q: Okay. It states, "This is unprofessional
18  behavior."
19  A: Yes.
20  Q: What do you think of that statement and --
21  A: I think that --
22  Q: -- what happened that day in general?
23  A: -- I think that had -- that that day in general, I
24  think that maybe Jabines is, um -- maybe she was unprofessional
25  with her behavior. You know, because there was, um, obviously

Page 41

1   some tools that were probably thrown on the ground on purpose.
2   You know, I mean, to -- to -- and have me come in there and to --
3   to set this guy up to make him seem like he tased me, like, it's
4   just completely crazy, you know.
5   I -- I mean, and these are people that are supposed to be, uh,
6   upholding our laws and stuff. You know, that's -- that's crazy
7   to me, and it's unprofessional.
8   Q: Did you see bullet point number 2, where it states,
9   "This creates liability for this agency now or for some time into
10  the future, should Maes elect to pursue civil action."?
11  A: Absolutely. I see that, and, um, it -- it was
12  never brought to my attention or else I would've tried to, um,
13  make sure that there was, um, some -- some light shed on the
14  situation more than what was, you know.
15  Q: I mean, after that situation in the cage, did you
16  ever imagine suing Mr. Erwine for what occurred?
17  A: No, I didn't even think of it twice. You know, I
18  mean, other than -- than him being called a rat and me contacting
19  him when I got out of jail, I never gave it another thought after
20  that until I talked to him about what he actually got fired for.
21  Because I had no knowledge of what -- I mean, I didn't get these
22  memorandums when -- when he got fired, you know. So I wouldn't
23  know anything about it. You know, I was in the dark, you know,
24  until -- until he shed some light on the situation.
25  Q: Okay.

Page 42

1  A: So --
2  Q: Are you aware of whether or not Mr. Erwine was ever
3  provided with these memorandums?
4  A: I don't know.  Um, he just -- he just told me what
5  he was fired for and kind of, you know, asked me what I -- I
6  remembered about that day, if I remembered that day.  And so I --
7  I, um -- you know, I had told him exactly what I just told you
8  guys, the same thing.  And he had told me that he had gotten
9  fired for excessive use of force with a taser, and so --
10 Q: Okay.
11 A: -- yeah.
12 Q: Do you recall anything else about what happened
13 with either Mr. Beaulieu or what happened in the cage that day --
14 A: Um --
15 Q: -- that you might tell me about?
16 A: Um, no, I don't think so.  I -- I mean, uh, with
17 Mr. Beaulieu, I think when, uh, Mike got to, um, his shift that
18 morning, he went to the -- the security cell door, asked the guy
19 what he needed, and the guy said he wanted some water, you know.
20 So he told me to get him a cup of water, and I took him a cup of
21 water.  He handed it to the dude inside the security cell, and
22 there was no more incidents.  The guy was --
23 Q: And so you were actually there when Mr. Erwine came
24 on shift and began talking to Mr. Beaulieu after the incident of
25 the toilet flushing in the security cell, right?

Page 43

1  A: Yes.  Yes.  I was --
2  Q: Okay.
3  A: -- still on shift, or I was just getting to -- to
4  -- to start my day, you know.  Um, and he came --
5  Q: Okay.
6  A: -- in and gave the guy some water.  I'd took him a
7  couple of water 'cause that was normal practice for us is, if
8  somebody was in the security cell, the trustee would get a cup of
9  water out of the sink in the kitchen, bring it to the deputy,
10 which at that point the deputy would hand it into the security
11 cell to the inmate.
12 The inmate would drink it, give the cup back to the deputy, and
13 he would give it back to the inmate, the trustee, and they would
14 take it and wash it.
15 Q: Okay.  So you would -- would you ever have any
16 direct contact with an inmate like Mr. Beaulieu who is in the
17 security cell?
18 A: No, other than feeding them their meals or handing
19 of them their meals.  And usually, I think -- usually the
20 deputies would do that, too.  But sometimes, they wouldn't, you
21 know, if -- if we were in a hurry, and there was a bunch of
22 bookings coming or something like that, you know.
23 Q: Okay.
24 A: But no, never, no contact with anybody in the
25 security cell.

