# Exhibit 16

# Exhibit 16

## DECLARATION OF RON DREHER

I, Ron Dreher, declare that the assertions in this Declaration are true and correct, based upon my personal knowledge, and that I am competent to testify to the facts stated below:

1. I am a rebuttal expert witness for the Plaintiff in Michael Erwine v. Churchill County and Churchill County Sheriff Benjamin Trotter currently pending before the Federal District Court in Northern Nevada in Case No: 3:18-cv-00461-RCJ-WGC;

2. A true and correct copy of my February 17, 2021 report in this case is attached hereto in Exhibit 13.

3. If I were called to give expert testimony in this case, it would be substantively the same as is contained in my report attached hereto in Exhibit 13.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: _April 30, 2021_ In Reno, Nevada

By: _____

Ron Dreher

1 | LUKE A. BUSBY, ESQ
Nevada Bar No. 10319
2 | LUKE ANDREW BUSBY, LTD.
316 California Ave 82
3 | Reno, Nevada 89509
775-453-0112
4 | luke@lukeandrewbusbyltd.com
*Attorney for the Plaintiff*
5

6 | **UNITED STATES DISTRICT COURT**

7 | **DISTRICT OF NEVADA**

8 | * * *

9 | MICHAEL ERWINE,

10 | Plaintiff,                                      Case No.: 3:18-cv-00461-RCJ WGC

vs.

11

CHURCHILL COUNTY, a political
12 | subdivision of the State of Nevada;     **PLAINTIFF'S FRCP 26 SUR-**
CHURCHILL COUNTY SHERIFF        **REBUTTAL EXPERT WITNESS**
13 | BENJAMIN TROTTER; and DOES 1           **DISCLOSURE**
through 10 inclusive;

14

Defendants.

15 | _____/

16

17 | Pursuant to Rule 26(a)(2)(B) of the Federal Rules of Civil Procedure, Plaintiff

18 | MICHAEL ERWINE ("Plaintiff") hereby provides the following sur-rebuttal expert

19 | witness disclosure in accordance with the Court's Order at ECF #89.

20 | The Plaintiff designates the following sur-rebuttal expert witness to testify on his

21 | behalf:

22

23 | 1. Ronald Dreher
PO Box 40502
24 | Reno, Nevada 89504
775-830-8877
25

26 | Mr. Dreher is a police practices expert who will testify as to his rebuttal opinions

27 | in this case in response to the Defendant's expert Aubrey Corwin, as further described

28

1

in Mr. Dreher's report and associated expert witness disclosures attached hereto as Exhibit 1.

**DATED** this <u>Thursday, February 18, 2021</u>

By:_____

LUKE BUSBY, ESQ.
NEVADA STATE BAR NO. 10319
316 CALIFORNIA AVE #82
RENO, NV 89509
775-453-0112
LUKE@LUKEANDREWBUSBYLTD.COM
*ATTORNEY FOR PLAINTIFF*

2

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## **Exhibit List**

1. Dreher Sur-Rebuttal Expert Report and Disclosures

1
2
3

## **CERTIFICATE OF SERVICE**

4
5       Pursuant to FRCP 5, I certify that on the date shown below, I caused service to
6   be completed of a true and correct copy of the foregoing pleading by:

7   _____        personally delivering;

8
9   _____        delivery via Reno/Carson Messenger Service;

10  _____        sending via Federal Express (or other overnight delivery service);

11  \_\_\_x\_\_\_       depositing for mailing in the U.S. mail, with sufficient postage affixed
                thereto; or,
12
13  _____       delivery via electronic means (fax, eflex, NEF, etc.) to:

14              Katherine F. Parks, Esq.
15              Thorndal Armstrong
                6590 S. McCarran Blvd. Suite B.
16              Reno, NV 89509
                Attorney for the Defendant
17

18          **DATED** this Thursday, February 18, 2021

19
                            By:_____
20                          LUKE BUSBY, ESQ.
                            NEVADA STATE BAR No. 10319
21                          316 CALIFORNIA AVE #82
                            RENO, NV 89509
22                          775-453-0112
                            LUKE@LUKEANDREWBUSBYLTD.COM
23                          *ATTORNEY FOR PLAINTIFF*
24
25
26
27
28

4

# Exhibit 1

# Exhibit 1

# ADVOCACY  INVESTIGATION SERVICES
P.O. Box 40502
Reno, Nevada 89504
Nevada Private Investigator's License No. 1002
Telephone: 775-830-8877
FAX:       755-348-4662
E-Mail: NRS289@aol.com

Luke Busby, Esq.                                                         February 17, 2021
316 California Ave. #82
Reno, Nevada 89509

Re:    AIS Case No. 2021-01 - Mike Erwine  – Opinion and Analysis by Ronald P. Dreher.

Dear Luke:

As requested, I have reviewed the following documents in the case Mike Erwine vs. Churchill County,  Et Al., Case No:  3:18-cv-00461-RCJ-WGC. The opinions listed herein are my response and rebuttal to Ms. Corwin's Earning Capacity Evaluation and her deposition:

**Documents reviewed:**

1. **Aubrey A. Corwin - Redacted Corwin report – Earning Capacity Evaluation – Michael Erwine v. Churchill County, ET AL, US District Ct. Case 3:18-cv-00461-RCJ-WGC, Corwin File No: 20L 1204-11453**

2. **US District Ct. - Amended Complaint – DC.No. 3:18-cv-00461-RJC-WGC – Filed August 6, 2020, Document No. 63.**

3. **US Court of Appeals For the Ninth Circuit – DC. No. 3:18-cv-00461-RJC-WGC - - MEMORANDUM – Filed – June 11, 2020.**

4. **US District Ct. Case No. 3:18-cv-00461-RJC-WGC – DEFENDANT CHURCHILL COUNTY'S RESPONSES TO PLAINTIFF'S FIRST REQUESNT FOR ADMISSIONS. November 25, 2020.**

5. **Michael S. Giurlani Background Investigation Review Regarding: Michael Erwine vs. Churchill County Case No. 3:18-cv-00461RCJWGC. – August 31, 2020.**

6. **Gil Coleman supplement to expert report – Damage letter – September 2, 2020.**

7. **Initial Disclosures report – December 19, 2018**

8. **December 12, 2016 – E-mail from Mike Erwine to Detective Scott Olson (LVMPD)**

9. **December 12, 2016 – E-mail from Detective Scott Olson (LVMPD) to Mike Erwine**

**10. November 22, 2016 – E-mail from Toni Bolton (LVMPD) to Mike Erwine**

**11. Declaration of Matthew Maes – January 18, 2021**

**12. Affidavit of Andrew Allen Beaulieu – June 5, 2018**

**13. Declaration of Michael Erwine – April 3, 2019**

**14. Mutual Release of all Claims – Proposed settlement agreement – unsigned/undated**

**15. Interviews with Michael Erwine.**

<u>**Introduction:**</u>

I have been representing professional peace officers in Nevada since 1983.