Page 44

1  Q: Do you recall whether Mr. Erwine mentioned anything
2  to you about what happened with Mr. Beaulieu?
3  A: No.  He had never said nothing to me about it, or
4  -- he had asked, you know, how long -- he'd asked -- not me, but
5  he asked the -- the deputies how long that guy had been in there,
6  and they -- they said whatever they said.  I can't remember, but,
7  um -- but I mean, he was in there acting like that all night.
8  They were -- they were messing with him, and he was, like, you
9  know, freaking out all night.  It was kinda like, um -- you ever
10 watched a dog get kicked?  You know, like -- kinda like that.
11 The guy is in the cell, and you're like -- you're -- you're
12 taunting and -- and -- and belittling him.  Like, uh -- yeah, it
13 was -- it was -- it wasn't -- the whole jail could hear it.  You
14 know, 'cause it's not a big jail, so, uh --
15 Q: Okay.  So you actually heard what was going on
16 between Mr. Beaulieu and the deputies who you mentioned earlier?
17 A: Yeah.  The whole jail --
18 Q: Okay.
19 A: -- heard it.
20 Q: And can you describe what they were saying to him?
21 A: I mean, you know, um, just, you know, um -- you
22 know, "You -- you're -- you're not gonna -- you're not gonna, uh
23 -- you're not gonna get water until you start -- start acting
24 correctly," or -- or -- or stuff.  I -- I don't even remember the
25 exact words, or, uh -- between the two, you know, because I was

Page 45

1  trying to sleep.
2  But, um, yeah, it was just -- it was -- it was like, uh -- some
3  guy is in the cell, and he's mad obviously 'cause he's in jail.
4  And whatever reason brought him to jail probably has him pretty
5  pissed off.  And so, you know, they -- they just kinda bickered
6  back-and-forth, and the guy was beating on the walls of the
7  security cell, keeping the entire jail awake.
8  And these guys weren't -- instead of trying to, um, diffuse the
9  situation or maybe bring the situation to an end as far as like,
10 um, there being any animosities or any kind of, um, um, anything
11 like that going on, they just kept poking at the guy like it was
12 something funny to them.  You know, and -- and -- 'cause they
13 were bored.  They didn't have nothing to do the rest of the
14 night.  So, you know, why not?  I guess, but --
15 MR. BUSBY: Okay.  All right.  I don't have
16 anything any further questions.  Ms. Parks may have some
17 questions for you, Mr. Maes.
18         CROSS EXAMINATION
19         BY: Ms. Parks
20 Q: Hey, Mr. Maes.  My name is Kathy Parks.  I
21 represent the defendants.  Can you tell me where are you giving
22 your deposition today?
23 A: Um, in an office.
24 Q: Are you with -- you're in an office?
25 A: Yeah.

Page 46

Q: Okay. What did you do to prepare for your deposition today?
A: Nothing.
Q: Did you speak with Mr. Erwine?
A: Um, just in reference to what time to be here, yeah.
Q: Okay. When did you speak with Mr. Erwine?
A: Um, I don't know. The -- earlier today, I -- I had, um, called him to verify the address and make sure that I was in the right place.
Q: Okay. Prior to that time that you called Mr. Erwine today to ask him what time to be there for your deposition, when's the last time before that you spoke with Mr. Erwine?
A: Um, I don't know. It was off and on throughout the -- the -- since the -- since he first contacted me.
Q: Like how many times?
A: I don't -- not -- not a lot. Just whenever there's been, um, something new with the developments of the lawsuit or whatever, he would call me and ask me to come -- he'd called me and asked me to come down, and -- and talk to his attorneys one time. I did that.
And then, um, I called him one time because I was, um -- I was, um, of fear for my safety because of the whole situation and just wanted to share my -- my, uh, feelings with him. And, uh, I

Page 47

think that's pretty much about it. I mean, a few times throughout the whole -- since -- since he first contacted me, but not -- not a lot.
Q: When did that happen that you contacted him and told him that you were concerned for your safety?
A: Uh, maybe about a month ago.
Q: Okay. Did something happened? Did someone associated with Churchill County make any sort of threats to you?
A: I -- I don't know if they were associated, but I definitely got a, uh, uh -- a text message with a video in it that had somebody getting decapitated and being told to shut up, or they would shut me up. So yeah, I -- I was a little, um, unnerved by that, if you -- if -- if to put it --
Q: Who sent you that video?
A: Well, see, that's the thing is I tried to call the number directly back, and there was -- it was disconnected. So, um, I don't know who sent it. I mean -- but I feel like -- I don't know. I -- I'm -- I'm pretty, um, comfortable with the -- the -- the -- the things in this, um, situation that would point it to be that I don't have any problems with anybody else on the, uh -- out in the world. So, like, I don't know. Um, maybe it's just me speculating, but I definitely feel like it probably came from somebody, at least, connected to the Churchill County Sheriff's Department. I don't know if directly to connect it. But yeah, I felt --