<u>**Overview:**</u>

On December 9, 2015, Deputy Mike Erwine became employed by the Churchill County Sheriff's Office (CCSO). Deputy Erwine applied for the CCSO September 2, 2015. He passed the background for that position and was hired. Between December 9, 2015 and October, 2016, Deputy Erwine participated in the CCSO Field Training Officer (FTO) process and successfully passed that training. He was assigned as a detention deputy. Deputy Erwine possessed a Category 1 Basic POST certification. During his tenure with CCSO he participated in various trainings and was provided with the general orders of the CCSO. General Orders of the CCSO describe various rules of conduct, use of force, detention duties and responsibilities, ethics and much more. Violations of those rules of conduct may result in discipline. Rules of conduct and actions required by deputies to take when violations of rules are observed are provided to require notification of violations to the deputies' supervisors. Thereafter, those supervisors must take the reported violations and investigate them in accordance with rules and regulations provided in the General Orders and in accordance with Nevada Revised Statutes (NRS). Nevada Revised Statutes Chapter 289 contain the peace officer bill of rights. Nevada peace officers are guaranteed due process in internal investigations regarding reported violations of the rules.

During my career as a law enforcement officer and as a representative of professional peace officers in Nevada, I have worked with and for members of law enforcement and members of local, state and federal elected officials in supporting, drafting and lobbying provisions of our peace officer's bill of rights under NRS chapter 289. In that capacity I have provided training to our professional peace officers in the application, administration and enforcement of these rights. These training seminars were attended by both non-supervisor and supervisor members of law enforcement including members of the Nevada Chief's and Sheriff's Association.

The Nevada Peace Officers Standards and Training Commission (POST) has adopted training that I have prepared in an effort to train law enforcement officials throughout our state in the

provisions of NRS Chapter 289.  Accordingly, state and local government law enforcement leaders are obligated to know the provisions of this chapter in order to ensure that the peace officers of our state are provided with due process when undergoing internal investigations.

NRS 289.055 requires law enforcement agencies to establish written procedures for investigating any complaint or allegation of misconduct made or filed against a peace officer employed by the agency and to make copies of the written procedures established available to the public.

**NRS 289.055  Establishment and availability of written procedures for investigating complaints and allegations of misconduct.  Each agency in this State that employs peace officers shall:**
    **1.  Establish written procedures for investigating any complaint or allegation of misconduct made or filed against a peace officer employed by the agency; and**
    **2.  Make copies of the written procedures established pursuant to subsection 1 available to the public.**
    **(Added to NRS by 1999, 948)**

CCSO Rules and Regulations, Chapter 2 (2.295) (Page ERO123) contains the following caption:

**"2.295 COMPLAINTS AND INTERNAL INVESTIGATIONS 2.300 Investigations: This section intentionally left blank".**

In my review of the "initial closures" regarding adherence to NRS 289.055, it appears that CCSO doesn't comply with the statute.

**Termination summary:**

On Monday, October 10, 2016, Churchill County Sheriff Ben Trotter met with Sheriff Deputy Mike Erwine.  He advised him that he was terminating him based on information he had received from Deputy Erwine's supervisor Sergeant Shawn Summers regarding several incidents occurring on October 8 and 9 2016.  The incident reports involved inmate – Andrew Beaulieu and inmate Matthew Maes.

Inmate Beaulieu was booked into CCSO detention center at 0332 hours, Saturday, October 8, 2016. Inmate Beaulieu requested and was denied water. He was belligerent and uncooperative toward deputies.  Deputy Erwine, who came to work later that morning around 0551 hours, provided water to Beaulieu and completed the booking process with him. Deputy Erwine completed a report on the water incident on his work computer.   The report, allegedly authored by Deputy Erwine was discovered by Sergeant Summers that day after he received a report from Inmate Beaulieu who was complaining about his treatment by the other deputies. Deputy Erwine's shift that day was 0600 hours to 1400 hours.

Inmate Matthew Maes incident occurred October 9, 2016 and involved a report by Deputy Jabines that Deputy Erwine had pointed and discharged his Taser at the inmate while laughing at him.

The accusation made by Sheriff Trotter to Deputy Erwine was that Deputy Erwine failed to report the incident involving Inmate Beaulieu to his supervisor and sided with the inmate encouraging the inmate to take civil action against CCSO.

Sheriff Trotter concluded that Deputy Erwine was a liability and stated that "…our Detention Division is being jeopardized by Deputy Erwine's continued employment here."  Sheriff Trotter advised Deputy Erwine that he was terminating him for failing to make his probation.  He then gave him a choice to resign or be fired.

Nevada Revised Statutes Chapter 289 provides certain rights to peace officers in Nevada. Those rights were not provided to Deputy Erwine by Sheriff Trotter. Deputy Erwine was not provided notice of Sheriff Trotter's decision to terminate him prior to the meeting with him on October 10, 2016.  Deputy Erwine was not investigated for the allegations that the Sheriff made against him.  Deputy Erwine was not given the right to have a representative of his choice present when the Sheriff made the allegations against him.  Deputy Erwine was not allowed to provide his side of what happened to Sheriff Trotter. Sheriff Trotter failed to provide due process to Deputy Erwine and gave him the ultimatum – Resign or be fired! Deputy Erwine chose to resign under duress.

NRS 289 provides for due process for peace officers when they are subject to investigations.

**<u>NRS 289.057</u>**  Investigation of allegation of misconduct; suspension without pay; review of file by peace officer in certain circumstances; law enforcement agency prohibited from keeping or making record of investigation or punitive action in certain circumstances.

    1.  An investigation of a peace officer may be conducted in response to a complaint or allegation that the peace officer has engaged in activities which could result in punitive action.

    2.  Except as otherwise provided in a collective bargaining agreement, a law enforcement agency shall not suspend a peace officer without pay during or pursuant to an investigation conducted pursuant to this section until all investigations relating to the matter have concluded.

    3.  After the conclusion of the investigation:

    (a) If the investigation causes a law enforcement agency to impose punitive action against the peace officer who was the subject of the investigation and the peace officer has received notice of the imposition of the punitive action, the peace officer or a representative authorized by the peace officer may, except as otherwise prohibited by federal or state law, review any administrative or investigative file maintained by the law enforcement agency relating to the investigation, including any recordings, notes, transcripts of interviews and documents.

    (b) If, pursuant to a policy of a law enforcement agency or a labor agreement, the record of the investigation or the imposition of punitive action is subject to being removed from any administrative file relating to the peace officer maintained by the law enforcement agency, the law enforcement agency shall not, except as otherwise required by federal or state law, keep or make a record of the investigation or the imposition of punitive action after the record is required to be removed from the administrative file.

    (Added to NRS by 2005, 620; A 2007, 422; 2011, 1750)

**NRS 289.060**   Notification and requirements for interview, interrogation or hearing relating to investigation; prohibition against use of certain statements or answers in subsequent criminal proceedings.