Page 48

Q: Did you --
A: -- that that's what it was.
Q: Did you make a police report regarding that video you received?
A: No, I did not.
Q: Do you still have the video you're talking about?
A: No, my phone got broken. Um, I -- I do concrete for a living and -- and my phone had gotten like, uh, smashed between, uh, wheelbarrow and my leg. So, um, the phone was ultimately destroyed. So no, I don't have that anymore.
Q: Okay. When's the last time that you were incarcerated in the Churchill County Detention Center?
A: Let's see. It would've been 2018.
Q: So that would've been -- that would've been several years after the incident that you've already given testimony about, correct?
A: Yes.
Q: Okay. And while you were incarcerated in the Churchill County Detention Center in 2018, did anyone on the staff threaten you and make you feel uncomfortable as it relates to anything involving Mr. Erwine?
A: Um, not in relevance to Mr. Erwine, but there was definitely the fact that I was charged with possession of a drug that was found in a car that's registered to somebody else. And I'm not even nowhere near the car. So yeah, there's -- there's

Page 49

definitely some, um -- some low lying, uh, aspects of that -- that that I feel like was definitely, uh, related to this. I mean, I'm not a lawyer or anything like that, but I do know that, like, possession is nine-tenths of the law. And, uh, to be in possession of something, I would have to have it in my possession, not in somebody else's car that's registered to that person driving the car.
And by the time that there's these alleged drugs found, I'm not even nowhere in the same, uh, part of the town, you know. Um, so the fact that I was charged with a crime for that, like yeah, that -- that's -- I feel like that's definitely because of this situation in -- in point.
Q: Who charged you with that criminal offense you were talking about?
A: The White Pine -- or the Churchill County Sheriff's Department.
Q: Okay. Were you prosecuted by the Churchill County District Attorney's Office?
A: Yes, I was.
Q: And what was the result of that prosecution?
A: Well, I got arrested. And when I got arrested for the possession of drugs, um, I happened to have a taser in my pocket which I did not know was illegal for me to have. And so they -- then they charged me with expelling and possession of a taser, a stun device. And --

Page 50

1    MR. BUSBY: And just for --
2    A: -- I was --
3    MR. MAES: Yes, sir?
4    MR. BUSBY: I'm sorry, Mr. Maes. Just for the
5 record, I'm going to make a continuing objection to any questions
6 that relates to anything that's occurred after the events
7 surrounding the October 2016 termination of my client from
8 Churchill County. Go ahead.
9    MR. MAES: Yeah.
10   Q: Continue on, sir.
11   A: So, um -- yeah, there -- there -- I mean, I was
12 charged with a crime. And I had a taser in my pocket, and, uh, I
13 was told, "Either you can take this taser, or we can give you a
14 both. And we can give you the habitual criminal." So I said,
15 "Okay. I'll take the taser with a one to four," and, um, I'll
16 move on with my life. And hopefully, they will, too.
17   Q: So you're referring to -- you said I think that you
18 were charged with being an ex-felon in possession of a firearm;
19 is that right?
20   A: No. Ex-felon in possession of a taser stun device.
21   Q: Oh, excuse me. Thank you. So tell me about the
22 felonies you've been convicted of.
23   A: Um, okay. I've been convicted of sales of a
24 controlled substance. Um, I've been convicted of a home
25 invasion. I've been convicted of a, um, reckless endangerment,

Page 51

1 um, a robbery 3. I've been convicted of, um -- let's see what
2 else. Oh, an ex-felon of possession of a taser, and a handful of
3 miscellaneous misdemeanors. But I mean, it's all in my PSI
4 reports. So I mean, you could read that if you'd like, you know.
5    Q: Sure. Could you take a look at Exhibit number 3
6 for me, please?
7    A: Exhibit 3, yep.
8    Q: Exhibit 3 is your declaration.
9    A: Yeah, I see it right here.
10   Q: Yeah. Did you type this document up?
11   A: Did I type it? No.
12   Q: Yes. Yes. Were you present when this document was
13 typed up or prepared?
14   A: Yes.
15   Q: And where were you when that was done?
16   A: I was sitting in an office.
17   Q: The felony convictions that you've just told me
18 about, how long do they date back in terms of years?
19   A: Um, so from 2004 was my first conviction, and 2018
20 was my last conviction.
21   Q: So 2018 was the last time you were convicted of a
22 felony?
23   A: Of any crime, yes.
24   Q: Well, what was that particular crime of felony?
25   A: The possession of meth was the -- the -- the felony