    1.  Except as otherwise provided in this subsection, a law enforcement agency shall, not later than 48 hours before any interrogation or hearing is held relating to an investigation conducted pursuant to NRS 289.057, provide a written notice to the peace officer who is the subject of the investigation. If the law enforcement agency believes that any other peace officer has any knowledge of any fact relating to the complaint or allegation against the peace officer who is the subject of the investigation, the law enforcement agency shall provide a written notice to the peace officer advising the peace officer that he or she must appear and be interviewed as a witness in connection with the investigation. Any peace officer who serves as a witness during an interview must be allowed a reasonable opportunity to arrange for the presence and assistance of a representative authorized by NRS 289.080. Any peace officer specified in this subsection may waive the notice required pursuant to this section.

    2.  The notice provided to the peace officer who is the subject of the investigation must include:

    (a) A description of the nature of the investigation;

    (b) A summary of alleged misconduct of the peace officer;

    (c) The date, time and place of the interrogation or hearing;

    (d) The name and rank of the officer in charge of the investigation and the officers who will conduct any interrogation or hearing;

    (e) The name of any other person who will be present at any interrogation or hearing; and

    (f) A statement setting forth the provisions of subsection 1 of NRS 289.080.

    3.  The law enforcement agency shall:

    (a) Interview or interrogate the peace officer during the peace officer's regular working hours, if reasonably practicable, or revise the peace officer's work schedule to allow any time that is required for the interview or interrogation to be deemed a part of the peace officer's regular working hours. Any such time must be calculated based on the peace officer's regular wages for his or her regularly scheduled working hours. If the peace officer is not interviewed or interrogated during his or her regular working hours or if his or her work schedule is not revised pursuant to this paragraph and the law enforcement agency notifies the peace officer to appear at a time when he or she is off duty, the peace officer must be compensated for appearing at the interview or interrogation based on the wages and any other benefits the peace officer is entitled to receive for appearing at the time set forth in the notice.

    (b) Immediately before any interrogation or hearing begins, inform the peace officer who is the subject of the investigation orally on the record that:

        (1) The peace officer is required to provide a statement and answer questions related to the peace officer's alleged misconduct; and

        (2) If the peace officer fails to provide such a statement or to answer any such questions, the agency may charge the peace officer with insubordination.

    (c) Limit the scope of the questions during the interrogation or hearing to the alleged misconduct of the peace officer who is the subject of the investigation. If any evidence is discovered during the course of an investigation or hearing which establishes or may establish any other possible misconduct engaged in by the peace officer, the law enforcement agency shall notify the peace officer of that fact and shall not conduct any further interrogation of the peace

officer concerning the possible misconduct until a subsequent notice of that evidence and possible misconduct is provided to the peace officer pursuant to this chapter.

(d) Allow the peace officer who is the subject of the investigation or who is a witness in the investigation to explain an answer or refute a negative implication which results from questioning during an interview, interrogation or hearing.

4. If a peace officer provides a statement or answers a question relating to the alleged misconduct of a peace officer who is the subject of an investigation pursuant to NRS 289.057 after the peace officer is informed that failing to provide the statement or answer may result in punitive action against him or her, the statement or answer must not be used against the peace officer who provided the statement or answer in any subsequent criminal proceeding.

(Added to NRS by 1983, 2097; A 1993, 2379; 2005, 622; 2011, 1750)

**NRS 289.080**  Right to presence and assistance of representatives at interview, interrogation or hearing relating to investigation; confidential information; disclosure; record of interview, interrogation or hearing; right of subject of investigation to review and copy investigation file upon appeal.

1. Except as otherwise provided in subsection 4, a peace officer who is the subject of an investigation conducted pursuant to NRS 289.057 may upon request have two representatives of the peace officer's choosing present with the peace officer during any phase of an interrogation or hearing relating to the investigation, including, without limitation, a lawyer, a representative of a labor union or another peace officer.

2. Except as otherwise provided in subsection 4, a peace officer who is a witness in an investigation conducted pursuant to NRS 289.057 may upon request have two representatives of the peace officer's choosing present with the peace officer during an interview relating to the investigation, including, without limitation, a lawyer, a representative of a labor union or another peace officer. The presence of the second representative must not create an undue delay in either the scheduling or conducting of the interview.

3. A representative of a peace officer must assist the peace officer during the interview, interrogation or hearing. The law enforcement agency conducting the interview, interrogation or hearing shall allow a representative of the peace officer to explain an answer provided by the peace officer or refute a negative implication which results from questioning of the peace officer but may require such explanation to be provided after the agency has concluded its initial questioning of the peace officer.

4. A representative must not otherwise be connected to, or the subject of, the same investigation.

5. Any information that a representative obtains from the peace officer who is a witness concerning the investigation is confidential and must not be disclosed.

6. Any information that a representative obtains from the peace officer who is the subject of the investigation is confidential and must not be disclosed except upon the:

(a) Request of the peace officer; or

(b) Lawful order of a court of competent jurisdiction.

Ê A law enforcement agency shall not take punitive action against a representative for the representative's failure or refusal to disclose such information.

7. The peace officer, any representative of the peace officer or the law enforcement agency may make a stenographic, digital or magnetic record of the interview, interrogation or

hearing. If the agency records the proceedings, the agency shall at the peace officer's request and expense provide a copy of the:

    (a) Stenographic transcript of the proceedings; or

    (b) Recording on the digital or magnetic tape.

    8.  After the conclusion of the investigation, the peace officer who was the subject of the investigation or any representative of the peace officer may, if the peace officer appeals a recommendation to impose punitive action, review and copy the entire file concerning the internal investigation, including, without limitation, any recordings, notes, transcripts of interviews and documents contained in the file.

    (Added to NRS by 1983, 2098; A 1991, 647; 1993, 2380; 2005, 623; 2011, 1752)

**NRS 289.040**  Law enforcement agency prohibited from placing unfavorable comment or document in administrative file of peace officer; exception; right to respond; provision of copy of comment or document; right to review administrative file under certain circumstances.

    1.  Except as otherwise provided in subsection 3, a law enforcement agency shall not place any unfavorable comment or document in any administrative file of a peace officer maintained by the law enforcement agency unless:

    (a) The peace officer has read and initialed the comment or document; or

    (b) If the peace officer refuses to initial the comment or document, a notation to that effect is noted on or attached to the comment or document.

    2.  If the peace officer submits to the law enforcement agency a written response within 30 days after the peace officer is asked to initial the comment or document, the peace officer's response must be attached to and accompany the comment or document.

    3.  If a peace officer is the subject of an investigation of a complaint or allegation conducted pursuant to NRS 289.057, the law enforcement agency may place into any administrative file relating to the peace officer only:

    (a) A copy of the disposition of the allegation of misconduct if the allegation is sustained; and

    (b) A copy of the notice of or statement of adjudication of any punitive or remedial action taken against the peace officer.

    4.  A peace officer must be given a copy of any comment or document that is placed in an administrative file of the peace officer maintained by the law enforcement agency.