Page 52

1 that got me arrested. So yeah. Um, yeah, it was the last felony
2 that I was, um, charged with and convicted of.
3    Q: All right. And where do you currently work?
4    A: Um, CVC Construction. It's a concrete company.
5 Um, I'm a concrete finisher.
6    Q: And you reside in Fallon; is that correct?
7    A: Yes.
8    Q: Are you from the Fallon area?
9    A: Um, no. I -- I lived there since 2013.
10   Q: Okay. And where did you live before Fallon?
11   A: Uh, a lot of places. Um, directly before Fallon
12 was Oregon.
13   Q: And what did you do up in Oregon?
14   A: Uh, nothing really. I was, um, unemployed, and I
15 did tattoos.
16   Q: Where were you born?
17   A: Rock Springs, Wyoming.
18   Q: How long have you worked for CVC Construction?
19   A: Almost four months.
20   Q: Are you currently on any sort of supervised
21 probation?
22   A: No.
23   Q: And where were you incarcerated with respect to
24 your last felony conviction?
25   A: I went to, um -- I -- I turned myself in Maricopa

Page 53

1 County and got transported to Churchill County, went to
2 sentencing and went to NNCC, at which time I did my intake. Then
3 I went to Stewart Camp.
4    Q: Okay. Where is Stewart Camp?
5    A: Next door to Northern Nevada Correctional Center,
6 Carson City.
7    Q: Okay. How many times have you ever met Mr. Erwine
8 in-person?
9    A: Um, can you -- can you, uh, repeat the question?
10   Q: Sure. How many times have you met Mr. Erwine
11 in-person?
12   A: Ever?
13   Q: Yes.
14   A: Uh, I don't know. Too many to count.
15   Q: Okay. So more than 10?
16   A: Well, I mean, I don't know how long we worked
17 together. But every day for the entire time we worked together,
18 I saw him daily, so yeah.
19   Q: All right. All right. I'm sorry, my question
20 wasn't a very good one, then. After October of 2016, how many
21 times have you met with Mr. Erwine in-person?
22   A: I don't know. I couldn't tell you off the top of
23 my head. Um, not more than a handful.
24   Q: Have you ever been to his home?
25   A: No.

Page 54

1     Q: Have you ever been out to have dinner with him, or
2 out with him socially?
3     A: No.
4     Q: Did he accept your Facebook request when you
5 friended him?
6     A: No.
7     Q: Are you married, Mr. Maes?
8     A: No, I'm not.
9     Q: Do you live with anybody?
10     A: I do.
11     Q: Who do you live with?
12     A: My friend, Sean.
13     Q: What's Sean's last name?
14     A: Osborne.
15     Q: And how old are you, Mr. Maes?
16     A: 34.
17     Q: Do you have any children?
18     A: Two.
19     Q: How old are your children?
20     A: 11 and --
21     MR. BUSBY: Objection.
22     A: -- 15.
23     MR. BUSBY: Relevance. This is completely
24 irrelevant in --
25     Q: Go ahead.

Page 55

1     MR. BUSBY: -- this case. Go ahead.
2     A: 11 --
3     Q: Go ahead.
4     A: -- and 15.
5     Q: When is the last time you spoke with Mr. Beaulieu?
6     A: Never have spoke with him.
7     Q: Okay. So you never -- you didn't know him after
8 that night or speak with him after that night that he was in
9 jail?
10     A: I never spoke with him ever.
11     Q: All right. When's the last time you talked to
12 Jimmy Thomas?
13     A: February last -- of last year.
14     Q: Do you know where he is currently?
15     A: I do not.
16     MS. PARKS: No further questions.
17     MR. BUSBY: Just a few follow ups, Mr. Maes.
18     REDIRECT EXAMINATION
19     BY: Mr. Busby
20     Q: Ms. Parks asked you a few questions about your
21 interactions with Mr. Erwine. Did Mr. Erwine ever tell you what
22 to say about the situation that occurred in the Churchill County
23 Jail?
24     A: Not at all. He just --
25     Q: Okay.