    5.  Upon request, a peace officer may review any administrative file of that peace officer maintained by the law enforcement agency that does not relate to a current investigation.

    (Added to NRS by 1983, 2097; A 1991, 2213; 2005, 621)

Sheriff Trotter, on October 10, 2016, in requesting and ordering Deputy Erwine to meet with him failed to notice Deputy Erwine of the charges against him in accordance with NRS 289.060; failed to investigate Deputy Erwine in accordance with NRS 289.057; failed to provide him with representatives as required by NRS 289.080 and drafted and placed documents in Deputy Erwine's personnel file without providing those documents to Deputy Erwine as required by NRS 289.040.  Deputy Erwine, subsequent to his resignation in lieu of being terminated, was denied his ability to respond to Sheriff's allegations. He was denied due process!

Sheriff Trotter, Sergeant Summers and other representatives of the CCSO, by their actions and inactions, and by their violations of  Deputy Erwine's rights as provided by NRS Chapter 289,

have branded and labeled Deputy Erwine as a "liability" preventing him from being hired as a peace officer by Nevada state or local government peace officer agencies.

**<u>Corwin Report - Opinion:</u>**

In response to Ms. Corwin's Earning Capacity Evaluation I noted that Ms. Corwin compiled a chronological background on Mr. Erwine with her objective being to evaluate his earning capacity and to rebut Dr. Coleman's loss calculations. Her report goes into some detail about Mr. Eriwne's employment history and then delves into what occurred during Mr. Erwine's ten month history with Churchill County SO.  She then briefs Mr. Erwine's termination/voluntary resignation on October 10, 2016.

Ms. Corwin summarizes  Mr. Erwine's rejections of law enforcement employment by Las Vegas Metro PD, North Las Vegas PD, Nevada Department of Public Safety, Washoe County S.O., Carson City  Department of Alternative Sentencing, Douglas County SO and Reno PD.  She concludes that his legal claims are "unsubstantiated" based on her review of the record; that he voluntarily resigned and that he was a probationary employee and could be "…dismissed without a cause or right of appeal…".   She further concludes that "There is no evidence at the time of this report that 'Trotter's memorandum was provided to the law enforcement agencies' other than Washoe County Sheriff's Department (sic), for which Mr. Erwine made application as outlined…or that any Defendant knowingly made false and defamatory statements about Plaintiff's employment history….".

Ms. Corwin's November 16, 2020 "Earning Capacity Evaluation" report, page 2 (paragraph 3and 4) states

> "As a rehabilitation counselor, I specialize in the assessment of an individual's ability to work and earn wages with or without consideration of the impact of an impairment or disability on their ability to work. This is commonly referred to as a 'vocational assessment' or 'earning capacity evaluation'." She goes on to state "…assessing one's vocational potential is individual specific. It considers one's academic level of achievement, work history, work skills, medical history (where relevant), geographic area of residence or where one would likely seek work or be employed. It considers review of research, both peer reviewed and industry based."  She goes on to state that "My work in this case and opinions were developed consistent with my professional scope and standards of practice as a Certified Rehabilitation Counselor and Licensed Professional Counselor."

Page 17 of Ms. Corwin's "earning capacity evaluation" states that she evaluated Mr. Erwine's earning capacity using the "RAPEL methodology." She defines this as "Rehabilitation Labor market access, placeability, earnings labor force participation and worklife expectancy both before and after his resignation. (Corwin Depo p. 42-43).  This is how she attempts to apply those variables:

In rebuttal to Ms. Corwin's Rehabilitation Labor market access statement and what she has written regarding Mr. Erwine's earning capacity based on that term, she seems to imply that Mr.

Erwine has been rehabilitated because he is capable of being a security guard and is currently employed by the Washoe Tribe as a police officer.  She fails to mention, or doesn't understand, that Mr. Erwine's earning capacity has been reduced substantially due to his inability to be employed by a Nevada state or local government law enforcement agency. (Corwin Depo. P-43-lines 10-13). The damages to his earning capacity is substantial if he is not employed in a Nevada state or local government law enforcement agency.

As to "labor market access" and "placeability" Corwin states:

> "However, my evaluation of the employment records, my evaluation of the information that I have available to me, that Mr. Erwine, he was -- had voluntarily resigned in lieu of termination during his probationary period and retains earning capacity, labor market access in placability to work as a police officer." (P-29 lines 21-25)

As to "labor force participation and work life expectancy" she cites his employment possibilities of being a security officer and his position as a Washoe Tribe police officer.  She states that her assessment is that he has 34.42 years of work life remaining from the time he resigned.  (Corwin Depo. Page 44, lines 11-15.

In Ms. Corwin's report on pages 18 through the first paragraph of page 24, she cites Mr. Erwines' previous jobs, how and when he applied for he CCSO Deputy Sheriff position, his "at will" status, his probationary status, his pay, some "Safety Rules and Regulations" of Churchill County Human Resources, some of his Field Training Officer (FTO), daily observation reports (DOR's), previous meeting with Captain Matheson, Sheriff Trotter's memorandum of October 7 2016 and October 10, 2016, a portion of the "Agreement" between CCSO and the CCSDA for fiscal year 2019 stating in italics that *"During the probationary period, employees may be dismissed without cause or right of appeal.*", the responses from the Department of Public Safety, Washoe County SO,  LVMPD, Carson City Department of Alternative Sentencing, Douglas County SO, NLVPD and Reno Police Department rejecting his application for employment.

Ms. Corwin ended her analysis with her conclusion that:

> "There is no evidence at the time of this report that Trotter's memorandum was provided to the law enforcement agencies,"(sic) other than Washoe County Sheriff's Department (sic), for which Mr. Erwine made application as outlined in the Amended Complaint or that, anyone Defendant knowingly made false and defamatory  statements about the Plaintiff's employment history which was published to the Washoe County Sheriff's Office, the Las Vegas Metropolitan Police Department, the Carson City  Department of Alternative Sentencing, the Douglas County Sheriffs Office, the Nevada Department of Public Safety Letter, and the North Las Vegas Police Department. Specifically, Trotter made the false statement of fact that Erwine 'clearly violated' Churchill County Sheriff's Office policies, 'on Taser and Use of Force', as well as, behavior standards." ( Corwin Earning Capacity Report Page 23 – 24.)

In rebuttal and in contrast to Ms. Corwin's statement that no evidence existed that Sheriff Trotter's October 10, 2016 memorandum was provided to law enforcement agencies, defendant's documents state otherwise:

> "Defendant admits in their "Defendant Churchill County's Responses To Plaintiff's First Request For Admissions  "Request for Admission No.14" "Admit that in response to the inquiry from the Washoe County Sheriff's Office requesting information regarding Erwine's employment with the Churchill County Sheriff's Office in ERWOO64-ERW0065, Churchill County sent the Washoe County Sheriff's Office a copy of Erwine's personnel file. See WC001-0130 and ERWINE 688-689",  And "Request for Admission NO. 15" "Admit that in response to the inquiry from the Washoe County Sheriff's Office requesting information regarding Erwine's employment with the Churchill County Sheriff's Office in ERW0064-ERW0065, Churchill County sent the Washoe County Sheriff's Office a copy of the October 10, 2016 Memorandum disclosed in ERW0053-55. See ERWINE 688-689."