Page 56

1     A: -- asked what I remembered, and I told him what I
2 remembered. And then we came, and we discussed those -- those
3 things with you, or with your office.
4     Q: Did you ever get the sense that he was trying to
5 get you to say something one way or the other about what
6 happened?
7     A: No, not at all.
8     Q: Okay. So the testimony you gave earlier today is
9 -- it comes from you. It's not from anyone else, Mr. Erwine,
10 anybody else, right?
11     A: Right.
12     Q: Okay. All right. And are you testifying about
13 what occurred based on a motivation of given the animus or
14 ill-will towards Churchill County?
15     A: No, not at all.
16     Q: Okay.
17     A: I mean, in all -- all actuality, they -- they were
18 pretty good to me, you know. As far as, uh, all the places I've
19 been incarcerated, they were probably the nicest to me, matter of
20 fact.
21     Q: You mean the Churchill County Jail?
22     A: Yeah.
23     MR. BUSBY: Okay. All right. No further
24 questions.
25     MS. PARKS: Nothing further.

Page 57

1     MR. BUSBY: Ms. Parks? Okay. Mr. Maes?
2     MR. MAES: Yes.
3     MR. BUSBY: The court reporter is going to prepare
4 a transcript of your deposition.
5     MR. MAES: Uh-huh.
6     MR. BUSBY: And we'll send you a copy, if you'd
7 like. It's called a read-and-sign copy. And you're welcome to
8 review it and make changes to your testimony, or corrections on
9 what's called the errata sheet that will come along with the
10 deposition.
11     MR. MAES: Okay.
12     MR. BUSBY: If you do make any changes or
13 corrections to your testimony, those can be commented on. And
14 you can be confronted about those changes if it comes to pass
15 that you testify at trial in this matter. So if you'd like, I
16 can provide you with a copy of the deposition for your review?
17     MR. MAES: Yes, please. Uh, that'd be great.
18     MR. BUSBY: Okay. We will do that. Okay. Thank
19 you, Mr. Maes.
20     MR. MAES: Yeah. Not a problem.
21     MS. FLETCHER: This concludes the recorded
22 deposition of Matthew Maes. Before going off the record, Ms.
23 Parks, would you like to order a copy of the transcript?
24     MS. PARKS: Yes, please.
25     MS. FLETCHER: Okay. We are now going off the

Page 58

1  record, and the time is 3:34 p.m.
2       (Deposition adjourned at 3:34 p.m.)

Page 59

1                CERTIFICATE OF RECORDER
2  STATE OF NEVADA     )
3                      )
4  COUNTY OF WASHOE    )
5
6  NAME OF CASE:  MICHAEL ERWINE, PLAINTIFFS VS CHURCHILL COUNTY
7  ET.AL. DEFENDANTS
8
9      I, Sally Fletcher, a duly commissioned Notary Public,
10 authorized to administer oaths or affirmations in the State of
11 Nevada, do hereby certify: That I recorded the foregoing
12 deposition of the witness, Matthew Maes, on 01/25/2021.
13     That prior to being examined, the witness was duly sworn to
14 testify to the truth. That deposition was recorded via audio and
15 video pursuant to NRCP30(b)(3) and said deposition recording is a
16 complete, true, and accurate recording of deposition testimony.
17 A transcript was created by E-Depositions LLC to aid the audio video
18 recording. A review of the deposition [X] was [ ] was not
19 requested by the deponent and [ ] was [X] was not requested by a
20 party of the action. If a review was requested, any changes
21 communicated to me by the deponent during the period allowed are
22 appended hereto.
23     I further certify that I am not a relative or employee of
24 an attorney or counsel of any of the parties, nor a relative or
25 employee of an attorney or counsel involved in said action, nor

Page 60

1  a person financially interested in the action.
2      IN WITNESS WHEREOF, I have hereunto set my hand in the City
3  of Las Vegas.
4
5  *[Signature: Sally Fletcher]*
6
7  Sally Fletcher
8  Notary Public
9  Appointment No. 16-1551-1

Page 61

1  STATE OF NEVADA       )
2                        )SS
3  COUNTY OF WASHOE      )
4  Case Name: MICHAEL ERWINE, PLAINTIFFS VS CHURCHILL COUNTY
5  ET.AL. DEFENDANTS
6  Case Number: 3:18-cv-00461-RCJ-WGC
7  Deposition Date: 01/25/2021
8  Deponent: Matthew Maes
9          DECLARATION UNDER PENALTY OF PERJURY
10         I declare under penalty of perjury under the laws
11 of the State of Nevada, that I have reviewed the entire
12 recording of my deposition taken in the above-captioned matter
13 or the same has been played or read to me, and the same is true
14 and accurate, save and except for the changes and/or
15 corrections, if any, as indicated by me on the ERRATA SHEET
16 attached hereto and made part hereof, with the understanding
17 that I offer these changes as if still under oath.
18         Executed on this_____ day of_____,
19 2021, at _____,
20                                _____
21                                          Matthew Maes