In my opinion Ms. Corwin ignored the admissions by defendant's when assessing Mr. Erwine's earning capacity. If Washoe County SO had the memorandum(s) from Sheriff Trotter there is no doubt in my mind that the other law enforcement agencies that Mr. Erwine applied for either had the same copies of those memorandums or had been verbally advised of those memorandums by Sheriff Trotter or his representatives.

Ironically though in her deposition she states in relevant part –

> "Um, well, Mr. Erwine's earning capacity, given his background, skills, education, and training, is that of a police officer. He's also held other jobs in his past that he would have labor market access in placability to, so his earning capacity would be predicated on jobs such as a police officer and the commensurate wages." (P 42 – lines 12-17)

> "He also has an earning capacity working doing security.  He has an earning capacity predicated on other jobs he's held in the past.  I would say working as a police officer would be the best representation of his future earning capacity." (P-43, Lines 10-13).

Mr. Erwine has been labeled as a liability by Sheriff Trotter. Accordingly, the chances of him being employed by a state or local government Nevada peace officer agency is almost zero.

Ms. Corwin's assessment, or her assumptions that Mr. Erwine's earning capacity remains the same regardless of whether he is ever employed by another law enforcement agency regardless of the fact that he has been branded and labeled as a liability to not only Churchill County SO, but other Nevada law enforcement state or local government agencies as well.  My rebuttal to her assessment is that this is not true given his rejection by the aforementioned law enforcement agencies.  To state that he now works for the Washoe Tribe and that his earning capacity

somehow is okay indicates that Ms. Corwin lacks a thorough understanding of the differences in earning capacities between state and local law enforcement agencies and Nevada Tribal peace office sovereign agencies.

Ms. Corwin states in her deposition that her opinions and assessments are based on facts and not on assumptions.  She objects to Dr. Coleman's report stating that his assumptions are not based on fact. She states that without an earning capacity evaluation being performed in the initial assessment the amount Mr. Erwine could earn in his lifetime would be pure speculation. (Corwin Dep. P-23-24).

Ms. Corwin did not interview Mr. Erwine in her assessment of his earning capacities. However, she basis her conclusions, lack of evidence and lack of substance on Mr. Erwine's earning capacity on Churchill County SO's reports and appears to believe and state that those reports are factual and truthful. She did not have time to interview Mr. Erwine. (Depo. Page 67-68)

 My rebuttal to Ms. Corwin's failure to interview Mr. Erwine is that when an investigation is requested and a noted expert witness such as Ms. Corwin is retained to investigate, she has the responsibilities to review all sides of the issue.  Absent Mr. Erwine's side of the termination/resignation being received – in person – or in his deposition (which I have not seen or read) it is unconscionable that his side of what happened was not requested by her.  Ms. Corwin's basis for Mr. Erwine's lack of earning capacity is simply that he resigned because of the incidents that occurred in or about October 8, 9 and 10, 2016, and because he was "at will" and a probationary employee.  No credence was apparently given to Mr. Erwine for what he witnessed and what he reported to his supervisors over his tenure with CCSO regarding inhumane acts towards inmates. Ms. Corwin, in my opinion was remiss in her assessment in not interviewing Mr. Erwine.   Ms. Corwin believes that with "34.42" years left in Mr. Erwine's life he may be able to gain law enforcement positions similar to the one that he has with the Washoe Tribe.  In rebuttal and in my opinion, what she apparently does not understand is that in Nevada once a law enforcement officer is branded as a liability, and as a "rat" by his supervisors,  the chances of that officer being employed by a state or local government law enforcement agency is nearly zero.  Mr. Erwine was hired by the Washoe Tribe Indian police as an officer.  However, the Washoe Tribe Indian police agency is not a Nevada state or local government law enforcement agency.

In reviewing her report in conjunction with her assessment and methodology used to assess Mr. Erwine's earning capacity it appears that she did not consider Mr. Erwine's ability to work and earn wages with or without consideration of the impact of an impairment on his ability to work.  In my opinion and in rebuttal to her assessment, Ms. Corwin's "individual-specific" assessment and methods used to assess Mr. Erwine's earning capacity failed to consider his academic level of achievement, his work history, his work skills, his geographic area of residence or where he would likely seek work or be employed.  She merely considered that he "voluntarily resigned" and was a probationary employee.

In my opinion and in rebuttal to Ms. Corwin,  Ms. Corwin's conclusions for Mr. Erwin's inability to gain law enforcement employment after he resigned from Churchill County S.O. in lieu of being terminated lacks credibility due to her personal lack of how our law enforcement

community works in Nevada when it comes to hiring officers like Mr. Erwine given what happened when he resigned.

According to  Mr. Erwine he resigned after being told he was being terminated by the Sheriff on October 10, 2016.  He was not advised that he was under investigation. He was not given a copy of the investigation. He was told that he was a liability and that he sided with the inmates and not the sheriff's office.  Accordingly, he was labeled and branded as a "no hire".  On October 10, 2016, Mr. Erwine's career in law enforcement in Nevada, that he trained for and worked for ended.

In Nevada, when an individual applies for a law enforcement position, a release of background information is required to be signed by the applicant. There is notice given to the applicant that they will not be able to see any background documents, verbally or otherwise, that is provided to the agency by any source providing documents.  Given the fact that Mr. Erwine was rejected by the local and state law enforcement agencies in Nevada where he applied, there is evidence that Churchill County SO and Churchill County released any and all documents regarding Mr. Erwine's employment to the requesting agencies either verbally or in writing. The Department of Public Safety Background POST certified course trains background investigators to make contact with the applicant's previous employers and to find out the reason why the applicant left their previous employer, especially if the previous employer is a law enforcement agency. The investigators are trained to make in-person or telephonic contact with the previous agencies and trained to go beyond what the applicant states in their application.  In other words the investigators are told to find out what really happened when the applicant left their previous employer.  In this case defendant Churchill County admits that this occurred and that Sheriff Trotter provided the damaging memorandums regarding Mr. Erwine termination/resignation to the Washoe County SO background investigator(s).
.
It is my opinion it is very likely that all of the reports that Ms. Corwin reviewed that described Mr. Erwine's history of employment with Churchill County SO were supplied, either verbally or in writing to those requesting agencies as well.  The comments by Las Vegas Metro Police Department (LVMPD) and North Law Vegas  Police Department (NLVPD), stating in writing that Mr. Erwine can never again (indefinitely) apply for those departments, substantiate the fact that Mr. Erwine has been branded and labeled as being unfit to be a peace officer in Nevada.

Corwin states, "There is no support for Dr. Coleman's opinions that Mr. Erwine would have been an appropriate candidate for hire at LVMPD, that he planned to move to Las Vegas, that he would have remained a police officer with LVMPD for his entire worklife, or that would have been promoted to a sergeant and then a lieutenant."

I rebut as follows:  In contract to Ms. Corwin's statement, the documents supporting Mr. Erwine being hired by and retained by LVMPD are contained in the November 22, 2016 email. In that e-mail from Toni Bolton, LVMPD Office of Human Resources, she congratulates Mr. Erwine and advised him that he has "…successfully passed the Police Recruit (NTN) selection process."  He was advised in that e-mail that a "…comprehensive background investigation…"would be the next step in his being considered for employment and that he would be contacted by a "Background Investigator".

In my opinion given Mr. Erwine's background prior to his constructive discharge from Churchill County S.O., he would have passed the background investigation and been hired by LVMPD contingent on his passing the polygraph examination.  It should be noted that Mike Erwin had passed the Voice Stress Analyzer (CCVSA) process given to him by CCSO. (This is a similar investigative tool used in many law enforcement agencies in lieu of the polygraph.) Given that fact he most likely would have passed the LVMPD polygraph examination.

Ms. Corwin states, "Just as an example, in the employment records of LVMPD, it was noted Erwine "does not meet LVMPD hiring standards based on Employment History ... You are not eligible to apply with LVMPD for any position indefinitely, and your name will be removed from all eligibility list(s) and processes." There is no evidence that this decision was in any way due to any action by Churchill County. In addition, LVMPD stated, "No assumption is made that you could not be approved for appointment with another police department."

Mr. Erwine was congratulated by LVMPD for successfully passing the Police Recruit selection process (Toni Bolton – LVMPD e-mail to Erwine – Nov. 22, 2016) when Mr. Erwine passed the background process and was hired by Churchill County SO in 2015. His background was untainted.  Sheriff Trotter's memorandum of October 10, 2016 states that Mr. Erwine was a liability to the sheriff's office based on incidents occurring on October 8, 9, 2016. Mr. Erwine signed a waiver granting access for the background investigators to his records – all of them. Mr. Erwine's e-mail response to LVMPD Detective Scott Olson of December 12, 2016, provides Mr. Erwine's side of what happened and why he resigned in lieu of being terminated.

Accordingly, Detective Olson most likely obtained or had already obtained Sheriff's Trotter's October 10, 2016 memorandum stating his reasons for terminating Mr. Erwine.  Sheriff Trotter's memorandum tainted Mr. Eriwine's background by labeling him a "liability".  It is abnormal for a Nevada Law Enforcement department to indefinitely ban an applicant for any employment.   In today's law enforcement world being labeled a "liability" and being terminated for that reason is a law enforcement career killer in my opinion.

Ms. Corwin states: "There is no foundation to support any opinion or claim that Mr. Erwine has sustained any past lost wages or future loss of earning capacity due to his voluntary separation from the Churchill County Sheriffs Department. Mr. Erwine has apparently been able to obtain and maintain employment with the Washoe Tribe, among other employers prior to this, following his resignation in 2016."

In rebuttal to Ms. Corwin, Tribal police departments and Nevada law enforcement departments do not have identical job duties, responsibilities, compensation or benefits.  Tribal police compensation and benefits are disparate in comparison with most Nevada State or Local Government law enforcement agencies.  While most Tribal police agencies require a POST certificate they are not necessary for employment unless the Tribal chief requires same.  Nevada POST doesn't recognize Tribal police departments.  To the best of my knowledge Tribal police officers work "at will".  Whereas Nevada state and local government law enforcement agencies have property and liberty interest rights either through Nevada Revised Statues, through collective bargaining agreements or both.   Tribal police agencies are Sovereign and each tribe

13

can set its own rules and minimum requirements.  They can individually set their own job duties and responsibilities. The laws the officers enforce are those set by the tribe. The jurisdiction in enforcing capital crimes are federal. Nevada local government and state government law enforcement agencies enforce state and local laws.   Some tribal police agencies have memorandum of understandings with their local sheriff offices for officer safety and jurisdiction purposes.

The pay is much less in the tribal police agencies.  The officers are usually tasked with minimal law enforcement duties – traffic control, some patrol functions, limited investigative functions and limited interactions with the public.  Unless the officer is part of the Tribe or is an Indian (Native American) there is little chance of advancement.

In Nevada, a POST certificate is good for 5 years.  Mr. Erwine advised me that because he is working for tribal police, Nevada POST is accepting his employment as fulfilling the annual POST requirements that he needs in keeping his POST certificate valid. As mentioned, Mr. Erwine currently holds a  Category 1, Basic POST certificate. Mr. Erwine states that he has Associate Criminal Justice degree as well.

If Erwin was hired by a state or local law enforcement agency he would be entitled to the compensation and benefits each sheriff's office or police agency has in NRS or in their collective bargaining agreement or both.  He would be entitled to our Nevada PERS retirement. His ability to learn the many facets of policing is enhanced. His ability to promote is enhanced.  His ability to transfer from one agency to the next through lateral transfers is enhanced. Tribal police agencies do not offer these benefits.

In my opinion Ms. Corwin's conclusions that "There is no foundation to support any opinion or claim that Mr.  Erwine has sustained any past lost wages or future loss of earning capacity due to his voluntary separation from the Churchill County Sheriff's Department", is incorrect and is not based on the facts of this case given what happened to Mr. Erwine during his tenure with CCSO.

To rebut Ms. Corwin and in contrast to Ms. Corwin's conclusions here is a list of most damages Mr. Erwine has sustained in being labeled a "liability" and branded as a "no hire" by Churchill County SO Sheriff Trotter. Based on the documents I have reviewed Sheriff Trotter has shared his views about Mr. Erwine's future employment with the law enforcement agencies in this report.

**Damages:**     Loss of Police/Fire NV PERS defined benefit retirement system.
Loss of post retirement life insurance benefits
Loss of employer paid medical, health, dental and life insurance benefits
Loss of premium benefits for being a training officer, investigator, motor officer, narcotics officer, administrator.
Reduced overtime and loss of call back overtime
Loss of shift differential pay
Reduced Uniform Allowance
Loss of Bilingual pay
Reduced Holiday Pay

Reduced sick leave
Reduced Vacation Pay
Loss of NRS 289 rights
Loss of Collective Bargaining rights under NRS 288
Loss of Police/Fire Heart/Lung lifetime benefits NRS 616 and 617.

**Gil Coleman's documents – reviewed:**

Page 5 of Mr. Coleman's compensation evaluation report includes his assumptions on Erwin's
lifetime earnings. My copy of that report doesn't include the compensation and benefits
comparisons of the tribal police as compared to the LVMPD and WCSO data. I do not have the
"Growth and Discount Rates page" attached to my copy of Coleman's document.

In a telephone call with Mr. Colemen on February 6, 2021, I did discuss his loss calculations of
Erwine's damages. Mr. Coleman explained how he calculated earnings and did include the
potential NV PERS lifetime damages as well. Mr. Coleman explained his past dealing with
Nevada Retired Public Employees of Nevada (RPEN) association and his past work with them.

In my opinion Nevada PERS is best in class and one of the best retirement systems in the United
States. If the earning capacity of Mr. Erwine was based on his employment as a peace officer in
a Nevada state or local government law enforcement agency he would be entitled to retire with
20 years of service at age 50. His contribution rate is 2.5% of each year of his police service.
NV PERS is calculated on his highest three (3) years of service. Hypothetically, if Mr. Erwine
retired at age 50 with 20 years of service in the NV PERS and he was making $100K a year, he
would receive $50K for the rest of his life with COLA's over that same period of time. NV
PERS is a defined benefit plan.

It is my opinion that Mr. Erwine has been labeled as not being qualified to be a professional
peace officer by a significant amount of law enforcement agencies in Nevada.

I do not know Mike Erwine. I do know Don Gibson and Mike Giurlani and have the greatest
respect for both of those highly qualified Nevada peace officers.

As I stated in the beginning of this report I have been representing Nevada professional peace
officers since 1983. Our law enforcement officers today are under scrutiny from the public. The
role of law enforcement officers and our objective is to "protect and serve". That is what we do
and why I represent peace officers.

Sincerely,

Ronald P. Dreher,
Executive Director -
Advocacy Investigation Services
Retired Reno Police Officer
775-830-8877

Cc:     file

**DISCLOSURES:**

**Testimony:**

**Expert Testimony  by Ronald P. Dreher, Chief Negotiator – Peace Officers Association of the Clark County School District (POACCSD):**

**IN THE MATTER OF THE ARBITRATION  BETWEEN  POLICE OFFICERS ASSOCIATION OF THE CLARK COUNTY SCHOOL DISTRICT (POACCSD)  AND CLARK COUNTY SCHOOL DISTRICT (CCSD),  WAGE STEP GRIEVANCE ,  FMCS File #160519-55312-3 HEARING: November 15, 2016 Las Vegas, Nevada, HEARING CLOSED: January 31, 2017 ARBITRATOR: Timothy D.W. Williams Arbitration Decision – March 31, 2017**

**Other testimony:**

**1999 through 2017 - Nevada State Legislature – Government Affairs Director for the Peace Officer's Research Association Of Nevada (PORAN) – drafting bill, testifying in front of the committees as a whole and individual committees.**

**2013 through 2019 – Nevada State Legislature – Lobbyist for the Law Enforcement Coalition, Washoe County School Principals' Association, Reno Police Protective Association – testifying in front of legislative committees; working with Legislative Counsel Bureau attorneys in drafting NRS 289, 288, 286 legislation.**

**2021 – Associate Government Affairs Director for the Reno Police Protective Association .**

**Publications –**

**Monthly police labor articles in the PORAC (Peace Officer Research Association of California) magazine from 2000  through 2017.  There were months that I had others write and publish the articles.**

**2001 to Present : author of the now POST certified PORAN labor representation training for numerous Nevada state and local law enforcement associations.**

**I continue to instruct and mentor law enforcement associations and employee organizations in labor representation.**

**Fee Schedule:**

**Hourly rate - $100.00 per hour – 15 minute increments  - all inclusive**
**Standby rate - $100.00 per hour – 15 minute increments**
**Travel rate - $50.00 per hour**
**Mileage Rate – IRS rates**

**Miscellaneous rates – Hotel, air, car rentals, copying, binders, etc at hourly rate as indicated above.**

**Resume:**

**Attached - dated – February 17, 2021**

<u>**PROFESSIONAL RESUME**</u>

Date:                              February 17, 2021

**Name:**                    **Ronald Phillip Dreher**

Business
Address:                          PO Box 40502, Reno, NV 89504

Telephone:
Business:                         775-830-8877
FAX:                              775 348-4662

Residential History:              Nevada resident since 1955

Current Employment:               Self-employed  - Advocacy Investigation Services – 1999
                                  to present.
                                  Nevada Private Investigator's license no. 1002.
                                  Nevada Process Server's license no. 1002
                                  City of Reno Business License no:8868

Past Employment:                  Reno Police Department -
                                  March 15, 1973 to July 23, 1999
                                  Honorably retired - Reno Police Department – Major
                                  Crimes Detective.

Law Enforcement:                  Project Transition - U. S. Army -
                                  Law Enforcement - 1971
                                  Southern Pacific Railroad Police
                                  1971
                                  Airport Police - City of Reno 1973
                                  Patrol Officer - City of Reno 1977
                                  Accident Investigator: 1979
                                  Motorcycle Officer: 1980
                                  Academy Training Officer 1980
                                  Field Training Officer – 1983-1987
                                  Undercover Narcotics - 1981-1983
                                  Patrol Officer - 1983

Critical Task Officer - 1983
Patrol Officer - 1983 - 1987
Burglary Detective - 1987 - 1988
Robbery/Homicide Det.-1988-1992
Major Crimes Detective - 1992 - 1998
Patrol Officer - 1998
Robbery/Homicide Detective (January 4,1999 through July 23, 1999).

Educational Background:    Earl Wooster High School - 1966
General Studies - diploma
Bachelor of Arts Degree - May, 1979
University of Nevada - Reno
Major: Social Services and Corrections
Minor: Criminal Justice

Military:    U.S. Army - 1968 – 1971
82nd Airborne in the USA
Served in Vietnam – 1969-1970,
173rd Airborne - Vietnam
Military Occupation: Airborne
Honorable Discharge

Formal Training:    Advance Course on The Reid Technique    of
Interviewing and Interrogation - March, 1999

Advanced Interview Techniques  -
January 1999

Hicks and Walt
Implementing the New Rules for Sexual Harassment
4 hours - July 31, 1998

State of Nevada - Attorney General
Domestic Violence Advanced Investigation
24 hours - February, 1998.

Dale Carnegie Employee Development Course - Human
Side of Law Enforcement
40 hours - November, 1995

California Homicide Investigator's
Seminar - 1997, 1995, 1993 and 1990
Child Fatality Review Team Training - 1994
Vehicle Pursuits - Reno PD - 1994
International Homicide Investigation - Seminar - 1994

FBI - Interpersonal Violence - 1992
VICAP - Case Management - 1992
Southern Police Institute – Solving Unresolved Homicides - 1991
Homicide - Death Investigation - 1991
Basic Blood Spatter - 1990
Kinesic Interviewing School - 1988
Field Training Officer - 1978-79 and 1984
Performance Appraisal Seminar - 1984
Employee Appraisal Seminar - 1984
Job Analysis Seminar - 1984
Work Performance Standards Seminar - 1984
Crime Scene Investigation - 1978 and 1979
Drug Enforcement - Basic Academy – 1981
National Intelligence Academy - 1981
Air Smuggling Seminar - 1982
Nevada Basic POST certificate - 1977
Nevada Intermediate POST certificate -1984.

Professional background:

Instructor - Principles of Drug Abuse
Truckee Meadows Community College - 1985
Staff Instructor – Back-to-back police academies - 1980
Community Services - Crime Prevention
Drug Abuse - Recognition and Prevention
Elementary, Middle and High School - 1984
Dispatch Training - 1995 through 1997
Police Briefing Training - Laws of Arrest
Departmental Training - Development of critical task manual - revamping the
employee appraisal process for Reno Police Officers - 1983 - 1984, 1998.
Field Training Officer - Patrol,
Detectives - 1978 through 1999.
Case management for major case investigations - 1995 through 1998.
Instructor – PORAN POST certified
Representative Training – 1999 to present.

Professional Labor Background/Experience:

Secretary - Reno Police Protective
Association (RPPA) - 1983,
President - RPPA - 1984 - 1986

19

Lobbied PORAC to allow Nevada
Associations to be members - (1983)
Secretary - RPPA - 1987- 1990
Vice President - RPPA 1990 - 1995
President - RPPA 1996 – 1999
Executive Director –1999-2003 Discipline/Discharge -
Representative 1983 to present.
Chief Negotiator - RPPA Negotiation Team
1983, 1985, 1996 through 2003 and 2011 to the present
time
Director - PORAN - 1996 - 1998
President - PORAN – 1998-2006
PORAN - Gov. Affairs Dir. 2006-
December 1, 2017
Chief Negotiator – RAPG – 2006 to present.
Chief Negotiator – Pershing County
LEA – 2001
Chief Negotiator - Airport Authority POA – 2011-2013
Chief Negotiator – Lovelock POA – 2013
Chief Negotiator – WCSDA 2006
Chief Negotiator – MPOA 2007-2013
Chief Negotiator – SPPA 2006-2009
Chief Negotiator – ECSDA 2007 to 2014
Chief Negotiator – WPOA 2009-2013
Chief Negotiator – WCPAA 2008-2017
Chief Negotiator – CCDSA 2006 to 2017
Chief Negotiator – CCSSA 2006 to Present.
Chief Negotiator – WCSPOA 2012-present.
Chief Negotiator – APTA 2015-Present
Chief Negotiator – WCNA 2013-2017
Chief Negotiator – WSPA 2008 to present
Chief Negotiator – LCSEA 2009-2016
Chief Negotiator – Nevada Classified School Employees
Association Public Workers of America, American
Federation of Teachers, AFL-CIO Local 6181 representing
the following Associations: – Humboldt County Employees
Association, Lander County Nevada Classified School
Employees Association, Elko County Employees
Association, Churchill County School District Employees
2009 to 2014.
Chief Negotiator – POACCSD – 2014 to 2018.
Labor consultant – Various associations.
Instructor – Police/Representation
classes – 1999 – present
Draft prohibited practices under NRS 288 guidelines.

20

Represent State enforcement officers and regular employees under NRS 284 guidelines.
Panel Representative – PORAC Legal Defense Fund – 1999-present.

Conferences/Training

Interest Based Bargaining – 1998-2018
FMCS mediation training – 1997
American Arbitration Association
Seminars – 1990-present
PORAC conferences 1984 to 2017
Labor Relations training.
Association Leadership
Rights of Association

Political Background/Experience:

Charter Member – Northern Nevada
Task Force on Child Abuse and
Neglect.
Charter Member - Citizens for Better Government- 1984
Active in interviewing political
candidates for Local, State and
Federal elections - 1984 to
present.
Political Action coordinator for
RPPA (1983-2003), PORAN 1999-present, WCPAA and
WSPA -2009 to present.
Testified at the Nevada Legislature, Reno City Council and
other political bodies since 1983.
Prepared public campaign for Reno
Police Chief appointment – 1997
Candidate – Reno City Council
Chairman and member – Downtown Reno Police Tax
District Committee
Former President – Region 38 – International Police
Association

Awards:

RPPA Officer-of-the-Year – 1991 and 1998.
Appreciation awards from City of Reno, Reno Police
Department, RPPA, PORAC, PORAN, VFW, VICTORY

Organizations:

Veterans of Foreign Wars (VFW) – Life member
American Legion – Member
Disabled American Veterans – (DAV) Member

21

International Police Assoc. (IPA)Member
Reno Elks #597 – Member
Retired Public Employee Assoc. (RPEN)

References:                    Larry Digesti, Esq.  775 – 323-7797
Mark Kilburn, Esq. 775-329-1735
Tom Donaldson, Esq. 775-741-1986
Michael Langton, Esq. 775-329-7557
Dave Ponte, past president, Reno Police Protective
Association –
Jason Soto, Reno Police Chief and former president RPPA
Dave Kinamon, past president RPPA
Ryan Ashton, president RPPA
Dave Della, past president,  Reno Police Supervisors and
Administrative Employees Association.
Al Snover, past president RPSAEA
Paul Sevcsik, past president RPSEA
Bill Ames, past president,  Peace Officers Research
Association of Nevada and past president WCSDA and
WCSSDA
Rich Tiran, past president – NPOA and past  Vice President
PORAN
Alan Roney, past president,  Reno Administrative and
Professional Group
Steve Bignam, past president - RAPG
Cheryl Bond, former president,  Washoe County Public
Attorneys' Association
Paige Dollinger, past president Washoe County Public
Attorneys' Association
Marcus Hodges, president Washoe County District
Attorney Investigator's Association
Shane Minick, past president, Sparks Police Protective
Association
Ron Dreher, past president, SPPA
John Edwards , past president,  Washoe County Sheriffs'
Deputies Association
Tim Ross, president Washoe County Sheriff's Supervisors'
Deputies' Association
Don Gil, past president, Washoe County Sheriff's
Supervisors Deputies Association
Ron Richmond,  past president,  Mesquite Police Officers'
Association
Chris Aker,  past president,  Winnemucca Police Officers'
Association
Mike Otterstrom, past president,  Elko County Deputy
Sheriffs' Association

Don Gibson, past president – Carson City Sheriff's
Protective Association,
Jim Primka, past president – Carson City Sheriff's
Supervisors Association
Craig Lowe, president  – Carson City Sheriff's Supervisors
Association
Al McNeil, former Sheriff and past President –Lyon
County Sheriffs Employees' Association
Ed Kendall, past president – Washoe County School Police
Officers' Association
Eric Diamond, president - Washoe County School Police
Officers' Association
Alyson Kendrick, past president – Washoe School
Principals' Association
Don McHenry, president - Washoe School Principals'
Association
Sharon Tremayne, past president – Lander County NCSEA
Kris Ost-Gregersen, past president – Elko County
Employees' Association
Julie Pomi – past president Washoe County Nurses
Association.
Michelle Russell, Nevada Classified School Employees
AFLCIO – Local 6181.
Cathie Timmons, American Federation of State County and
Municipal Employees
Tony Russo/Matt Caldwell, past and current president,
POACCSD – 2013-present
Devon Reese, Esq.
Jason Guinasso, Esq.

Ronald P. Dreher

.